# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHN H. BENGE, JR., )
    *PETITIONER* )
                         )               05 - -550
                         )
    *v.*                     )     NO. _____, 2005
                         )
                         )
RICK KEARNEY, WARDEN )
SUSSEX CORRECTIONAL )
INSTITUTION, )
    *RESPONDENT* )
                         )

---

## ON PETITION FOR A WRIT OF *HABEAS CORPUS*

---

## PETITIONER'S BRIEF IN SUPPORT OF A PETITION
## FOR A WRIT OF *HABEAS CORPUS*

---

July 10, 2005

JOHN H. BENGE, JR.
SUSSEX CORRECTIONAL
           INSTITUTION
P.O. BOX 500
GEORGETOWN, DE 19947

## TABLE OF CONTENTS

Table of Contents----------------------------------------------------------------------------- i

Table of Citations------------------------------------------------------------------------------ iv

Statement of the Nature and Stage of the Proceedings------------------------------------ 1

Summary of Argument-------------------------------------------------------------------------8

Statement of Facts
    I.    The Events Of October 20, 2002---------------------------------------- 10

    II.    The Prosecutor's Trial Strategy – The Three
        Assaults As Intent To Kill

        A. Pretrial Proceedings------------------------------------------------ 14
        B. The Prosecutor's Opening Statement----------------------------- 14
        C. The Prosecutor's Evidence------------------------------------------ 15
        D. the Prosecutor's Closing Argument----------------------------- 19

    III.    The Court's Instructions To The Jury---------------------------------- 21

    IV.    The Jury's Verdict-------------------------------------------------------- 25

    V.    The October 10, 2003 Sentencing Proceeding------------------------ 25

    VI.    The Delaware Supreme Court's Decision On Appeal-------------------- 27

Argument
    I.    Due Process Required A Jury Verdict Based
        Upon A Specific Unanimity Instruction-------------------------------- 30

        A. The Evidence Essential To The Prosecutor's
            Theory Created An Unwelcome Dichotomy –
            And The Need For Specific Unanimity------------------------- 30

        B. The Constitutional Standard: The *Schad-Edmunds* Principles---34

        C. The Constitutional Standard Applied – Both Prongs Of The *Schad*
            Test Required A Specific Unanimity Instruction----------------- 35

            1.  *Schad v. Arizona*--------------------------------------- 35

            2. The Legislative Intent Prong

                a. Statutory Text And "Discrete Sets Of Actions"--- 36

i

b.  Constitutional Doubt And The Rule Of Lenity---- 37

3. Due Process Under *Schad* Specific Mandated A
Specific Unanimity Instruction------------------------------ 39

D.  The Genuine Probability Of Juror Confusion
Necessitated A Specific Unanimity Instruction---------------------- 52

II.    The Incomplete "Dangerous Instrument"
Instruction Had A Substantial And
Injurious Effect And Influence On The Verdict----------------------------- 57

A.  The Constitutional Standard Of Substantial
And Injurious Effect And Influence---------------------------------- 57

B.  The Constitutional Standard Applied: The Incorrect
Definition Of "Dangerous Instrument" Was Of
Substantial And Injurious Effect----------------------------------------- 57

III.   The Prosecutor's Wanton Attack On Petitioner's Character So Infected
The Trial With Unfairness As To Deny Due Process------------------------- 64

A.  The Constitutional Standard------------------------------------------ 64

B.  The Constitutional Standard Applied -- The Prosecutor's
Comment Was Outcome Determinative------------------------------ 64

IV.    Evidence Of The Unlawful Electronic Interception Charges So Unfairly
Prejudiced The Trial As To Deny Due Process--------------------------------- 69

A.  The Constitutional Standard-------------------------------------------- 69

B.  The Evidence Of Eavesdropping Inflamed
The Jury's Instinct To Punish-------------------------------------------- 69

V.     The Sentences Imposed Exceeded The "Maximum
Statutory Penalties" Permissible Under The
6th Amendment---------------------------------------------------------------- 73

A.  Introduction----------------------------------------------------------- 73

B.  *Apprendi/Blakely* As Applied To
Delaware – An Approach---------------------------------------------- 73

C.  Sentencing Reform In Delaware, 1984 – 2004:
A Primary Source History------------------------------------------- 75

D. The TIS Sentencing Scheme As Applied To
Petitioner Violates The 6th Amendment---------------------------- 84

1. The Delaware Court's Focus – Appellate
Review And 6th Amendment Formalism------------------ 84

2. 6th Amendment Formalism Does Not
Trump *Apprendi/Blakely*------------------------------------ 86

3. § 4204(m) Restricts The Sentencing Power-------------- 87

4. Reading §4204(m) As Limiting The
Sentencing Power Is In Accord With
Established Delaware Principles Of
Statutory Construction-------------------------------------- 91

5. The Rule Of Lenity And The
Doctrine Of Constitutional Doubt------------------------- 92

6. TIS Compared To the Washington
And Federal Systems--------------------------------------- 93

a).The Washington System Compared-------------------- 93

b).The Federal System Compared----------------------- 94

c).The TIS System Compared---------------------------- 94

D. The TIS Sentencing System As Applied
In Petitioner's  Case Violates The 6th Amendment------------------ 95

Conclusion------------------------------------------------------------------------------------- 104

## ATTACHMENTS

## UNREPORTED CASES

*Benge v. State*, Order, No. 137, 2004 , November 12, 2004 (Del.)

*Benge v. State*, Order, No. 544, 2003 November 15, 2004, (Del.)

*Evans v. State*, __A.2d.__ , No. 67, 2004, Nov. 23, 2004 (Del.)

*Evans v. State*, __A.2d.__, No. 67, 2004, April 11, 2005 (Del.)

*Fuller v. State*, No. 38, 2004, October 29, 2004  (Del.)

*Price v. State*, No. 486, 2003 Sept. 8, 2004 (Del.)

# TABLE OF CITATIONS

## CASES

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)----------------------------------passim, post-73

*Ayers v. State,* 844 A.2d 304 (Del., 2004)--------------------------------------28,54,56

*Barrett v. State* , 775 P.2d 1276 (Nev., 1989)-------------------------------------50

*Beck v. Alabama*, 447 U.S. 625 (1980)------------------------------------------60

*Benge v. State*, Order, No. 137, 2004, November 12, 2004 (Del.)--------------6, passim, post-73

*Benge v. State,* Order, No. 544, 2003, November 15, 2004 (Del.)---------------45,60

*Biasaccia v. Attorney General*, 623 F.2d 307 (3rd Cir., 1980) *cert. denied,*
   449 U.S. 1042 (1980)-------------------------------------------------------69

*Blakely v. Washington*, 542 U.S. ___ (2004)----------------------------------5,6,passim,post-73

*Buehl v. Vaughan*, 166 F.3d 163 (3rd Cir., 1999)------------------------------------57,66

*Crosby v. State*, 824 A.2d 894 (Del., 2003)-------------------------------------81

*Cupp v. Naughten*, 414 U.S. 141 (1973)-----------------------------------------57

*Darden v. Wainwright*, 477 U.S. 168 (1986)-------------------------------------65

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)--------------------------------65

*Dorszynski v. United States* 418 U.S. 424 (1974)-------------------------------77

*Dunn v. United States*, 307 F.2d 883 (5th Cir., 1962)--------------------------------67

*Edward J. DeBartolo Corp. v Florida Gulf Coast Building & Construction
Trades Council,* 485 U.S. 568 (1988)------------------------------------------38

*Evans v. State*, __A.2d__, No. 67, 2004, Nov. 23, 2004 (Del.)-------------------102

*Evans v. State*, __A.2d__, No. 67, 2004, April 11, 2005 (Del.)--------------------78,96

*Fuller v. State*, No. 38, 2004, October 29, 2004 (Del)---------------------------passim, post-80

*Gaines v. State*, 571 A.2d 765 (Del., 1990)-------------------------------------80

*Getz v. State*, 538 A.2d 726 (Del., 1988)-------------------------------------------18,27,70

*Geschwendt v. Ryan,* 967 F.2d 877 (3rd Cir., 1992) *cert. denied* 503 U.S. (1992)-------60

*Handy v. State,* 745 A.2d 1107 (Md., 2000)-------------------------------------------------50

*Hartman v. State,* 403 SO.2d 1030 (Fla. Dist. Ct. App., 1981)--------------------------50

*Henry v. State,* 805 A.2d 860 (Del., 2002)---------------------------------------------------49

*In Re: Winship,* 397 U.S. 358 (1970)-------------------------------------------------------57

*Jones v. United States,* 526 U.S. 227 (1999)--------------------------------------------38,92

*Kontakis v. Beyer,* 19 F.3d 110 (3 Cir., 1994)------------------------------------------57,66

*Koon v. United States,* 518 U.S. 81 (1996)--------------------------------------------------84

*Kotteakos v. United States,* 328 U.S. 750 (1946)-------------------------------------------57

*Lam v. Kelcher,* 304 F.3d 256 (3rd Cir., 2002)---------------------------------------------65

*Lilly v. State,* 649 A.2d 1055 (Del., 1994)----------------------------------------------------60

*Lisenba v. California,* 314 U.S. 219 (1941)-----------------------------------------------57,69

*Lesko v. Owens,* 881 F.2d 44 (3rd Cir., 1989)----------------------------------------------69

*Marshal v. Hendricks,* 307 F.3d 36 (3rd Cir., 2002)---------------------------------------65

*Mayes v. State,* 604 A.2d 839 (Del., 1992)----------------------------------------------81-90

*Moore v. Morton,* 255 F.3d 95 (3rd Cir., 2001)---------------------------------------------65

*Osburn v. State,* 224 A.2d 52 (Del., 1966)----------------------------------------------------78

*Peterkin v. Horn,* 176 F. Supp. 2d 342 (E.D. Pa., 2001)---------------------------------66,71

*Pitts v. State,* 649 P.2d 788 (Ok. Crim. App., 1982)---------------------------------------50

*Price v. State,* No. 486, 2003 Sept. 8, 2004 (Del.)---------------------------------------67

*Probst v. State,* 547 A.2d 114 (Del., 1998)-------------------------------------------------61

*Ring v. Arizona,* 536 U.S. 584 (2002)--------------------------------------------------------87

*Sandstrom v. Montana,* 442 U.S. 510 (1979)------------------------------------------------57

*Schad v. Arizona,* 501 U.S. 624 (1991)----------------------------------------passim, 34-52

*Seevey v. State*, 211 A.2d 908 (Del., 1965)------------------------------------------------------77

*Siple v. State*, 701 A.2d 79 (Del., 1997)------------------------------------------------------81-85

*Snyder v. Andrews*, 708 A.2d 237 (Del., 1998)------------------------------------------------91

*Speiser v. Randall*, 357 U.S. 513 (1958)----------------------------------------------------34

*State v. Johnson*, 730 SO.2d 1035 (La. App., 1999)-----------------------------------------50

*Taylor v. State*, 827 A.2d 24 (Del., 2003)-----------------------------------------------------3

*United States v. Bartolotta*, 153 F.3d 875 (8th Cir., 1998),
*cert. denied* 525 U.S. 1093 (1999)-----------------------------------------------------------50

*United States v. Beros*, 833 F.2d 455 (3rd Cir., 1987)------------------------------------55

*United States v. Booker*, __ U.S. __ (2005)--------------------------------------passim, post-73

*United States v. Brown*, 508 F.2d 427 (8th Cir., 1974)------------------------------------50

*United States v. Cusumano*, 943 F.2d 305 (3rd Cir., 1991)-------------------------------34,53

*United States v. Dukovich*, 11 F.3d 140 (11th Cir., 1994),
*cert. denied* 511 U.S. 1111 (1998)-----------------------------------------------------------50

*United States v. Dunnigan* 507 U.S. 87 (1993)---------------------------------------------98

*United States v. Edmunds*, 80 F.3d 810 (3rd Cir., 1996)--------------------------35,53,62

*Unites States v. Fanfan*, __U.S. __ (2005)----------------------------------------------------73

*United States v.Gibson*, 553 F.2d 453 (5th Cir., 1977)------------------------------------40

*United States v. Navarro*, 145 F.3d 580 (3rd Cir., 1998)-----------------------34,44,91

