## V. THE SENTENCES IMPOSED EXCEEDED THE MAXIMUM PENALTIES PERMISSIBLE UNDER THE 6TH AMENDMENT

### A). Introduction

This Court is, of course, well acquainted with the significance of the 6th Amendment jury trial right in sentencing proceedings in the aftermath of *Apprendi/Blakely/Booker/Fanfan.*[9] Petitioner will not waste the Court's valuable time by rehashing those cases. However, as Petitioner knows of no case raising *Apprendi/Blakely* as applied to Delaware in this Court, and as the necessary context is somewhat involved, this brief does set forth such details of the Delaware sentencing scheme as are necessary to resolve the sentencing issue raised in this Argument V.

### B). Apprendi/Blakely Applied To Delaware – An Approach

Determining how the *Apprendi/Blakely* "bright line" rule ( *Blakely*, slip opinion at p. 12) applies to Delaware requires an examination of the manner in which the sentencing power of a Delaware judge functions with respect to the enhancement of penalties based upon facts not found by a jury or admitted by the defendant. Such an analysis is directed toward the question of whether the power of a Delaware judge to enhance

---

[9] *Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington,* 542 U.S. __ (2004); *United States v. Booker* and *United States v. Fanfan,* __U.S.__ (2005).

a sentence above an ascertainable level is conditional – that is, dependent upon the finding of additional facts. In undertaking such an analysis, this brief looks to the intent of Delaware's legislature in enacting the applicable sentencing statutes as revealed in the legislative history; applies the rules of construction applicable to Delaware sentencing statutes; applies the rule of lenity and the doctrine of constitutional doubt; compares the Delaware sentencing system to that involved in *Blakely* and the former Federal system; and, finally, seeks to determine whether the Delaware sentencing statutes as heretofore construed and as applied to the sentencing in this case are consistent with the principles of *Apprendi/Blakely.*

While due regard is to be given to the holdings of the Delaware Supreme Court as to matters of state law, the conclusion of that court that "*Blakely* does not impact Delaware" (*Benge v. State*, appeal order, p.2) is not determinative in this case.  The issue here is whether the sentences imposed upon Petitioner were consistent with the 6th Amendment – and so it was in *Blakely* that the Washington Supreme Court's rejection of *Apprendi* as applied to its system and upholding of the sentence there did not control or preclude a 6th Amendment analysis and a contrary holding by the Supreme Court.

74

*C). Sentencing Reform In Delaware, 1984 – 2004: A Primary Source History*

In the early 1980's, the Delaware General Assembly joined in the national movement toward sentencing reform with the enactment of 64 Delaware Laws ("Del. Laws"), Chapter 402. This legislation, effective July 18, 1984, created the "Delaware Sentencing Accountability Commission" – which promptly became known as "SENTAC." (The full text of this act and each of the Delaware Laws referenced in this Argument V appear at Ap., A222-233).

Pursuant to the legislative enabling act, SENTAC was tasked with formulating and submitting "sentencing guidelines" to the Delaware Supreme Court for adoption "by court rule." The SENTAC guidelines, which were to be finalized by March 1, 1985, were to be developed "consistent with the overall goals of ensuring certainty and consistency of punishment commensurate with the seriousness" of an offense [subsection (c) of §1 of the 1984 act].

The sentencing guidelines that SENTAC was charged to develop were, according to the General Assembly, to "establish objective criteria to be utilized in determining which offenders shall be assigned to each of the...accountability levels" (i. e., levels of punishment – incarceration, probation, and so forth) and to "define under what conditions of

aggravation or mitigation and in what manner a sentencing judge may impose a sentence outside of the guidelines..." §2 (c) (2) and (3), 1984 Act. Further, SENTAC was to "recommend" a procedure or a tribunal for "appellate review" of sentences by the defendant *or* the State in cases of an out of guideline sentence. § 2 (g), 1984 Act.

This initial sentencing reform legislation also provided as follows:

> Such guidelines shall have no force and effect unless [adopted by court rule]; and shall not in any event authorize or be construed as authorizing the exercise of any power or duty exceeding or conflicting with those heretofore or hereafter granted by Act of the General Assembly or pursuant to inherent authority granted under the Delaware Constitution.
>
> §2 (a), 1984 Act

In this first iteration of sentencing reform in Delaware, the Delaware Supreme Court was to establish sentencing guidelines by court rule pursuant to enabling legislation.

All did not go, however, in accordance with the timetable envisioned by the General Assembly. In September of 1985, seven months after the deadline set by the General Assembly for the submission of the SENTAC recommendations to the Delaware Court, the legislature passed another act establishing "realistic dates for completing the duties" of SENTAC. 65 Del. Laws, Ch 206. This legislation established a new

76

date of March 1, 1986 for the SENTAC recommendations with "non-binding pilot testing" to begin on July 1, 1985.

It was not until September 15, 1987, however that the Delaware Court actually adopted the SENTAC recommendations. The Court later described its action as follows in *Ward v. State*, 567 A.2d 1296 (Del., 1989), at 1297:

> In 1987, we adopted the Commission's five-level punishment scheme, known as SENTAC guidelines and ordered Delaware courts to implement them, subject to certain conditions. One of the most important conditions was that "[t]he sentencing standards are considered voluntary and non-binding; thus, no party to a criminal case has any legal or constitutional right to appeal to any court a statutorily authorized sentence which does not conform to the sentencing standards." Administrative Directive Number Seventy-Six, Del. Supr., Christie, C.J. (Sept. 15, 1987)

The *Ward* opinion rejected an appeal of a sentence that was beyond the SENTAC guidelines but well within the statutory maximum. The Court held in *Ward* that in Delaware appellate review of a criminal sentence is limited to determining if the sentence imposed is within the statutory maximum,[10] citing for that precept a pre-SENTAC case, *Seevey v. State*, 211 A. 2d 908 (Del., 1965). [ One year after the *Seevey* decision, the Delaware Court opined that it lacked jurisdiction to review a sentence

---

[10] This scope of review is identical to the pre-1984 Federal system. *Dorszyski v. United States, 418 U.S. 424 (1974).*

within the statutory limits, *Osburn v. State*, 224 A.2d 52 (Del., 1966)].

SENTAC's mission did not, however, end with *Ward* or the Delaware Supreme Court's Administrative Directive Number Seventy-Six which had, in essence, maintained the existing sentencing scheme in Delaware, engrafting onto that system the SENTAC guidelines with the label of "non-binding." In July of 1989, the General Assembly enacted the "Truth In Sentencing Act Of 1989," popularly known as "TIS," the second iteration of sentencing reform in Delaware. (67 Del, Laws, Ch. 130).

By means of TIS – the "most comprehensive *legislative* revision of the Delaware *statutory* sentencing system" [*Evans v. State*, No. 67, 2004, April 11, 2005 (Del.) ("*Evans* II"), slip opinion, p. 29 (emphasis supplied)] the General Assembly overhauled sentencing practice in Delaware. With an effective date of July 1, 1990 (34 months after the Delaware Supreme Court's Administrative Directive Number 76 adopting the SENTAC guidelines as "voluntary and non-binding"), §2 B. of TIS declared, among other things that the "sentence of incarceration for a felony shall be a definite sentence" [§5, TIS; 11 Del. C. §4205 (a)] ; abolished parole [§5 TIS;11 Del. C. § 4354; §4205 (j)]; classified all felonies into seven categories – "A" through "G" (§ 7, TIS; 11 Del.

78

C.§4354); and prescribed a mandatory period of probation for all felony offenders [§6, TIS; 11 Del. C.§ 4204 (I)].

The sentencing reform efforts of SENTAC were not ignored by the General Assembly in TIS. In one of the "carefully crafted statutes" (*Evans* II, slip opinion p.34) comprising the TIS legislation, the Delaware legislature qualified as follows the power granted to sentencing judges to impose any sentence of incarceration "up to the maximum stated" for each class of felony:

> Whenever a court imposes a period of incarceration at Level V custody in excess of 30% of the maximum allowable penalty or imposes a period of incarceration at Level V custody less than 20% of the maximum allowable penalty, such court, shall explain in writing, the aggravating or mitigating circumstances for imposing such penalty. The basis for aggravating or mitigating circumstances shall be prescribed and adopted by the Sentencing Accountability Commission.

> § 18, TIS; 11 Del. C. § 4204 (m)

This provision of TIS tied the exercise of the sentencing power directly to the SENTAC guidelines as the SENTAC presumptive standards are:

> ...are loosely based on up to to 25% of the statutory maximum; serious aggravating factors increase the penalty up to 50% or up to 100% of the maximum...[T]he increased or decreased penalties, for most aggravating or mitigating circumstances are not specified... the "up to 25%" increase or decrease guide should be utilized when possible.

79

SENTAC Benchbook, p. 4 [11]
(relevant excerpts from the Benchbook appear starting at Ap., A178)

The second iteration of sentencing reform in Delaware was, therefore, wholly a product of the state legislature not requiring the subsequent adoption of a court rule to become operative.

The TIS Act was followed by the decision of the Delaware Supreme Court on March 14, 1990 in *Gaines v. State*, 571 A.2d 765 (Del., 1990) in which that Court held that a sentence which departed from the SENTAC guidelines presented no basis for reversal on appeal.

The General Assembly thereafter approved the "TIS Clarification Act" (67 Del. Laws, Ch. 350) on July 13, 1990 which bore the full title of "An Omnibus Act...To Provide Clarification And Consistent Application Of The Intent Of The Truth In Sentencing Act." [12]  The act to "clarify" TIS followed the TIS Act itself by just over one year and *Gaines v. State* by four months..

§ 1 of the TIS Clarification Act struck the previously enacted text of §4204 (m) – set forth above – and substituted the following amended § 4204 (m):

---

[11] The SENTAC Benchbook has been formally recognized by the Delaware Supreme Court as an aid to construction of sentencing statutes. *Evans* II, slip opinion, p. 34.
[12] Under the "single subject" provision of the Delaware constitution, the title give to a bill proposed in the General Assembly is one of the keys to its constitutionality. The title is not, therefore, mere surplusage or decoration. *Evans* II, slip opinion, p. 21-23.

Whenever a court imposes a sentence inconsistent with the presumptive sentences adopted by the Sentencing Accountability Commission such court shall set forth on the record its reasons for imposing such penalty.

The third and final iteration of sentence reform in Delaware was a legislative effort to clarify its previously expressed intent and to make *all* out of guideline sentences subject to the statement of "reasons" requirement. [At the same time as it continued to advance a reform agenda of determinate sentencing, the General Assembly amended the Delaware habitual offender statute in 1990 to reflect its "unambiguous intent" to *expand* the unbridled discretion of sentencing judges to impose "up to a life sentence" for habitual criminals under 11 Del. C.§4214. See §37, TIS Clarification Act, 67 Del. Laws, ch. 350 and *Crosby v. State*, 824 A.2d 894 (Del., 2003). The General Assembly included both "determinate" and true "indeterminate" sentencing systems as part of TIS and differentiated between their application.

On January 31, 1992, the Delaware Supreme Court held that § 4204 (m) forms no basis for an appeal of a sentence because of the "prior rulings" of that Court. *Mayes v. State*, 604 A.2d 839 (Del., 1992).

*Mayes* was followed in 1997 – at a point thirteen years and seven general elections removed from the initial SENTAC legislation and just three years before *Apprendi* – by *Siple v. State*, 701 A.2d 79 (Del.,

81

1997). In *Siple*, the Court held that the sole grounds for appeal of a criminal sentence in Delaware were: unconstitutionality of the sentence; factual predicates that were either false, impermissible, or that lack "minimal indicia of reliability;" judicial vindictiveness; bias; or a sentencing imposed with a "closed mind." *Siple,* 701 A.2d, at 83. The Court reaffirmed that its Administrative Directive Number Seventy-Six of 1987 permitted no basis for an appeal on the sole ground that a sanction deviated from the SENTAC guidelines. That Court went on to state that the issue of appellate review would ultimately be up to the General Assembly and chided SENTAC for its "evident" failure to recommend an appellate procedure.

Following the decision in *Blakely*, the first challenge to the consistency of Delaware's TIS sentencing scheme with the 6th Amendment to reach the Delaware Supreme Court was in *Fuller v. State*, No. 38, 2004, October 29, 2004 (Del.) which was, of course, decided while *Booker* was pending decision after argument. In *Fuller*, the defendant appealed sentences of five years imprisonment for three drug convictions on the basis that the sentencing judge had enhanced the sentences above the TIS guidelines because the defendant "... at a

82

minimum knew of his brother's false testimony and allowed it at his trial." *Fuller*, slip opinion, p. 14.

