that the General Assembly drew a distinction between a habitual offender designation under section 4214(a) and an habitual offender status under section 4214(b). In 1970, before the Truth-in-Sentencing Act was passed, a person serving a life sentence under section 4214(a) could receive the benefit of parole, and for that purpose a life sentence would be considered a fixed term of forty-five years. A person serving a life sentence imposed under subsection 4214(b), however, was not eligible for parole.

When Truth-in-Sentencing was enacted, the General Assembly retained the distinction first made in 1970 between habitual offenders who were serving life sentences under section 4214(a) and under section 4214(b), respectively. After the passage of the Truth-in-Sentencing Act, persons sentenced to life as habitual offenders under section 4214(a) were not eligible for release on parole. Such persons were still eligible for conditional release under section 4348, however, because subsection (a) specifically incorporated section 4381 by reference. The General Assembly accomplished its intention to provide for sentence reduction through the accumulation of good time credit by continuing to treat a life sentence

33

imposed under section 4214(a) in the Truth-in-Sentencing Act as a fixed term of 45 years.[92]

In *Crosby*, we determined that, when the Truth-in-Sentencing Act was adopted, the General Assembly intended to treat a person sentenced to life under section 4214(a) differently from persons who received other life sentences,[93] by making that person eligible for conditional release. That intent, we held, was clearly reflected in all of the General Assembly's carefully crafted statutes and amendments. The General Assembly

---

[92] Accordingly, in *Crosby*, the sentencing judge stated that Delaware law equates Crosby's life sentence, as an habitual offender under title 11, section 4214(a) of the Delaware Code, to a fixed term of forty-five years. In fact, Crosby's life sentence was based on the trial judge's belief that Crosby would be "eligible for a significant sentence diminution by earning good time." The SENTAC Benchbook recognized that explicitly:

> Habitual criminal status, is not, per se, a class A offense, but is declared on petition from the Attorney General. If declared under Section 4214(a) may receive a sentence of UP TO LIFE imprisonment at Level V, such sentence being subject to "good time credit" but no other form of diminution or suspension. If declared under section 4214(b), the sentence is LIFE without suspension, probation or any other form of diminution.

Delaware Sentencing Accountability Commission Benchbook 21 (2003). Therefore, the sentencing judge concluded that the availability of earning good time credit meant that Crosby would be eligible for conditional release before the expiration of the sentence, *i.e.*, before the end of Crosby's natural life. The sentencing judge stated that "was a factor I took into account."

[93] At the time *Crosby* was decided, a life sentence under section 4214(a) of the habitual offender statute was unique in comparison to the General Assembly's statutory scheme for other life sentences. It differed by express statutory language from any of the following types of life sentences: "A life sentence for murder in the first degree is 'life without benefit of probation or parole or any other reduction.' A life sentence for a class A felony is not subject to the statute authorizing the award of good time. A life sentence for a three-time violent offender is not subject to the probation or parole of Title 11, Chapter 43, which includes § 4381."

34

accomplished that intent by not repealing section 4346(c) and by continuing to treat a life sentence for an habitual offender under section 4214(a) as a fixed term of forty-five years under section 4346(c). Therefore, in *Crosby* we held that a person sentenced to life as an habitual offender pursuant to section 4214(a) is to be "considered as having been sentenced to a fixed term of 45 years," and qualifies for conditional release pursuant to section 4348, based upon good time credits earned pursuant to section 4381.[94]

Following our decision in *Crosby*, the Attorney General's Office asked the General Assembly to change the law.[95] Even though less than 5% of criminal appeals are reversed by this Court, such requests have become a routine practice.[96] The habitual offender provisions that were originally enacted in section 4214(a) as part of the Truth-in-Sentencing Act and construed in *Crosby* were amended in 2004. Those 2004 amendments to

---

[94] *Crosby v. State*, 824 A.2d 894, 900-02 (Del. 2003) (citations omitted).

[95] The Committee Findings of the House of Representatives state:

> A representative from the Attorney General's office explained that there has been ambiguity in regards to a sentence of life in prison. In the past, life in prison could mean 45 years and not an entire natural life in prison. He stated that this bill makes it clear that a life sentence means that the individual will be incarcerated for the rest of their natural life and will not have the option of parole or any reduction in time served.

[96] The percentage of criminal appeals reversed by the Delaware Supreme Court are set forth each year in the Annual Statement Report of the Delaware Judiciary. For the past few years, the reversal rates in criminal appeals were: 3.4% (2004); 3.8% (2003); and 4.9% (2002).

section 4214(a) are not an issue in this appeal, and play no role in our resolution of the issue presented here.

### Broad Statements in Crosby Caused Confusion

Because Jackson was sentenced to life with the possibility of parole in accordance with statutes adopted before the 1989 enactment of the Truth-in-Sentencing Act, Jackson's natural life sentences were not affected by that legislation. Crosby, however, was sentenced to life under section 4214(a) of the Truth-in-Sentencing legislation. Unfortunately, in explaining how the Truth-in-Sentencing statute operated in Crosby's case, this Court discussed pre-Truth-in-Sentencing aspects of our *Jackson* opinion in terms that were unnecessary to our holding in *Crosby*.

Our decisions in *Crosby* and *Jackson* both involved an application of the good time credit statute, but to different types of life sentences: in *Jackson*, a life sentence for specific *pre-1990 violent* crimes and in *Crosby*, a life sentence for *post-1990 non-violent* habitual offenders. As earlier noted, section 4346(c) treated a life sentence as a fixed term of forty-five years for purposes of determining parole eligibility in cases involving pre-Truth-in-Sentencing *parole eligible* life sentences for violent crimes -- *i.e. Jackson*.[97] For those life sentences, good time credit was earned only for the purpose of

---

[97] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).

36

accelerating the date of parole eligibility, but *never* for purposes of conditional release.[98]

Section 4346(c), on the other hand, applied to post-Truth-in-Sentencing section 4214(a) life sentences for non-violent habitual offenders, who were never eligible for parole but were eligible for *conditional release* under section 4348 by the sentence reduction provisions of Truth-in-Sentencing Section 4381 – *i.e. Crosby*.[99] For those life sentences, good time credit was earned only for the purpose of accelerating the date of conditional release, but *never* for purposes of parole.

In *Crosby*, we held that under the Truth-in-Sentencing statute, a life sentence meant a term of forty-five years *but only* for section 4214(a) non-violent habitual offenders. That was because the new Truth-in-Sentencing section 4381 had been incorporated into the new section 4214(a) provision of the Truth-in-Sentencing statute. In this statutory setting, the references in *Crosby* to the operation of section 4346 and section 4348 upon the pre-Truth-in-Sentencing life sentences with the possibility of parole for violent crimes, were overbroad and unnecessary to our holding. That *obiter dicta* in *Crosby* is what caused the initial confusion in this case.

---

[98] *Id.*
[99] *Crosby v. State*, 824 A.2d 894 (Del. 2003).

When *Jackson* was decided in 1997, we stated that section 4348 did not apply to *any* life sentence. That statement was also overbroad. In *Jackson*, we should have more accurately stated that section 4348 did not apply to any life sentence with the possibility of parole that was *imposed before the effective date of Truth-in-Sentencing*. That qualification is important, because the Truth-in-Sentencing statute did make the conditional release provisions in section 4348 applicable to a life sentence imposed after 1990 under section 4214(a). Thus, "to the extent" we stated that *Jackson* was overruled by *Crosby*, it was only to the extent that the unqualified reference in *Jackson* to "*any* life sentence" was overbroad and was not limited to the issue presented by *Jackson*: pre-Truth-in-Sentencing life sentences with the possibility of parole.

### Jackson Controls Evans

We have concluded that the cases of *Jackson* and *Crosby* were both decided correctly. We have also determined that *Evans* is controlled by *Jackson* rather than *Crosby*. Evans' life sentence was – like Jackson's life sentence – a natural life sentence with the possibility of parole. Evans' life sentence was not – like Crosby's life sentence – equivalent to a fixed term of forty-five years.

38

In deciding to reconsider this matter, we asked the State to produce copies of Evans' records at the Department of Correction. Evans' records confirm that his sentence was for life with the possibility of parole. When Evans was originally sentenced, his records at the Department of Correction read: sentence – life; release – death; and parole eligibility – eleven years five months nine days.