*United States v. Procopio*, 88 F.33d 21 (1st Cir., 1996)-----------------------------------66

*United States v. Young*, 470 U.S. 1 (1985)-------------------------------------------------66

*Taylor v. State*, 827 A.2d 24 (Del., 2003)-----------------------------------------------------3

*Walls v. State*, 560 A.2d 1038 (Del., 1989)---------------------------------------------------61

*Ward v. State*, 575 A.2d 1156 (Del., 1990)-------------------------------------------------42,77

*Williams v. New York*, 337 U.S. 241 (1941)---------------------------------------------96,98

<u>CONSTITUTIONAL PROVISIONS</u>

United States Constitution, Amendment V----------------------------------------- passim
United States Constitution, Amendment VI----------------------------------------- passim

<u>FEDERAL STATUTE</u>

28 U.S.C. §2254---------------------------------------------------------------------1,7,100

<u>DELAWARE STATUTES AND SUPERCEDED SESSION LAWS</u>

Title 11, Delaware Code

§203---------------------------------------------------------------39,91
§222---------------------------------------------------------23,24,38,48
§231 (a), (c)-----------------------------------------------------42
§251 (a)---------------------------------------------------------42
§253------------------------------------------------------------42
§601------------------------------------------------------------33
§611------------------------------------------------------------22
§612------------------------------------------------------22,36,37,39
§1442-----------------------------------------------------------38
§1443-----------------------------------------------------------38
§1447A----------------------------------------------------------38
§4204(k)--------------------------------------------------------- 4
§4204(m)-------------------------------------------------passim, post-73
64 Delaware Laws, Chapter 402--------------------------75
65 Delaware Laws, Chapter 206--------------------------76
67 Delaware Laws, Chapter 130, § 2,B.C----------------78
67 Delaware Laws, Chapter 350, §1----------------------80

<u>OTHER AUTHORITIES</u>

SENTAC Benchbook----------------------------------------80,84

Delaware Supreme Court Administrative
Directive Number Seventy-Six-----------------------------82

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

John H. Benge, Jr. ("Petitioner") has filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254 with this Court which attacks three October, 2003 Superior Court convictions in Sussex County, Delaware. These include the lead offense of assault second degree for which Petitioner received a sentence of eight years imprisonment. The constitutional grounds upon which this petition is predicated are four separate 5th Amendment due process bases and a 6th Amendment *Blakely v. Washington* defect in Delaware's sentencing scheme in criminal cases. This brief supports that petition.

The prosecutor's "theory" of this case, here a consideration of unusual significance because of the jury's verdict, was reflected in the initial charges against Petitioner, the two indictments subsequently obtained against him, the evidence offered by the prosecutor at trial, and finally in the prosecutor's closing argument to the jury.

The prosecutor portrayed the events resulting in criminal charges as beginning with Petitioner breaking into the office/apartment of a motel in Rehoboth Beach; then spraying his former wife with pepper spray; spraying his former wife's "paramour," Edward S. "Stacey" Smith ("Smith"), with that same pepper spray; shooting at Smith with a revolver and missing; and then shooting Smith in the shoulder with a second revolver, all in furtherance of a

1

failed plan to incapacitate and murder the two. Petitioner's trial testimony told a markedly different version of events.

On April 29, 2003, in the prosecutor's final formulation of the charges alleged, Petitioner was indicted on a total of ten felonies and two misdemeanor counts: this "superceding" indictment[1] charged Petitioner with the attempted murder in the first degree of Smith; two counts of attempted kidnapping in the first degree; four counts of possession of a firearm during the commission of a felony; assault second degree (chemical spray) – this as to Petitioner's former wife; burglary second degree; possession of a firearm by a person under a Family Court protective order; and two counts of criminal contempt of a Family Court order. [Docket Entries and Indictment, pages A1- A16; A18 – A22, Appendix to Petitioner's Brief in Support of Petition for a Writ of *Habeas Corpus* ("Ap.")].

After seven days of jury trial in Georgetown, Delaware (August 18-21 and 25-27, 2003), the prosecutor was unable to prove the commission of

---

[1] This was the last in a series of three charging documents. At the time of Petitioner's arrest on October 20, 2002, he was charged with assault first degree (this lead charge was later changed to the attempted murder count); the firearms charges; two counts of assault second degree (chemical spray); burglary; offensive touching; and criminal contempt charges. The significance of this sequence of charges to the instant petition is this: the prosecutor recognized from the date of Petitioner's initial arrest that the shooting of Smith was a *separate and distinct act* from Smith being pepper sprayed and that separate "weapons" were used. The prosecutor made a pretrial tactical decision not to pursue the pepper spray charge as to Smith. The import of this change in the State's position to the instant case is expanded upon below.

2

even a single offense alleged in the April 2003 indictment. Petitioner was found guilty only of the lesser included offenses of assault second degree upon Smith (a lesser included charge two levels down from the attempted murder count), criminal trespass (a misdemeanor) and offensive touching as to his former wife. Petitioner was acquitted of the attempted murder of Smith, all of the gun charges, the burglary, and the charge that he had used pepper spray against his former wife.[2]

Initially faced with maximum possible penalties of life in prison plus 146 years and "presumptive sentences" under the Delaware "Truth in Sentencing" sentencing scheme of life plus 26 years, Petitioner was ultimately convicted of offenses carrying a maximum of eight years in prison (for the assault second degree), one year for the criminal trespass, and 30 days for the offensive touching.     In contrast, the Delaware sentencing guideline "presumptive sentences" for the offenses that Petitioner was convicted of were: "up to two" years imprisonment for the assault second degree (a felony); up to one year of unsupervised probation for the criminal trespass misdemeanor; and a fine for the offensive touching unclassified misdemeanor conviction.

Sentencing occurred on October 10, 2003 after preparation of a

---

[2] The attempted kidnapping charges and the firearm charges attendant thereto were dismissed by the Court before trial after Petitioner raised ethical questions under *Taylor v. State*, 827 A.2d 24 (Del. Supr., 2003) about the continuation of the prosecution of the kidnapping charges given the lack of any substantial evidence supporting those counts in the indictment. (See Motion to Dismiss, Docket entry no. 63, July 9, 2003, App., A 7).

3

presentence report.  Although the assault second degree verdict meant under Delaware law that the jury had found that Smith had suffered *no* "serious physical injury," the sentencing judge imposed the maximum terms of incarceration permitted by Delaware's legislature: eight years for the assault, one year for trespassing, and 30 days for offensive touching.  In addition, each of these terms of incarceration was ordered to be served pursuant to 11 Del. C. §4204 (k) which prohibits *any* reduction of the length of a prison term by "good time," early release, or other shortening (Sentencing Order of October 10, 2003, Ap., A160).  In other words, the sentencing judge ordered Petitioner to actually serve every day in prison legally possible, day for day.

Petitioner appealed the guilty verdicts and sentences to the Delaware Supreme Court.  In his appeal, Petitioner raised the same 5th Amendment due process and 6th Amendment issues that form the bases of this petition for *habeas corpus* relief.

In Petitioner's opening brief on his direct appeal to the Delaware Supreme Court, Petitioner attacked each of the convictions on 5th Amendment due process grounds.  Petitioner raised four issues: i) the failure of the trial judge to give a "specific unanimity" instruction to the jury as to the weapon used in the assault on Smith (i. e., whether one of the two guns or the pepper spray) and whether the assault was done "intentionally" or "recklessly" and because of the confusing, numerous verdicts possible (Petitioner's Opening

4

Brief on direct appeal, pp.19-21)[3] which failure Petitioner asserted violated his

due process right to a fair trial; ii) the trial judge's use of an obsolete definition

in instructing the jury as to the lesser included offenses of assault second

degree and  assault *third* degree , a misdemeanor (Petitioner's Opening Brief

on direct appeal, p.21), another due process basis for the appeal; iii) the

prosecutor's *ad hominem* attack on the character of the Petitioner during his

trial testimony (Petitioner's Opening Brief on direct appeal, pp.14 – 19 ) which

was cited as an instance of prosecutorial misconduct arising to the level of a

due process violation because of its nature; and, iv) the trial court's failure to

exclude evidence of "prior bad acts" by the Petitioner (Petitioner's Opening

Brief on direct appeal, pp. 8 – 13), a further due process ground for the

invalidity of the convictions.

    During the pendency of Petitioner's direct appeal to the Delaware

Supreme Court, the United States Supreme Court issued its opinion in *Blakely*

*v. Washington,* __U.S.__ (2004).  Petitioner's sentencing was predicated on the

same 6th Amendment defect as was present in *Blakely*.  By a Supplemental

Memorandum (Ap., A214-221) filed in the then pending appeal, Petitioner

attacked his sentence on the grounds that the sentencing judge "enhanced" the

penalty  imposed upon Petitioner on the basis of facts  found by the judge but

neither tried to a jury or admitted by Petitioner.

---

[3] Petitioner's Opening Brief on direct appeal appears in its entirety: Appendix, A188-213.

this brief is attached hereto).  In the four paragraphs devoted to the issue, the Delaware Court found *Blakely* to be wholly inapposite to Delaware as its sentencing guidelines are "voluntary and non-binding" according to that court. *Benge v. State*, appeal order, p.2.

Following the opinion of the Delaware Supreme Court on November 15, 2004, Petitioner has filed a petition for a writ of *habeas corpus* with this Court which asserts the same five grounds raised by Petitioner in his direct appeal.

Jurisdiction is vested in this Court by 28 U.S.C. §2254. The warden of the Delaware state penal institution in which Petitioner is confined is named as the respondent in this petition.  This action is brought in the judicial district in which Petitioner is presently confined. Petitioner's petition for a writ of *habeas corpus* has been filed within six months of the date of the order of the Delaware Supreme Court affirming Petitioner's convictions on direct appeal.

Petitioner has exhausted all state remedies available to him as each of the due process and 6th Amendment claims raised in this petition have been presented to the Delaware Supreme Court on direct appeal.

This is Petitioner's brief in support of his petition for *habeas corpus*.  It has been prepared without the benefit of counsel and with only the legal research facilities available to Petitioner at Sussex Correctional Institution, Georgetown, Delaware.

7

## SUMMARY OF ARGUMENT

1.    The trial court's failure to instruct the jury as to the necessity for "specific unanimity" regarding the means of commission and the requisite state of mind for the offense of assault 2nd degree created the likelihood of a composite or "patchwork" verdict and deprived Petitioner of his 5th Amendment due process right. Genuine likelihood of juror confusion arose as a result of the prosecutor's evidence of three separate assaults on and injuries to Smith with three different weapons established by the evidence as lesser included offenses.

2.    The trial court's use of an obsolete definition of "dangerous instrument" in its instructions on the offenses of assault 2nd degree and assault 3rd degree was so fundamentally unfair as to deprive Petitioner of his 5th Amendment due process right.

3.    In the context of this case, given the centrality of the issue of credibility, the prosecutor's wanton *ad hominem* attack on Petitioner's character so infected the entire trial process with unfairness as to deprive Petitioner of his 5th Amendment due process right.

4.    The trial court's failure to exclude evidence of "prior bad acts" - the charges upon which Petitioner was awaiting trial in another case - violated Petitioner's right to fundamental fairness and 5th Amendment due process.

8

5.     Petitioner's sentences for assault 2nd degree (8 years imprisonment), criminal trespass (1 year imprisonment), and offensive touching (30 days imprisonment) exceeded the maximum statutory penalties under Delaware law for purposes of the 6th Amendment as those sentences were imposed as a result of facts found solely by the sentencing judge and were neither tried to the jury or admitted by the Petitioner at the time of sentencing.

<u>**STATEMENT OF FACTS**</u>

*I).The Events Of October 20, 2003*

The following is taken from the statement of facts appearing in the brief filed on Petitioner's behalf on his direct appeal to the Delaware Supreme Court:

"In the early morning of Sunday, October 20, 2002, the Defendant [5] found himself in the office of the Oak Grove Motel in Rehoboth Beach, Delaware, a 54 year old "broken man." [Trial Transcript ("Trans.") Vol.F-127, Ap., A91]. Until recent years, he had been, by all appearances, moderately successful in life. He had graduated from college, served in the United States Army, graduated from law school, was admitted to the Delaware Bar in 1976, and practiced in a small law firm for twenty years. He also married Donna Lovett Benge in 1979, later had three children with Donna, and their family lived in a comfortable suburban home. (Trans., Vol. E-72-74; Ap., A32-34).