The Delaware Court began its analysis of the *Fuller* appeal with the following declaration:

> With certain exceptions involving mandatory sentences, Delaware has an indeterminate sentencing system. Although there are voluntary sentencing guidelines, the sentencing judge is not bound by them [citing *Mayes v. State, supra* ]. The sentencing judge need only state his reasons for imposing a sentence outside the guidelines [citing 11 Del. C. § 4204 (m)]. We review a sentence of a criminal defendant for abuse of discretion.
>
> *Fuller v. State*, slip opinion pp.15 – 16

In *Fuller*, the Delaware Court expressly refused to reach the *Blakely* issue raised by the defendant (footnote 60, *Fuller* slip opinion p.20) but reversed the sentence imposed nonetheless on the basis that the trial judge (who had enhanced the sentence based upon facts not tried to a jury) had not made an adequate record of specific facts showing that the defendant had engaged in conduct constituting an obstruction of justice.

Petitioner's direct appeal in this case and in the unrelated case from Superior Court in New Castle County were both pending before the Delaware Supreme Court at the time of the decision in *Fuller*. That court did not rule on the *Blakely* issue in Petitioner's appeal from Sussex County – the instant case – but did find that "*Blakely* does not impact

83

to the sentences imposed on Petitioner in this case, the core issue is whether the authority of a Delaware judge to enhance a sentence under §4204 (m) operates in a manner consistent with the 6th Amendment trial by jury - not whether the labels used by the Delaware Court are accurate.

## 2). 6th Amendment Formalism Does Not Trump Apprendi-Blakely

The right of jury trial is not a "mere procedural formality but a fundamental reservation of power" meant to ensure the ultimate control of the people in the judiciary. *Blakely*, slip opinion, p.9. *Apprendi*, according to the *Blakely* court, reflects the need to give "intelligible content" to the substantive right of trial by jury. *Id.* The essence of Blakely is that judicial fact-finding to support an offense enhancement is "*...only constitutional when that finding raises the sentence beyond the sentence that could have lawfully been imposed by reference to facts found by the jury or admitted by the defendant.*" Stevens, Justice, dissenting in *Fanfan*, slip opinion, p.7 (emphasis in original).

In any *Apprendi/Blakely* analysis, labels are "irrelevant," *Apprendi,* 530 U.S., at 478, and are not a "principled basis" of discrimination among sentencing systems. *Booker*, slip opinion, p.6:

> If a state makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no matter how the State labels it -- must be found by a jury beyond a reasonable doubt.

86

> *Ring v. Arizona*, 536 U.S.584 (2002), at
> 602, quoted in *Booker*, slip opinion, p.6-
> 7.

Nor is it of significance whether the judge's authority to enhance a sentence depends upon finding a specific fact, one of several facts, or *any* aggravating fact – that the judge acquires the authority to enhance a sentence only upon the finding of a fact beyond those found by the jury brings the *Apprendi/Blakely* rule into play. *Blakely*, slip opinion at p. 9. *Apprendi* and *Blakely* are explicit on this point: when it comes to squaring the operation of a given sentencing system with the right to trial by jury, labels – that is, form over function – will not suffice.

The Delaware Court's use of the labels "voluntary and non-binding' and "indeterminate" (the latter having appeared for the very first time in Delaware jurisprudence in *Fuller v. State*, a post-*Blakley* but pre-*Booker* decision) does nothing to resolve the issue in this case. That issue hinges on the limitations and conditions placed on the authority of a Delaware judge to enhance a penalty.

### *3). §4204 (m) Restricts The Sentencing Power Of Delaware Judges*

The key to the applicability of *Apprendi/Blakely* to the enhanced sentences imposed on Petitioner is obviously the manner in which 11 Del. C. §4204 (m) permits a sentencing judge to exercise the sentencing

power granted by 11 Del. C. §4205. In other words – does §4204 (m) limit the power of the sentencing judge in such a manner that additional, non-jury found facts are necessary and used to vest the judge with the authority to impose the enhanced sentence imposed upon Petitioner?

The short answer here to that question is found in the existing opinions of the Delaware Supreme Court: "The sentencing judge need only state his reasons for imposing a sentence outside the guidelines," *Fuller v. State*, slip opinion, p. 15; "...the trial court must explain its reasons, but it is authorized to exceed the SENTAC guidelines..." *Benge v. State*, appeal order, p.3. It is of overriding importance in this case that the pronouncements of the Delaware Court as to the necessity for a statement of reasons apply only to *enhanced* sentences. According to that Court, no reasons need be given for a sentence *within* the guidelines – the same conclusion one is led to by a straightforward reading of § 4204(m): the "reasons" must accompany – "shall [be] set forth on the record" – the sentence enhancement and therefore operate authorize it..

The Delaware Supreme Court has twice since *Blakely* made quite clear that a Delaware sentencing judge must both *have* and *state* reasons as a predicate to lawfully imposing a enhanced sentence. Those "reasons" are the key to the operation of § 4204 (m) and when, as here,

88

those "reasons" consist of findings of fact beyond those made by a jury, the 6th Amendment principle of *Apprendi/Blakely* is offended. See *Booker*, slip opinion, pp. 10 – 11. That §4204 (m) and the Delaware Court label this sentence enhancement predicate as "reasons" rather than "facts" is not constitutionally significant. *Blakely* pp. 6-7. A fact no matter how labeled is still a fact for purposes of *Blakely*. *Fuller* and *Benge* make the point directly: the judge acquires the authority to impose an out of guideline sentence only upon findings beyond a jury verdict – "reasons".

Repeated use by the Delaware Court of the terms "voluntary" and "non-binding" with respect to a sentencing judge's application of the TIS/SENTAC presumptive sentences suggests that a judge may freely depart from these guidelines to impose any sentence within the legislatively fixed maximum. However, *Fuller* and *Benge* make clear that a sentencing judge is limited by the statement of "reasons" dictate of §4204 (m) and derives the authority to enhance a sentence from those "reasons," not the jury verdict alone. No reasons, no enhancement.

Has the Delaware Supreme Court at any point after the 1990 enactment of §4204 (m) construed that statute as not *requiring* the presence and statement of reasons for sentence enhancement? *Mayes v.*

89

*State, supra,* might be read as suggesting that the failure to state reasons

for a sentence enhancement affords no right to appellate relief:

> §4204 (m) may not be reasonably construed as a mandate or basis
> for reversible error since we have previously ruled that the
> SENTAC guidelines provide "no basis for appeal."

*Mayes v. State,* supra, 604 A.2d, at 846

But two distinct considerations militate against reading *Mayes* as

dispensing with the requirement that reasons be stated in connection with

a sentence enhancement or as qualifying the rulings in *Fuller* and *Benge.*

First, *Mayes* is primarily, if not exclusively, a scope of appellate review

case. Just as the four pre-*Booker* decisions of the Supreme Court cited in

that opinion did not anticipate the role of the 6th Amendment jury trial

right in sentencings (see *Booker,* slip opinion at pp. 15-17), the Delaware

Court did not anticipate *Blakely* by twelve years in *Mayes* (or by 17 years

by its Administrative Directive Number Seventy-Six).

More importantly, however, the date of the defendant's offense in

*Mayes* was October-November of 1988 and the guilty plea in that case

was entered in April of 1990 – *Mayes* is, simply stated, a *pre*-TIS, *pre*-§

4202 (m) case by a margin of 20 months. *Obiter dictum* has no

precedential value in Delaware cases dealing with sentencing law. *Evans*

II, slip opinion at p. 37.

90

In light of the clarity with which the Delaware Supreme Court subsequent to *Mayes* has stated the necessity for a sentencing judge to set forth reasons for any sentence enhancement in *Benge* and *Fuller*, the holding in *Mayes* cannot be deemed a contrary controlling holding.

### 4). Reading §4204(m) As Limiting The Sentencing Power Is In Accord With Established Delaware Principles Of Statutory Construction

It is not by distortion of meaning or a strained reading of §4204 (m) that Petitioner suggests that statute as one that must be read as a limitation on the sentencing power of Delaware judges. Such a reading does no violence to established rules of statutory construction adhered to by Delaware's highest court.

Those principles are succinctly set forth in *Snyder v. Andrews*, 708 A.2d 237 (Del., 1998). Delaware sentencing statutes present no basis for judicial interpretation unless an ambiguity is present in the language of the statute itself. An ambiguity arises only if the language used in a statute is reasonably susceptible of different conclusions or interpretations or if the literal interpretation of the words in a statute would lead to an unreasonable result.

Applying these principles of construction without sophistry leads to the reading of §4204 (m) as a legislative directive that the SENTAC

91

guideline sentence be imposed in the absence of stated reasons justifying an enhanced sentence. Plainly, the reading Petitioner suggests of §4204 (m) as limiting the sentencing power of Delaware judges conforms to the rules of statutory construction applicable to Delaware sentencing laws.

### 5). *The Rule Of Lenity And Doctrine Of Constitutional Doubt*

The right to trial by jury is fundamental. *Blakely*, slip opinion, p. 9. The rule of lenity counsels construction of a statute to require a greater, not lesser, protection of the 6th Amendment right to trial by jury. *United States v. Navarro*, supra, 145 F.3d at 587.

Such a construction does not conflict with the limitation of the rule of lenity expressed in 11 Del. C. §203, for that statute applies only to Part I of the Delaware Criminal Code, not Chapter 42 wherein the sentencing statutes are found.

Further, the doubtful constitutional questions that would arise under *Apprendi/Blakely* in the application of its "bright line rule" (*Blakely*, slip opinion at p. 12) if §4204 (m) was to be read as not subject to the jury trial right are avoided by the reading of that statute advanced by Petitioner. The doctrine of constitutional doubt militates for a reading of §4204 (m) that would include the right to trial by jury. *Jones v. United States, supra.*

### *6). TIS Compared To The Washington And Federal Systems*

### *a). The Washington System Compared*

As described in Blakely, the features of the Washington sentencing system that were relevant to a 6th Amendment analysis are as follows: a "shall not exceed" maximum term of incarceration fixed by stature; a "standard range" of sentences – the guideline penalties – that are also statutory; a provision that a judge may exceed the standard range only if "substantial and compelling reasons" justify an "exceptional sentence;" and a statutory listing of non-exclusive aggravating factors justifying sentence enhancement. When a judge imposes an exceptional sentence, findings of fact and conclusions of law must be set forth. In *Blakely*, the judge "could not have imposed the exceptional...sentence on the basis of the facts admitted in the guilty plea." *Blakely*, slip opinion p. 7.

Pursuant to the Washington sentencing scheme, and following a three day non-jury sentencing hearing, the defendant in *Blakely* received a prison sentence of 90 months (37 months above the standard sentence maximum) based upon the trial judge's finding of "deliberate cruelty" in the commission of the offense of kidnapping second degree.[12]

---

[12] *Blakely* makes the point that the sentence imposed by the Washington trial court is an example of the conversion of a "separate offense into a sentencing factor." See *Blakely*, slip opinion page 11 and footnote 11. This is because the sentence imposed

93

### *b). The Federal System Compared*

Petitioner will not presume to tell this Court how the Federal sentencing system operates, but *Booker* makes clear that under the system in place prior to that decision a Federal judge could enhance a sentence above the Federal Sentencing Commission guidelines only where there existed an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into account by the guidelines. *Booker*, slip opinion p. 9.

In *Booker*, the defendant was sentenced to 30 years imprisonment based upon the sentencing judge's post-trial finding that the defendant had possessed a certain quantity of an illegal drug and obstructed justice. That sentence was eight years above the sentence which the jury verdict alone would have supported, *Booker*, slip opinion p. 2.

### *c). The TIS System Compared*

As in the Federal commission model, SENTAC has prescribed "presumptive" sentences that its guidelines declare to be appropriate for

---

in *Blakely* for second degree kidnapping with the "deliberate cruelty" enhancement was essentially the same as for first degree kidnapping. Petitioner's case is an even more dramatic example of this phenomenon: after a non-jury proceeding of approximately forty minutes, the SENTAC assault second degree Class D felony presumptive sentence of 0-2 years was enhanced by *400%* to an eight year term of imprisonment based upon the protection order aggravator. This full sentence of 9 years, 30 days was essentially the same as the *maximum* possible penalty for the assault first degree charge of which Petitioner was acquitted by a jury.

94

the "typical criminal case."[13] Those guidelines are referenced in the statute of general application to sentencings - §4202 (m). "Exceptional sentences" departing from the SENTAC presumptive sentences may be appropriate for "substantial and compelling reasons;" sentences within the guidelines require no explanation.  SENTAC has published a non-exhaustive list of both aggravating and mitigating factors in its Benchbook. Those factors were directly incorporated into the first (i.e., 1984) version of §4204 (m).