The Department of Correction records reflect that Evans' status has always been consistent with our interpretation of the applicable sentencing statutes in *Jackson*. Evans' release date was death, *unless* he was granted parole. For purposes of *parole eligibility only*, Evans' life sentence was computed as a term of forty-five years. Evans was eligible for parole after serving one third of forty-five years and could accelerate his parole eligibility date by earning good time credit.[100]

When Evans was sentenced to life with the possibility of parole, the statutory sentencing system did not permit Evans to be released prior to his death—unless parole was granted. Similarly, good time credits only applied to Evans' natural life sentence for purposes of accelerating Evans' parole eligibility date. Accordingly, we hold that Evans – like Jackson – is not

---

[100] *Stirparo v. State*, 297 A.2d 406 (Del. Super. Ct. 1972).

39

eligible for conditional release and must remain incarcerated until his death, unless he is granted parole.[101]

### Conclusion

The opinion issued by this Court on November 23, 2004 is withdrawn and shall have no force or effect. House Bill No. 31 is unconstitutional in its entirety. The judgment of the Superior Court in Evans' case is affirmed.

---

[101] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).

40

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DERRICK FULLER, | § | No. 38, 2004 |
| | § | |
| Defendant Below, | § | Court Below: Superior Court |
| Appellant, | § | of the State of Delaware in |
| | § | and for New Castle County |
| | § | |
| STATE OF DELAWARE | § | Cr. ID No. 0305001419 |
| | § | |
| Plaintiff Below, | § | |
| Appellee | § | |

Submitted: September 8, 2004
Decided: October 29, 2004

Before **HOLLAND**, **JACOBS** and **RIDGELY**, Justices.

On appeal from the Superior Court. **AFFIRMED** in part, **VACATED** in part, and **REMANDED**.

Bernard J. O'Donnell, Esq., Wilmington, Delaware for Appellant.

Timothy J. Donovan, Jr., Esq., Department of Justice, Wilmington, Delaware for Appellee.

**RIDGELY**, Justice

Derrick Fuller appeals his convictions by a jury and sentences imposed by the Superior Court for the offenses of possession with the intent to deliver cocaine,[1] possession of drug paraphernalia[2] and maintaining a vehicle for the purpose of keeping a controlled substance.[3] Fuller was acquitted on the charge of trafficking in cocaine.[4] The trial judge sentenced Fuller to five years of imprisonment, the maximum incarceration available.

Fuller has raised five issues in this appeal. He contends that the trial judge abused his discretion by: 1) denying his motion for a mistrial after the trial judge struck certain testimony, 2) admitting statements of skepticism by a police officer during the course of Fuller's statement to the police, 3) limiting cross-examination of a police officer on his intention to arrest Fuller's brother, 4) instructing the jury on joint possession of a controlled substance, and 5) enhancing Fuller's sentence because of his brother's perjury at the trial. We find no basis to reverse the convictions in this case. We do conclude that there is insufficient competent evidence in the present record to support any finding that Fuller suborned the perjury by his brother. We therefore vacate Fuller's sentences and remand for resentencing.

---

[1]     DEL. CODE ANN. 16, § 4751 (2004).

[2]     *Id.* at § 4771.

[3]     *Id.* at § 4755(a)(5).

[4]     *Id.* at § 4753A(a)(2)(a).

2

1.

On the afternoon of May 2, 2003, Fuller's vehicle was stopped by the Wilmington Police Department. Fuller was the driver and owner of the vehicle. The police removed Fuller and a passenger from the vehicle and then searched it. The police found two plastic bags containing 20.32 grams of crack cocaine hidden underneath the carpeted floormat in the trunk of the vehicle. The police also found $114 in Fuller's pant pockets. The police then searched Fuller's apartment and seized $800 from his bedroom.

At trial, the State's key witness was Officer David Rosenblum, the chief investigating officer. Officer Rosenblum testified to the events leading up to the stop, the search of Fuller's vehicle, as well as statements made by Fuller. Ean Fuller, Derrick Fuller's younger brother, testified for the defense that he was living with his brother at the time of the arrest and that he had hidden the cocaine in Derrick Fuller's vehicle without his knowledge. Fuller, who did not testify at his trial, was acquitted of the trafficking in cocaine charge, but was convicted of possession of cocaine, maintaining a vehicle for the purpose of keeping cocaine and possession of drug paraphernalia.

After his trial testimony, Ean was arrested on the same drug charges previously filed against his brother. Ultimately those charges were dropped and Ean pled guilty

3

instead to committing perjury at Fuller's trial.  He did not implicate Fuller or anyone

else in the subornation of his perjury.

At Fuller's sentencing the prosecutor argued several aggravating factors, and

also asserted that Fuller "knew his brother was going to lie."[5]     Fuller made no

statements about his brother's perjury on the instruction of his counsel.  Although

Fuller did not testify, the trial judge found that Fuller "at the very least, would have

been aware of what his younger brother was doing" and "at the very least, allowed his

brother to [commit perjury]."[6]  The trial judge expressly indicated that it was Ean's

perjury that justified the sentence he imposed, and that Fuller's sentence would not

have been as severe if the trial judge were not allowed to consider Ean's perjured

testimony.[7]

II.

We will address the issues raised in the order Fuller has presented them.

_____

[5]     Sentencing Transcript of Derrick Fuller on January 9, 2004 at 13.

[6]     *Id*. at 13.

[7]     *Id*. at *24*  The trial judge stated:

> If the Court did not take that [Ean's perjury] into consideration, the Court would
> impose an enhanced sentence based on Mr. Fuller's background and, specifically, his
> serious history of criminal convictions.  But so the record is clear, in case it has to
> be revisited, if the Court were not allowed to take into consideration this situation
> involving Ean Fuller's perjury on Derrick Fuller's behalf, then the sentence would
> not be as severe as the one the Court is going to impose.

4

A.

Fuller argues that the trial judge abused his discretion by denying his motion

for a mistrial after Officer Rosenblum made a non-responsive prejudicial remark on

direct examination by the State. Officer Rosenblum testified that Fuller was arrested

at gunpoint because the police received information that Fuller was "probably armed."

Defense counsel objected to this statement. The trial judge immediately and *sua*

*sponte* instructed the jury to disregard Officer Rosenblum's remark, and even told the

jury there was no reason to believe it.[8] Fuller moved for a mistrial, which was denied.

Fuller argues that a mistrial should have been granted because Officer Rosenblum's

testimony was unfairly prejudicial and deprived him of a fair trial.        We

review for abuse of discretion a trial judge's decision to deny a motion for a mistrial.[9]

---

[8]    Transcript of Trial Proceedings on October 7, 2003 at 105. The trial judge instructed:

Ladies and gentlemen of the jury, I don't know where this suggestion that the
defendant was probably armed came from.

I've spoken to the attorneys before the case began. That just comes out of left field.

There's no reason for you to believe that there's some reason why, at that time, the
police thought the defendant was armed and that kind of innuendo is unacceptable
and you are to ignore it. There is no basis for the police to believe that this
particular defendant was armed.

Now, what they said over the radio, that's one thing, but in terms of now that we're
in a courtroom, was there a reason to believe that the defendant was armed, there
was none.

[9]    *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2001) (citing *Taylor v. State*, 685 A.2d 349, 350
(Del. 1996)).

5

It is well settled that a mistrial is warranted only if "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated."[10]  In fact, prejudicial error will normally be cured by the trial judge's instructions to the jury.[11] Moreover, "[t]he trial judge is in the best position to assess whether a mistrial should be granted, and may exercise his discretion in deciding whether to grant a mistrial. Absent an abuse of that discretion, the appellate court will not disturb the trial judge's decision."[12]

In the present case, we find that defense counsel's objection and the trial judge's instruction to the jury to disregard Officer Rosenblum's statement mitigated the effects of the comment and cured the error.[13]  The jury is presumed to have followed the trial judge's instruction and disregarded Officer Rosenblum's stricken testimony.[14]  Accordingly, we hold that the trial judge properly exercised his

---

[10]     See *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974). *See also Dawson v. State*, 637 A.2d 57, 62 (Del. 1994) ("A mistrial is mandated only when there are 'no meaningful and practical alternatives' to that remedy.") (quoting *Bailey v. State*, 521 A.2d 1069, 1077 (Del. 1987)).