A few years before that Sunday morning in Rehoboth Beach, his previous life began to unravel. He left his firm to try to establish a solo practice. Donna said that he had started drinking too much and became distant. He encountered economic difficulties in his practice, his income dwindled, and eventually he lost his ability to practice law altogether. Donna, who had

---

[5] This earlier brief referred to Petitioner as the "Defendant." This section of Petitioner's present brief will retain this term.

10

started working full-time again, had distanced herself from him and suggested their separation which he could not understand because he did not want their marriage to end. (Trans.,Vol.E-75-76; Ap., A35-37). They lived apart in their home although he wanted to reconcile with her.      In time, he began to suspect that Donna was having extramarital affairs and asked her whether it was so. She denied it to him. (Trans.,Vol. E-79-80; 92-93; Ap., A37-38; 39-40). When he found out and could no longer ignore signs of Donna's infidelity, he became more despondent. He later realized that, despite her denials to him, she had an affair with her boss at work while he and Donna were still married. (Trans., Vol. E-94-97; Ap., A41-42). He also believed that, while they were still married, Donna had begun an affair with Stacey Smith, the 15 years younger maintenance man at the Oak Grove Motel that her family owned and that she also managed in Rehoboth Beach during summers. (Trans., Vol. E-98-107; 121-127; Ap., A45-54;56-62).

   In the meantime, Donna petitioned and they were officially divorced. Although he had remained in the family home pending their divorce, he would have to leave it the following month according to their property division agreement, and he had no livelihood or place to live afterwards.

   In the midst of this, while he had lost or was losing all that he had valued during his past life, he thought often of taking his own life, which Donna knew. His own sister had shot herself several years before. (Trans., Vol. E-

11

72;115; Ap., A32;55). Despondent and embittered in believing that his wife had abandoned him when he needed her most, by the morning of October 20, 2002, he had decided that he would take his own life in front of her. (Trans., Vol. E-115; 127-130;Ap., A55; 62-65).

He drove to the Oak Grove Motel in Rehoboth where he knew Donna would be. Early in the morning, he entered into the locked office area using keys of Donna that he had copied secretly. He was armed with two handguns in belt holsters. He had cut the telephone wires to the office. (Trans., Vol. F-73-88; Ap., A66-81).

Once he had entered the motel office where he had intended to kill himself in front of Donna, it became clearer to him that he could not carry out what he had planned to do because of how his death would affect his family and children. (Trans., Vol. F-92-94; 105-106; Ap., A82-84; 85-86). He heard a noise in the office area, however, and feared that his entry had been discovered. On checking to see where the noise originated, he found Donna reading in her bed alone. (Trans., Vol. F-110; Ap., A87). Surprised that Stacey was not with Donna and realizing he may have been wrong about believing that Donna and Stacey had been having an affair, he asked Donna where Stacey was. When Donna screamed and jumped from the bed, he panicked and sprayed mace towards the bed hoping that it would cause her to

12

flee and lock herself in the bathroom so that he could get away. (Trans., Vol. F-112; Ap., A88).

Donna fled from the bedroom to the office. He chased her fearing that she would get outside before him and hinder his escape. He caught her by the door so that he could get outside before she did. (Trans., Vol. F-113-114; Ap., A89-90) As he did, he saw Stacey charging him from the rear of the office. He sprayed Stacey with the mace hoping that he could get away but Stacey tackled him in front of the office door. (Trans., Vol. F-114; Ap., A90) The mace may have hit Donna. As Stacey and he grappled while he tried to get out the front door, he felt Stacey grabbing for the gun in the holster around his waist. The gun discharged as they struggled over it wounding Stacey in the shoulder. They tumbled out the door and were struggling on the ground outside when Rehoboth Police officers arrived and separated the two men." (Trans., Vol. F-132; Ap., A94).

## II). The Prosecutor's Trial Strategy – The Three Assaults As Intent To Kill

Given the overarching significance attached by the Delaware Supreme Court to the prosecutor's "theory of the case" in rejecting Petitioner's "specific unanimity instruction" argument on appeal, it is enlightening to examine the record to determine precisely what it was that the prosecutor attempted to prove to the jury and argued to them in both opening and closing statements.

13

### *A). Pretrial Proceedings*

In a pretrial memorandum submitted to the Superior Court just two and one-half months before trial, the prosecutor stated the operative facts of the case. After describing Petitioner's initial entry into the motel office, the prosecutor continued as follows: " Once in Mrs. Benge's presence, the defendant demanded to know the whereabouts of Stacey Smith.   When Mrs. Benge declined to answer, he sprayed her in the face with mace.  Her resulting screams attracted the attention of Stacey Smith who was in a nearby room.  Mr. Smith came into Mrs. Benge's room and began struggling with the defendant, who then sprayed Mr. Smith in the face with mace.  Then the defendant, who was wearing a double holster, pulled out two handguns.  He aimed one gun at Mr. Smith, whose response was to grab the defendant's arms to keep the weapon from being aimed at his had (*sic*).  During the struggle, the defendant fired one shot which barely missed striking the victim's head.  The defendant fired again. This shot went into the victim's shoulder." (State's Memorandum Opposing The Defendant's Motion To Suppress, Docket Entry No. 46, June 4, 2003; Ap., A5).

### *B). The Prosecutor's Opening Statement – The State's Case Hinges On Both The Gunshots And Pepper Spray*

The prosecutor's opening statement to the jury introduced to them the theme that would recur in the State's case: each of the three separate assaults

14

on Smith evidenced Petitioner's intent to kill and constituted proof of the attempted murder charge.

The assault on Smith with pepper spray and the distinct assaults with each of two separate firearms could not have been stated more plainly by the prosecutor: "...Stacey ...had heard something...He went into the living room and he saw the defendant with his arm around [her], spraying her...Stacey immediately went to her aid and as he did, the defendant let go of [her] and sprayed Stacey in the face with the mace...The two men struggled...A shot goes off...the defendant pulls out the second smaller handgun...another shot rings out.  Stacey feels pressure in his chest.  He has just been shot". (Trans., Vol. B-30-31).

### C). The Prosecutor's Evidence – The Victim's Testimony; The Medical Evidence; The Physical Evidence; Petitioner's "Prior Bad Acts;" And The Prosecutor's Attack On Petitioner's Character

As one might anticipate, the prosecutor's opening statement did not leave the State's case out on the proverbial limb. The testimony, medical evidence, and physical evidence offered by the State were all designed to support the prosecutor's contention that Smith had been maced, shot at, and shot, all reflective of Petitioner's intent to kill.

### 1). Smith's Testimony As To The Mace And Gunshots

Smith testified that when he first encountered Petitioner, Petitioner was holding a "weapon," the pepper spray (Trans., Vol. D-199).  Smith testified on

15

direct examination that he was sprayed with an unknown substance, that he could not keep his eyes open, that a gun was fired next to his head and then he was shot by a second gun. (Trans., Vol. D-199-203)

As to the injuries he suffered, Smith stated that he had been shot by one gun, suffered a perforated eardrum from a second gunshot blast, and had "irritated" eyes from pepper spray Trans., Vol. D-205-206). The effect of the pepper spray lasted all day and night. (Trans., Vol. D-206).

### 2). *The Medical Evidence*

Two physicians from Beebe Hospital in Lewes, Delaware who had treated Smith in the Beebe emergency room and another ear, nose and throat specialist were the witnesses called by the prosecutor to describe the injuries to Smith.

The prosecutor asked Dr. Gabre-Madhin, a Beebe Hospital trauma surgeon, to describe the nature of the injuries Mr. Smith presented on October 20[th.] In a response of a single sentence, Dr Gabre-Madhin stated that Mr. Smith had suffered a gunshot wound and a "burn injury" to his eyes "from some spray" (Trans. Vol. B-191). The doctor also stated that the eye injury caused Mr. Smith a "significant amount of pain." (Trans., Vol. B-192 ).

Dr. Thomas Shreeve, a Beebe emergency room physician, also identified Mr. Smith's October 20th injuries as both a gunshot wound and irritation of the eyes. (Trans., Vol. D-65).

16

The third medical witness called by the prosecutor was Dr. Paul Howard, an ENT specialist. The sole substance of Dr. Howard's testimony was to relate the punctured eardrum suffered by Smith from a "gun blast" and the pain resulting therefrom. (Trans., Vol. B-63 -67).

### 3). The Physical Evidence

The physical evidence that the prosecutor offered in support of the State's case – and that the prosecutor urged the jury to consider "above all else" – included the cylinder of pepper spray and the two guns that the prosecutor contended had caused the gunshot wound and perforated eardrum.

At no point did the prosecutor attempt to identify any one – or all, for that matter – of the three weapons as "the one" supporting the case for the lesser included offense of assault second degree. Each of the three weapons were tied to the attempted murder charge as evidence of Petitioner's intent and described in the prosecutor's closing to be of paramount importance to the case. (Trans., Vol. G-55).

### 4). The Evidence Of Pending Charges – "Prior Bad Acts"

At the time of Petitioner's August, 2003 trial in Sussex County, he was awaiting trial in New Castle County on burglary and unlawful electronic interception charges stemming from the same acts that the prosecutor placed before the Sussex jury as evidence of his "intent" or "motive."

17

Despite the objection of Petitioner's counsel, the trial judge permitted the prosecutor to introduce evidence that in July of 2002 (three months prior to the October events in Rehoboth), Petitioner had illegally entered the house where his former wife was residing and surreptitiously tape recorded her "conversations."

The trial court made a pretrial ruling that evidence of the pending unlawful interception charges could be introduced by the prosecutor despite the presence of "three other things" speaking to intent and motive. (Trans., Vol. A-42, Ap., A31). The record reflects that to reach this ruling, the trial court conducted an analysis under *Getz v. State*, 538 A.2d 726 (Del., 1988) and made a finding that the evidence of such charges would be "somewhat prejudicial" (Trans., Vol. A-48, Ap.,A31). However, the court did not, in so ruling prior to trial, explore to any depth the nature of that "somewhat prejudicial" effect and its potential impact on the jury. Specifically, the court did not consider how the evidence would impact the jury in the context of the entire case, the possible distraction that the evidence might create, or the possibility that the evidence of pending charges would inflame the jury's urge to punish the Petitioner – to convict him of something rather than to simply free him.

Admission of evidence of the pending charges in New Castle County necessitated that Petitioner address those charges in his testimony at trial as

18

well as the allegations in the instant case, placing an entirely distinct set of issues before the Sussex County jury.

Following Petitioner's trial testimony and the jury verdict in Sussex County, a transcript of his trial testimony was used to reindict Petitioner in New Castle County on eight additional felony counts. That transcript was prepared by the Sussex Superior Court official reporter on an expedited basis at the special written request of the Sussex County Resident Judge,[6] not the trial judge.

### 5). The Prosecutor's Attack on Petitioner's Character

Petitioner testified at the trial and sharply contested the version of events of October 20 , 2003 as suggested by the prosecutor. Petitioner denied that he had pepper sprayed his wife or that he had shot Smith. Petitioner's testimony thus created a clear-cut choice for the jury as to which version of events they wished to believe.

At the conclusion of the prosecutor's cross-examination of Petitioner, the prosecutor directed this remark to Petitioner as he sat before the jury: "You're quite a humanitarian, aren't you?" (Trans., Vol. F131; Ap., A93). The context of this remark in Petitioner's testimony made it unmistakable that the

_____

6 Docket Entry No. 18, (Ap.,A15) See also Docket Entry No. 17, New Castle Co (Ap.,A15)

prosecutor did not believe Petitioner's version of events. (Trans, Vol. F-130-132; Ap., A92-94).

When later asked by the trial judge in chambers if there was any explanation for the question the prosecutor responded with a simple "No" and offered no justification or rationale for posing the question to Petitioner (Trans., Vol. F-142; Ap., A95). On appeal, the State did not attempt to offer any reason justifying the prosecutor's remark. The State sought only to suggest that the impact of the improper remark was "cured" by a jury instruction.