The TIS scheme contains every feature found by the Supreme Court to be of significance in a 6th Amendment analysis of the determinative Federal and Washington systems. While there is, of course, difference of language, the functional aspects of these three systems for 6th Amendment purposes are indistinguishable.

After a very brief proceedings, Petitioner was sentenced to 8 years in prison for assault 2nd° and 1 year for trespassing based upon the trial judge's finding as to violation of the protective order  - the severed charge for which Petitioner was awaiting trial. SENTAC presumptive sentences are 0-2 years for the assault and a fine for the trespass.

---

[13] The SENTAC guidelines are set forth in a Benchbook. See footnote 11 and Ap.A178 for relevant excerpts from the Benchbook.

95

**D).  *The TIS Sentencing System As Applied In Petitioner's Case Violates The  6th Amendment Principle of Apprendi/Blakely*___**

The unambiguous statutory mandate requiring a Delaware sentencing judge to state "reasons" for an enhanced sentence places the TIS sentencing system on the *Blakely* side of the *Apprendi* bright line rule. The TIS sentencing scheme is not a true "indeterminate" sentencing system: *Blakely* makes clear that the term "indeterminate" applies to that type of system wherein the sentencing judge has unfettered discretion to impose a sentence within a statutory range without the necessity to find facts or state reasons as a predicate to the sentencing enhancement authority. *Blakely* cites the system employed in New York in *Williams v. New York,* 337 U.S. 241 (1941) as a true "indeterminate" scheme: in *Williams*, the sentencing judge was empowered to impose a penalty of death without the statement of any reason at all. *Blakely*, slip opinion, p.8. That in a sentencing system such as that in *Williams* a judge might *choose* to state reasons to justify a particular sentence is an entirely separate matter from whether the authority to enhance a sentence is dependent upon those reasons.

The amendment of §4204 (m) in the TIS Clarification Act of 1990 eliminated even the modest *unfettered* discretion of a Delaware judge to enhance a sentence 5% above the maximum SENTAC presumptive

96

sentences. Before that 1990 amendment, a judge was completely free to enhance a sentence to 30% of the allowable sentence without stating any justification whatsoever. Post-TIS Clarification Act, however, the judge was given full discretion only within the guideline range - "reasons" are required in the case of *any* departure from the SENTAC "presumptives."

This necessity for "reasons" to enhance is both an significant legislative limitation on the sentencing power and the *Blakely* breakpoint for purposes of applying the *Apprendi* rule. However inartfully expressed, however lacking in direct declaration, however unlike the language employed in other sentencing schemes, §4204 (m) is nonetheless the command of the Delaware General Assembly that the SENTAC guideline sentences *shall* be imposed unless reasons are stated for a departure. The authority of a Delaware judge to exceed those guidelines derives from the existence and statement of those "reasons" in a given case – without such reasons, the judge's power to impose a sentence is limited to the SENTAC presumptive sentences. Although a judge in an indeterminate sentencing regime might find certain facts to be of particular importance with respect to a given sentence, the difference in Delaware is that §4204 (m) makes the judicial power to enhance *dependent* upon the existence of "reasons."

97

To read §4204 (m) otherwise stultifies the General Assembly's clear intent to "statutorily revise" Delaware's pre-1984 discretionary sentencing system, see *Evans* II, slip opinion p. 29, and to emplace a sentencing system that reins in the unlimited discretion of judges. The stated intent of the Delaware legislature was to create a statutory sentencing scheme the purpose of which was "...ensuring certainty and consistency of punishment...", §1, 1984 SENTAC Act, and to define the conditions of aggravation under which an out of guideline sentence may be imposed. *Id*, §2. It is not dispositive that the Delaware legislature has not expressly stated that the SENTAC presumptive standards are "mandatory" for neither has the legislature termed the guidelines "advisory." Rather, the clear legislative direction is that the SENTAC presumptive sentences *shall* be imposed unless there is a statement of reasons not to do so. An indeterminate system – the core of which is broad judicial discretion in sentencing – is antithetical to the General Assembly's stated end. That the Delaware legislature might have been clearer does not alter the meaning of §4204 (m).

A critical question here is this: what sentence would the facts found in the jury verdict alone have supported? The answer is found in §4204 (m) as explained by *Fuller* and *Benge*: without a statement of

98

"reasons" for an enhanced sentence only a sentence within the SENTAC guidelines would be permissible; "the sentencing judge need only state his reasons for imposing a sentence outside the guidelines" [citing §4204(m)]. *Fuller v. State, supra,* (slip opinion p.15); accord, *Benge v. State, supra* (appeal order p.3): "the court must explain its reasons" for a sentence enhancement.

In Petitioner's case, the sentencing judge in fact went beyond the facts found by the jury to establish the reasons for enhancing Petitioner's sentence: "To the extent I am certainly going to exceed the sentencing guidelines, to the extent that an aggravator is needed, it certainly would be the fact that [Petitioner] was subject to a Protection From Abuse Order." (Sentencing Proceeding Transcript, Ap., A29-30). The issues relating to the protection order had been severed for a separate trial (Docket Entry No. 59, July 9, 2003) and a trial thereon was scheduled for two months after the date of Petitioner's October sentencing. The sentencing judge also found "undue appreciation of offense" as an aggravating factor although no particulars of this enhancing factor were explained. (Sentence Order Ap., A160). Whatever was intended in the finding of "undue depreciation," that issue was not presented to Petitioner's jury.

99

What would have happened in Petitioner's appeal to the Delaware Supreme Court if the sentencing judge had failed to state reasons for the enhancement of Petitioner's sentence? *Fuller v. State*, a post-*Blakely* decision, remanded a sentencing to the trial court as a result of the sentencing judge's failing to state adequate reasons for exceeding the SENTAC guideline: such an enhancement could not be based upon an alleged suborning of perjury absent "independent findings necessary to establish willful impediment to or obstruction of justice, or an attempt to do the same through the perjury of another witness." *Fuller v. State*, *supra*, slip opinion p. 18. According to the Delaware Court in *Fuller*, the sentencing judge's authority to enhance a sentence requires not only reasons but "specific facts" sufficient to support the enhancement – in *Fuller*, that meant "independent findings" clearly beyond the scope of anything that would have been presented to the jury at a trial in the guilt-innocence phase of a trial. Fuller, slip opinion, p 18.  In a true "indeterminate" system, the adequacy of reasons for a sentence "enhancement" would not arise as an issue because the sentencing judge would have the power to sentence more severely based upon "no reason at all." *Williams v. New York*, *supra*.

In an indeterminate sentencing system, *Fuller* would not have been reversed because there would be no question of enhancement above an ascertainable level of sentence, e.g., the TIS presumptives.. Yet, the Delaware Court stated the issue in *Fuller as* follows: "The question before us is whether there was competent evidence, and whether the *requisite findings* appear in the record, to support the *trial judge's decision to enhance* Fuller's sentence." *Fuller*, slip opinion, p.15 (emphasis supplied).

*Fuller* serves to illustrate the 6th Amendment problem with the approach taken by the Delaware Court and why that approach is irredeemably in conflict with the *Apprendi/Blakely* holdings. *Fuller* seeks to ground its result on *United States v. Dunnigan*, 507 U.S. 87 (1993), a decision that upheld enhancement of a sentence based upon the defendant's perjury in trial testimony. However, the result in *Fuller* was not mandated by *Dunnigan* and *Booker* holds that the reach of *Dunnigan* is "limited." So while the Supreme Court in *Booker* was seeking to confine *Dunnigan* to sentences within the guidelines ("applying *Blakely* to the Guidelines would invalidate a sentence that relied on such an enhancement if the resulting sentence was outside the range authorized by the verdict," *Booker*, slip opinion, p.15), the Delaware Court was

101

applying *Dunnigan* in *Fuller*, an *enhanced* sentence case. It is not readily apparent how *Fuller* can be reconciled with *both Dunnigan* and *Apprendi/Blakely/Booker*.[14] The bright line of *Apprendi/Blakely* is difficult to discern in its applications by the Delaware Court.

The TIS sentencing system and §4204(m) might not cross the *Apprendi/Blakely* bright line if the reasons relied upon for sentence enhancement did not constitute "facts" – a theoretical but not necessarily practicable possibility; or if "reasons" to justify a sentence were statutorily required for *all* sentences and not just departure from the SENTAC guideline sentences. But that it could be imagined how TIS might be altered to square with *Apprendi/Blakely* does not make it so. Where "reasons" are necessary to an enhancement of a sentence above an otherwise ascertainable level (i.e., the SENTAC "presumptive sentences") and those reasons consist of facts found by a judge alone, "...the jury has not found all of the facts which the law makes essential to

---

[14] Uncertainty has been the hallmark of the Delaware Court's result in sentencing cases of recent date. In addition to the constitutionally muddled rationale in *Fuller*, *Evans* II overruled *Evans v. State*, _ A.2d_ No. 67, 2004, November 23, 2004 (Del.) ("*Evans* I") on the definition of a "life sentence with the possibility of parole." *Evans* I declared its reading of the Delaware statutes relevant to that definition to be the only "principled" reading possible. Four and a half months later, the Delaware Court applied an entirely new set of principles to reverse itself in *Evans* II. Such relativist reasoning also produced *Fuller* in October of 2004.

the punishment...and the judge has exceeded his proper authority."
*Booker*, slip opinion, p.7.

In sentencing Petitioner, the trial judge tied the enhancement of the SENTAC presumptive sentence to the specific §4204 (m) "reasons" stated on the record – the existence of the protective order. Insofar as the record reflects, absent the judge's factual finding as to the protective order (and finding of "undue depreciation"), there was no reason why the SENTAC guideline sentence of 0-2 years imprisonment would not have been imposed. *Cf., Fuller*, slip opinion, p. 18 – the enhancement in *Fuller* would not have been imposed but for the perjury.

TIS labels sentence enhancing facts as "reasons" – the "reasons" used here to enhance Petitioner's sentence were not tried to a jury or admitted by Petitioner at the time of his sentencing. The TIS sentencing system as applied to Petitioner violated the 6th Amendment. That the pendulum of favor may now have swung away from determinate sentencing does not operate to cure the constitutional problem with TIS. As in *Blakely* and *Booker*, a resentencing within the SENTAC "presumptive sentence" is mandated.

## CONCLUSION

**Relief By *Habeas Corpus* Is Warranted On Each Of The Grounds In This Petition**

The factual basis of this petition makes plain that each of the three convictions in Sussex County Superior Court were obtained contrary to established principles of due process. The granting of relief to Petitioner by writ of *habeas corpus* is warranted under 28 U.S.C. §2254, conditioned upon a new trial on the three charges against Petitioner within such time as this Court shall fix.

Further, each of the sentences imposed upon Petitioner exceeded the *Apprendi/Blakely* statutory maximums fir purposes of the 6th Amendment. The writ sought by this Petition should also be granted on that basis, conditioned upon a resentencing.

The scope of review on *habeas corpus* encompasses all prior proceedings, including opinions rendered on state appeals. *Kontakis v. Beyer, supra,* 19 F.3d, at 116. An examination and analysis of the record in this case leads to the conclusion that a writ of *habeas corpus* should be granted.

John H. Benge, Jr.
Sussex Correctional Inst.
Date: July 10, 2005                    PO Box 500
Georgetown, DE 19947

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN H. BENGE, JR. | § | |
| | § | NO. 137, 2004 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE | § | in and for New Castle County |
| | § | Cr. ID. No. 0301005493 |
| Plaintiff Below | § | |
| Appellee. | § | |

Submitted: October 13, 2004
Decided: November 12, 2004

Before **STEELE**, Chief Justice, **Holland** and **Berger**, Justices.

ORDER

This 12th day of November, 2004, on consideration of the briefs of the parties, it appears to the Court that:

1) John H. Benge, Jr., appeals from his conviction, following a guilty plea, of two counts of burglary third degree, three counts of unlawful interception of communications (wiretapping), and one count of attempted wiretapping. Benge argues that his three year prison sentence for the first wiretapping offense violated his constitutional right to trial by jury.

2) Benge admitted that he illegally entered his former wife's home, and installed a recording device in order to eavesdrop on her. He entered his guilty plea on these charges three months after being sentenced on several violent felony charges, which also involved his former wife and her boyfriend. After hearing from the victim and Benge, the Superior Court sentenced Benge outside the SENTAC guidelines because it found "a lack of remorse, among other matters."