[11]     *Dawson*, 637 A.2d at 62 (citing *Sawyer v. State*, 634 A.2d 377, 380 (Del. 1993); *Diaz v. State*, 508 A.2d 861, 866 (Del. 1986)).

[12]     *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986) (citing *Thompson v. State*, 399 A.2d 194, 199 (Del. 1979)).

[13]     *Cf. Boatson v. State*, 457 A.2d 739, 743 (Del. 1983); *Edwards v. State*, 320 A.2d 701, 703 (Del. 1974).

[14]     *Claudio v. State*, 585 A.2d 1278, 1280 (Del. 1991); *Kornbluth v. State*, 580 A.2d 556, 560 (Del. 1990).

6

discretion in deciding that a curative instruction was a meaningful and practical alternative to declaring a mistrial.

B.

Fuller's next argument is that the trial judge erred by admitting Officer Rosenblum's pre-trial comment during questioning of Fuller that showed skepticism regarding Fuller's initial explanation of why the drugs were in his vehicle. At trial Officer Rosenblum testified that following Fuller's arrest and a waiver of his *Miranda*[15] rights, Fuller explained that the drugs actually belonged to a Colombian drug lord who performed work on his vehicle. Officer Rosenblum testified that he had asked Fuller if he wanted to go with that story, and Fuller then shrugged his shoulders and asserted that the cocaine was not his. Defense counsel objected to the admissibility of Officer Rosenblum's skeptical response to Fuller's explanation. The trial judge overruled the objection but nevertheless instructed the jury that Officer Rosenblum's "belief is irrelevant."[16] Citing *Doyle v. Ohio*[17] and *McDonald v. State*,[18]

---

[15]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

[16]     Transcript of Trial Proceedings on October 7, 2003 at 133.

[17]     426 U.S. 610 (1976) (holding that it is unfair and a deprivation of due process to use the defendant's silence to impeach their explanation at trial).

[18]     816 A.2d 750, 753 (Del. 2003) (referencing the well settled principle that a "criminal defendant's silence may not be used against him after he has received governmental assurances through *Miranda* warnings.").

7

Fuller suggests that the trial judge's limiting instruction was not sufficient to address the potential prejudice of Officer Rosenblum's statement and that the officer's statement should not have been admitted because it unfairly subverted Fuller's constitutional right to remain silent.

We review a trial judge's ruling admitting or excluding evidence for abuse of discretion.[19] Here, the trial judge did not abuse his discretion in allowing the jury to hear the complete exchange between Fuller and Officer Rosenblum during the investigation. Moreover, the trial judge cured any prejudice by instructing the jury that Officer Rosenblum's belief was irrelevant and that it was for them to decide what to believe.[20] It is presumed that the jury complied with the trial judge's instruction.[21]

Furthermore, Fuller's reliance on *Doyle* is not persuasive. In *Doyle*, the defendants chose to remain silent upon their arrest and receipt of their *Miranda* warnings.[22] The defendants testified at trial that they had been framed in the drug

---

[19]    *Howard v. State*, 549 A.2d 692, 693 (Del. 1988).

[20]    Transcript of Trial Proceedings on October 7, 2003 at 133.

[21]    *Claudio*, 585 A.2d at 1280; *Kornbluth*, 580 A.2d at 560.

[22]    *Doyle*, 426 U.S. at 613-14.

8

transactions at issue.[23]  The prosecution impeached the defendant's testimony on cross-examination as a result of their failure to tell the "frame up" story to the narcotics agent who arrested them and gave them *Miranda* warnings.[24]  The United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."[25]  In essence, *Doyle* forbids comment on a defendant's post-Miranda silence.[26]  In this case, however, Fuller waived his *Miranda* rights and made a statement to Officer Rosenblum.  Therefore, *Doyle* is inapplicable in the instant case.  Fuller's reliance on *McDonald* is also inapplicable for the same reasons.

We therefore hold that the trial judge, in conjunction with his limiting instruction, properly exercised his discretion in permitting Officer Rosenblum to testify regarding his conversation with Fuller about his explanation of why the drugs were in his vehicle.

C.

---

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

[26]     *Doyle*, 426 U.S. at 613-14.

9

Fuller next argues that the trial judge abused his discretion by precluding the
defense from cross-examining Officer Rosenblum about his intention to arrest Ean
after Ean testified that he, not Fuller, was the possessor of the cocaine. Before Ean
testified, defense counsel was informed by the State that the Wilmington Police
Department intended to arrest Ean after he testified, presumably on drug charges.[27]
Following Ean's testimony, defense counsel called Officer Rosenblum as a witness,
at which time the following dialogue took place:

Q.    Officer Rosenblum, did you learn of Ean Fuller's possible
      testimony yesterday?

A.    Yes.

Q.    And at that time, did you use your cellphone and other
      communication devices to call for assisting officers to arrest Ean
      Fuller after his testimony?

A.    At the request of - -.[28]

The State objected to this line of inquiry before Officer Rosenblum could
answer completely. The trial judge sustained the objection, ruling that this line of
inquiry was irrelevant, would be an inefficient use of the court's time and would

---

[27]    Transcript of Trial Proceedings on October 7, 2003 at 9-11.

[28]    Transcript of Trial Proceedings on October 7, 2003 at 58.

10

confuse the jury.[29]  The trial judge also instructed the jury to disregard defense

counsel's question and the partial answer given by Officer Rosenblum.

Fuller relies on D.R.E. 616,[30] *Snowden v. State*,[31] and *Weber v. State*[32] in

arguing that the rejected line of inquiry went toward Officer Rosenblum's bias and

interest and was therefore admissible.  Fuller contends that the defense should be

permitted to question a police officer concerning his bias, motivation and interest

where a police officer is a witness and is prepared to arrest and charge two people for

committing an offense, but the State contends that only one person has committed the

offense.

---

[29]    Transcript of Trial Proceedings on October 7, 2003 at 59.  The trial judge stated:

> It's too collateral and too amorphous.  It invites a mini trial on who made the
> decision, what the basis of that decision was.  We can't get into that in front of the
> jury because it's confusing and an inefficient use of time.  If we don't have this mini
> trial for why the police attempted to do what they apparently attempted to do, then
> the jury has to speculate about that.  So, what it winds up is simply being a form of
> innuendo, and it really is beside the point as to whether the State has proved beyond
> a reasonable doubt through the presentation of evidence to that effect that the
> defendant did certain things on certain days.

[30]    D.R.E. Rule 616.  This rule states: "For the purpose of attacking the credibility of a witness,
evidence of bias, prejudice or interest of the witness for or against any party to the case is
admissible."

[31]    672 A.2d 1017, 1025 (Del. 1996) ("The bias of a witness is subject to exploration at trial and
is 'always relevant as discrediting the witness and affecting the weight of his testimony.'").

[32]    457 A.2d 674, 681 (Del. 1983) (requiring that "counsel be permitted to inquire into any acts,
relationships, or motives reasonably likely to create bias.").

11

We find that the defense's proposed line of inquiry was not directed toward any bias on the part of Officer Rosenblum but, rather, sought to elicit a conclusion or an opinion of the police that Ean's admissions were credible. It was for the jury, not Officer Rosenblum, to decide the credibility of the witness. We also note that Ean made a full confession on the witness stand that the drugs were his. Any error in precluding the admission of evidence of Ean's impending arrest in this case was clearly harmless beyond a reasonable doubt.[33] Ean testified to his possession of the drugs and additional evidence of his impending arrest would have amounted to little more than surplusage.[34]

### D.

Fuller next argues that the trial judge erred in instructing the jury on the concept of joint possession of a narcotic substance. The trial judge instructed the jury that "[t]wo or more people may have joint possession of a narcotic drug, if jointly and knowingly, they have dominion, control and possession ... ."[35] Fuller argues that there was insufficient evidence to find joint control in this case, and that such an instruction invited unnecessary jury confusion. As evidence of such confusion, Fuller

---

[33]   *Chapman v. California,* 386 U.S. 18 (1967).

[34]   *Reynolds v. State*, 424 A.2d 6, 7 (Del. 1980).