### D). *The Prosecutor's Closing Argument*

The stated purpose of the prosecutor's closing argument to the jury was to "touch briefly upon the essential elements of each of the *charged* offenses" – attempted murder, the weapons charges, burglary, and the pepper spray assault on Petitioner's former wife. (Trans., Vol.G-50). To that end, the prosecutor described the start of the physical confrontation between Smith and the Petitioner: "Stacey Smith is maced...He was afraid it was some kind of acid...All he can manage to see is the light" (Trans., Vol.G-69-70). Then, Smith is shot at and then shot by the second of two guns to discharge (Trans., Vol.G-71). This, the prosecutor stated, was preceded by Petitioner pepperspraying his former wife in her bedroom (Trans., Vol.G-66) then

20

grabbing her around her neck after she had run into the living room (Trans., Vol.G-67).

The prosecutor urged the jury to find the Petitioner guilty of attempted murder in the first degree, the weapons charges, assault second degree (chemical spray) (again, this charge related to Petitioner's former wife, not Smith), and the burglary count. (Trans., Vol.G-74). The prosecutor did *not*, however, at any point suggest to the jury how the State contended the lesser included assault 2nd° and 3rd° offenses might be supported by the evidence.

During the State's rebuttal closing, no less than six references were made to Smith being pepper sprayed and only three to him being shot. (Trans., Vol. G-117-118; 130-134). The prosecutor referred to Smith being repeatedly pepper sprayed (Trans., Vol. G-117) so as to carry out the Petitioner's intent to incapacitate then kill him. (Trans., Vol. G-130). As to the lesser included offenses, the prosecutor touched upon that subject only once in closing: the jury was told that it was "...only going to get to lesser-included offenses once you decide that the [Petitioner] never intended to kill Stacey Smith" (Trans., Vol.G-133). The prosecutor denied the possibility of the jury failing to find intent to kill and at no point identified to the jury which of the three weapons involved was the weapon the State relied upon to establish any of the lesser included assaults *vis-a-vis* Smith.

21

The prosecutor did end the State's rebuttal by "beseeching" the jury to convict the Petitioner of attempted murder. (Trans., Vol.G-136).

### III). *The Court's Instructions To The Jury*

The trial judge's instructions to the jury are reproduced in full in the Appendix to this brief (Ap., A96-126).

In instructing the jury, the judge identified the following as lesser included offenses of attempted first degree murder: assault 1st°; assault 2nd°; and assault 3rd°.  The 2nd° and 3rd° assault instructions were intended to correspond to those offenses as set forth, respectively, in 11 Del. C. §612 (a) (2) (for 2nd°) and 11 Del. C. § 611 (2) (for 3rd°).  Accordingly, the trial judge instructed the jury as follows:

In order to find the defendant guilty of Assault in the Second Degree, you must find that the following elements have been established beyond a reasonable doubt:

1.  The defendant acted recklessly or intentionally.  I have previously defined the terms "recklessly" and "intentionally" for you.

AND

2.  The defendant caused physical injury to Edward S. Smith by means of a deadly weapon or a dangerous instrument. Physical injury means impairment of physical condition or substantial pain.  I have previously defined the terms "deadly weapon" and "dangerous instrument" for you.

\* \* \*

In order to find the defendant guilty of Assault in the Third Degree, you must find that all of the following elements have been established beyond a reasonable doubt:

1.  The defendant acted criminally negligent. A person acts "criminally negligent" when the person fails to perceive a risk

22

that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

AND

2. The defendant caused physical injury to Edward S. Smith. I have previously defined the term "physical injury" for you.

AND

3. The defendant used a deadly weapon or dangerous instrument to cause the physical injury. I have previously defined the terms "deadly weapon" and "dangerous instrument" for you.

The trial judge defined "intentional" as having a "conscious object or purpose." "Reckless" was defined as follows:

A person acts recklessly with respect to an element of an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would have observed in the situation.

Both instructions given to the jury contained the terms "deadly weapon" and "dangerous instrument," terms specifically defined by the Delaware Criminal Code. As to these, the trial court employed the following definitions:

"Deadly weapon" includes a firearm, a bomb, a knife of any sort (other than an ordinary pocket knife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chains or ice pick or any dangerous instrument which is used, or attempted to be used, to cause death or serious physical injury.

\*               \*              \*

"Dangerous instrument" means any instrument, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury.

23

Prior to the date of the events forming the basis of the charges against Petitioner, the definition of "dangerous instrument" had been amended by the Delaware General Assembly to expressly include "disabling chemical spray," a term that itself was expressly defined to include "mace" and "pepper spray." See current 11 Del. C. §222 (4) and (6). The definition of "dangerous instrument" employed by the trial court in its instructions to the jury was therefore incomplete and obsolete and did not reflect the current state of the law at the time of the charged crimes.

The transcript of counsel's conference with the trial court on jury instructions reveals several significant discussions regarding lesser included offenses with respect to the charges involving Smith – particularly assault 2nd°. However, the record contains no clear reason as to why the judge chose to give the "dangerous instrument" definition of 11 Del. C. §222 (4) *without* "disabling chemical spray" as a part of that definition. It is clear, however, that the judge definitely viewed assault 2nd° as fitting the facts of the case: "I will give [§ 612] (a) (2)" was his final, unequivocal ruling. (Trans., Vol.G-24). That statute, of course, included "disabling chemical spray" as a part of the definition of "dangerous instrument."

Two things are quite apparent from the conference on instructions; first, the trial court did *not* purport to rule that as a matter of law pepper spray could

24

*not* be considered as a "dangerous instrument" (or, for that matter, as a "deadly weapon") under Delaware law; and, further, the trial court made no finding under the under the facts of this case that pepper spray should be eliminated from the definition of "dangerous instrument" given to the jury or that they should be told not to consider it as such.

The trial court did not instruct the jury as to what, generally, a lesser included offense consists of or when a conviction of a lesser included is proper. Although the jury did receive a *general* unanimity instruction, the judge did not admonish the jury that it had to agree unanimously upon the *specific* means of commission and mental state present with respect to any offense alleged in order to find the defendant guilty of any offense.

## *IV). The Jury's Verdict*

After about two and one-half hours of deliberation, the jury returned a verdict in which they found Petitioner not guilty of attempted murder first degree; all of the weapons charges; burglary second degree; and the assault second degree (chemical spray) that was alleged to have occurred against Petitioner's former wife.

As to the seven lesser included offenses upon which the jury was instructed, the jury found Petitioner not guilty of two different assault first degree offenses, then ultimately announced that it had found Petitioner guilty

25

of assault second degree and the misdemeanors of criminal trespass and offensive touching as to his former wife.

### *V). The October 10, 2003 Sentencing Proceeding*

The trial judge ordered the preparation of a presentence report and scheduled sentencing before him on October 10, 2003. In a proceeding of approximately forty minutes (the complete 33 page transcript of which appears at Ap. A-127-159) , the presiding judge first heard from Petitioner, then from Smith and Petitioner's former wife, and finally from the prosecutor. No psychological evaluation of Petitioner had been prepared for the sentencing.

The sentence imposed for each of the convictions substantially exceeded the Delaware SENTAC sentencing guidelines: the assault 2nd° conviction carried a guideline sentence of from zero to two years in prison – despite the absence of any prior criminal history (not even traffic violations), the judge imposed the maximum possible penalty of eight years in prison subject to the provision that such term *not* be reduced by "good time" or early release; as to the misdemeanor of criminal trespass, the guideline sentence was a period of unsupervised probation of up to twelve months – the judge imposed a year in prison, not subject to reduction; finally, as to the unclassified misdemeanor of offensive touching, the judge imposed thirty days in prison, rather than the monetary fine provided for in the Delaware sentencing guidelines.

26

The sentencing judge was aware of the legislatively mandated necessity that he state the reasons for the departure from the guidelines. At the sentencing, the judge stated: "To the extent I am certainly going to exceed the sentencing guidelines, to the extent that an aggravator is needed, it certainly would be the fact that Mr. Benge was subject to a Protection From Abuse Order." (Trans., Sentencing October 10, 2003, Ap. A127-159). The sentencing order signed by the judge (Ap. A160-167) lists as aggravating sentencing factors both the presence of the protection from abuse order and "undue depreciation of offense," an aggravating factor that was not discussed at the sentencing or commented upon by the judge. It is not at all clear how the trial judge found this additional aggravating factor to apply.

At the time of the sentencing, Petitioner was scheduled for trial on the severed criminal contempt charges in January of 2004. These offenses were alleged to have occurred as a result of Petitioner's violation of the protection from abuse order relied upon by the judge in sentencing Petitioner to periods of incarceration above the guidelines. The trial judge had severed these charges before the August trial on the attempted murder and other charges in the indictment. Petitioner had not, at the time of the October sentencing, admitted to the protection from abuse order charges or any matter relative thereto as he was scheduled for trial thereon two months after the October sentencing.

27

### *VI). The Delaware Supreme Court's Decision On Appeal*

In a nine page order dated November 15, 2005, the Delaware Supreme Court affirmed each of Petitioner's convictions. That court's order rejected each of the grounds that Petitioner now raises in this *habeas corpus* petition.

As to the evidence of "prior bad acts" in the pending electronic interception charges, the Delaware Court deferred to the trial judge's analysis under *Getz v. State*, *supra*, and concluded that the evidence was properly admitted as proof of "intent" and as "establishing motive." The court's opinion reflects that it applied an "abuse of discretion" standard of review of the trial court's ruling and that the trial judge had properly balanced the "possibility" of prejudice.

The Delaware Court singularly found that a curative instruction given by the trial judge to the jury following the "improper prosecutorial remark" as to Petitioner's character was sufficient to offset any prejudice. Again, the court's order does not recite the consideration of other factors it examined, if any, in its analysis of this ground for the appeal before it.

As to the contention that a specific unanimity instruction was necessitated by the facts of the case, the Delaware Supreme Court first held that a specific unanimity instruction is "not required in every case." For this rule, the Court relied upon a series of accomplice liability cases culminating in *Ayers v. State*, 844 A.2d 304 (Del., 2004).

The Court then proceeded to reason that because the trial judge had omitted any reference to "disabling chemical spray" in defining "dangerous instrument" for the jury, they "could not have reasonably found" that pepper spray had been used to injure Smith. Accordingly, the jury, according to the court, "must have concluded that the dangerous instrument was a firearm" in returning its verdict of guilty on the assault 2nd° charge involving Smith. The Court did not attempt any analysis as to whether "pepper spray" was actually within the definition of "dangerous instrument" given to the jury and the Court cited no authority for its holding. However, it is quite clear that the Delaware Court did *not* rule that as a matter of law that pepper spray could not as a matter of law be a "dangerous instrument' under the Delaware definitions.

Finally, as to the trial court's use of the obsolete "dangerous instrument" definition in connection with the assault 2nd° and 3rd° offenses, the Court found that the jury did not rely on the erroneous definition in reaching its verdict of guilty on assault 2nd°. No error was therefore present according to the Delaware Court.

## ARGUMENT

I.    **DUE PROCESS REQUIRED A JURY VERDICT BASED UPON A SPECIFIC UNANIMITY INSTRUCTON**

A).    *The Evidence Essential To The Prosecutor's Theory Created An Unwelcome Dichotomy – And The Need For a Specific Unanimity Instruction*

The prosecutor deliberately and ambitiously chose to elevate the lead charge against Petitioner to attempted murder rather than to maintain the offenses of assault first degree and assault second degree (chemical spray) upon which Petitioner was initially arrested. In making that strategic decision, the prosecutor viewed the pepper spraying of Smith, the gunshot next to his ear, and the gunshot wound to his shoulder as the essence of the State's case on the element of intent to kill central to the charge of attempted murder.

At the same time, however, the gunshot that perforated Smith's eardrum and the pepper spray that burned his eyes established sufficient evidence, along with the circumstantial evidence of Petitioner's state of mind, to warrant jury instructions on lesser included offenses ranging from assault first degree down to assault third degree (a misdemeanor).

This dichotomy in the State's case – the same evidence potentially supporting two vastly different end results, attempted murder or misdemeanor, life in prison or a monetary fine – created a dilemma for the prosecutor: how to

30

present evidence essential to the attempted murder charge yet at the same time *not* concede to the jury that precisely the same evidence supporting attempted murder could justify a verdict on as minor an offense as negligent use of pepper spray – essentially an mishap with a caustic substance.