1

3) Benge's sole argument on appeal is that, under the holding in *Blakely v. Washington*,[1] the trial court violated his constitutional right to a trial by jury because it exceeded the SENTAC sentencing guidelines. In *Blakely*, the United States Supreme Court invalidated a sentence that exceeded the "standard range" but not the statutory maximum term for the crime. The governing state sentencing scheme required courts to find "substantial and compelling reasons" before imposing an "exceptional sentence" (one that exceeds the standard range), and provided appellate review of the record in support of the trial court's findings. *Blakely* invalidated the exceptional sentence because it exceeded the maximum sentence that could be imposed based solely on a jury verdict.

4) *Blakely* does not impact Delaware's sentencing scheme because the SENTAC guidelines are voluntary and non-binding. As we explained in *Siple v. State.* [2]

---

[1] 124 S.Ct. 2531 (2004).

[2] 701 A.2d 79, 82-83 Del. 1997)(Citations omitted).

2

On September 15, 1987, this Court issued Administrative Directive Number Seventy-Six. That directive implemented the sentencing guidelines that had been developed by SENTAC, and provided that:

> 2. Any judge who finds a particular sentencing standard inappropriate in a particular case because of the presence of aggravating or mitigating or other relevant factors need not impose a sentence in accordance with the standards but such judge shall set forth with particularity the reasons for the deviation…
>
> \*      \*      \*
>
> 3. The sentencing standards are considered voluntary and nonbinding; thus no party to a criminal case has any legal or constitutional right to appeal to any court a statutorily authorized sentence which does not conform to the sentencing standards.

This Court's Administrative Directive…requires that reasons be given for deviations from SENTAC's sentencing guidelines because this Court does have appellate jurisdiction to review criminal sentences on the basis of alleged: unconstitutionality; factual predicates which are either false, impermissible, or lack minimum indicia of reliability; judicial vindictiveness, bias, or sentencing with a "closed mind;" and any other illegality. Except for these constitutional and legal constraints, it is well-established that appellate review of criminal sentences is limited in Delaware to a determination that the sentence is within the statutory limits. Delaware, unlike the federal and several state jurisdictions has not provided for appellate review of criminal punishments that deviate from sentencing guidelines.

Thus, the trial court must explain its reasons for doing so, but it is authorized to exceed the SENTAC guidelines without making any factual findings beyond those reflected in the jury's verdict.

3

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is, AFFIRMED.

BY THE COURT:


/s/ Carolyn Berger
Justice

4

IN THE SUPREME COURT OF THE STATE OF DELAWARE

JOHN H. BENGE, JR.,                    )
                                       ) No. 544, 2003
    Defendant Below,           )
    Appellant,                 ) Court Below: Superior Court
                                       ) of the State of Delaware in
v.                                     ) and for Sussex County
                                       )
STATE OF DELAWARE,                     ) Cr. ID No. 0210012355
                                       )
    Plaintiff Below,           )
    Appellee.                  )

Submitted:  September 15, 2004
Decided:  November 15, 2004

Before **STEELE**, Chief Justice, **BERGER** and **JACOBS**, Justices.

*O R D E R*

This 15th day of November 2004, on consideration of the briefs of the parties, it appears to the Court that:

1.    John H. Benge, Jr., appeals his convictions in Superior Court of assault in the second degree, offensive touching, and trespass in the first degree. Benge advances four different claims of error. First, he claims that the trial judge improperly admitted prior bad act evidence. Second, Benge claims that the trial judge erred by failing to declare a mistrial following an improper prosecutorial remark. Third, he claims that the trial court judge erred by not including a specific unanimity instruction to the jury in connection with the lesser-included offense of second degree assault. Finally, Benge claims that the trial judge gave an improper

jury instruction on the lesser-included offense of third degree assault. After a careful review of the record, we hold that there was no abuse of discretion in admitting the prior bad act evidence under Rule 404(b). Furthermore, we hold that the trial court committed no error in instructing the jury to disregard the improper prosecutorial remark and committed no error in instructing the jury on the lesser-included offenses of second and third degree assault. Accordingly, we affirm.

2.     In response to a 911 call, the Rehoboth Beach Police arrived at the Oak Grove Motor Court Inn to find Benge and Edward Stacey Smith involved in an altercation outside the motel. Smith, who was on top of Benge at the time the police arrived, had sustained a gunshot wound to his chest. At the scene, the police recovered two loaded handguns, two speed loaders, several live, loose .22 caliber rounds, and two holsters which were attached to Benge's belt.

3.     This incident was the result of the deterioration and later dissolution of the marriage between Benge, and his ex-wife, Donna Kay Lovett. Lovett informed Benge that she wanted to separate and moved into her brother's North Wilmington home. In fact, Benge had checked her phone records, and placed a recording device under Lovett's bed with a microphone attached to the mattress. After some time, Lovett returned to the couple's home in Centreville. From that point on Benge continually sought reassurance from Lovett that she had not fallen in love with someone else.

2

4.    In October 2001, Lovett filed for divorce, left the Centreville home and permanently moved to her brother's house in North Wilmington. After Lovett left, Benge took a set of her new house keys and duplicated them. He then used those duplicate keys to enter the North Wilmington home on several occasions, continuing to do so even after the divorce had become final. On one of these occasions he placed a voice-activated tape recorder in the dresser located in Lovett's bedroom. Furthermore, her brother, the owner of the North Wilmington home, saw Benge driving near the house at around the time of the break-in.

5.    After the divorce was final, Lovett began a new relationship with Smith, a man whom she had known for several years. Smith was an elementary school teacher and worked during the summer as a maintenance man at Oak Grove, which Lovett's family owned.

6.    In October 2002, Benge drove to the motel and took with him two loaded handguns with holsters, extra ammunition in two speed-loaders, a pair of wirecutters, and a can of high-intensity pepper spray. When Benge reached the motel, he illegally entered room number five, using a duplicate set of keys. After consuming alcohol, he left the motel room and went in search of Lovett and Smith. Once outside the motel, Benge cut the telephone line that ran to the facility. He then entered the motel office, which has separate apartments on each side. Benge entered one of the apartment bedrooms where he found Lovett. He confronted her,

3

demanding to know where Smith was. After apparently failing to get the answer he wanted, Benge sprayed Lovett in the face with the pepper spray. Lovett ran from the bedroom to the living room and tried to unlock the door of the apartment. Benge then pulled her back and sprayed her again.

7. Smith heard Lovett screaming and entered the room from the other apartment. When Smith entered the room Benge released Lovett, whom he had been holding with a weapon at her face. Lovett then fled to the motel office and managed to call the police on her cell phone. Lovett observed Benge and Smith struggling in the apartment and heard two gunshots.

8. After Benge released Lovett, he sprayed Smith in the face and chest with the pepper spray. A struggle ensued and Benge drew one of his handguns. Smith heard gunshots and tried to push Benge out the door. As a result of the struggle, Smith sustained a gunshot wound to his chest, a punctured right eardrum, irritated eyes, a gouge in his left foot, and other less serious injuries.

9. At trial Benge testified that he had been so distraught over the divorce that he had decided to kill himself and claimed that he wanted to commit suicide in front of Lovett and Smith. Benge expressly denied any intention to harm anyone else. Benge further claimed that once inside the motel office, however, he decided against suicide, but panicked when he saw Lovett and as a result sprayed her with the pepper spray. When Smith charged him, he also sprayed Smith. Benge also

4

testified that during the struggle, he could not see what was going on because his sweatshirt was pulled over his head. Although, Benge acknowledged that his gun went off, he denied pulling the trigger. Benge did admit, however, that he had duplicated Lovett's keys and used those keys to enter the North Wilmington home where he had placed the tape recorder.

10.     In his first claim, Benge challenges the admission, over his objection, of evidence of his prior bad acts in connection with Lovett, specifically the evidence of the two earlier illegal entries. The first occurred in December 2001 at Lovett's North Wilmington home and the second occurred in the spring of 2002 at the same residence. Benge contends that the evidence was irrelevant and unfairly prejudicial under Delaware Rule of Evidence 404(b). We review the decision to admit evidence under Rule 404(b) for abuse of discretion.[1]

11.     There was no abuse of discretion in admitting the evidence of Benge's prior bad acts. The evidence of the earlier illegal entries was presented to prove Benge's intent and to establish his motive for breaking into the motel and attacking both Lovett and Smith. Proof of intent and proof of motive are proper purposes for admitting evidence of prior bad acts under Rule 404(b).[2] The alleged entry was committed in an effort to record conversations between Lovett, with whom Benge

---

[1] *Allen v. State*, 644 A.2d 982, 985 (Del. 1994).

[2] *See Vanderhoff v. State*, 684 A.2d 1232, 1233 (Del. 1996).

5

was obsessed, and Smith, toward whom Benge had animosity.  These prior bad acts add substantially to proving intent and establishing a motive.  The trial judge performed the appropriate tests under Rule 403 and *Getz v. State*,[3] properly balancing the probative value of the prior bad act evidence against the possibility of unfair prejudice to the accused.

12.    Benge next contends that the trial judge erred by failing to declare a mistrial following an improper prosecutorial remark.  After Benge was cross-examined by the prosecutor, during which he testified to his hope that Smith had not been shot during the altercation, the prosecutor remarked "[y]ou are quite a humanitarian, aren't you?"[4]  The defense objected to the remark and the trial judge immediately instructed the jury to disregard the comment.  Following the testimony a luncheon recess was called and the trial judge conferred with counsel.  The trial judge asked defense counsel if there was anything more he would like the Court to do.  At this point defense counsel did not ask for a mistrial; instead, he asked the trial judge to "go a little further and tell [the jury] just to make it very clear that's not to be given any consideration whatsoever."[5]  Immediately following the recess the trial judge instructed the jury:

---

[3]  538 A.2d 726 (Del. 1988) (establishing the following six factors as the test to use when deciding to admit evidence under Rule 404(b)).

[4]  Trial Tr. at F-131.

[5]  Trial Tr. at F-142.

6

> That sort of [comment] should not happen.   Ms. Wither is an
> experienced prosecutor and I was surprised when she said that.  When
> I tell you to disregard that, it is very important that you just disregard
> that.   It is not appropriate for any attorney who appears in this
> courtroom to express an opinion about any witness or any defendant
> who comes up here and testifies.  So when I tell you to disregard that,
> I say that as strongly as I possibly can.  So please disregard it and we
> will go on.[6]

13.    Since Benge neither objected to this cautionary instruction nor

requested a mistrial, this challenge, raised for the first time on appeal, must be

reviewed for plain error.[7]  Because the trial judge forcefully cautioned the jury, in

detail, not once, but twice, there is no plain error.  Under these circumstances the

instructions given by the trial judge were sufficient to cure any unfair prejudice

resulting from the improper prosecutorial remark.[8]

14.    In his third claim, Benge contends that the trial judge erred by not

including a specific unanimity instruction on the lesser-included offense of second-

degree assault.  Benge argues that a unanimity instruction was required because a

conviction for second degree assault mandates a finding that he injured Smith "by

means of a deadly weapon or dangerous instrument."[9]  Benge argues that the

---

[6] Trial Tr. at F-148.

[7] DEL. SUPR. CT. R. 8; *Capano v. State*, 781 A.2d 556, 653 (Del. 2001).

[8] *See Pennell v. State*, 602 A.2d 48, 52 (Del. 1991) ("This Court has repeatedly held that even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks.") (citations omitted); *accord Steckel v. State*, 711 A.2d 5, 11-12 (Del. 1998).

evidence adduced at trial would have enabled the jury to find that he injured Smith by means of either the handgun or the pepper spray. According to Benge, given the choice between the handgun and the pepper spray it cannot be determined if the jury unanimously agreed on the specific instrumentality used to injure Smith.

15. We review Benge's third claim for plain error because this argument was not raised at trial.[10] A specific unanimity instruction is not required in every case.[11] Although here there is evidence that Benge both pepper-sprayed and shot Smith, the definition of "dangerous instrument" that was submitted to the jury did not mention pepper spray. The jury instruction, on the other hand, did make a specific reference to a firearm. Moreover, the trial judge omitted the reference to a "disabling chemical spray," which is part of the statutory definition of "dangerous instrument."[12] Based on this definition the jury could not have reasonably found that Benge used a "disabling chemical spray" to severely injure Smith. Accordingly, they must have concluded that the dangerous instrument was a firearm and there was no plain error.

---

[9] *See* 11 *Del. C.* §612(a)(2).

[10] Del. Supr. Ct. R. 8; *Capano*, 781 A.2d at 653.

[11] *See Ayers v. State*, 844 A.2d 304, 309 (Del. 2004); *Dixon v. State*, 673 A.2d 220, 228 (Del. 1996).

[12] 11 *Del. C.* §224(4).