[35]   Transcript of Trial Proceedings on October 7, 2003 at 149-50.

12

points to the fact that the jury acquitted him on the charge of trafficking in cocaine but convicted him for possession of the very same cocaine.

"The decision whether to give a particular jury instruction lies in the sound discretion of the trial court, and will not be reversed absent an abuse of discretion."[36] "A trial court's charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[37]

We hold that the jury instruction on joint possession was supported by the evidence for two reasons. First, there was Fuller's initial statement to the police that the cocaine belonged to a Colombian drug lord who had performed work on his vehicle. Although Fuller denied ownership of the drugs, it can reasonably be inferred from this statement that Fuller knew that the cocaine was in his vehicle and hence in his possession. Second, a rational fact finder could accept Ean's testimony that the drugs partly belonged to Ean yet also rejected Ean's testimony that Fuller had no knowledge of the drugs. Thus, there was sufficient evidence for the trial judge to instruct the jury on the concept of joint possession.

---

[36]    *Price v. State*, No. 367, 1995, 1996 Del. LEXIS 318, at *5 (Del. Aug. 19, 1996) (citing *Sheeran v. State*, 526 A.2d 886, 893 (Del. 1987)).

[37]    *Probst v. State*, 547 A.2d 114, 119 (Del. 1988) (citing *Baker v. Reid*, 57 A.2d 103, 109 (Del. 1947) (quoting *Flamer v. State*, 490 A.2d 104, 128 (Del. 1984)).

13

We also reject Fuller's contention that the joint possession jury instruction confused the jury, thereby resulting in an inconsistent verdict. The fact that the jury acquitted him of trafficking in cocaine but convicted him for possession of the very same cocaine does not compel the conclusion of jury confusion. After a careful review of the record, we are satisfied that there was sufficient evidence to support Fuller's convictions and that his acquittal on the charge of trafficking in cocaine is explainable simply as a matter of jury lenity.[38] Moreover, jury verdicts are insulated from judicial review on the basis of inconsistencies.[39]

### E.

We now turn to the sentencing issue. The trial judge imposed a sentence of five years imprisonment for Fuller's three convictions on the ground that Fuller at a minimum knew of his brother's false testimony and allowed it at his trial.[40] Fuller contends that the trial judge erred by enhancing his sentence because the trial judge impermissibly considered Ean's perjured testimony as a determinative sentencing

---

[38]     *Tilden v. State*, 513 A.2d 1302, 1307 (Del. 1986).

[39]     *United States v. Powell*, 469 U.S. 57 (1984).

[40]     *See supra* note 5 and accompanying text. We note that the trial judge made no conclusion that Fuller's lawyer knowingly participated in an obstruction of justice.

14

factor, that Fuller had a Fifth Amendment right to remain silent, and that there was no evidence presented that Fuller had suborned perjury or committed fraud.[41]

We begin our analysis by noting that a trial judge is permitted to consider a defendant's perjury or obstruction of justice as a sentencing factor.[42]  The question before us is whether there was competent evidence, and whether the requisite findings appear in the present  record, to support the trial judge's decision to enhance Fuller's sentence on the basis that Ean committed perjury while testifying at Fuller's trial. Absent any evidence in the record to link Fuller to the commission of that offense, we must answer this question in the negative.

With certain exceptions involving mandatory sentences, Delaware has an indeterminate sentencing system.  Although there are voluntary sentencing guidelines, the sentencing judge is not bound by them.[43]  The sentencing judge need only state his reasons for imposing a sentence outside the guidelines.[44]  We review a sentence of a

---

[41]    No conduct is a crime unless defined by the Delaware Criminal Code or another law. "Suborning perjury" is not identified as a crime in the Delaware Criminal Code by that phrase.  Our use of the term "suborning perjury" in this opinion is simply a reference to liability for the conduct of another under DEL. CODE ANN. tit. 11, § 271 (2004).

[42]    *See* Jean E. Maess Annotation, *Propriety of Sentencing Judge's Consideration of Defendant's Perjury or Lying in Pleas or Testimony in Present Trial,* 34 A.L.R. 4th 888. (1984).

[43]    *Mayes v. State*, 604 A.2d 839, 845 (Del. 1992).

[44]    DEL. CODE ANN. tit. 11, § 4204(m) (2004).

15

criminal defendant for abuse of discretion.[45]  Our review of a sentence "generally ends upon determination that the sentence is within the statutory limits prescribed by the legislature."[46]  "Thus, in reviewing a sentence within statutory limits, this Court will not find error of law or abuse of discretion unless it is clear from the record that a sentence has been imposed on the basis of demonstrably false information or information lacking a minimal indicia of reliability."[47]  "In reviewing a sentence within the statutory range, this Court will not find error unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind."[48]

The United States Supreme Court has held that commission of perjury or obstruction of justice is a permissible sentencing factor in the federal system after guilt has been resolved.[49]  The trial court must, however, "review the evidence and make independent findings necessary to establish willful impediment to or obstruction of

---

[45]     *See Boo'ze v. State*, No. 331, 2003, 2004 Del. LEXIS 145, at *9 (Del. Jan. 12, 2004). *See also Fink v. State,* 817 A.2d 781, 790 (Del. 2003) ("This Court reviews sentencing of a defendant in a criminal case under an abuse of discretion standard.").

[46]     *Boo'ze,* 2004 Del. LEXIS 145, at *9 (citing *Mayes,* 604 A.2d at 843).

[47]     *Id.*

[48]     *Id.* (citing *Fink,* 817 A.2d at 790).

[49]     *United States v. Dunnigan,* 507 U.S. 87 (1993)

16

justice, or an attempt to do the same ... ."[50]    The Supreme Court reasoned that "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows the judicial proceedings to progress without resorting to perjury."[51]   In *Dunnigan*, the Supreme Court found that there was ample support for the district court's findings that the defendant committed perjury during his drug prosecution given the numerous witness who contradicted the defendant regarding so many facts on which the defendant could not have possibly been mistaken.[52]  The Supreme Court further found that enhancing a defendant's sentence due to a defendant's perjured testimony at trial would not interfere with a defendant's right to testify because a defendant's right to testify does not include the right to commit perjury.[53]

It logically follows and we therefore hold that a defendant has no right to suborn perjury from a witness at his or her trial.  Consistent with the United States Supreme Court decision in *Dunnigan*, we also hold that to enhance a defendant's

---

[50]     *Id.* at 95 (citations omitted).

[51]     *Id.* At 97-98.

[52]     *Id.* at 95-96.

[53]     *Dunnigan*, 507 U.S. at 96.

17

sentence by reason of perjury committed by another person at trial, the trial judge must review the evidence and make independent findings necessary to establish willful impediment to or obstruction of justice, or an attempt to do the same through the perjury of another witness.[54]  The trial judge must identify on the record at least some specific facts, not just conclusions, showing that the defendant engaged in such conduct.[55]  The trial judge must also, at least briefly, explain or it must otherwise be apparent from the record why the subornation of perjury was material.[56]

In this case, the trial judge stated that he would not have enhanced Fuller's sentence to the maximum sentence allowed for the offenses, were it not for Ean pleading guilty to perjury at a separate proceeding.  However, Ean's guilty plea to perjury does not establish *per se* that another person suborned his perjury.  Nor does the fact that Fuller was convicted notwithstanding Ean's exculpating testimony establish that Fuller suborned perjury.

---

[54]    *See Matthews v. United States*, 11 F.3d 583, 587 (6th Cir. 1993). *See also United States v. Sassanelli*, 118 F.3d 495, 500 (6th Cir. 1997) (holding that a trial judge must "make independent findings that the defendant committed perjury" to enhance the defendant's sentence on this ground).

[55]    *See* DEL. CODE ANN. tit. 11, § 271 (2004). *Cf. Sassanelli*, 118 F.3d at 501 (holding that in the context of a defendant's perjury "the sentencing judge must identify for the record at least some specific instances of conflicting testimony and specify which portions of the defendant's testimony he finds materially perjurious.").

[56]    *United States v. Spears*, 49 F.3d 1136, 1143 (6th Cir. 1995) (citations omitted).  In the present case, the trial judge did explain his belief that Ean's perjury was the basis for Fuller's acquittal on the trafficking charge.