The prosecutor's solution to the State's predicament was to argue to the jury only the "intent to kill" inferences from the evidence and to simply *deny* the *possibility* of the evidence establishing *any* lesser included offense. This necessitated the trial strategy of eschewing any coherent argument as to how the jury could find Petitioner guilty of assault 2nd° or 3rd° by use of the pepper spray against Smith; that is, not to admit of the possibility of a lesser included offense verdict and to hope that the jury did not see such an offense in the facts. This strategy deliberately *fostered* jury confusion by leaving the jurors at a loss as to how the State believed the lesser includeds were to apply while at the same time the prosecutor placed emphasis on the elements of the lesser offenses during the State's closing argument. Additionally, the prosecutor had to remain silent when the judge inadvertently used an obsolete definition of "dangerous instrument" that, fortuitously for the State, omitted the element of "disabling chemical spray."

The problem in this case with the State" "theory" is that the jury rejected any suggestion that the prosecutor had "got it right" – the jury acquitted Petitioner of the attempted murder and assault 1st° charges, the essential

31

element of the latter being "*serious* physical injury." In fact, the jury's acquittal of Petitioner on the charge of burglary 2nd° resounds with their belief that Petitioner did *not* enter the motel with the intent to commit *any crime at all.* The jury also rejected the notion that Petitioner had done any act with a "deadly weapon" or a "dangerous instrument" which caused "serious physical harm" to Smith. Compounding the problem, the State's argument on appeal proceeded as if the jury had actually *agreed* with the prosecutor, thus exposing the constitutional flaws in the State's case noted below.

The acquittals on the more serious offenses – *predicate findings* to the jury's consideration of the charge of assault 2nd° - reflect the jury's view that any physical injury to Smith was not "serious." That result begs these questions: Which injury was the basis for the guilty verdict on assault 2nd°? – the gunshot wound, perforated eardrum, or eye irritation? Which weapon? – gun1, gun2, or the pepper spray? [Similar questions arise with respect to the offensive touching conviction involving Petitioner's former wife: upon which touching did the jury base its conviction? If, as the State contended on appeal and the Supreme Court found (*Benge v. State*, appeal order, p.4), this conviction was based on the pepper spraying of Petitioner's former wife, which "member of [his] body" was used by Petitioner to effect the touching which caused alarm? At what point in the instructions given to the jury did the trial court define "member of his body" to include pepper spray or any other

32

instrument or device?   See 11 Del. C. § 601, offensive touching]   These questions only serve to highlight the problem with the approach to the charges in this case taken by the State at the trial level and the argument advanced by the State on appeal.

Six possible and very different offenses were within the ambit of the jury's verdict of guilty of assault 2nd°: intentional use of a firearm resulting in Smith's gunshot wound; reckless use of a firearm to cause the shoulder wound; intentional use of a firearm to perforate Smith's eardrum; reckless use of a firearm to the same end; intentional use of pepper spray; and, finally, reckless use of pepper spray.

The prosecutor's strategy left the State's case on the lesser included offenses at sea without a rudder – the evidence of pepper spray was before the jury with an instruction from the court on both assault 2nd° and 3rd°, but *without* a single word from the prosecutor as to how the jury should proceed on these offenses once it found no intent to kill present in the case.

Given the facts of this case considered as a whole and the prosecutor's trial strategy with respect to the lesser included offenses, the trial court's failure to instruct the jury as to the need for "specific unanimity" – the need for a unanimous verdict as to both state of mind and means of commission – resulted in a denial of due process.

33

### *B). The Constitutional Standard: The Schad-Edmunds Principles*

While cases presenting the need for a "specific unanimity" instruction are the "exception," *United States v. Navarro*, 145 F.3d 580 (3rd Cir., 1998), there are nonetheless those case in which the failure to give such instructions does rise to the level of denying due process.

Petitioner submits that this case is one such instance. The combined effect of the evidence offered by the prosecutor, the discrepancy between the acts alleged in the indictment and the lesser included offenses considered by the jury, the astounding number of possible jury votes on the ultimate verdict, the absence of a prosecution "theory" pertaining to the lesser includeds, and the lack of overall judicial guidance as to lesser included offenses in general all combined to create the genuine likelihood of juror confusion. In such circumstances, the failure to give a specific unanimity instruction renders Petitioner's convictions void on due process grounds.

The right to a specific unanimity instruction as a matter of due process is governed both by the principles set forth in *Schad v. Arizona*, 501 U.S. 624 (1991) [an extension of the rule of specificity required by *Speiser v. Randall*, 357 U. S. 513 (1958)] and the rule proscribing jury verdicts resulting from likely juror confusion – or "patch work" verdicts - as set forth in *United States v. Edmunds*, 80 F. 3d 810 (3rd Cir., 1996) and *United States v. Cusumano*, 943 F.2d 305 (3rd Cir., 1991).

34

*C). The Constitutional Standard Applied: Both Prongs Of The Schad Test*
*Required A Specific Unanimity Instruction*

*1). Schad v. Arizona*

Under *Schad v. Arizona, supra,* as applied in *United States v. Edmunds, supra,* and *United States v. Navarro, supra,* when a criminal statute provides alternative routes to a conviction, jurors must be unanimous with respect to a particular route if different *offenses* are embodied in that statute. A further inquiry into the due process aspects of a statute defining different means for violating the same offense may be required under the *Schad* test. See *United States v. Navarro,* 145 F.3[d], at 586.

Preliminary to the application of the *Schad* test to this case, Petitioner notes that although the due process need for a specific unanimity instruction was raised in the direct appeal of Petitioner's convictions to the Delaware Supreme Court, that court conducted no *Schad* analysis. This Court is therefore not constrained by any prior construction of any of the Delaware statutes here involved by the Delaware courts insofar as a *Schad* analysis proceeds.

*2). The Legislative Intent Prong*

This prong of the *Schad* test, as made clear in *Edmunds* and *Navarro,* involves application of a set of interpretive principles: an examination of the text and legislative history of a statute; the tradition of a jury verdict as

35

representing substantial agreement on a discrete set of actions; the principle that statutes are construed to avoid grave and doubtful constitutional issues; and the rule of lenity which operates to require more, not less, unanimity. *Edmunds*, 145 F.3d, at 586-587.

### *a). Statutory Text And "Discrete Sets Of Actions"*

The Delaware assault 2nd° statute delineates no fewer than sixteen separate "discrete sets of actions" constituting the crimes it defines. 11 Del. C. § 612 involves a wide range of circumstances in which the statute may have application – some of those situations involve weapons; some, but not all, require physical injury; some relate to acts against law enforcement, or medical care provider personnel, or state employees – and two separate states of mind, reckless and intentional, are elements of the offenses.

The specific subsection involved in Petitioner's case, 11 Del. C. § 612 (2), sets forth these distinct sets of prohibited acts: the causing of physical injury (but not "serious physical injury") by: i) intentional use of a "deadly weapon;" ii) reckless use of a "deadly weapon;" iii) intentional use of a "dangerous instrument;" or iv) reckless use of a "dangerous instrument."

Accordingly, a jury verdict of guilty of assault 2nd° under 11 *Del. C.* §612 (2) has the potential of encompassing a broad range of "discrete sets of actions" unless it is based upon unanimous agreement as to precisely what conduct – means of commission and state of mind – a defendant engaged in to

36

establish guilt beyond a reasonable doubt. In this case, the uncertainty arising from blurring the distinctions between the § 612 (2) "discrete sets of actions" erodes the traditional nature of a jury verdict.

The range of conduct prohibited by §612 (2) includes alternative courses of conduct accompanied by different mental states – intentional and reckless. These states of mind are very different: acting with a "conscious object or purpose" versus "conscious disregard of a substantial and unjustifiable risk in a gross deviation from reasonable care." This case is therefore more akin to *Edmunds* than *Navarro*. See *United States v. Navarro*, 145 F.3[d], at 589.

The very text of 11 Del. C. § 612 (2) itself thus supports the conclusion that it creates separate offenses requiring specific jury unanimity when more than one possible means to a conviction is present on the facts of a given case. The statutory language does not support the conclusion that it creates merely "alternative means to the same offense" as the offenses defined are both quite distinct and disparate in their nature.

Each factor considered in the legislative intent prong of the *Schad* test therefore favors specific unanimity.

### b). *Doctrine Of Constitutional Doubt And The Rule Of Lenity*

The due process considerations inherent in construing a criminal statute also speak significantly in this case. Historically, intentional use of a firearm has been treated as morally disparate from the reckless use of an object that

37

may lack the inherent design to cause injury and therefore become a "dangerous instrument" *only* in the specific circumstances in which it is used. 11 Del. C § 222 (4). One need only look to the indictment in this case for evidence of this moral disparity: Delaware imposes enhanced mandatory penalties for those who possess a firearm during the commission of a felony as compared to a "dangerous instrument." See 11 Del C. § 1447A. "Gun crimes" are subject to severe penalties under the Delaware sentencing scheme: possession of a firearm during the commission of any felony carries a three year minimum sentence and a twenty year maximum. 11 Del. C.§ 1447A. Carrying a concealed deadly weapon is a felony punishable by up to two years with enhanced penalties for subsequent offenses and school zone violations. 11 Del. C. §1442. By contrast, there is no *per se* penalty for possessing a "dangerous instrument" during the commission of a felony; and carrying a concealed "dangerous instrument" is a misdemeanor. 11 Del. C. § 1443.

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided" the duty of the court is to adopt the latter. *Jones v. United States*, 526 U.S. 27 (1999). This principle has for so long been applied that it is beyond doubt. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568 (1988). The disparities in the means of commission of Delaware's assault 2nd° statute militate against

38

a reading that would create but one offense to avoid raising doubt regarding due process principles.

Further, the rule of lenity counsels construction of 11 Del. C. § 612 (2) in favor of Petitioner – and as requiring specific unanimity. Jury unanimity is an important enough due process protection that a court should be hesitant to require less of it. *United States v. Navarro*, 145 F.3d, at 587. While 11 Del. C. § 203 modifies the traditional rule of construction with respect to statutes defining crimes in the Delaware Criminal Code to require them to be read in light of their fair import and to promote justice and the purpose of a given statute, the rule of lenity still has application under the *Schad* analysis – which proceeds from the 5th Amendment due process protection.

### 3). *Due Process Under Schad Mandated A Specific Unanimity Instruction*

Even if this Court harbors the residue of doubt regarding assault second degree under §612 (2) after application of the legislative intent prong of the *Schad* test, the due process standards of *Schad* - involving a more searching standard (*United States v. Navarro*, 145 F.3$^d$, at 590) – force the conclusion that a specific unanimity instruction was required under that statute given the facts of this case.

Fundamental fairness mandates that a conviction be based on a "discrete set of actions;" the convictions here, based upon a verdict obtained with no specific unanimity instruction, are subject to speculation as to what the jury

39

"must have" agreed upon as to the elements of assault 2nd° it found proven by the State. A trial ideally serves the purpose of resolving factual questions – not generating new disputes as what the jury verdict "meant." A specific unanimity instruction would have eliminated the need for speculation to resolve Petitioner's appeal. With the evidence arguably supporting any one of the six possible assault 2nd° offenses present, due process principles preclude a valid conviction in the absence of a specific unanimity instruction because it is impossible to know which prohibited act the jury agreed upon in its guilty verdict. Here, unlike a general verdict on a multiple object conspiracy indictment (see, e. g., *United States v. Navarro*, *supra*, 145 F.3d, at 590), it does not settle the issue to state that there might be sufficient evidence to support a conviction on each of the six alternatives – because the jury had first to agree on *exactly* what Petitioner had done *before* reaching the issue of his guilt or innocence. *United States v. Gibson*, 553 F. 2d 453 (5th Cir., 1977)

The other factor in the due process prong of the *Schad* test is the concept of equivalent blameworthiness. The "critical" inquiry here is "...not whether the ...alternative means are moral equivalents in all possible cases; the question is whether the alternatives could ever be treated as the equivalents of each other." *United States v. Navarro*, 145 F.3d, at 591.