16.    In his fourth claim, Benge contends that the trial judge erred by not including the complete statutory definition of "dangerous instrument" in the jury instructions on the lesser-included offense of third degree assault. The instruction, similar to the one given on second degree assault, specifically omitted the term "disabling chemical spray" from the statutory definition of "dangerous instrument." Because this claim is raised for the first time on appeal, we review for plain error.[13]

17.    There is no showing of plain error here because the omission of the instrumentality of a "disabling chemical spray" in the jury instruction meant that the jury's assessment of the evidence was being confined by the trial judge's instruction and by the State's theory of the case, namely, that Benge attempted to kill Smith by shooting him in the chest. The State never claimed that Benge attempted to kill Smith by dousing him with pepper spray. Moreover, the jury convicted Benge of *second degree* assault rather than *third degree* assault. There can be no reversible error based on this jury instruction because the jury did not rely on this instruction to convict Benge; he was convicted of second degree assault. The third degree assault instruction had no bearing on the outcome of Benge's case. Accordingly, there was no plain error.

---

[13] DEL. SUPR. Ct. R. 8; *Capano*, 781 at 653.

9

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.

BY THE COURT:


/s/ Myron T. Steele
Chief Justice

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WARD T. EVANS, | § | |
| | § | No. 67, 2004 |
| Defendant Below, | § | |
| Appellant, | § | Court Below:  Superior Court of |
| | § | the State of Delaware in and for |
| v. | § | Kent County |
| | § | |
| STATE OF DELAWARE, | § | Cr. I.D. No. 88K01678DI |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:  September 22, 2004
Decided:    November 23, 2004

Before **STEELE**, Chief Justice, **HOLLAND, BERGER** and **JACOBS**, Justices, and **HARTNETT**, Justice (Retired),[1] constituting the Court *en Banc*.

Upon appeal from Superior Court.  **REVERSED and REMANDED.**

Ward T. Evans, Smyrna, Delaware; *Pro Se* Appellant.

Loren C. Meyers and Gregory E. Smith, Esquires, Deputy Attorneys General, Department of Justice, Wilmington; for Appellee.

*Per Curiam*:

---

[1] Sitting by designation pursuant to DEL. CONST. art. IV, § 38 and DEL. CODE ANN. tit. 29, § 5610(a)(2) (2001) and DEL. SUPR. CT. R. 2, 4.

The defendant below, Ward T. Evans, appeals from an order of the Superior Court denying his motion for correction of an illegal sentence. We reverse the Superior Court's denial of Evans' motion and remand the case to the Superior Court for a determination of whether Evans has earned any good behavior or merit credits, and for a recalculation of Evans' conditional release date consistent with our holding that Evans' life sentence should be considered a 45-year term.

### *Facts*

On September 29, 1982, a jury convicted Evans of first degree rape. Evans was sentenced to life in prison with the possibility of parole. The status sheet completed by the Department of Corrections did not give Evans a conditional release date. Rather, it listed Evans' maximum release date as "death" and recites his maximum sentence, less good time, as "life."

In 1993, 1996 and 1999, the Board of Parole denied Evans' requests for parole. On January 8, 2004, Evans filed a motion with the Superior Court, claiming that his sentence was illegal. Evans argued that under the conditional release statute he was entitled to have a conditional release date calculated as if his life sentence were a 45-year term.

The Superior Court denied Evans' motion, and Evans appealed. On appeal Evans maintains that this Court's decision in *Crosby v. State*[2] requires that his life

---

[2] 824 A.2d 894 (Del. 2003).

sentence be calculated as a 45-year term for purposes of determining his qualification for conditional release. We agree.

### The Proper Term of Years for Calculating
### Evans' Conditional Release Date

Evans' appeal presents issues of statutory interpretation, which this Court reviews *de novo*.[3] As long as a sentence falls within the statutory maximum, an order of the Superior Court denying a motion for modification of that sentence is reviewed for abuse of discretion.[4]

Under Superior Court Rule 35(a), a defendant is entitled to have an illegal sentence corrected at any time. Evans argues that his sentence, as applied by the Department of Corrections, is illegal, because it does not provide a conditional release date. Evans urges that the conditional release statute[5] incorporates the definition of a life sentence that is set forth in the parole statute,[6] and that under that latter definition, his life sentence must be fixed as a 45-year term for purposes of calculating his conditional release date.

Sections 4346 and 4348 of Title 11 establish the rules for the parole and the conditional release of inmates. For purposes of determining eligibility for parole,

---

[3] *State v. Lewis*, 797 A.2d 1198, 1199 (Del. 2002); *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203, 1205 (Del. 1997).

[4] *Lewis*, 797 A.2d at 1202; *Mayes v. State*, 604 A.2d 839, 842-43 (Del. 1992).

[5] 11 *Del. C.* § 4348.

[6] 11 *Del. C.* § 4346.

2

Section 4346(c) expressly states that a life sentence should be considered "a fixed term of 45 years." Section 4348 provides that an inmate is entitled to conditional release at the expiration of the maximum term sentenced, less any merit and good time credits earned. Although Section 4348 contains no separate definition of "life sentence," it does provide that a person conditionally released shall "be deemed as released upon parole."

Evans contends that Section 4348 incorporates Section 4346(c)'s definition of a life sentence as a 45-year term. In 1997, in *Jackson v. Multi-Purpose Criminal Justice Facility*, this Court held that Section 4348 did not incorporate the 45-year term defined by Section 4346. In 1998, however, we expressly overruled that holding in *Crosby v. State*, in which we held that Sections 4346(c) and 4348 must be read *in pari materia*, and that as so read, Section 4348 incorporates Section 4346(c)'s definition of a life sentence as a 45-year term.

We noted in *Crosby* that Sections 4346 and 4348 were enacted at the same time and are contained in the same chapter of the Delaware Code. Section 4346(c) provides that a life sentence must be considered as a 45-year term for purposes of both determining eligibility for parole under Section 4346(a) and accelerating that eligibility through merit and good behavior credits. Section 4348 provides that an inmate's conditional release date can be accelerated by merit and good behavior credits, and that conditional release shall "be deemed as on parole." On that basis,

3

we conclude that Section 4348 incorporates Section 4346(c)'s definition of a life sentence as a fixed 45-year term.[7]

Our ruling in *Crosby* controls Evans' life sentence. As such, that sentence is illegal because Evans' maximum release date does not reflect that 45-year term. Although the State urges us to limit our holding in *Crosby* to felons sentenced under the habitual offender statute, there is no principled way to read *Crosby* in that manner. Although the defendant in *Crosby* was sentenced under the habitual criminal statute,[8] our holding with respect to Sections 4346(c) and 4348 did not in any way turn on that fact.

We limit our holding in this case to crimes committed before June 30, 1990, the effective date of the Truth in Sentencing Act of 1989. That Act prospectively eliminated good time credits for inmates serving a life sentence imposed for a Class A felony.[9] As we recognized in *Crosby*, by eliminating such good time credits, the General Assembly intended that a life sentence imposed for Class A felonies would no longer be considered a term of 45 years, but rather would be a

---

[7] *Crosby*, 824 A.2d at 899.

[8] 11 *Del. C.* § 4214.

[9] 11 *Del C.* § 4381(a).

4

natural life sentence.[10]    The Truth in Sentencing Act does not control Evans'

sentence, however, because the crime for which he was sentenced was committed

before June 30, 1990.    Accordingly, Evans is entitled to have his conditional

release date accelerated by whatever good time credits he has earned or may earn

in the future.

Both parties raise the issue of whether Evans has earned any good time or

merit credits.[11]    The record does not contain sufficient information to permit a

calculation of Evans' good time or merit credits.   On remand, the Superior Court

shall address that issue, so that any credits earned by Evans will be applied to the

45-year term so as to advance his conditional release date.

### Conclusion

For the foregoing reasons, the Superior Court's order refusing to modify

Evans' sentence was erroneous.   The judgment of the Superior Court is therefore

reversed and this matter is remanded to the Superior Court for a determination of

---

[10] *Crosby*, 824 A.2d at 900.   The General Assembly, by amending the Delaware Code in this manner, impliedly recognized that before the amendments a life sentence was not for a person's natural life, but rather for a 45-year term.

[11] 11 *Del. C.* § 4382 (1987) allows an inmate to earn good behavior ("good time") credits when he has not been guilty of any violation of discipline or any rules of the Department of Corrections. 11 *Del. C.* § 4384 (1987) allows an inmate to earn merit credits by participating in rehabilitation programs offered by the Department of Corrections.  Section 4384 was repealed by 67 Del. Laws, c. 130, effective July 17, 1989, and the provisions for "good time" credits are now contained in Section 4381.

whether Evans has earned any good time or merit credits, and for an appropriate adjustment of his "maximum release date."

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WARD T. EVANS, | § | |
| | § | No. 67, 2004 |
| Defendant Below, | § | |
| Appellant, | § | Court Below – Superior Court |
| | § | of the State of Delaware, |
| v. | § | in and for Kent County |
| | § | Cr. ID. No. 88K01678DI |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: March 16, 2005
Decided: April 11, 2005

Before **STEELE**, Chief Justice, **HOLLAND, BERGER, JACOBS** and **HARTNETT**,[1] Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

James Brendan O'Neill, Esquire, Bernard J. O'Donnell, Esquire and James D. Nutter, Esquire, Assistant Public Defenders, Wilmington, Delaware, for appellant.

Loren C. Meyers, Esquire, Gregory E. Smith, Esquire and Kim E. Ayvazian, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Thomas J. Allingham, II, Esquire, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, amicus curiæ.[2]

***Per Curiam***:

---

[1] Sitting by designation pursuant to Del. Const. art. IV, § 38 and Del. Code Ann. tit. 29, § 5610(a)(2) (2001) and Del. Supr. Ct. R. 2, 4.

[2] This Court appointed Mr. Allingham to act as amicus curiæ. We appreciate his *pro bono* professional services.

This is an appeal from a final judgment of the Superior Court. In an opinion issued by this Court on November 23, 2004, that judgment was reversed. As a matter of Delaware law, however, our prior decision in this proceeding did not become final.

During the pendency of this appeal, House Bill No. 31[3] was enacted by the General Assembly and signed into law by the Governor, although the Governor questioned its constitutionality.[4] House Bill No. 31 declares the November 23, 2004 decision in this specific proceeding "null and void," directs this Court generally on matters of statutory construction, and states that the "General Assembly asserts its right and prerogative to be the ultimate arbiter of the intent, meaning, and construction of its laws." In this opinion, we hold that House Bill No. 31 is unconstitutional in its entirety. That legislation, therefore, has no bearing on our reconsideration of the merits of Evans' appeal.

The question presented in this appeal is whether the life sentence currently being served by Evans makes him eligible for release from incarceration *only* if parole is granted. The answer depends upon whether

---

[3] 75 Del. Laws, c. 1, § 1.

[4] In a letter requesting the Justices' opinions concerning the constitutionality of House Bill No. 31, the Governor stated: "I question the constitutionality and enforceability of several provisions of the bill." As a result of this decision, that request becomes moot.

2

Evans' life sentence is controlled by this Court's holding in *Jackson v. State*[5]

or by our holding in *Crosby v. State*.[6] We conclude that Evans' life sentence

is controlled by the holding in *Jackson*.    Therefore, unless he is granted

parole, Evans is not eligible for release from incarceration prior to his death.

In this opinion, we reconsider our prior decision.    Although *en Banc*

opinions are not withdrawn frequently, it does happen occasionally.[7]    We

have concluded that the opinion issued by this Court on November 23, 2004,

must be withdrawn.    We have also concluded that the judgment of the

Superior Court must be affirmed.

### *Facts*

On September 29, 1982, a jury convicted Evans of Rape in the First

Degree.    Evans was sentenced to life in prison with the possibility of parole.

The status sheet completed by the Department of Correction did not give

Evans a conditional release date.    Rather, it listed Evans' maximum release

date as "death" and recites his maximum sentence, less good time, as "life."

In 1993, 1996 and 1999, the Board of Parole denied Evans' requests

for parole.    On January 8, 2004, Evans filed a motion for post-conviction

---

[5] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).
[6] *Crosby v. State*, 824 A.2d 894 (Del. 2003).
[7] *See Haas v. United Tech. Corp.*, 450 A.2d 1173 (Del. 1982) (prior *en Banc* opinion withdrawn); *Pathe Indus., Inc. v. Cadence Indus. Corp.*, 425 A.2d 952 (Del. 1981) (prior *en Banc* opinion withdrawn).    *Compare Gondek v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26 (1965) (reopening a final judgment in the interests of justice).

3

relief in the Superior Court, claiming that his sentence was illegal. Evans argued that under the conditional release statute in existence when his crimes were committed, he was entitled to have a conditional release date calculated as if his life sentence were a term of forty-five years.

The Superior Court denied Evans' motion. It did so without any analysis and without issuing an opinion. The Superior Court's ruling is simply a checked box on a preprinted form. Evans then appealed.