18

Unlike the facts in *Dunnigan*, the record here shows that Fuller remained silent during his trial. It is well established that no negative inference can be drawn against Fuller for his exercise of his Fifth Amendment right at trial.[57] Nor may any negative inference be drawn against Fuller for the exercise of his Fifth Amendment right at sentencing.[58] The record in this case does not show why the State did not obtain any statement from Ean about his perjury or anyone else's involvement in suborning it. On the other hand, the record does show that the State presented no evidence that Fuller suborned perjury, nor did the trial judge make independent findings from competent evidence in the record to establish that Fuller willfully did so. While it is undisputed that Derrick Fuller and Ean Fuller are brothers, this family tie is not a permissible factor for sentence enhancement.[59]

### III.

Accordingly, we **AFFIRM** Fuller's convictions in the Superior Court for possession with the intent to deliver cocaine, possession of drug paraphernalia and maintaining a vehicle for the purpose of keeping a controlled substance. We

---

[57]    *Griffin v. California*, 380 U.S. 609 (1965).

[58]    *Mitchell v. United States*, 526 U.S. 314 (1999).

[59]    *Cf.* United States Sentencing Commission, Sentencing Guideline Manual § 5H1.4 (stating that family ties is an impermissible factor for departing from federal sentencing guidelines).

19

VACATE Fuller's sentences[60] and **REMAND** for resentencing in conformance with

this opinion.[61]  Jurisdiction is not retained.

---

[60]    Because we have vacated the sentence for the reasons we have stated, we need not address in this appeal Fuller's argument that he was entitled to a jury determination that he suborned or acquiesced in perjury under *Blakely v. Washington*, 124 S. Ct. 2531 (2004).

[61]    We leave for the trial judge any determination in the first instance of whether he should recuse himself under *Los v. Los*, 595 A.2d 381 (Del. 1991) so that another judge may sentence Fuller.

20

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| LOU G. PRICE, | ) |
| | ) No. 486, 2003 |
| Defendant Below, | ) |
| Appellant, | ) Court Below:  Superior Court |
| | ) of the State of Delaware in |
| v. | ) and for New Castle County |
| | ) |
| STATE OF DELAWARE, | ) Cr. A. Nos. IN-01-07-1529 and |
| | ) IN-01-07-1530 |
| Plaintiff Below, | ) I.D. No. 0106010693 |
| Appellee. | ) |

Submitted:  July 21, 2004
Decided:  September 8, 2004

Before **STEELE**, Chief Justice, **HOLLAND, BERGER, JACOBS**, Justices and
**LAMB**, Vice Chancellor.\*

Upon appeal from the Superior Court.  AFFIRMED.

Joseph M. Bernstein (argued) and Andrew J. Witherell, Wilmington,
Delaware for appellant.

Timothy J. Donovan, Jr., (argued), Natalie S. Woloshin, and James V.
Apostolico, Department of Justice, Wilmington for appellee.

**STEELE**, Chief Justice:



CORRECTIONAL INST. LAW LIBRARY

\*Sitting by designation pursuant to Del. Const. Art. IV § 12.

A Superior Court jury convicted Leon Price of First Degree Murder and Possession of a Firearm During the Commission of a Felony.  The trial judge sentenced him to life imprisonment without probation or parole on the murder conviction, plus an additional twenty years for the weapons offense.  In this appeal from his conviction, Price contends that the prosecutor in her closing argument argued that the evidence supported a conviction on a theory of accomplice liability despite the fact that the trial judge had ruled that the evidence did not support accomplice liability and had accordingly refused the State's request for a jury instruction on the subject.

After a review of the evidence and consideration of the applicable law, we affirm the conviction.  Despite her troubling tactics, the prosecutor's inappropriate remarks did not, in light of substantial evidence of guilt and the trial court's curative instruction, create reasonable doubt about the fairness of Price's trial. Notwithstanding our conclusion that we must affirm the conviction, after careful review of the trial transcript and, after considering widely accepted standards of prosecutorial conduct, we find that the prosecutor's actions here conflicted with her responsibilities under the ABA Standards of Conduct.  We, therefore, strongly suggest that the Attorney General take appropriate action to address this deficiency.

2

## I.

Leon Price led a drug distribution ring operating between New York City and West Chester, Pennsylvania. Jamel Daniels was one of Price's principal cohorts. A Grand Jury indicted both Daniels and Price for the murder of Kensworth Griffith, a local drug dealer.[1] For several weeks before his murder, Griffith avoided contact with Price because he owed him "serious money" for drugs he had sold on Price's behalf. On the day of the shooting, Griffith, Daniels and two other drug dealers, Jose Martinez and Jamik Mosley, met Price at a gas station. All five drove around together for about an hour before Price stopped the car on the side of a rural road. Price and Daniels got out and pretended to urinate and asked Griffith to get out of the car. As soon as Griffith was out of the car, Price and Daniels both shot him, each firing at least two shots. Price shot Griffith with a .25 caliber Derringer that was never recovered, and Daniels shot Griffith with a .45 caliber Glock that was recovered and matched by ballistic evidence.

At trial, the medical examiner testified that Griffith died as a result of a combination of all of the shots. Martinez, Mosley, Price's girlfriend, and Griffith's best friend each gave testimony supporting the above-recited facts. There was evidence that Price paid certain individuals to supply him with a false alibi. There

---

[1] The Superior Court severed Price and Daniels' cases for trial. Daniel's appeal, No. 506, 2003, is pending before this Court.

was also evidence that Price and Daniels had an extremely close relationship (likened to "twins") and that they often communicated without speaking. There was no direct evidence, however, that Price directed Daniels to shoot Griffith.[2]

## II.

At the prayer conference, the State repeatedly requested an instruction on accomplice liability. Both of the prosecutors argued to the trial judge that the record evidence would support the requested jury instruction.[3] It is evident that despite substantial evidence that Price shot Griffith, the prosecutors were not content to rely on that theory of the case alone. They persistently insisted that the evidence also supported an accomplice liability theory as an alternative basis on which to convict Price of First Degree Murder. The trial judge considered seriously the arguments of both parties made over the course of two consecutive days, but ultimately expressed his belief that there was no evidence to support an accomplice liability theory. He, therefore, declined to give the State's requested instruction. We note the following instances, before his penultimate ruling, where the trial judge made it clear that he could find no evidence to support the requested instruction:

---

[2] The trial judge repeatedly found that there was no direct evidence that Price told Daniels to shoot Griffith. At one point, the trial judge said, "... there is no evidence that he [Price] directed him, not nary a witness that you can point to that Price directed Daniels. I don't know how you get around it." Trial Transcript at p. 88 (April 24, 2003).
[3] James V. Apostolico and Natalie S. Woloshin were the Deputy Attorneys General of record for the State.

4

The Court: I don't know how you get accomplice liability from there. Where is the factual basis to give it?[4]

~

The Court: ...How did Price in any way aid – How is Daniels the principal? There's no evidence that Daniels was the Principal actor here.[5]

~

Mr. Apostolico: I understand You Honor's view of the evidence here. And that is consistent with the State's theory. But it appears to the State that --
The Court: If you can point me to evidence, then you got – I have a much different situation. But the problem here is I don't think you can. Because what I recited was basically your opening statement.
Mr. Apostolico: That is correct. State can't argue with that.
The Court: I'm not opposed to giving it, but I've got to have, in light of their objection --- even before their objection I started off with that look. Tell me where the evidence is.[6]

~

Mr. Apostolico: There's no direct evidence in the – where you have Price telling Daniels, I want you to finish him off.
The Court: That's the issue I have.[7]

~

Ms. Woloshin: That 18-page letter indicates that he orchestrated the drug deal and he told Mel, Jamel was to take Kenny so that Kenny would be the driver. He gave Jamel the money and told them specifically where to go and where it was. And I think he even writes in the letter, take Route 92, or whatever it is.
The Court: He also said, I didn't do it, didn't know anything about it. It was a beef between Mosley and -- even from his statement I don't have anything which in any way shows that he aided, abetted, or did anything other than do a drug deal that didn't come off.
Mr. Apostolico: *Right, I think that's a fair statement.* (emphasis supplied)
The Court: So I don't have anything –[8]

---

[4] Prayer Conference Tr. at p. 3 (April 23, 2003).
[5] *Id.* at p. 4.
[6] *Id.* at p. 10.
[7] *Id.* at p. 13.
[8] Prayer Conference Tr. at p. 14.