The complete polarity of the charges here – intentional injury by use of a gun *versus* reckless injury via pepper spray – standing alone is adequate under

40

this principle to establish the absence of equivalent blameworthiness. A specific unanimity instruction was therefore required. The "different routes" here cannot be viewed as "mere alternatives." Use of a gun to intentionally inflict injury cannot be equated with reckless use of pepper spray – one device is the essence of lethality, the other specifically designed to be a non-lethal alternative.

Questions of *actus reus* aside, in a *Schad-Edmunds* analysis there remains the consideration that neither the State, in its argument, nor the Delaware Supreme Court, in its order in this case, attempted to address: the issue of state of mind. It is here that the State's argument falls far short of the controlling constitutional principles.

The trial judge clearly found sufficient evidence to instruct the jury on both "intentional" and "reckless" conduct as an element of assault 2nd°. Although both the State and the Delaware Court went to great lengths to conclude what the jury "must have" found with respect to the injury suffered and the weapon used to inflict it, neither deigned to comment on what the jury found Petitioner's mental state to be. Perhaps this was because both the State and the Court implicitly agreed that the jury must have found that mental state to have been "intentional." Or, perhaps both the State and the Court found no need for a *Schad* analysis as to mental state as each simply deemed "intentional" and "reckless" to be such equivalents under Delaware law for

41

purposes of affirming the assault 2nd° conviction in this case that no specific finding on this point was necessary.

It does not surprise that the State would shy away from an "equivalent blameworthiness" inquiry into the two separate mental states within the elements of the Delaware assault second degree statute – for both the Delaware General Assembly and the Delaware Supreme Court have previously spoken plainly on this aspect of the *Schad* test.

11 Del. C. § 251 (a) provides that proof of the state of mind set forth as an element of an offense is necessary in a criminal prosecution. 11 Del. C. §§ 231 (a) and (c), respectively, separately define "intentional" and "reckless," employing the same language as used in the trial court's instructions in this case. Further, and of determinative significance here, 11 Del. C. § 253 provides that while proof of "intentional" conduct satisfies the need to prove "recklessness," the opposite does not hold true: reckless conduct will not support a conviction where intentional conduct is required as an element of the offense. By *statute*, these states of mind are not interchangeable in Delaware: reckless conduct can never be treated as the equivalent of intentional conduct.

The Delaware Supreme Court has directly held that "...recklessness is a *less culpable* state of mind that that required for intent" under the Delaware Criminal Code, citing §§ 231 (a) and (c) as well as §253 of Title 11. *Ward v. State*, 575 A.2d 1156 (Del., 1990).

42

Thus, it is manifest that both by statute and under the case law of Delaware's highest court, Delaware's Criminal Code does not equate the level of blameworthiness for "intentional" and "reckless" conduct. Those states of mind could not ever be treated as equivalents under Delaware law. *Cf. Navarro*, 145 F3d, at 591. Under *Schad*, this disparity voids the conviction of assault 2nd° in this case as no specific unanimity instruction was given by the trial court. Without a specific unanimity instruction, assault second degree, under the State's formulation of that offense, comes perilously close to the definition prohibited by the principles set forth in *Schad:* "crime" may not be so generically defined that "...any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering" may support a conviction. *Schad v. Arizona,* 501 U.S., at 633. Yet, in this case, in effect, that was the end result.

*Schad* expressly holds that if two distinct mental states are supposed to be merely different means to satisfy the *mens rea* element of a single offense, due process mandates that those distinct mental states must reasonably reflect notions of equivalent blameworthiness. *Schad v. Arizona*, 501 U.S., at 643. Absent an implicit reversal of *Ward v. State, supra*, by the Delaware Court in this case or an unstated finding by that Court that the jury "must have" found Petitioner's conduct to have been "intentional" (a finding to accompany the other "must have" – that the jury "must have" found the injury to Smith to be

43

the gunshot wound), the conviction of assault second degree here does not withstand a *Schad* analysis.

On Petitioner's direct appeal, counsel for the State attempted to "paper over" the constitutional defect in Petitioner's convictions by arguing that the jury verdict "had to be" in accord with the prosecutor's "intent to kill theory." The core of the State's argument on appeal was this:

> The definition given to [Petitioner's] jury can not *[sic]* reasonably be interpreted to include an instrumentality such as "disabling chemical spray," since that portion of the statutory definition of a "dangerous instrument" was specifically omitted by the trial judge in defining the statutory term. Here, Smith suffered a gunshot wound to the chest. Mace or pepper spray is only a temporarily disabling chemical spray [11 Del. C. § 222(6)] which also does not create " a substantial risk of death or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of any bodily organ." There was no reasonably *[sic]* probability that [Petitioner's] jury was confused in its task. *Had the trial judge employed the complete statutory definition of "dangerous instrument" contained in 11 Del. C. § 222 (4), which includes "any disabling chemical spray," then [Petitioner's] plain error contention regarding the lack of a specific unanimity instruction would be more compelling.*
>
> \*                               \*                               \*
>
> The missing linchpin in [Petitioner's] specific unanimity instruction argument is that the trial judge did not utilize the entirety of the general statutory definition for "dangerous instrument"...

> (State's Brief on appeal, p.25)
> (emphasis supplied)

In its order disposing of Petitioner's direct appeal, the Delaware Supreme Court found the State's argument to control the issue:

> ...Although here there is evidence that [Petitioner] both pepper-sprayed and shot Smith, the definition of "dangerous instrument" that

44

was submitted to the jury did not mention pepper spray. The jury instruction, on the other hand, did make a specific reference to a fire-arm. Moreover, the trial judge omitted the reference to a "disabling chemical spray," which is part of the statutory definition of "dangerous instrument." Based on this definition the jury could not have reasonably found that [Petitioner] used a 'disabling chemical spray' to severely injure Smith. Accordingly, they must have concluded that the *dangerous instrument* was a *firearm* and there was no plain error.

> *Benge v. State, supra*, order p.8
> (emphasis supplied)

Contrasting these conclusions to *Schad,* several things become apparent:

❖ First, it is evident that the Delaware Supreme Court did *not* purport to rule as a matter of law that the definition of "dangerous instrument" in the Delaware Criminal Code (prior to the "disabling chemical spray" amendment) precluded pepper spray from being within that definition. The Supreme Court's ruling was limited to the facts of this case.

❖ Second, the logic supporting the State's argument with respect to the jury's ultimate conclusion would seem strained at best – akin to the "...fantastic arrangement of words, by which a man can prove a horse chestnut to be a chestnut horse" recalled by Abraham Lincoln in a debate.* To paraphrase the State's argument: "if the correct instruction had been given (as is required by law and as should have

---

\* Basker, *The Collected Works Of Abraham Lincoln*, Vol. III, p.399.

45

been done), a specific unanimity instruction would be warranted. Because, however, the instruction was wrong – quite apart from what the evidence established with respect to lesser included offenses upon which the trial court would instruct the jury – the end result is error free as the jury's verdict had to reflect its finding that Smith was 'severely' injured by a 'dangerous instrument' which means that a *firearm* was the only possible means of injury."

❖ Third, the State's argument totally ignores the difference between a "deadly weapon" and a "dangerous instrument" under Delaware law. The jury was instructed that these have distinct definitions under Delaware and the trial court's instructions to the jury did not indicate that a "firearm" was a "dangerous instrument."   Yet, the Delaware Court held that the jury "*must have* considered that the *dangerous instrument* was a *firearm...*" (emphasis supplied).   To do so, of course, the jury would have *had* to ignore and/or confuse the two distinct means of commission of second degree assault as a "firearm" is a "deadly weapon" and not a "dangerous instrument" under the definitions in the jury instructions.  While the State and the Delaware Court may have chosen to ignore this difference, there is no reason in the record of this case to conclude that the *jury* did. This is, in fact, a highly cogent reason for a specific unanimity instruction.

46

❖ Finally, given the verdict of guilty as to assault 2nd°, the Court was compelled to explain away the jury's finding that the gunshot wound injury to Smith was *not* a "*serious* physical injury" but merely a "physical injury" (which under Delaware law as stated to the jury was defined as follows: "physical injury means impairment of physical condition or substantial pain"). To avoid the appearance that it endorsed the notion that a gunshot wound could be considered not a "serious physical injury," the Court in its opinion employed the term "severe" injury – a term not in the Delaware Criminal Code and created on an *ad hoc* basis for this case. Indeed, the State's brief on appeal assumed that the jury found "serious physical injury" (State's Brief, p.25) without attempting to reconcile this with the jury's acquittal of Petitioner on the assault 1st° charge – meaning, of course, that the jury found no "serious physical injury" present.

Perhaps most significantly, the State's argument does not accurately reflect either the facts that the *prosecutor*[7] placed into evidence before the jury or the law given to them in the instructions that they did receive:

❖ No fewer than five prosecution witnesses, including two police officers [Cynthia Lovett (Trans., Vol. C-41-42); Smith; Petitioner's

---

[7] During the conference with the trial court on instructions the prosecutor pointedly asked: "Why give a lesser that does not fit the facts?" (Trans., Vol. G 21)

47

former wife; and Officer Kevin Jones and Corporal Paul W. Parsons of the Rehoboth Beach Police Department] testified as to the effects of pepper spray.  Smith repeatedly referred to the can or cylinder of pepper spray held by Petitioner as a "weapon" without correction by the prosecutor. The medical testimony of three doctors as well as their medical records dealt with the injurious effect of pepper spray. And, the canister of pepper spray was introduced into evidence as an exhibit. Finally, the prosecutor repeatedly referred to the pepper spray injury to Smith in the State's closing argument.

To argue, as the State does, that pepper spray was not an "instrumentality" of injury which the jury had in the evidence before it is diametrically opposed to what the  State's evidence at trial established. The instructions in fact given to the jury expressly stated that the jury was permitted to find either the use of a "firearm" *or* the use of a "dangerous instrument" to cause injury – *two* separate classes of means, *not one* with differing qualities under Delaware law. 11 Del. C. § 222 (5) differs markedly from 11 Del. C. §222(4) and (6).

As it is clear that the Delaware Supreme Court did not construe "dangerous instrument" to exclude pepper spray as a matter of law, it is disingenuous for the State to argue that the pepper spray undeniably present  in

48

this case could not have brought about the physical injury undeniably caused to Smith's eyes according to the State's own witnesses.  Simply stated, given the evidence presented to the jury by the prosecutor, it is beyond principled debate to deny that the jury could have readily, correctly, and justifiably concluded that the pepper spray present in this case was capable of causing "physical injury" (i.e., impairment of physical condition or substantial pain) as an "...instrument, article, or substance which, under the circumstances in which it is used...is readily capable of causing death or serious physical injury."

What is plain in this case is that the trial judge found there to be sufficient evidence of both a "deadly weapon" *and* a "dangerous instrument" present and he instructed the jury as to both.  If, as the State contended on appeal the State's "theory" was limited to the use of a *firearm,* clearly the evidence was, in the view of the trial judge, *not* so limited.  If the State's theory as contended on appeal was indeed "embodied" in the instructions given to the jury (State's brief, p.30), there would have been no basis in law for the "dangerous instrument" instruction given by the judge – for there must be some evidence present which would *rationally* allow the jury to find the elements of a lesser included offense to justify an instruction on the same to the jury. *Henry v. State*, 805 A.2d 860 (Del., 2002)

The *sine qua non* of the State's argument offered in opposition to the need for specific unanimity is the assertion that it is not possible under the

49

generalized definition of "dangerous instrument" in the Delaware Criminal Code to find that pepper spray is within its scope.[8]  However, under similarly general definitions of "deadly weapon" or "dangerous" weapon, device, and/or instrument, these courts have concluded that pepper spray or mace is indeed within the items described: *Handy v. State*, 745 A.2d 1107 (Md., 2000) (the fact that pepper spray is not expressly  included in the statutory definition did not preclude it from being within the statute);  *United States v. Dukovich,* 11 F.3d 140 (11th Cir., 1994), *cert. denied* 511 U.S. (1994);  *United States v. Bartolotta*, 153 F.3d  875 (8th Cir., 1998), *cert. denied* 525 U.S. 1093 (1999);  *United States v. Brown*, 508 F.2d 427 ( 8th Cir., 1974);  *Hartman v. State,* 403 SO.2d 1030 (Fla. Dist. Ct. App., 1981):  *State v. Johnson*, 730 SO.2d 1035 (La. App., 1999); *Barrett v. State*, 775 P.2d 1276 (Nev., 1989); and *Pitts v. State*, 649 P.2d 788 (Ok. Crim. App., 1982). Accordingly, absent a ruling of law that pepper spray is excluded from the Delaware definition of "dangerous instrument," the holdings in the above cases tend to show that a reasonable juror *could* indeed conclude that pepper spray would justify a "dangerous instrument" guilty verdict on assault 2ndo - creating the need in this case for a specific unanimity instruction.  While the above cited cases do not, of course, bind the Delaware court to any particular reading of the assault second degree

---

[8] Petitioner notes the irony of a prosecutor arguing a lesser, rather than greater, reach of a weapons statute.