On appeal, Evans argues that this Court's decision in *Crosby v. State*[8] requires that his life sentence be calculated as a forty-five year term for purposes of determining his qualification for conditional release. In its initial answering brief with this Court, the State admitted that Evans' argument was correct. Thereafter, this Court granted the State's motion to withdraw that brief, after which the State filed a "Substituted Answering Brief," now arguing that Evans' case is controlled by this Court's decision in *Jackson v. State*.[9]

As earlier noted, our opinion of November 23, 2004 did not become final. We later decided to reconsider that opinion and asked the parties to file supplemental memoranda. Unfortunately, despite the serious issues presented in this case, the State initially failed to address one of our

---

[8] *Crosby v. State*, 824 A.2d 894 (Del. 2003).
[9] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).

4

inquiries, and we directed the State to file a complete response.  The supplemental briefing is now concluded.

### House Bill No. 31

House Bill No. 31 declares that the November 23, 2004 decision of this Court in this very proceeding to be "null and void."[10]  House Bill No. 31 also declares that the Delaware Constitution "vests authority and sole responsibility for lawmaking in the General Assembly."  House Bill No. 31 further provides that "the General Assembly asserts its right and prerogative to be the ultimate arbiter of the intent, meaning, and construction of its laws, and to vigorously defend them."[11]

### Separation of Powers

The defining principle of the American constitutional form of government is separation of powers.[12]  In the United States, the foundation for both our national and state governments are three separate branches – the legislative, executive, and judicial, each coordinate and in the main

---

[10] *See* House Bill No. 31, Section 1, § 5402.

[11] *Id.*

[12] *See* M.J.C. Vile, *Constitutionalism and the Separation of Powers* 1-175 (1967); and William B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Studies in Political Science, IX [New Orleans, 1965]).  *See also,* John A. Fairlie, *The Separation of Powers,* 21 Mich. L. Rev. 393-436 (1922); Malcolm P. Sharp, *The Classical American Doctrine of "The Separation of Powers,"* 2 U. Chi. L. Rev. 385-436 (1935); B.F. Wright, Jr., *The Origins of the Separation of Powers,* 13 Economica 169-85 (1933); William S. Carpenter, *The Separation of Powers in the Eighteenth Century,* 22 Amer. Pol. Sci. Rev. 32-44 (1928); Francis G. Wilson, *The Mixed Constitution and the Separation of Powers,* 15 Sw. Soc. Sci. Q. 14-28 (1934-35).

independent of the others.[13]  As the United States Supreme Court stated over

one hundred years ago:

> It is believed to be one of the chief merits of the American
> system of written constitutional law, that all powers intrusted to
> government, whether State or national, are divided into the
> three grand departments, the executive, the legislative, and the
> judicial.   That the functions appropriate to each of these
> branches of government shall be vested in a separate body of
> public servants, and that the perfection of the system requires
> that the lines which separate and divide these departments shall
> be broadly and clearly defined.   It is also essential to the
> successful working of this system that the persons intrusted
> with power in any one of these branches shall not be permitted
> to encroach upon the powers confided to the others, but that
> each shall by the law of its creation be limited to the exercise of
> the powers appropriate to its own department and no other.[14]

The American tripartite system of separating governmental authority

was the result of a combination of historical experience and contemporary

political theory.   The desirability of dividing the power of government into

three main divisions is traceable to numerous philosophers beginning with

Aristotle.[15]   The more immediate influences on colonial America, however,

were philosophers such as Charles Montesquieu,[16] Jean Jacques Rousseau,[17]

---

[13] John A. Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393 (1922).
[14] *Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880).  M.J.C. Vile, *Constitutionalism and the Separation of Powers* 13 (1967).
[15] In his *Politics*, based on his study of Athens and other Greek city states, Aristotle identifies three main governmental agencies:  the general assembly, deliberating upon public affairs; the public officials; and the judiciary.  Book IV, ch. 14, *cited in* John A. Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393, 393 (1922).
[16] *See* Baron De Montesquieu, *The Spirit of the Laws* (Thomas Nugent trans., 1949).
[17] *See* Paul M. Spurlin, *Rousseau in America*, 1 French-American Review 8-16 (1948).

6

and John Locke;[18] and English common law scholars like Edward Coke, Henry deBracton, and William Blackstone.[19]   In advising against the concentration of governmental power, Montesquieu wrote:

> When the legislative and executive powers are united in the same person, or in the same body of magistracy, there can be then no liberty . . . .  Again, there is no liberty, if the power of judging be not separated from the legislative and executive powers.  Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator.   Were it joined to the executive power, the judge might behave with all the violence of an oppressor.  There would be an end to everything, were the same man, or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals.[20]

These principles – derived from philosophies and theories of political science – were well known to American statesmen in 1776.   Because separation of powers was generally considered by American colonists to be a fundamental maxim of proper government, its absence under the English rule of King George III eventually became intolerable and led to the American Revolution.

---

[18] John Locke, *The Second Treatise of Government* §§ 221, 243 (T. Peardon ed., 1952).
[19] Daniel A. Farber & Suzanna Sherry, *A History of the American Constitution* 6 (1990). 1 William Blackstone, *Commentaries on the Laws of England* 150-51 (a Facsimile of the First Edition of 1765-69 by University of Chicago Press 1979).
[20] Baron De Montesquieu, *The Spirit of the Laws* n. 39.

7

### First State Constitutions

The Declaration of Independence was the catalyst that elevated the separation of powers doctrine into what is now known as "a first principle of free government."[21]    The Declaration of Independence expressed the concerns that required "dissolv[ing] the political bands" with England. Those concerns included interference with the judicial process by the King and Parliament, by: obstructing "the Administration of Justice by refusing his Assent to Laws for establishing Judiciary Powers;" making "Judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries;" and "depriving us in many cases of the benefits of Trial by Jury."

Independence from England meant that each of the former colonial states became a new sovereign entity. In 1776, that status required each colonial state to draft its own constitution. The framers of the first state constitutions had lived under a system of intermingled legislative and judicial powers. In the 17th and 18th centuries colonial legislatures in America functioned as courts of equity of last resort, by either hearing

---

[21] Philadelphia *National Gazette* (Gaillard Hunt, ed., Feb. 6, 1792), quoting VI *The Writings of James Madison* 91 (N.Y., 1900-10). William B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Studies in Political Science IX [New Orleans 1965]).

original actions or providing appellate review of judicial judgments.[22]

Often, however, those hybrid legislative and judicial assemblies decided to inject themselves into the judicial process by enacting special bills.    It was common for such legislation to nullify the judicial judgment in a particular case.[23]

The first state constitutions reflect the desirability of separating the legislative from the judicial power, prompted by royal and legislative interference with judgments of the American colonial courts.    Notably, Delaware's 1776 Constitution[24] and all of the other first state constitutions, provided for the same three departments.    Six of those constitutions contained a general clause expressly allocating the powers of government among these three branches – the legislative, executive, and judicial. Although the specific provisions varied, the legal result reflected in each of the first state constitutions was the same: to define the sovereign power with

---

[22] Gordon S. Wood, *The Creation of the American Republic 1776-1787*, 154-55 (1969).

[23] M. Clarke, *Parliamentary Privilege in the American Colonies* 49-51 (1943).  *See, e.g., Judicial Action by the Provincial Legislature of Massachusetts*, 15 Harv. L. Rev. 208 (1902) (collecting documents from 1708-1709); 5 Laws of New Hampshire, *Including Public and Private Acts, Resolves, Votes, Etc.*, 1784-1792 (Metcalf ed. 1916); Robert Ludlow Fowler, *The Origin of the Supreme Judicial Power in the Federal Constitution*, 29 Am. L. Rev. 713 (1895).  *See also* 1 James Bradley Thayer, *Cases on Constitutional Law* 78 n.1 (Cambridge, Mass., George H. Kent ed., 1895); *Appeals from Colonial Courts to the King in Council, with Especial Reference to Rhode Island*, Ann. Rep. of the Am. Hist. Ass'n 299-350 (1894).

[24] *State ex rel. Biggs v. Corley*, 172 A. 415, 419 (Del. 1934).

9

precision and to restrain its exercise within marked boundaries.[25]

From 1776 until 1787, the doctrine of separation of powers was expanded and exalted to the foremost position in the American framework of constitutionalism.    By the 1780's many believed that the principle of separation of powers was "the basis of all free governments," the most important attribute of the kind of government for which they had fought the American Revolutionary War.[26]    According to Thomas Jefferson, "the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others."[27]    In a September 28, 1787 letter to John Adams, Jefferson wrote:    "The first principle of a good government is certainly a distribution of its powers into executive, judiciary, and legislative and a subdivision of the latter into two or three branches."[28]

---

[25] *See* Randy J. Holland, *State Constitutions:  Purpose and Function*, 69 Temp. L. Rev. (1996).    *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 45 (1996) (Souter, J., dissenting) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 398-99 (1798) (Iredell, J., dissenting in part)).

[26] Portsmouth, *N.H. Gazette*, Mar. 15, 1783; Jefferson, *Notes on Virginia*, ed. Peden, 120. 3 Jefferson's Words (Ford ed., 1892), 424-25.

[27] Jefferson, *Notes on Virginia*, ed. Peden, 120.  3 Jefferson's Words (Ford ed., 1892), 424-25.

[28] 3 *Jefferson's Words* (Ford ed., 1892), 424-25.

### United States Constitution

At the time Jefferson wrote that letter to Adams, the United States Constitution was submitted to the states for ratification in 1787.  A primary collective concern of the states was whether the proposed Constitution included strong provisions for separating the powers of government.  The Federalist papers were written in defense of the proposed federal Constitution.  They were published in 1787 and 1788 as the joint work of Alexander Hamilton, James Madison, and John Jay.

In an effort to give the states assurance during the ratification process, Federalist No. 81 explained that the proposed federal Constitution's formulation for separating the powers of government was modeled after many existing state constitutions.  Indeed, Delaware's 1776 Constitution was cited as one of the model state constitutions for separating legislative and judicial powers:

> These considerations teach us to applaud the wisdom of those states, who have committed the judicial power in the last resort, not to a part of the legislature, but to distinct and independent bodies of men.  Contrary to the supposition of those, who have represented the plan of the convention in this respect as novel and unprecedented, it is but a copy of the constitutions of New Hampshire, Massachusetts, Pennsylvania, Delaware, Maryland, Virginia, North-Carolina, South-Carolina

11

and Georgia; and the preference which has been given to these models is highly to be commended.[29]

### *Legislative Interference With Specific Cases Prohibited*

Federalist No. 81 also explained that the separation of powers in the proposed federal Constitution would preclude the national legislature from interfering with a "particular case," in exactly the same way that the state constitutions prohibited such legislative interference.

> A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases. This is the principle, and it applies in all its consequences, exactly in the same manner and extent, to the state governments, as to the national government, now under consideration. Not the least difference can be pointed out in any view of the subject.[30]

Thus, in 1792, James Madison was describing the separation of powers doctrine as "a first principle of free government."[31]

That same year, Delaware adopted a new Constitution, after a convention over which John Dickinson presided.[32]   Under Dickinson's formulation, Delaware's 1792 Constitution again separated its powers of government by keeping them both "distinct in department" and "distinct in

---

[29] The Federalist No. 81, at 544-45 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). *See also* The Federalist, Nos. 47-51 (James Madison).

[30] The Federalist No. 81, at 545 (Alexander Hamilton) (Jacob E. Cooke, ed. 1961).

[31] Philadelphia *National Gazette,* Feb. 6, 1792, VI *The Writings of James Madison* 91 (Gaillard Hunt, ed. N.Y.1900-10).

[32] *Claudio v. State*, 585 A.2d 1278, 1295 (Del. 1991).

12

office, and yet connected in operation."[33]  As Dickinson observed, "in a well-regulated state, judges ought to be equally independent of the executive and legislative powers."[34]

*Both federal and state judicial decisions*, in the first few decades after ratification of the United States Constitution and the adoption of Delaware's 1792 Constitution, reflect a consensus that the principle of separation of powers prohibited legislative interference with the judgments of American courts in specific cases.  In *Calder v. Bull*,[35] the Connecticut legislature had enacted a statute that set aside the final judgment of a state court in a civil case.  The sole issue before the United States Supreme Court was the construction of the *Ex Post Facto* Clause of the United States Constitution.  Nevertheless, Justice Iredell, a leading Federalist who led the United States Constitution to ratification in North Carolina, noted:

> the Legislature of [Connecticut] has been in the uniform, uninterrupted, habit of exercising a general superintending power over its courts of law, by granting new trials.   It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, *with respect to suits depending or adjudged*, new rights of trial, new privileges of proceeding, not previously recognized and regulated by positive institutions

---

[33] *The Political Writings of John Dickinson* (1801).   John Dickinson, *Letters of Fabius, Pamphlets*, 182-83 (Ford, ed.).   Jefferson to John Adams, Sept. 28, 1787, Boyd, ed., *Jefferson Papers*, XII, 189; [John Dickinson], *Letters of Fabius*, Ford, ed., *Pamphlets*, 182-83; Wilson, "Lectures on Law," Wilson, ed., I *Works of Wilson* 435.  *In re Request of the Governor for an Advisory Opinion*, 722 A.2d 307 (Del. 1998).