5

Mr. Apostolico:    We think the evidence supports the principal accomplice relationship.

The Court:  What are the facts to support it other than Daniels was Mr. Price's alleged lieutenant?  Generally speaking, you have no other evidence from anything other than Daniels said, Yeah; why don't you get out of the car; come on.[9]

The Court: But I mean the language says the jury can be instructed -- before the jury can be instructed as to accomplice liability, there must be evidence that someone other than the defendant was the principal whom the defendant aided and abetted.  And that is clearly not the case here...[10]

Ms. Woloshin:  Consciousness of guilt.  This was an earlier draft.

The Court:    What you have is what I have here.    And the consciousness of guilt I hadn't – what's your position on that?

Mr. Bernstein: Putting that in?

The Court:  I don't know if they still want it.

Ms. Woloshin:  We'd rather have accomplice liability.

The Court:  I don't think there's a trade in the offing.

Mr. Apostolico:  We don't have strong feelings about it.  I think it is covered in the state of mind generally.

The Court:  If you don't have any strong feelings, I'm not going to mess with it.  Anything else you want to say on accomplice liability?

Mr. Apostolico: No, Your Honor.  We made our position.

Mr. Bernstein: You know our position.

The Court:  Does it help if I give it in the next case?

Ms. Woloshin: *You have to in that one.*  (emphasis supplied)

Mr. Apostolico:  We'll definitely argue for it in the next one.[11]

The Court: ...All right.  I'm not going to, as you might have suspected – I just don't see accomplice liability here.  I just don't see it from the evidence.  Not that I see the legal theory.  And I do see the inference

---

[9] The day after the Prayer Conference, and before the parties' summations, final arguments were heard on the jury instructions.  Trial Tr. at p. 10.

[10] Trial Tr. at p. 16.

[11] *Id.* at p. 42-43.

that could be drawn in some fashion. But it's just not the evidence to give in my estimation.

...

The Court: All Right. So the State has the exception as to the failure to give accomplice liability. Any other exception?

Ms. Woloshin: No.[12]

Immediately after the final conference on the instructions, Woloshin made the following statements during her summation:

> ... And at this point it's important for you to know that *in Delaware, if you direct another person to commit a crime, you who directed them are just as responsible as the person you directed...*. So it's pretty clear that, because of their relationship, that *Jamel Daniels knew what was going to happen and was directed by the defendant* to help him kill Kenny [Griffith] because of the debt that Kenny owed the defendant. *Therefore the defendant is responsible* for all of the injuries that Kenny suffered from the shots that Jamel Daniels fired. And those injuries were... (Pause.) ... And Dr. Pearlman testified that all of the injuries together caused Kenny's death; multiple gunshot wounds caused Kenny's death; although the most serious of those injuries are, first, the one to Kenny's abdomen, one the defendant caused when he shot Kenny with his Derringer; and the other one was to the back and shoulder area, which caused damage to the lungs and heart, which was caused by the bullet that *Jamel Daniels fired at the direction of the defendant*.[13] (emphasis added)

After Woloshin finished her summation, defense counsel objected, explaining that he did not object during her summation because he did not want to highlight her comments any more than necessary. The following exchange took place:

> Mr. Bernstein: ... We talked, I'm going to say, ad nauseam, about accomplice liability and the State's obvious desire to get an accomplice liability instruction, which the Court denied. And we

---

[12] *Id.* at p. 44, 47.
[13] *Id.* at p. 74-76 (emphasis added).

7

agreed on causation, the language that the State proposed to the effect that more than one person can be responsible. But what was argued here was accomplice liability. He's responsible for something that somebody else did. I don't know how to unring that bell, Your Honor. I very strongly object. I am asking for a mistrial. It's just improper. They couldn't have been more on notice that it was taboo. They did it anyway. I just don't know what to say.

The Court: Ms. Woloshin.

Ms. Woloshin: Your Honor, I discussed this issue with Mr. Bernstein outside before I did this. And I told him exactly what I was going to say. I said I was going to say to this jury that if they believed that the defendant directed either by word or deed Jamel Daniels, then he was responsible for what Daniels did. And *I did not imply that Daniels was the principal.* I simply said that, if the defendant directed, if they believed that the defendant directed Daniels to do this, then he's just as responsible. And this is directly in coming from – these are reasonable inferences from the evidence, in that the relationship between Jamel Daniels and Lou Price was so tight, it was an employee/employer relationship in some type of context other than say that if he believed – *if he directed him, then he's responsible.*

The Court: *But there is no evidence that he directed him,* not nary a witness that you can point to that Price directed Daniels. *I don't know how you get around it.* I looked up at the same breath ' cause I didn't quite understand it… And *you also said it's Delaware law. And I'm not instructing them in that fashion.* The charge I gave you guys doesn't say anything like that….*So how can you say it's Delaware law if I'm not going to instruct them on it? …*[14] (emphasis added)

At this point Woloshin begins to *reargue* the appropriateness of an accomplice

liability instruction.  In fact, she makes some of the same arguments that

Apostolico had made unsuccessfully only hours earlier:

---

[14] Trial Tr. at p. 85-88.

Ms. Woloshin: There was also – there was evidence about their relationship. There was also testimony about the fact that Jamel Daniels was the one who opened the door and got Kenny out of the car. There was also -- or there's a reasonable inference that if there was not -- some type of understanding between the two of them, the reasonable inference is why did Jamel Daniels pull out his gun and start firing if there was no understanding between them? *Obviously, there had been some understanding --*

The Court: But there must be some evidence to support that. I mean, you can speculate on a lot of things that they may very well have said. Maybe I just misunderstood the point.

Ms. Woloshin: I think there was testimony about things that occurred. And the State can argue all reasonable inferences from the evidence. And there's a reasonable inference that if Jamel Daniels did nothing after the defendant fired his gun the reasonable inference is that they must have had some sort of understanding between them or else Jamel wouldn't have fired.

The Court: I don't know how you get to that point. But I've heard that portion. I really don't. But the question is, what do, if anything, we do? I don't think there is any evidence to support that. But *what do you respond to "that is Delaware law" where you have instructions and I have the instructions and there's no instruction that Price is responsible for what Daniels does?* Don't I have to instruct them as to the law?

Ms. Woloshin: Yes, Your Honor.

The Court: How do we get past that? Even if you can argue that what you did, you argued something – you've told them that Price is responsible for what Daniels does. So now what do I do – there's nothing in the instructions. And the only exception the State took was on the accomplice liability issue, so that's not the law. Again, how do we get around that?

Ms. Woloshin: If I could have a moment Your Honor.
(Pause.)

Ms. Woloshin: I think in that type of argument that I was making, as I was referring to the causation that we had instructed, that the Court had – that we had discussed earlier, under Delaware law, more than

one person can be held responsible for causing the death of another. And if I misstated that, I apologize. But I think that the Court can – in order to cure that the Court can reread the causation instruction that you gave. And the Court can say I was wrong on how I phrased it. I mean, this is not evidence, obviously. The Court is the ultimate definer of the law. And the Court can say that. And the Court can say that I was wrong if I misstated the causation instruction.

Mr. Bernstein:  . . .To try and argue that, well, I made a mistake. I really meant to say causation, all she had to say was that more than one person can be responsible, which is exactly what we agreed to. She didn't begin to talk about causation then because that was at the tail end of the argument.

~

The Court: (after reading back the disputed comments by the prosecutor) *That's just not an accurate statement of the evidence. It's not close. It really isn't.* I mean that part isn't, where you say "it's pretty clear that Jamel Daniels knew what was going to happen and was directed by the defendant to help kill Kenny because of the debt." If you can point to me any witness that said that, that would take care of one situation, but I don't think you can. Interestingly enough, nobody even asked Mosley or Tito [Martinez]...was there any exchange between Daniels and Price relative to what happened after it happened? I don't think. And there was no testimony in that regard. So how do we get that? [15]

Ms. Woloshin: Do you want a response?

The Court: Yeah. I was being rhetorical.