50

statute, cases of this sort do expose the flaw in the State's position here with respect to what the jury "must have found."

The "impossible finding" contention urged by the State as controlling here in fact merely serves to illustrate the poverty of the State's position. Rather than justify the omission of a specific unanimity instruction, the argument put forth by the State highlights the need for the jury to have been so instructed. Similarly, the State's contention that Petitioner's alleged pepper spraying of his former wife was the basis of the offensive touching conviction –a contention adopted by the Delaware Supreme Court in its order – is not in accord with either the facts or the law. The jury, after proper instructions on the misdemeanor offense, found Petitioner guilty of touching his former wife "with a member of his body" – by definition, not pepper spray. Yet, the Delaware Court twice in its order referred to Petitioner pepper spraying his wife even though the jury returned a verdict of not guilty on the assault second degree (chemical spray) charge involving her.

This conclusion is inescapable: if the trial court had given a specific unanimity instruction, there would be no need for the State to spin its web of "must haves"- which lack any measure of internal consistency - regarding the jury's verdict.

A jury trial should not be comparable to a prosecutorial shell game; nor should an appeal become an *apologia* for the State's failures at trial.   In

51

Petitioner's case, with six equally viable "theories of the case," one theory must have been proven beyond a reasonable doubt. "Guilty but not guilty of the same act" is contrary to *Schad* due process.

**D). *The Genuine Probability Of Juror Confusion Necessitated A Specific Unanimity Instruction***

In the instant case, once the jury voted to acquit Petitioner of all charges set forth in the indictment [i.e., attempted murder, burglary, the firearms charges, and assault 2nd° (chemical spray)], the jurors were cast adrift in a sea of uncertainty with respect to how the prosecution contended that the lesser included offenses applied to the facts of the case:

❖ No charging document specified the lesser included offenses that the jury was to consider;

❖ The prosecutor's deliberate decision not to offer the jury an articulated theory of how to apply the lesser includeds gave them no guidance in that regard. In fact, the prosecutor urged the jury to not even consider the lesser includeds;

❖ The prosecutor presented evidence of three separate injuries (a gunshot wound; a perforated eardrum; and the pepper spray burns) and three separate means of infliction of those injuries (two guns and the pepper spray) and three separate states of mind (intentional, reckless, and negligent). Accordingly, each of the twelve jurors had nine separate

52

alternatives from which to choose: intentional use of gun1, gun2, or the pepper spray; reckless use of gun1, gun2, or the pepper spray; or negligent use of gun1, gun2, or the pepper spray. Mathematically, this leads to the astounding total of 4021 possible "guilty" vote permutations among the twelve jurors on the assault 2nd° of which only nine are *unanimous* verdicts of guilty; and

❖ The trial court neither instructed the jury as to what a lesser included offense consisted of nor did that court, contrary to the State's suggestion on appeal, instruct the jury that it was to limit its fact finding to the "theory" argued by the prosecutor. The jury *was* told that they were the "sole" judges of the facts in the case.

❖ The instruction actually given at trial, erroneous though it was, actually *added* to the potential for jury confusion. The jurors were left to ponder why after five prosecution witnesses had related the effects of their exposure to pepper spray and after numerous references to pepper spray in the prosecutor's closing, the judge did not mention pepper spray as among the many devices specifically mentioned in the judge's instructions on weapons definitions.

A conviction cannot stand if there is a "real risk" that a jury will convict without agreement on a discrete set of facts. *United States v. Edmunds, supra;*

53

*United States v. Navarro, supra; and United States v. Cusumano, supra.* In the instant case, in the absence of a specific unanimity instruction, the instructions which were in fact given to the jury created the genuine risk that their verdict would be the product of confusion or a composite end result.     Every factor identified in existing case law as likely to cause juror confusion -- and more - was present here: a discrepancy between the indictment and the evidence that the jury was to consider on the lesser included offenses; the lack of a lesser included offense theory on the part of the prosecutor; the complexity of the evidence -- here, in the sense of the number of possible verdicts presented; and the failure of the trial court to provide the jury with any guidance in general with respect to their consideration of lesser included offenses.

The Delaware Supreme Court's ultimate justification for rejecting Petitioner's specific unanimity argument on direct appeal was that such an instruction "is not required in every case," a proposition for which that court cited *Ayers v. State, supra,* an accomplice liability case. While accomplice liability may have the "equivalent blameworthiness" absent from this case, the *Ayers* opinion does state the rule applicable here: according to the Delaware Court in *Ayers*, a specific unanimity instruction *is indeed required* if one count charged encompasses two separate incidents either of which might support a defendant's conviction for a particular charge, *Ayers,* 844 A.2d, at 309.  Surely, in the absence of the jury being *expressly instructed* that they

54

were *not* to consider the gunshot causing the perforated eardrum or the pepper spray burns in connection with the lesser included offenses with respect to Smith, no case more closely fits the *Ayers* rule than this one.

The principle recognized in the *Ayers* case is essentially the same as that set forth in *United States v. Beros*, 833 F. 2d 455 (3rd Cir., 1987) – a jury verdict based upon a "patchwork" of guilty findings cannot stand. Where there are multiple "theories" of guilt all of which are supported by the evidence and yet each of which represents a distinct criminal offense – in *Beros*, four such theories, in Petitioner's case, six as to assault 2nd°, three as to assault 3rd° – a verdict of guilty not based on a specific unanimity instruction cannot withstand due process scrutiny.

What can be said with certainty about this case is that without the making of assumptions extraneous to the jury verdict it *cannot* be said precisely what criminal act the evidence established in the view of the jury. This is the crux of the *Schad* issue in this case – *just what* did Petitioner do? Due process is not satisfied by a procedure in which an appellate court selects one of several equally viable factual theories and arbitrarily anoints that selection with possessing the exclusivity of " logical result."

The pretrial decision by the prosecutor – an experienced veteran of major criminal trials in Sussex County – to overindict Petitioner beyond any reasonable expectation of a conviction on the lead charge generated the

55

problem of the facts as ultimately found by the jury simply not meshing with the State's "theory." An erratic trial strategy exacerbated the consequences the prosecutor's reach exceeding the grasp of the State's evidence. Had the prosecutor deliberately set out to confuse the jury, it is difficult to imagine a strategy that would be more effective to that end than that actually employed. To compensate for these errors in judgment at the trial level, the State was on appeal compelled to fictionalize the facts and offer up a dissembling legal argument.

Only a verdict based on a specific unanimity instruction would have satisfied due process in this case.

56

## II.     THE     INCOMPLETE     "DANGEROUS     INSTRUMENT" INSTRUCTION HAD A SUBSTANTIAL AND INJURIOUS EFFECT AND INFLUENCE ON THE GUILTY VERDICT

### A).   The Constitutional Standard Of Substantial And Injurious Effect Or Influence

Petitioner is acutely aware of the limitations of *habeas corpus* review and that, in particular, such review is not designed to substitute the views of federal judges for those of state courts on matters of state law.

Notwithstanding those limitations, it holds true that even a single erroneous jury instruction may render a conviction void on constitutional grounds. *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In Re Winship*, 397 U.S. 358 (1970); *Cupp v. Naughton*, 414 U.S. 141 (1973).

The applicable constitutional standard is whether an erroneous instruction had a "substantial and injurious effect or influence" in determining a jury verdict. *Lisenba v. California*, 314 U.S. 219 (1941); *Kotteakos v. United States*, 328 U.S. 750 (1946); *Kontakis v. Beyer*, 19 F.3d 110 (3rd Cir., 1994); *Buehl v. Vaughan*, 166 F.3d 163 (3rd Cir., 1999).

### B). The Constitutional Standard Applied – The Incorrect Definition Of "Dangerous Instrument" Was Of Substantial And Injurious Effect

In the instant case, it has been conceded by the State that the trial court employed an obsolete, superceded definition of "dangerous instrument" in instructing the jury as to both assault 2nd° and 3rd° as lesser included offenses

57

of the attempted murder lead charge. The net effect of that erroneous definition is that the jury was *not* instructed that they could consider the pepper spray as a "dangerous instrument" for purposes of returning a guilty verdict on assault 3rd°, a misdemeanor.

The State's answer to the defect in the "dangerous instrument" instruction in the instant case has been two-fold. First, the State argued on direct appeal that because the State's "theory" of the case was not that Petitioner intended to kill Smith by means of pepper spray, the jury's "assessment of the evidence" was "confined" to the judge's instruction omitting pepper spray as a "dangerous instrument." This, according to the State, means that the only instrumentality of injury that the jury could possibly have thought to have been used was a firearm and the only injury to Smith that it was possible for the jury to find to have occurred was the gunshot wound . In its consideration of the evidence, according to the State, the jury is limited to the view of the prosecutor as to what the evidence proves.

Further, the State has argued, the error in the trial court's instruction was somehow "cancelled out" by the jury's verdict of guilty on assault 2nd°. According to the State, "once the jury decided that [Petitioner] was guilty of the lesser included offense of assault second degree involving victim Smith no further consideration of the third degree assault possibility was required." (State's Brief on appeal, p. 30).

58

In its opinion, the Delaware Supreme Court held that the assault third degree instruction "had no bearing on the outcome of [Petitioner's] case" because the jury returned a verdict of guilty as to assault 2nd°. (*Benge v. State*, appeal order, p.9).

Neither the Court nor the State have cited any authority for the proposition that a guilty verdict on an *intermediate* lesser included offense (a critical factor) obviates the need to determine if an erroneous instruction on a lesser included offense had a "substantial and injurious effect or influence" on the final jury verdict.

Conceptually, the State's "two wrongs make it all right" argument requires this Court to overlook the fact that the State is advancing the proposition that the same weapons definition error by the trial court that *validated* Petitioner's conviction of assault 2nd° also *precluded* a conviction of assault 3rd°.    This argument is offered the State even though the only difference in the assault 2nd° and assault 3rd° statute is the requisite state of mind – recklessness for second degree, negligence for third.

The State would have the Court believe that a jury's consideration of a case with multiple layers of lesser included offenses is a step by step process wherein deliberations are limited to the offenses in the sequence in which they are charged. In the State's model of the workings of a jury's deliberation, as argued in this case in any event, the individual jury members never look at the

59

entirety of the offenses charged but consider them one by one in order of severity.

The State's suggestion on this point is wrong both legally and as a practical matter.  The jury in this case was not instructed to follow any particular format in their deliberations, let alone the course suggested by the State. The jury *was* told that they were the "sole and exclusive judges of the facts" of the case and  that "how you conduct your deliberations is solely within your province." These instructions did not limit the jury's deliberative proceedings to the process that the State suggests they *must* have followed.

Federal courts have long recognized that the State's notion of how a jury reaches its final verdict is simply not in accord with the realities of the process. For example, in *Beck v. Alabama*, 447 U.S. 625  (1980), the United States Supreme Court adopted a due process principle regarding lesser included offenses in part because it was aware of the fact that a jury might convict rather than free a defendant if not presented with the option of a lesser included.

Moreover, there are *Schad* due process aspects to a multi-level offense case that the State's argument here disregards (emphasis supplied):

> *Schad* teaches us that, in cases involving offenses on a ladder, if the trial court wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict *for an offense higher up  rather than for an intermediate offense.*

> *Geschwendt v. Ryan*, 967 F.2d 877 (3rd Cir., 1992)

60

*cert. denied* 506 U.S. 977 (1992), at 884.

This same passage is set forth in *Lilly v. State*, 649 A.2d 1055 (Del., 1999), at 1062.