[34] Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 123 (2002).

[35] *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798).

13

> . . . . *The power . . . is judicial in its nature*; and whenever it is
> exercised, as in the present instance, it is an exercise of judicial,
> not of legislative, authority.[36]

The decisions of the highest state courts during that period reflect the same understanding of the separation of powers.  In *Bates v. Kimball*,[37] for example, a special act of the Vermont Legislature authorized a party to appeal from the judgment of a court even though the time for appeal had expired.  The Vermont Supreme Court framed the question before it as: "Have the Legislature power to vacate or annul an existing judgment between party and party?"[38]  The answer was unequivocal:  "The necessity of a distinct and separate existence of the three great departments of government . . . had been proclaimed and enforced by . . . Blackstone, Jefferson and Madison," and had been "sanctioned by the people of the United States, by being adopted in terms more or less explicit, into all their written constitutions."[39]  Citing the United States Supreme Court's decision in *Hayburn's Case*,[40] the Vermont Supreme Court held that the power to annul a final judgment was "an assumption of Judicial power," and,

---

[36] *Id.* at 398 (emphasis added).
[37] *Bates v. Kimball*, 2 D. Chip. 77 (Vt. 1824).
[38] *Id.* at 83.
[39] *Id.* at 84.
[40] *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792).

14

therefore, forbidden.[41]

### *Individual Cases Decided Under Judicial Power*

Turning to the issue in this case, the constitutionality of House Bill No. 31, we start with the proposition that "the doctrine of separation of powers is integral to the fabric of the Delaware Constitution."[42] The history of Delaware "admits of no doubt that from the beginning our state government has been divided into the three departments, legislative, executive and judicial. It is likewise true that, generally speaking, one department may not encroach on the field of either of the others."[43]

In *Marbury v. Madison*, Chief Justice John Marshall observed that the United States Constitution "vests the whole judicial power of the United States in one supreme court, and such inferior courts as Congress shall, from time to time, ordain and establish."[44] Similarly, the Delaware Constitution vests the entire judicial power of our government exclusively in the judiciary. Article IV, § 1 of the Delaware Constitution provides: "The

---

[41] *Id.* at 90. *See also Merrill v. Sherburne*, 1 N.H. 199 (N.H. 1818) (legislature may not vacate a final judgment and grant a new trial); *Lewis v. Webb*, 3 Me. 326 (Me. 1825); T. Cooley, *Constitutional Limitations* 95-96 (1868) (collecting cases); J. Sutherland, *Statutory Construction* 18-19 (J. Lewis ed. 1904).

[42] *Joseph v. C.C. Oliphant Roofing Co.*, 711 A.2d 805, 808 (Del. Super. Ct. 1997).

[43] *Tr. of New Castle Common v. Gordy*, 93 A.2d 509, 517 (Del. 1952) (citations omitted). *See also Joseph v. C.C. Oliphant Roofing Co.*, 711 A.2d at 808.

[44] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 173 (1803).

15

judicial power of this State shall be vested in a Supreme Court . . . and such other courts as from time to time by law [be] established."

The judicial function is to interpret the law and apply its remedies and penalties in particular cases.[45]  The judiciary has "the power, not merely to rule on cases but to decide them . . . with an understanding, in short, that 'a judgment conclusively resolves the case' because a "judicial power" is one to render dispositive judgments.'"[46]     In that regard, the Delaware Constitution specifically vests this Court with jurisdiction to hear appeals from the Superior Court in criminal causes and to determine all matters *finally*. Del. Const. Art. IV, § 11 so provides:

> The Supreme Court shall have jurisdiction . . . [t]o receive appeals from the Superior Court in criminal causes, upon application of the accused in all cases in which the sentence shall be death, imprisonment exceeding one month, or fine exceeding One Hundred Dollars, and in such other cases as shall be provided by law; and *to determine finally all matters of appeal on the judgments and proceedings of said Superior Court in criminal causes . . . .*[47]

The United States Supreme Court has held that the principal effect to be accomplished by the separation of legislative from judicial power is that "'[a] legislature without exceeding its province cannot reverse a

---

[45] John A. Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393 (1922).
[46] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (emphasis and citations omitted).
[47] Del. Const. art. IV, § 11 (emphasis added).

16

determination once made, in a particular case; though it may prescribe a new rule for future cases.'"[48] In 1868, the eminent constitutional scholar Thomas Cooley addressed precisely the question presented by House Bill No. 31:

> If the legislature cannot thus indirectly control the action of the courts, by requiring of them a construction of the law according to its own views, it is very plain it cannot do so directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, or directing what particular steps shall be taken in the progress of a judicial inquiry.[49]

Summarizing the separation of powers principles in the United States, Professor Bernard Schwartz concludes:

> [D]eclaratory acts seeking to interpret earlier legislation and to give such interpretation retroactive effect are generally condemned. The legislature cannot set aside a construction of the law already applied by the courts in actual cases. As the high bench once put it, "To declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative. One of the fundamental principles of all our governments is, that the legislative power shall be separated from the judicial." Similarly, the legislature cannot interfere directly in litigation. Thus, it cannot annul, set aside, vacate, reverse, modify, or impair the judgment of a competent court. It cannot compel the courts to grant new trials, order the

---

[48] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. at 222 (quoting The Federalist No. 81 (Alexander Hamilton)).
[49] *Id.* at 225 (quoting Thomas Cooley, *Constitutional Limitations* 94-95 (1868) (collecting cases)).

17

discharge of offenders, or direct what particular steps shall be taken in a particular judicial proceeding.[50]

Every decision of the United States Supreme Court since its 1792 opinion in *Hayburn's Case* has uniformly held that such a legislative act exceeds the power of the legislature.[51]

House Bill No. 31 declares this Court's November 23, 2004 decision in this very proceeding (*Evans v. State*) is "null and void." Where retroactive legislation – such as House Bill No. 31 – requires its own application in a case already adjudicated, it "reverse[s] a determination once

---

[50] Bernard Schwartz, *A Commentary on The Constitution of the United States: The Powers of Government* 117 (1963) (quoting *U.S. v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944)).

[51] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995). *See, e.g., Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948) ("Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government"); *United States v. O'Grady*, 89 U.S. (22 Wall.) 641, 647-48 (1875) ("Judicial jurisdiction implies the power to hear and determine a cause, and . . . Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal . . . ."); *Gordon v. United States*, 117 U.S. 697, 700-704 (1864) (opinion of Taney, C.J.) (judgments of Article III courts are "final and conclusive upon the rights of the parties"); *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 411 (1792) (opinion of Wilson and Blair, JJ., and Peters, D.J.) ("[R]evision and control" of Article III judgments is "radically inconsistent with the independence of that judicial power which is vested in the courts"); *Id.* at 413 (opinion of Iredell, J., and Sitgreaves, D.J.) ("[N]o decision of any court of the United States can, under any circumstances, . . . be liable to a revision, or even suspension, by the [l]egislature itself, in whom no judicial power of any kind appears to be vested"). See also *Pa. v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431 (1856) ("[I]t is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby . . . . This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the private rights of parties. When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it.").

18

made, in a particular case."[52] That is constitutionally impermissible, because only the Delaware judiciary has the power, "province and duty . . . to say what the law is" in particular cases and controversies.[53]

The provision in section 5402 of House Bill No. 31, that declares this Court's decision in *Evans v. State* "null and void," is a legislative act that purports to exercise judicial power in a specific case. As such, that provision in House Bill No. 31 violates Article IV, §§ 1 and 11 of the Delaware Constitution.[54]

### *Laws Interpreted Under Judicial Power*

House Bill No. 31 is unconstitutional in other respects as well. The United States Supreme Court has recognized that the "essential balance" created by the separation of governmental authority in the existing state constitutions and the proposed United States Constitution "was a simple one. The Legislature would be possessed of the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' but the power of '[t]he interpretation of the laws' would be 'the proper and peculiar

---

[52] The Federalist No. 81 at 545 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).
[53] *State ex rel. Oberly v. Troise*, 526 A.2d 898, 905 (Del. 1987) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803)).
[54] *See State ex rel. Walker v. Harrington*, 27 A.2d 67, 72 (Del. 1942) (stating that "the jurisdiction of the Supreme Court is defined in the Constitution and that its jurisdiction cannot be impaired or restricted by language contained in any legislative act").

province of the courts.'"[55]  Accordingly, two hundred years ago, in *Marbury*

*v. Madison*, the United States Supreme Court held:

> It is emphatically the province and duty of the judicial
> department to say what the law is.  Those who apply the rule to
> particular cases, must of necessity expound and *interpret* that
> rule.  If two laws conflict with each other, the courts must
> decide on the operation of each . . . . *This is of the very essence
> of judicial duty.*[56]

House Bill No. 31 states that the General Assembly asserts its "right

and prerogative to be the ultimate arbiter of the intent, meaning, and

construction of its laws and to vigorously defend them."  House Bill No. 31

also establishes specific standards for judicial officers to apply when

interpreting or construing Delaware law.  Those provisions in House Bill

No. 31 attempt to confer upon the General Assembly fundamental judicial

powers.  Consequently, those provisions in sections 5402 and 5403 of House

Bill No. 31 also violate Article IV of the Delaware Constitution.

### Single Subject and Title Provisions

House Bill No. 31 is unconstitutional for a third reason:  it addresses

at least two distinct and separate subjects.  The first subject is this Court's

November 23, 2004 decision in *Evans v. State*, which House Bill No. 31

---

[55] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 222 (1995) (quoting The Federalist No.
78 (Alexander Hamilton)).
[56] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78 (1803) (emphasis added).  *See*
Robert Lowery Clinton, *Marbury v. Madison and Judicial Review* (University Press of
Kansas 1989).

purports to declare "null and void."[57]    The second subject is the establishment of prospective standards for the judicial interpretation and application of Delaware laws.[58]  These constitute two distinct and separate subjects of legislation.   The official synopsis of House Bill No. 31 so reflects, by addressing each subject in separate paragraphs:

> This bill declares the case of *Ward T. Evans v. State of Delaware* null and void . . . .
>
> The bill also established specific standards for judicial officers to use when interpreting or construing Delaware law.[59]

By combining two distinct and separate subjects in a single bill, House Bill No. 31 violates the single-subject provision of Article II, Section 16 of the Delaware Constitution.[60]

Article II, § 16 of the Delaware Constitution reads as follows:   "No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."[61] The provision that a bill contain only one subject and that the title of the bill express its subject are distinct requirements having different historical

---

[57] House Bill No. 31, Section 1, §§ 5401-02.
[58] House Bill No. 31, Section 2, § 5403.
[59] House Bill No. 31, Synopsis.
[60] *Clendaniel v. Conrad*, 83 A. 1036, 1042 (Del. 1912) (legislation comprising "two distinct and separate subjects" violates the Single-Subject Provision).
[61] Del. Const. art. II, § 16 (the "Single-Subject Provision").

21

origins.[62]  Nevertheless, these two requirements are frequently combined in a single provision, such as Article II, § 16 of the Delaware Constitution, to achieve a common purpose.[63]

The potential problem caused by an omnibus bill is an uninformed legislative vote – a problem recognized even by the Romans who, in 98 B.C., enacted the *Lex Caecilia Didia* to prohibit the adoption of laws which contained unrelated provisions – the *lex satura*.[64]  The omnibus bill continued to be a cause for concern in colonial America prior to the Revolutionary War.[65]  Accordingly, the constitution of nearly every state now contains a general requirement that each legislative act be limited to a single subject.[66]

Almost every state constitution requires that the title of a bill adequately express its subject matter.[67]  These "title" provisions are also intended to insure informed legislative action, as the 1897 debates on the Delaware Constitution reflect:

> Oftentimes bills have been introduced in the Legislature with
> very harmless titles, but amendments have been added to those

---

[62] *See* Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 Minn. L. Rev. 389, 391 (1958).
[63] *Id.*
[64] *See* Luce, *Legislative Procedures* 548-49 (1922).
[65] *Id.*
[66] Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, XLII Minn. L. Rev. 389, 390 (1958).
[67] *Id.*

22

bills and when they have passed both Houses, they are entirely different from what they were originally.[68]

The two general requirements of Article II, § 16 were included in the Delaware Constitution of 1897 in order to "prevent deception of the general public and the members of the General Assembly by titles to bills which give no adequate information of the subject matter of the bills."[69] The single-subject and title provisions in Article II, § 16 are intended to assure sufficient notice that "legislation, the content of which was inadequately brought to the public attention, or so-called sleeper legislation" does not slip through the General Assembly.[70] If a bill contains multiple subjects or the title of the bill would "trap the unwary into inaction," it violates Article II, § 16 of the Delaware Constitution.[71]

House Bill No. 31 graphically illustrates the dangers of an uninformed legislative vote where the title of a bill is inadequate. This Court has always looked to the language of any statute when interpreting its provisions.[72] Nevertheless, sections 5403(b) and (c) of House Bill No. 31 provided for judicial officers to "strictly interpret or construe legislative intent" and to "use the utmost restraint in interpreting or construing the laws of this State."