Ms. Woloshin: ...I argued what I thought were reasonable inferences from the evidence in that there must have been some understanding between them because the defendant got out of the car and Jamel went and opened the car door. How would you know to let Kenny out of the car unless there was some understanding to get him out of the car?

The Court: The only testimony is they were going to Delaware to get the drugs from the defendant's house. That was the only testimony.

---

[15] Trial Tr. at p. 88-91 (emphasis added).

10

And that was a ruse, that there was no indication that Daniels knew otherwise. There just isn't anything.

Ms. Woloshin: And I think I said there must be some understanding between the two of them because Daniels got Kenny out of the car...[16]

~

The Court: (after agreeing to a proposed curative instruction) I will add for the purposes of the record, whatever it's worth, I don't think you intentionally intended to circumvent or do anything wrong. I mean that. That and ten cents may get you a cup of coffee. I don't think you intended to do anything improper or incorrect. I guess that doesn't change much, but still.

Ms. Woloshin: I think that's a pretty accurate observation. There was absolutely no intention on my part to circumvent the Court's order or rules.

The Court: I honestly don't think there was.[17] (emphasis added)

### III.

We find the above related transcript excerpts astonishing. While we hesitate to take issue with the trial judge's gratuitous (and curious) comment that he did not think Woloshin intended to circumvent his clear ruling rejecting accomplice liability, we note his palpable frustration and believe that his comments were, as he said, mere additions "for the purposes of the record . . ., whatever it's worth . . . ." It is important, we think, to focus on the long, tedious battle the State waged to convince the trial judge to give an instruction on accomplice liability that would tell a jury, in essence, that "in Delaware, if you direct another person to commit a

---

[16] *Id.* at p. 96-98.
[17] *Id.* at p. 103-104.

crime, you who directed them are just as responsible as the person you directed . . .

."

The trial judge flatly, clearly and unambiguously rejected that requested instruction. As the trial judge saw the evidence: " . . . – even from his statement I don't have anything which in any way shows that he aided, abetted, or did anything other than do a drug deal that didn't come off . . . there must be evidence that someone other than the defendant (Price) was the principal (Daniels) whom the defendant aided and abetted, *and that is clearly not the case here.*" To say that the prosecutors were on notice that the trial judge saw *no* evidence to support an accomplice liability charge would be an understatement. The trial judge *expressly stated* that he found "no evidence that he (Price) directed him (Daniels)." Nevertheless, Woloshin, present when those rulings were made on the record, stated in her closing that "in Delaware, if you direct another person to commit a crime, you who directed them are just as responsible as the person you directed . . . . Therefore, the defendant (Price) is responsible . . . from (sic) the shots that Jamel Daniels fired."

We are mindful that the trial judge faced a dilemma. He was at the end of a long First Degree Murder trial about to go off track because of the prosecutor's conduct in her initial closing. The trial judge believed a curative instruction might save the case from error sufficiently substantive to otherwise warrant a mistrial.

12

He may also have believed that a for-the-record comment that the prosecutor did not intend to circumvent his rulings could reinforce his justification for opting for a curative instruction rather than a mistrial to resolve any unfair prejudice.  The trial judge may well have considered that in the future he would have to work with this prosecutorial team.   The prosecutor, nonetheless, not only characterized the evidence in a way that the trial judge had found to be unsupported by the record but also urged the jury to convict on a legal theory on which he had adamantly refused to charge.  However his efforts to salvage the trial may be viewed, we do not believe the record supports the trial judge's professed conclusion that the prosecutor did not intend to violate his earlier ruling denying her requested instruction on accomplice liability.

After thoroughly reviewing this record and carefully considering the prosecutor's remarks about her summation and her arguments opposing the motion for a mistrial, we can only conclude that she intentionally ignored the trial judge's clear finding that the evidence did not support a contention that Price "directed" Daniels to kill Griffith.  Even before her summation, the prosecutor made her disapproval of that ruling evident by a frustrated retort that the trial judge would "have to" give the accomplice liability instruction at Price's co-defendant, Daniel's

13

trial.[18]  The trial judge had ruled that the evidence did not support a jury instruction that Price could be held responsible if he had done no more than to direct Daniels to shoot the victim.  Despite that ruling, Woloshin, nevertheless, informed the jury that "in Delaware" Price would be responsible if they determined that he "directed" Daniels to shoot Griffith.  The prosecutor knew that the trial judge's instruction on the law of the case would present no such legal theory to the jury. Despite that, she unabashedly argued to the jury that the evidence supported such a finding.  The trial judge's unequivocal ruling that the evidence did *not* support the theory and that his final instructions would not put the issue to the jury did not deter her from making certain that the jury would have an alternative theory on which to convict Price even if they did not believe that the evidence supported a finding that Price, himself, shot Griffith.

Woloshin's response to the defense's objection and to the Motion for a Mistrial dispels any uncertainty about her intentions before the jury.

First, she deflected responsibility for her actions by suggesting that Bernstein was also at fault because she "told him exactly what I [she] was going to say" and because Bernstein did not challenge her before she made her outlaw argument.  It is not defense counsel's responsibility, however, to review a prosecutor's summation for compliance with the trial judge's rulings on proposed

---

[18] A retort to which Apostolico, her co-counsel, promptly and tactfully responded: "We'll definitely *argue* for it in the next one."

14

instructions, nor is there any suggestion that if he had so cautioned her, that the caution would have caused her to rethink her position.

Second, during her initial response to the objection, Woloshin attempted to *reargue* the State's position on the sufficiency of the evidence to support her argument that Price directed Daniels to shoot Griffith, stating, "And this is directly in coming from – these are reasonable inferences from the evidence...." To that the trial judge responded, " But there is *no evidence that he directed him,* not nary a witness that you can point to that Price directed Daniels. I don't know how you get around it." (emphasis added)  Undaunted and continuing to justify her blatant sidestep of the trial judge's ruling, Woloshin responded: "There was also -- or there's a reasonable inference that if there was not – some type of understanding between the two of them. *Obviously, there had been some understanding."*

Finally, after pausing to realize that reargument at this stage of the proceedings was both improper and futile, she took a different tack. Disingenuously, we believe, Woloshin insisted that her objectionable argument was simply "referring to the causation that we had instructed."  Causation, however, only related to the fact that when two people shoot another at the same time and the multiple shots indistinguishably cause death, a jury can find both persons responsible.  "Causation" had absolutely nothing to do with whether Price "directed" Daniels to shoot Griffith and Woloshin knew that both at the time of her

15

closing argument *and* at the time she argued against the defense's Motion for a Mistrial.

The record supports only one conclusion: Woloshin's refusal to accept the trial judge's clear ruling on an issue that she remained determined to argue to the jury caused her to embark on an inappropriate legal frolic of her own. Her actions reflect no concern about complying with an adverse ruling from the bench.

The issue here is not whether the trial judge erred by refusing to give an accomplice liability charge where inferences from the evidence supported it. The issue is whether the prosecutor's refusal to abide by the ruling and her inappropriate remarks to the jury unfairly prejudiced Price in a way that jeopardized Price's right to a fair trial.

## IV.

We review a claim of prosecutorial misconduct *de novo* to determine whether the conduct was improper or prejudicial.[19] There can be no question that a prosecutor's blatant refusal to abide by a critical ruling by a trial judge on the law constitutes misconduct. Therefore, the issue becomes whether that misconduct warrants reversal of the conviction.[20] In *Hughes v. State,* this Court adopted a three-part test to evaluate prosecutorial misconduct: "the closeness of the case, the centrality of the issue affected by the (alleged) error, and the steps taken to mitigate

---

[19] *Hunter v. State,* 815 A.2d 730 (Del. 2002).
[20] *Id.* at 737.

16

the effects of the error."[21]   *Hunter v. State*[22] also demands that we review the misconduct itself to determine if it is part of a pattern of prosecutorial misconduct; the repetition of which "adversely affects the integrity of the judicial process," and may warrant reversal.[23]

The corroborative physical evidence and testimony of numerous witnesses convinces us that this is not a close case. There were two eyewitnesses to the actual shooting, each of whom testified consistently with the other. There was also evidence of an attempt by Price to "buy" an alibi defense, which demonstrated his awareness of guilt.