The problem here is that the jury *did* return a guilty verdict on an *intermediate* offense – assault 2nd° was three offense levels removed from the lead charge of attempted murder. Because the Delaware Court did not find the omission of "pepper spray" in the "dangerous instrument" definition to be harmless *per se* – that Court found any error to be harmless *because* of the guilty verdict on assault 2nd° - the ladder of offenses due process principle in *Schad* is offended by the erroneous instruction given here.

The error in this case is thus not simply the trial court's use of an obsolete definition; rather, that error grew to one of due process significance when the jury found Petitioner not guilty of attempted murder and the two separate counts of assault 1st°.

Nor was the error otherwise harmless under Delaware law: the failure to instruct a jury as to each element of an offense is plain error. *Walls v. State,* 560 A.2d 1038 (Del., 1989); and a deficiency in an instruction is plainly erroneous when it "undermines the ability of the jury to intelligently perform its duty." *Probst v. State,* 547 A.2d 114 (Del., 1998).

The State concedes that the jury was improperly instructed on both assault 2nd° and assault 3rd°. If given a proper instruction on "dangerous

61

instrument," the jury could readily have returned a guilty verdict on assault 3rd° based upon Petitioner's use of the pepper spray and the burn injuries to Smith. The State surely would not have argued such a verdict to be improper. The defect here – the erroneous definition omitting pepper spray – is a defect of the sort that "cannot be cured by a judge's finding that in a trial without the error a guilty verdict would surely have been reached." See *United States v. Edmunds*. *supra*, Stapleton, Judge, dissenting, 80 F.3$^{d}$, at 827.

What is objectively ascertainable in this case is that the jury convicted Petitioner of the *least* serious misdemeanor offenses possible in the *other counts* in this case – trespassing instead of burglary second degree and offensive touching. In the circumstances of this case considered as a whole – the lack of a specific unanimity instruction, the prosecutor's strategy of not providing the jury with argument as to the State's theory on the lesser included offenses, the inflammatory evidence regarding other conduct by the Petitioner (see Argument IV below), the inexcusable attack by the prosecutor on the Petitioner's character (see Argument III below), the prosecutor "beseeching" the jury for a conviction (Trans., Vol. G-136) - it is indeed likely that any difference in the instruction given as to "dangerous instrument" that would have permitted the jury to have no doubt about pepper spray as being within that definition would have removed any question that they may have had with respect to a guilty verdict on the assault 3rd° misdemeanor.

62

The erroneous instruction as to the definition of "dangerous instrument" under Delaware law had substantial and injurious effect and influence in the determination of the jury's verdict in this case and was therefore error of constitutional magnitude.

### III. THE PROSECUTOR'S WANTON ATTACK ON PETITIONER'S CHARACTER SO INFECTED THE TRIAL WITH UNFAIRNESS AS TO DENY DUE PROCESS

The final question asked by the prosecutor on cross-examination of Petitioner – a question that was clearly rhetorical – had every appearance of being designed to suggest to the jurors that the prosecutor had knowledge regarding Petitioner's credibility beyond that presented in the case. That the prosecutor's question, or, more properly described, the prosecutor's comment, was so excessively disparaging as to infect the trial process with fundamental unfairness establishes a due process basis for voiding the convictions in this case. This is particularly so as the prosecutor was able to offer *nothing* in justification of the remark when questioned by the trial judge – the comment was beyond any explanation of colorable legitimacy.

In disparaging Petitioner's credibility – "You're quite a humanitarian, aren't you?"(Trans., Vol. F-131; Ap., A93) – in a case where veracity was critical, the prosecutor crossed over the boundary dividing zeal and constitutional proscription.

### *A). The Constitutional Standard*

The constitutional standard for reviewing prosecutorial misconduct involves a case-by-case determination of whether the impropriety rendered the

64

trial process fundamentally unfair; that is, whether the prosecutor so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden v. Wainwright,* 447 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974); *Lam v. Kelchner,* 304 F.3d 256 (3rd Cir., 2002); *Marshall v. Hendricks,* 307 F.3d 36 (3rd Cir., 2002).

## B).  The Constitutional Standard Applied: The Prosecutor's Comment Was Outcome Determinative

The effect of a curative instruction designed to lessen the impact of an improper remark by a prosecutor -- the basis upon which the Delaware Supreme Court rejected Petitioner's direct appeal on this issue (appeal order, p. 7) – is but one of a number of factors examined in applying the due process standard above.  The prosecutor's remarks are evaluated in context to determine if the jury has been distracted from the real issues. *Marshall v. Hendricks, supra.* The comment is to be viewed in light of the entire trial with an assessment of the severity of the misconduct giving due weight to the effect of a curative instruction and the quantum of evidence against the defendant. *Moore v. Morton,* 255 F.3d 95 (3rd Cir., 2001).  No single factor is determinative in this analysis.

In the instant case, the ultimate issues came down to a question of whether the events leading to Smith's injuries were more accurately described in the

65

testimony of Petitioner or Smith, the only two persons in a position to know what occurred between them. Credibility was of paramount importance.

After a trial of some length, the prosecutor failed to prove a single charge as alleged in the indictment. The jury clearly rejected the notion that Petitioner entered the motel with the intention to commit a crime as he was acquitted on the burglary charge. Similarly, the linchpin of the prosecutor's case, the intent to kill, was found not to be present. The guilty verdicts returned by the jury were two minor misdemeanors and an assault 2nd° offense as to which the operative facts remain in dispute (see Argument I hereto).

In such circumstances, an excessively disparaging comment on character -- a remark laden with sarcasm which was tantamount to labeling Petitioner a "fraud" -- is critical in its impact on the jury. *Marshall v. Hendricks, supra,* 307 F.3d at pp. 65-66; *U.S. v. Procopio,* 88 F.3d 21 (1st Cir., 1996); *Kontakis v. Beyer,* 19 F.d 110 (3rd Cir., 1994); *Beuhl v. Vaughan,* 166 F.3[d] 163 (3rd Cir., 1999); *Peterkin v. Horn,* 176 F. Supp. 2d 342 (E.D. Pa. 2001); *U.S. V. Young,* 470 US 1 (1985).

Moreover, the suggestion by the prosecutor that the State had evidence regarding Petitioner's veracity *beyond* that offered to the jury was plain. The prosecutor's personal opinion of Petitioner was evident. *Beuhl v. Vaughan,* 166 F.3d 163 (3rd Cir., 1999).

66

In that context, the impact of a curative instruction is, at best, minimal. "If you throw a skunk into the jury box, you can't instruct the jury not to smell it." *Dunn v. U.S.*, 307 F.2d 883 (5th Cir., 1962), at 886. There are, quite simply, some things that a jury just cannot put out of mind.

Given that the quantum of proof offered by the prosecutor was anything but overwhelming, the prosecutor's disparagement of Petition's character in such a manner as to suggest that the prosecutor knew more of the credibility issue, created the substantial possibility of the jury being distracted from the real issues. The jurors may not have been able to disregard the prosecutor's remark and in fact used it – intentionally or unintentionally, consciously or subconsciously – to infer a lack of truthfulness in Petitioner's testimony.

A jury verdict of guilty resulting from such misconduct cannot stand.

One further consideration may be appropriate to this inquiry. While Petitioner is aware that review of prosecutorial misconduct on *habeas corpus* is under due process criteria and not the more extensive supervisory standard, it is fair to call to this Court's attention that Petitioner's trial took place in an atmosphere of prosecutorial conduct "run amok" according to the Delaware Supreme Court. *Price v. State,* No. 486, 2003, September 8, 2004, Steele, C.J. (Del.), slip opinion at 21.

67

According to that Court, a twenty year history of its admonishment of prosecutors in the Delaware Department of Justice has had so little impact as to warrant the Court's suggestion that the Delaware Attorney General consider "removal for cause" proceedings against offending subordinates. *Price v. State, supra,* slip opinion at 22.

Delaware's highest court has identified an institutionalized agency culture fostering trial misconduct by prosecutors. In the absence of an effective deterrent to this endemic plague of excess, the most that a prosecutor risks is criticism in an appellate decision – an admonishment which is often anonymous: the prosecutor in *Price* was not even identified by name. That has proven itself an almost useless remedy against continuing abuse.

Petitioner's trial was a continuation of this pattern of unalloyed misconduct engaged in by prosecutors who are seemingly immune from any consequence of significance for an unbridled "win at any cost" mentality.

68

## IV. THE EVIDENCE OF THE UNLAWFUL INTERCEPTION CHARGES SO UNFAIRLY PREJUDICED THE TRIAL AS TO DENY DUE PROCESS

### A). *The Constitutional Standard*

Admission of evidence of "prior bad acts" alleged to have been committed by a defendant in a criminal case may rise to the level of depriving a trial of its fundamental fairness. This is the case where the erroneously admitted evidence is a "crucial, critical, highly significant factor" in a case and the probative value of the evidence is so "conspicuously outweighed by its inflammatory content" that a defendant's right to a fair trial has been violated. *Lesko v. Owens,* 881 F.2d 44 (3rd Cir., 1989). See also *Lisenba v. California,* 314 U.S.219 (1941) *Kontakis v. Beyer, supra; Bisaccia v. Attorney General,* 623 F.2d 307 (3rd Cir., 1980) *cert. denied* 449 U.S. 1042 (1980).

### B). *The Evidence Of Eavesdropping Inflamed The Jury's Instinct To Punish*

In arguing to the trial court against the admission of the unlawful electronic interception evidence, defense counsel stated the inquiry as follows:

> What we have here is uncontradicted testimony that John Benge entered the Oak Grove Motel, that John Benge was armed with a chemical spray device, that the chemical spray device was some device that was relevant to an event, Donna Benge and Mr. Smith. John Benge was armed. A fight, altercation, whatever the words of art may be, broke out between Mr. Smith and John Benge, that during

69

the course of that fight, two weapons were removed
from holsters in some fashion; that during the course
of that fight, at least one of the weapons was fired in
some fashion; that during the course of that fight,
John Benge was subdued.

What need is there for an April 12th break-in to a
vacant home six months before under those factual
circumstances? (Trans. Vol. A43-44).

Defense counsel, apparently alone in this regard, was keenly aware of the

highly prejudicial nature of the evidence of the pending charges and stated to

the jury in his closing that the evidence of tape-recording "…gets people upset

inside, people such as yourselves, and makes you want to punish him." (Trans.

Vol. G-92).

The prosecutor, however, whether out of concern for the weakness of the

rest of the State's case or the credibility of the State's witnesses, chose to

emphasize Petitioner's obtaining of a key, entry into the house, and tape

recording in closing argument, specifically singling out each of those events to

the jury. (Trans. Vol. G60-61).

On direct appeal, Petitioner argued this holding in *Getz v. State, supra,*

which was offered as controlling in Petitioner's case:

Where, as here, the State presents direct
evidence, through the testimony of the alleged
victim, that an attack occurred, no evidential
purpose is served by proof that the defendant

70

> committed other intentional acts of the same type.
> *Getz v. State, supra,* 538 A.2d, at 733.

The Delaware Supreme Court found Petitioner's case to be somehow distinct from *Getz,* so much so that it admitted only of the "possibility" that the tape-recording evidence was prejudicial. (appeal order, p. 6).

Evidence of "other wrongs" or "prior bad acts" is unfairly prejudicial in a constitutional sense where it appeals to a jury's sympathy, arouses a sense of horror, provokes an instinct to punish or otherwise may cause a jury to base its verdict on something other than the established propositions. *Peterkin v. Horn,* 176 F. Supp. 2d 342 (E.D. Pa., 2001).

Here, the evidence of the pending unlawful electronic interception charges against Petitioner did precisely that — it distracted the jury from the issues actually contested and placed Petitioner on the defensive with regard to his actions that had nothing to do with the events of October 20th in Rehoboth. Petitioner was compelled to attempt to justify the tape recordings as best as he could in the context of the disintegration of his life — and it provoked the jury to want to punish him as a result of the highly inflammatory nature of the evidence.

The established propositions at trial were as argued by defense counsel and were largely not in dispute. According to the trial judge, the prosecutor had

ample evidence *other* than the tape recording to establish intent or motive. Accordingly, the admission of evidence of unlawful electronic interception at a time six months before the date of those "established propositions" served only to provide the jury with a distraction – a highly prejudicial one at that – from the issues at trial and to deny due process.