---

[68] 1 *Delaware Constitutional Debates 1897* 264.
[69] *Opinion of the Justices*, 194 A.2d 855, 856 (1963).
[70] *Id. See also* Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 91 (2002).
[71] *In re the Opinion of the Justices*, 177 A.2d 205, 208 (1962).
[72] *See Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218-20 (Del. 1993).

House Bill No. 31 provided absolutely no notice, however, that it impacted at *least sixty other statutes* in which the General Assembly stated that those statutes must be *liberally or broadly construed* to accomplish the General Assembly's intent, e.g., Del. Code Ann. tit. 19, § 721 in the Employment Practices Act ("this subchapter shall be liberally construed to promote the full employment opportunity of qualified handicapped persons who seek such opportunity in good faith.").[73]

### House Bill No. 31 Entirely Unconstitutional

House Bill No. 31 contains a severability clause, which reads: "If any provision of this Act or the application thereof to any person or circumstance

---

[73] *See also* Del. Code Ann. tit. 3, § 929; Del. Code Ann. tit. 3, § 3201; Del. Code Ann. tit. 3, § 9001; Del. Code Ann. tit. 3, § 10213; Del. Code Ann. tit. 5, § 3308; Del. Code Ann. tit. 6, § 1-103; Del. Code Ann. tit. 6, § 2512; Del. Code Ann. tit. 6, § 4201; Del. Code Ann. tit. 6, § 4501; Del. Code Ann. tit. 6, § 4601; Del. Code Ann. tit. 7, § 6020; Del. Code Ann. tit. 7, § 6404; Del. Code Ann. tit. 7, § 6423; Del. Code Ann. tit. 7, § 6501; Del. Code Ann. tit. 7, § 6619; Del. Code Ann. tit. 7, § 8001; Del. Code Ann. tit. 9, § 7001; Del. Code Ann. tit. 10, § 902; Del. Code Ann. tit. 10, § 1053; Del. Code Ann. tit. 10, § 1902; Del. Code Ann. tit. 10, § 6512; Del. Code Ann. tit. 10, § 7102; Del. Code Ann. tit. 10, § 9905; Del. Code Ann. tit. 11, § 2548; Del. Code Ann. tit. 11, § 4358; Del. Code Ann. tit. 11, § 6502; Del. Code Ann. tit. 11, § 6571; Del. Code Ann. tit. 12, § 2357; Del. Code Ann. tit. 12, § 4002; Del. Code Ann. tit. 13, § 401; Del. Code Ann. tit. 13, § 1502; Del. Code Ann. tit. 14, § 8201; Del. Code Ann. tit. 14, § 8213; Del. Code Ann. tit. 14, §9201; Del. Code Ann. tit. 16, § 921; Del. Code Ann. tit. 16, § 1421; Del. Code Ann. tit. 16, §5201; Del. Code Ann. tit. 16, § 6101; Del. Code Ann. tit. 17, §426; Del. Code Ann. tit. 18, § 3701; Del. Code Ann. tit. 18, § 4204; Del. Code Ann. tit. 18, § 4404; Del. Code Ann. tit. 20, § 3130; Del. Code Ann. tit. 21, § 2602; Del. Code Ann. tit. 21, § 8101; Del. Code Ann. tit. 22, § 1712; Del. Code Ann. tit. 22, § 1714; Del. Code Ann. tit. 22, § 1812; Del. Code Ann. tit. 22, §1901A; Del. Code Ann. tit. 24, § 2501; Del. Code Ann. tit. 24, § 5501; Del. Code Ann. tit. 25, § 7001; Del. Code Ann. tit. 26, § 801; Del. Code Ann. tit. 29, § 2517; Del. Code Ann. tit. 29, § 5067; Del. Code Ann. tit. 29, § 9007A; Del. Code Ann. tit. 31, § 381; Del. Code Ann. tit. 31, § 3601; Del. Code Ann. tit. 31, § 3821; Del. Code Ann. tit. 31, § 4002; Del. Code Ann. tit. 31, § 4014; Del. Code Ann. tit. 31, § 5203.

is held invalid, such invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and, to that end, the provisions of this Act are severable." The purpose of the severability clause is to shield from invalidation any constitutional provisions of House Bill No. 31, if other provisions are declared unconstitutional.

Generally, a severability clause is enforceable.[74] *Each* of the separate substantive provisions in sections 5402 and section 5403 of House Bill No. 31, however, violates the requirement of separation of legislative and judicial powers in the Delaware Constitution. Moreover, a severability clause is unenforceable where, as in House Bill No. 31, the legislation collectively violates the single-subject provision in Article II, § 16.[75] If it were otherwise, the policy considerations served by the single-subject provision would be seriously undermined.[76] Accordingly, the severability clause does not shield any of the substantive provisions of House Bill No. 31 from invalidation.

---

[74] *See, e.g., Stiftel v. Malarkey*, 384 A.2d 9 (Del. 1977).
[75] *Clendaniel v. Conrad*, 83 A. 1036, 1042 (Del. 1912) (legislation comprising "two distinct and separate subjects" violates the Single-Subject Provision). *See also Heggs v. State*, 759 So.2d 620 (Fla. 2000); *Senate of Cal. v. Jones*, 988 P.2d 1089 (Cal. 1999); *Litchfield Elementary Sch. Dist. v. Babbitt*, 608 P.2d 792 (Ariz. Ct. App. 1980).
[76] Millard H. Rudd, *No Law Shall Embrace More than One Subject*, 42 Minn. L. Rev. 389, 399 n.8 (1958).

*House Bill No. 31 Inoperative*

The State argues that "irrespective" of House Bill No. 31's constitutionality, this Court should consider it as a "clear declaration of legislative intent in the original act." That we cannot do. In *Marbury v. Madison*, the United States Supreme Court held "[i]t is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it."[77] Therefore, "an act of the legislature, repugnant to the constitution, is void."[78] After so concluding in *Marbury*, Chief Justice Marshall then asked the following questions:

> If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law?[79]

The answer in *Marbury v. Madison* was a "resounding no."[80] To conclude otherwise would, in Chief Justice Marshall's words "subvert the very foundation of all written Constitutions . . . to restrict [legislative] powers within narrow limits."[81]

---

[77] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.* at 178.

26

Chief Justice Marshall's stirring answer is equally applicable here. House Bill No. 31 is unconstitutional in its entirety. Therefore, under *Marbury v. Madison*, it is void and can have no effect in our reconsideration of our November 23, 2004 decision issued in this case.

### Evans' Issue on Appeal

We next turn to the issue presented by Evans' appeal, which is whether his life sentence is for the term of his natural life (unless parole is granted), or for a term of forty-five years. The resolution of that question requires an overview of Delaware's statutory sentencing system.

### Original Statutory Sentencing System

The sentencing provisions of the Delaware criminal justice system appear in several different statutes, many of which were originally enacted separately and then amended on numerous occasions over the last few decades. Courts must read all of those statutes, as amended, *in pari materia* to interpret and give effect to the statutory sentencing scheme in operation at any given point in time.

In 1964, the General Assembly enacted sections 4346 and 4348 of Title 11. Section 4346 is entitled Eligibility for Parole. Subsection (a) provides: "A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has

27

served 1/3 of the term imposed by the court, such term to be reduced by such merit and good behavior credits as have been earned, or 120 days, whichever is greater."[82]  Subsection (c) also provides, in part: "For all purposes of this section, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years."

Section 4348 of Title 11, which is entitled "Release Upon Merit and Good Behavior Credits" provides, in pertinent part: "A person having served that person's term or terms in incarceration, less merit and good behavior credits as having been earned, shall, upon release, be deemed as released on parole until the expiration of the maximum term or term for which the person is sentenced."  This Court has recognized that, insofar as the terms and conditions of non-custodial status are concerned, there is little practical difference between release on parole under section 4346 and conditional release under section 4348.[83]

Prior to 1990, an *eligible* inmate could obtain early release in two ways: from the Parole Board under section 4346(a) or by conditional release

---

[82] Section 4346 provides in relevant part:
> (a)  A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has served 1/3 of the term imposed by the court, such term to be reduced by such merit and good behavior credits as have been earned, or 120 days, whichever is greater.  For the purpose of this subchapter, "court" shall include any court committing an offender to the Department.

[83] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203, 1206 (Del. 1997).

28

pursuant to section 4348.[84]  *Release of an inmate on parole under section 4346 is a matter of discretion for the Parole Board.  Conditional release under section 4348, however, is non-discretionary.*  If an inmate who is eligible for conditional release has accumulated sufficient good behavior and merit credits, he or she must be released from incarceration on his or her short-term release date, *i.e.*, the maximum period of incarceration less accumulated good behavior and merit credits.[85]

### Truth-in-Sentencing Act

The most comprehensive legislative revision of the Delaware statutory sentencing system was the Truth-in-Sentencing Act of 1989, which became effective in 1990.  Under the Truth-in-Sentencing Act, a sentence of Level V incarceration for any crime committed after June 29, 1990 is no longer subject to the parole provisions of section 4346.  That is, beginning in 1990, the General Assembly prospectively abolished parole as a basis for early release from Level V incarceration for any post-June 29, 1990 crime.[86]

Although the 1989 Truth-in-Sentencing Act *completely eliminated parole* for crimes committed after its effective date, that statutory enactment continued generally to *permit conditional release* for good time credit.  The

---

[84] *Id.*
[85] *Id.*
[86] *Robinson v. State*, 584 A.2d 1203 (Del. 1991) ("The Truth-in-Sentencing Act was never intended by the Delaware General Assembly to have a retroactive effect.").

29

Truth-in-Sentencing Act thus provides that: "All sentences imposed for any offenses other than a life sentence imposed for class A felonies *may be reduced* by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections."[87]  Thus, for crimes committed after June 29, 1990, the reduction of a sentence by earned good time would result in conditional release under section 4348 for eligible inmates.

### *Jackson Decision*

In *Jackson*, this Court confronted the same question that is presented by Evans on this appeal.   Jackson, like Evans, was sentenced to life imprisonment, with the possibility of parole, before the enactment of Truth-in-Sentencing.  The issue presented in *Jackson* was whether an inmate who is serving a life sentence with the possibility of parole is entitled to conditional release by the Department of Correction under Del. Code Ann. tit. 11, § 4348.

Jackson was sentenced in 1973 to two concurrent life terms in prison, with the possibility of parole, for Kidnapping in the First Degree and Rape in the First Degree.  After his application for parole was denied in 1995, Jackson filed a petition for a writ of mandamus in the Superior Court.

---

[87] Del. Code Ann. tit. 11, § 4381(a).

Jackson claimed that the Department of Correction was required to set a conditional, or "short-term," release date for him under section 4348.

It was undisputed that for the purpose of determining Jackson's parole eligibility, the Parole Board was required to treat his life sentence as a fixed term of forty-five years.[88]  Jackson argued, however, that the Department of Correction also was required to treat his life sentence as a fixed term of forty-five years for purposes of calculating a conditional release date.  That is, Jackson, like Evans, asserted that, even if the Board denied him parole under section 4346, he was still entitled to conditional release by the Department of Correction under section 4348.  In *Jackson*, we rejected that argument, and held that an inmate who is serving a life sentence with the possibility of parole is not entitled to conditional release under section 4348.[89]  We stated that, if the General Assembly had intended to permit those inmates serving life sentences with the possibility of parole to be eligible for conditional release under section 4348, it would have expressly so stated in the statute.[90]

---

[88] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).  *See* Del. Code Ann. tit. 11, § 4346(c).
[89] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d at 1205.
[90] *Id.* at 1207 (citing *State v. Skinner*, 632 A.2d 82, 86 (Del. 1993)).

31