The next factor is the centrality of the issue. The medical examiner testified that Griffith died as a result of the combined effect of all of the gunshot wounds. Therefore, the jury would not have to find that Price directed Daniels to shoot Griffith in order to convict, even if the evidence supported such a theory. The jury would only need to find that Price shot Griffith, since Griffith died as a result of the combined shots fired by Daniels and Price.

Finally, the trial judge gave a clear curative instruction on the law and told the jury specifically that Price could not be held responsible for Daniels' actions:

---

[21] 437 A.2d 559, 571 (Del. 1981) (quoting *Dyson v. United States,* 418 A.2d 127, 132 (D.C. 1980)).
[22] Note 19, *supra.*
[23] *Hunter,* 815 A.2d at 737-738; *Brokenbrough v. State,* 522 A.2d 851, 864 (Del. 1987).

> Further, I instruct you as a matter of law that you may not hold Mr. Price responsible for the actions of Mr. Daniels. You may only consider the evidence in the record as to Mr. Price's activities in determining whether he is guilty or not guilty as charged and may not impute anything done by Mr. Daniels to Mr. Price in that regard. Do you understand?[24]

This instruction sufficiently mitigated any unfair prejudice to Price because it took from the jury the issue unfairly put to it by Woloshin, and made it clear that the jurors were to focus on Price's actions regardless of what Daniels may have done. A jury is presumed to follow the instructions given by the court notwithstanding a prosecutor's outlaw argument.[25] Accordingly, all three of the *Hughes* factors weigh heavily in favor of a conclusion that the prosecutor's misconduct did not result in unfair prejudice that adversely affected the outcome of the case.

We conclude that the prosecutor's conduct, although inexcusable and regrettable, did not so compromise the integrity of the judicial process that Price did not receive a fair trial. Accordingly, the conviction must be affirmed.

### V.

In *Hunter*, we lamented that at least five instances of prosecutorial misconduct were found during 2002 that resulted in three reversals of

---

[24] Trial Tr. at p. 105.
[25] *Brown v. State*, No. 528, 2000, 2001 Del. LEXIS 325, at *3 (Del. 2001) (juries are presumed to understand and follow instructions issued by the Superior Court); *Pena v. State*, No. 555, 2003 (Decided August 12, 2004).

18

convictions.[26]   We also cited a litany of cases that expressed "considerable concern" about a general failure to improve prosecutorial standards of trial conduct.[27]  Once again:  "For over twenty years, this Court has been admonishing prosecutors to follow ABA Standards of Conduct and refrain from making improper comments during summation that could prejudice the defendant."[28]  A prosecutor "represents all the people, including the defendant"[29] and must "seek justice, not merely convictions."[30]   Further, the American Bar Association's standards governing prosecution, condemn: (i) the expression of personal beliefs as to the credibility of witnesses;[31] (ii) the misrepresentation of trial evidence;[32]  (iii) commenting on the fact that a defendant exercised his or her constitutional right to remain silent;[33] (iv) denigrating the role of defense counsel;[34] (v) misrepresenting the legal effect of defendant's statements;[35] (vi) an appeal to the jury's sense of

---

[26] 815 A.2d at 731 citing *Walker v. State,* 790 A.2d 1214 (Del. 2002); *Morris v. State,* 795 A.2d 653 (Del. 2002); *Williams v. State,* 796 A.2d 1281 (Del. 2002); *Williams v. State,* 803 A.2d 927 (Del. 2002).

[27] *Brokenbrough,* 522 A.2d at 854.

[28] *Williams,* 803 A.2d at 928.

[29] *Bennett v. State,* 164 A.2d 442, 446 (Del. 1960).

[30] *Sexton v. State,* 397 A.2d 540, 544 (Del. 1979). See also *State v. Torres,* 744 A.2d 699, 708 (N.J. 2000) "A prosecutor is not simply another lawyer who happens to represent the State. Because of the overwhelming power vested in his office, his obligation to play fair is every bit as compelling as his responsibility to protect the public."

[31] *Clayton v. State,* 765 A.2d 940, 942 (Del. 2001).

[32] *Morris,* 795 A.2d at 659.

[33] *Bowe v. State,* 514 A.2d 408, 410 (Del. 1986).

[34] *Walker,* 790 A.2d at 1219.

[35] *Warren v. State,* 774 A.2d 246, 255 (Del. 2001).

19

personal risk or the level of safety in the community;[36] or (vii) an attempt to inflame the prejudices of the jury by name-calling or other pejorative language.[37]

At first glance, and consistent with *Hunter*, this appears to be an issue that we would review on a "clean slate" because this Court has not seen this specific kind of prosecutorial misconduct in past decisions.[38]  However, while this particular instance of misconduct may enjoy "clean slate" status, this particular prosecutor does not.  We note for the purposes of this decision that the same prosecutor who committed misconduct here was also at the center of a recent appeal highlighting her serious failures to comply with the rules of discovery in a capital murder case.[39]  In an extraordinary, and likely telling, turn of events, the Attorney General, herself, reviewed, and then abandoned, the State's argument on appeal defending this prosecutor's conduct in that capital case.[40]  We are obligated to express our concern that prosecutorial misconduct leading to reversal of an otherwise error free conviction includes not only "repetition of the same type or category of errors," but also a persistent pattern of misconduct by a single

---

[36] *Williamson v. State*, 707 A.2d 767 (Table), 1998 WL 138697 (Del. 1998).
[37] *Brokenbrough*, 522 A.2d 860-61.
[38] 815 A.2d at 738 citing *Coyle v. State*, 618 A.2d 90 (Table) (Del. 1992).
[39] See *Padilla v. State*, 852 A.2d 908 (Table) (Del. 2004).
[40] The Attorney General, after personally reviewing the briefs and the transcript of the oral argument made by the offending prosecutor before this Court, determined that, in light of the particular errors made by the prosecutor, a *nolle prosequi* should have been entered after the first mistrial – and requested that we remand for that purpose.

20

prosecutor whose actions cannot be fairly attributed to human error or honest mistake and compels equally strict scrutiny.

Departure from these ethical and professional obligations *should* be remedied other than by reversing convictions as a means to punish "a blundering . . . prosecutor."[41] Where (as here) we can fairly conclude the unfair prejudice caused by such a prosecutor did not adversely affect the outcome of a trial and did not reflect a pattern of conduct that compromises the integrity of the judicial process, we must find other ways to address the prosecutor's misconduct.

A prosecutor is simultaneously both an officer of this Court and an officer of this State; the direct report of a duly elected Attorney General. Besides performing the role of chief law enforcement officer of the State, the Attorney General also supervises prosecutors with a view to obtaining effective and uniform enforcement of the criminal laws.[42] Thus, so as the public looks to the Attorney General when law enforcement runs amok, so do we when prosecutorial conduct does the same. The misconduct in this case was not a mere moment of incompetence, nor a matter of inexperience. At best, it was outright indifference to a trial judge's ruling. At worst, the prosecutor acted with intent to prejudice the defendant's right to a fair

---

[41] *Torres*, 744 A.2d at 708. "The purpose of our system of criminal justice is to protect the innocent and punish the guilty. When a criminal trial is barred without reference to the evidence and a potential criminal is set free, the pain of such preclusion is felt, not by the inanimate State, or by some penitent assistant prosecutor, but by the offender's next victim. In such a way, the innocent are denied the protection due them by our Constitution."

[42] See generally *29 Del. C. § 2502 et seq.*

21

trial. What is not arguable is that the prosecutor acted in a manner wholly at odds with her overriding duty as a prosecutor and as an officer of the court, to seek justice. The Attorney General has an appropriate statutory mechanism at her disposal to address this situation.[43]   Accordingly, we refer this matter to the Attorney General to afford her an opportunity to take measures she deems appropriate.

The judgment of the Superior Court is AFFIRMED.

---

[43] 29 *Del. C.* § 2511. Tenure. Any attorney or other employee regularly employed by the Department of Justice to render services shall be appointed by the Attorney General to serve at the Attorney General's pleasure. After 3 years full-time service the employee shall have attained tenure and shall continue to be regularly employed during efficient and good behavior and shall not be removed because of religious or political opinions or affiliations or except for due cause, after a hearing before a court consisting of 3 judges of the Superior Court of the State.

22