E-102

BENGE - Direct

1  subsequent weeks discussing that, did Stacey Smith

2  come back into the scope as a potential intervener?

3      A    No.  I asked Donna later on, after the turn

4  of the New Year, I asked her at some point, more than

5  once, if she was seeing Stacey Smith, and she said,

6  "No."

7          In fact, her reaction was kind of peculiar

8  because she said, "Oh, no.  I'm not."  It led me to

9  believe that the suggestion that she and Stacey Smith

10  would have a relationship was something she found

11  not -- she found repugnant.  That he was her friend.

12  He was someone she counted on to help at Oak Grove,

13  but because of the age difference, she could never

14  become interested in him romantically.

15          I asked her about that several times.  Each

16  time she denied it in a similar way that led me to

17  believe that I was, again, being paranoid asking the

18  question.

19      Q    Christmas Eve Day, 2001, what do you

20  remember regarding any unusual event that day?

21      A    Well, I had -- Christmas is Donna's big time

22  of the year.  She starts planning for Christmas on

23  December 26th, and she stops after midnight on

E-103

BENGE - Direct

1    December 24th.  It's 365 days of the year for her.

2    She buys Christmas presents all year round, and it's

3    just the time of year that she celebrates the most.

4    Everything revolves around Christmas.

5        And I was hoping that the holiday spirit and

6    the family togetherness that we were going to have,

7    and which we did have, December 25th, 2001, that that

8    would work to bring us together because Christmas had

9    been so happy for us for so many years.  That Donna

10   would see that this is what had to be preserved.

11       She said she had to work a half day on

12   Christmas Eve.  It was a week day, and then she was

13   going to see her aunt, not really her aunt, but a

14   sort of distant relative who is called aunt for

15   convenience sake.  Her name is Evelyn Macoy.  She

16   lives in Wilmington not very far at all from where

17   Donna works.  Donna said she would be seeing Evelyn

18   after work, and we could expect her home after that.

19       Because it was Christmas Eve, all the kids

20   were home.  Laura was home from school, and we were

21   going to begin our holiday together.

22       So I knew that Donna had found a new

23   favorite jewelry store in Rehoboth called Fun to

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 50

E-104

BENGE - Direct

1    Find, and I had been down there weeks before,

2    whenever, I'm not sure, and I had gotten her a pair

3    of earrings, two stars on the end of a little chain,

4    one star on each ear.  That, I thought reflected the

5    holiday, and I was going to tell her she was one star

6    and I was the other.

7         I was going to stop in her office and give

8    those to her.  Just as sort of an idea of how she was

9    feeling that day and just to have some time between

10    myself and her alone.  Her office is on King Street

11    in Wilmington.  And I pulled up in the block.  Her

12    office is in the 1200 block.  I pulled in the 1300

13    block to park, which is one block north.

14         And I parked right behind a truck that

15    seemed familiar to me.  I got out to go to her

16    office, and I said, "That's a very familiar looking

17    truck," and I looked at it.  And it was a big black

18    Dodge diesel V8 with the extended cab, and instead of

19    truck tires, it just has very small tires, not big

20    truck tires like you would expect at all.  Small

21    tires that sometimes people are familiar with trucks

22    even laugh at.  And I said, "I know that truck.  I've

23    seen it.  And that is Stacey Smith's truck."

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 51

BENGE ~ Direct

1        Q       Did you charge in to the workplace and catch

2    them?

3        A       No.  No, I looked at the truck.  I looked in

4    the back.  I saw there was a couple of little small

5    gift packages, like you get at the store when they

6    don't want to gift wrap, but they give you sort of a

7    holiday bag.  I saw those.  I looked around.

8            I looked at the license plate number, and I

9    said, "That is Stacey Smith's truck, and he must be

10   there with Donna."  So, no, I got in my car, and I

11   drove away.

12           And I thought it must be -- I know Donna is

13   very dependent on Mr. Smith for Oak Grove business.

14   So I thought it was something where he had been in

15   the neighborhood, perhaps, and they got together, or

16   he had stopped by her office, and they were just

17   there for a few minutes.  So I didn't want to

18   embarrass anybody.  I will go.  It's time for me to

19   go.  I will go away, and I will see Donna later.

20       Q       When did Donna move out of the house, Snuff

21   Mill?

22       A       Well, she said here that she moved out in

23   September of 2001, and that's the first I learned

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 52

BENGE - Direct

1   about that.  As far as I know, she didn't move out

2   until March of 2002.

3        Q    Wouldn't you have noticed that she was no

4   longer at home?

5        A    Well, I think if Donna did not come home,

6   yes, I would notice if that were the case, and the

7   nights that she spent at her brother's house, her

8   brother Doug's house, on West 19th Street in

9   Wilmington I was very concerned.  I would call to see

10  if she was there.

11       And one night, in fact, I went to Doug's

12  house, West 19th Street, to make sure that she was

13  there.  So, yes, if she had moved out, I certainly

14  believe I would have noticed.

15       Q    By March of 2002 when she did move out, what

16  was your impression regarding her being involved,

17  other than Jim Doe, which had ended by that point,

18  with any other male?

19       A    None.  Because I asked her again had anyone

20  replaced me in her heart, and again, I had asked her

21  if she was involved with Stacey Smith, and she said

22  no.  In a way, that was unmistakably clear.

23       Donna had never, never said anything to me,

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A53

BENGE - Direct

1    which I later learned was untrue.  She had never lied

2    to me.  I thought her incapable of telling an untruth

3    because even when we were eating dinner and we would

4    get telephone solicitation calls and Donna would be

5    very annoyed, but she would not hang up.  I would

6    tell her to tell whoever it was that she already had

7    that particular product.  I have already got one of

8    those so I'm going to hang up, but she wouldn't say

9    that.

10        She would not tell an untruth, and I thought

11   that I could fully trust her and believe her if she

12   told me she was not involved with anyone else, and,

13   specifically, when I asked if it was Stacey Smith and

14   she said no, that there was no question, and she was

15   not involved with him because she would not lie to

16   me.

17       Q    You heard Stacey Smith talk about a

18   telephone conversation that was initiated by you, you

19   with him, and you heard him testify to that on

20   Thursday?

21       A    A telephone conversation where I called him

22   at his home, yes, sir.

23       Q    Do you know the date of that?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER
A 54

E-115

BENGE - Direct

1      Q    Okay, you told us part of the why.  I guess

2    I will finish up on the why.  When you gave her

3    whatever it is that you are going to give to her, did

4    you expect to be on planet earth much longer?

5      A    Mr. Hurley, after the things that had

6    happened, I began to think that there was no place

7    for me and that everybody would be better off if I

8    was not around.  So, yes, I thought I would have no

9    need for it.

10     Q    Now you had been through a family suicide

11   situation four or five years earlier, and so I guess

12   it was devastating?

13     A    November of 1997, yes, we had been through

14   that as a family, yes.

15     Q    So even you have firsthand knowledge of what

16   that does to the survivors?

17     A    Very close.  My sister Peggy was younger

18   than me.  My birthday is October 22nd.  Her's was

19   October 23rd, and so the family always said that she

20   was my birthday present that year.  So we were very,

21   very close, and I blame myself forever because

22   shortly before her death, there were signs that I

23   should have seen, and I should have done something.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 55

E-121

BENGE - Direct

1    you.  Would you recite your recollection of the

2    conversation when the three of you were in the same

3    room at the same time?

4        A    Yes.  I came in, and Mr. Smith was there,

5    and before I said anything, Donna came into the room.

6    And I had brought coffee for Donna.  So it was kind

7    of a flat situation.

8            I said, "Do the kids know about this?"  And

9    by that, I think everybody present knew that I was

10   referring to the fact that Mr. Smith was there in the

11   mornings.  And Donna said to me, "Yes, they know."

12   And then she said, "I think you better leave."  And I

13   put the coffee down on the table, and I left.  The

14   doughnuts also, but I left, yes.

15       Q    Did you raise your voice, get angry, yell,

16   scream?

17       A    No.  There was nothing to raise my voice

18   about.  Donna told me that the kids were aware of

19   what was going on.  I was not aware that the children

20   knew, and that's all there was to discuss.

21       Q    After you left there that day in July, did

22   you return to those premises without her permission

23   in order to place a tape recording device?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-56

BENGE - Direct

```
 1      A     Unfortunately, yes, Mr. Hurley, I did that.
 2            MR. HURLEY:  May we have an instruction,
 3      Your Honor?
 4            THE COURT:  All right.
 5            Ladies and gentlemen of the jury, I think I
 6      told you last week from time to time evidence would
 7      come in, and it would be of a nature that it would
 8      only come in for a certain purpose.  I think we are
 9      going to hear a repeat of evidence that the
10      prosecution earlier, or previously offered, and when
11      it came in at that time, I read to you an
12      instruction, which explains to you how you are
13      supposed to consider that evidence.  And I'm going to
14      read to you that instruction again.
15            Ladies and gentlemen, you are about to hear
16      evidence which you might regard as evidence of other
17      bad acts.  This evidence was offered in the past by
18      the prosecution in the context of demonstrating the
19      mental state or motive that the State alleged the
20      defendant had.  It cannot be used for any other
21      purpose.  The weight that you give this evidence, if
22      any, as it pertains to the defendant's mental state
23      or motive, is entirely for you to decide in your
```

E-123

BENGE - Direct

1    discretion as you see fit.

2            While I am allowing the introduction of this

3    evidence, as a matter of law, you are not, in any

4    way, to interpret that decision as any reflection of

5    the Court's view of the evidence or the weight, if

6    any, to which it is entitled.

7            I want you to understand that you must not

8    use this evidence to infer that the defendant is a

9    person of bad character who, because of bad

10   character, is more likely to be guilty of any one of

11   the offenses that he is charged with.

12           You are required to consider all of the

13   evidence that is introduced before you in order to

14   determine whether the State has met its burden

15   proving guilt beyond a reasonable doubt.

16           Go ahead, Mr. Hurley.

17           MR. HURLEY:  Thank you, Your Honor.

18   BY MR. HURLEY:

19   Q    Why did you make your way into 203 Florence

20   Avenue and leave a tape recorder in the residence?

21   A    I had to know the truth.  I had to know what

22   Donna -- I had to know if she had betrayed me.  I had

23   to know if I was being told the truth.  I had to know

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A58

BENGE ~ Direct

1    that.  I wanted to be right, Mr. Hurley.  I wanted to

2    be right.

3         I wanted to prove to myself that Donna had

4    told me the truth when she said that I want a divorce

5    because I want it to be just me and the kids for a

6    while.  There is no one else.  I just want it to be

7    me and the kids.  I had to know if that was true.

8         And I thought that if I could prove to

9    myself that Donna and Mr. Smith were not sleeping in

10   the same bed, that they were just friends, that it

11   was just an extension of the Oak Grove people, of the

12   Oak Grove crew, and I thought it would be that.

13        I knew deep down inside that I had to be

14   wrong in my thought that they had a relationship that

15   was intimate, and I knew I could prove to myself that

16   it wasn't that.  That they weren't intimate.  That I

17   was misreading the situation entirely.  That Donna

18   was being truthful to me.

19        And I thought that this was a way that I

20   could find out, and I was foolish, foolish, but I had

21   to prove -- I had to have proof one way or another.

22   I had to know.

23        Q    As a result of placing a tape recorder in

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 59

BENGE - Direct

1    her home, her temporary home I guess you could say,

2    were you able to gather together tapes and listen to

3    the contents?

4         A    Yes.

5         Q    And would you characterize for the jury's

6    benefit the significance of things that came from

7    those tapes that you were able to hear?

8         A    Well, they were horrible in quality, just

9    miserable.  I couldn't -- for a long time, I couldn't

10   decipher anything, and that gave me comfort.  That

11   there was nothing on there.

12        But then, I picked up a couple of areas that

13   were suspicious, and my son had a lot of sound

14   equipment.  He's got computers and video games and

15   electronics and whatever.  And I was able to use one

16   piece of equipment to adjust the speed and the tone

17   of the tape, and in two separate areas, I picked up

18   sounds of sexual activity.

19        Q    Meaning?

20        A    Specifically?

21        Q    Specifically.

22        A    There was a sound of a bed, or mattress, and

23   then what appeared, or what sounded like, a male

BENGE - Direct

1   groaning, and then Donna saying, "Are you okay,"

2   which I knew when she says that -- I know when she

3   says that.

4       Q    You heard that before?

5       A    Yes, I heard it many, many, many times.

6       Q    What else was on the tape that you could

7   decipher?

8       A    Then the tape of the next day, the tape of

9   the next night, there was Donna and Mr. Smith

10  laughing and laughing, and Mr. Smith said, as he was

11  laughing, "I haven't -- I hadn't thought of that,"

12  and Donna said, "I like -- I like to explore."  And I

13  knew what that was.

14      Q    Was there anything else?

15      A    Donna also said what she liked to do.  That

16  was on the tape as well.

17      Q    Did that involve a reference to oral sex?

18      A    Yes.

19      Q    How many hours did you spend listening to

20  those excerpts?

21      A    Not hours, Mr. Hurley.

22      Q    Minutes?

23      A    Days.


                CHRISTINE L. QUINN
              OFFICIAL COURT REPORTER

                    A 61

E-127

BENGE - Direct

1     Q   Over and over and over?

2     A   Yes.

3     Q   What month of what year was it that you were

4  doing this?

5     A   July, the last part of July of 2002.

6     Q   Why were you doing that to yourself?

7     A   Because I couldn't believe it.  And I

8  thought I was wrong.  If I listened to the tapes

9  enough, the material would not be there.

10    Q   That's illogical?

11    A   That's why I listened to the tapes to make

12  it go away.

13    Q   Did it go away?

14    A   No.

15    Q   Were you taking any medication at that

16  point?

17    A   I don't take medication.

18    Q   From that point on, tell the jury, if you

19  will, the journey that led you to arm yourself and go

20  that Sunday morning to Oak Grove?

21    A   Well, I kept -- I resolved that's what I had

22  to do.  I had to remove -- I had to remove the

23  cancer.  And the cancer was me.  I had to destroy

A 62

BENGE - Direct

1    myself.  So I set about determining how I would do

2    it.  And I came up with a plan.  But I couldn't do it

3    immediately.

4            I found several reasons why not, and then on

5    August the first, I fell off my broken ladder, and I

6    broke my heel, and I was incapacitated for two

7    months.  So now I'm tortured by what my life has

8    become, and I can't walk around.  So now I did sit at

9    home, and for two months the thought was with me,

10   night and day, as I sat in my chair with my leg up,

11   unable to do anything, and having to live with what

12   had happened to my life.

13   Q    A couple years before that, you were

14   surrounded by three children and a wife who was

15   surrounding you in August of 2002?

16   A    My son was there only half the time, and I

17   was alone.  No one.

18   Q    In your thinking, looking back on yourself

19   then, why were you the cancer?  Why wasn't Stacey

20   Smith or Donna the cancer?

21   A    Donna was the children's mother.  She was

22   too important to them, particularly my son.  I could

23   never harm her.  Never.  I could never harm her.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 63

BENGE - Direct

1            Mr. Smith was just -- was just there.  There

2      was nothing special about him.  He was just there.

3      Just the same way that Mr. Doe was there.  He really

4      meant nothing in the situation.  So I had no reason

5      to want to harm him.  If I had harmed him, I would be

6      doing nothing to accomplish an end to the situation.

7            If I was gone, Donna had a chance at

8      happiness, and I thought that the kids would recover

9      in due course.

10     Q    You mentioned a plan.  What was the plan

11     that you formulated as you're sitting there for a

12     couple months disabled, partially disabled?

13     A    Well, I was going to shoot myself.

14     Q    Where, and under what circumstances?

15     A    I was going to shoot myself in the office of

16     the Oak Grove Motel with Donna and Stacey Smith

17     present.

18     Q    Would you help the jury understand, who

19     never thought of anything like that, why you chose

20     Oak Grove, and why you chose to have witnesses?

21     A    I wanted Donna -- I wanted Donna and

22     Mr. Smith to understand the depth of the hurt, the

23     depth of the consequences of their lies and

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER
A44

BENGE - Direct

1    deception.

2           If I wasn't going to be around, they were

3    going to know why, and they were going to have to

4    live with the fact that Oak Grove, which is where

5    they met, where they carried on their deceitful,

6    secret relationship, that Oak Grove was where I --

7    where I died.

8       Q    And had you thought exactly how you were

9    going to exterminate yourself?

10      A    I was going to shoot myself, yes.

11      Q    How?  Where?

12      A    I was going to place my uncle's gun in my

13   mouth and pull the trigger.

14      Q    Blow the top of your head off in front of

15   them?

16      A    If that's what happens, yes.

17           MS. WITHERS:  May we approach, Your Honor?

18           THE COURT:  All right.

19           (Whereupon, counsel approached the bench and

20       the following proceedings were had:)

21           MS. WITHERS:  Well, on the one hand, I'm

22   very desirous of getting this trial finished.

23           I'm uncomfortable beginning what is going to

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A 65

F-73

J. BENGE - CROSS

1        Q.    But it was Stacey Smith whose shadow would

2     never darken the doorway of the Snuff Mill residence,

3     you named him specifically?

4        A.    That's who I was talking about at the time,

5     yes.

6        Q.    On October 20th when you left Wilmington to

7     go to Rehoboth, you were dressed in dark blue pants,

8     dark blue tee shirt, dark blue sweatshirt with a

9     hoody, and a dark blue baseball cap.  Is that your

10    favorite color or were you trying to wear some sort of

11    cat burglar-type attire?

12       A.    Blue, Ms. Withers, is my favorite color.  I

13    went to Brandywine High School.  Their colors are blue

14    and white.  They have been mine since that time.  When

15    I played football, I was proud to wear those colors.

16    Those are, in fact, my favorite colors.

17       Q.    You brought wire cutters with you?

18       A.    Yes.

19       Q.    Where did you get the wire cutters from?

20       A.    I had an extensive tool collection at home.

21    The wire cutters were part of it.

22       Q.    Where were they in your outfit that night,

23    where were you carrying them?

DAVID WASHINGTON
Official Court Reporter

A 66

J. BENGE - CROSS

1          MR. HURLEY:  I think this was morning, Your

2     Honor, not at night.

3          THE COURT:  What I think she is referring to,

4     he would have left his residence in Wilmington

5     sometime during the night?

6          MR. HURLEY:  Thank you.

7          THE WITNESS:  Well, what you are referring to

8     is wrong.  I did not leave my residence sometime in

9     the middle of the night, but the answer to your

10    question:  The wire cutters would have been in one of

11    the pockets of the pants.

12    BY MS. WITHERS:

13         Q.   Where did you get the keys to the motel

14    office door?

15         A.   From Donna's car.

16         Q.   The same time when you went into her car to

17    get the Florence Avenue keys or a different occasion?

18         A.   Probably on a different occasion.

19         Q.   So there was more than one occasion you have

20    gone into her car to take things out and made copies

21    of them and replaced the originals?

22         A.   Yes.

23         Q.   So those keys were not given to you by


                    DAVID WASHINGTON
                 Official Court Reporter

                      A-67

J. BENGE - CROSS

1     anyone?

2         A.    Not the keys to the office, no.

3         Q.    The pants that you were wearing actually had

4     a canvas belt on them, but the holsters were on a

5     leather belt around the waist, would you agree that's

6     accurate?

7         A.    Yes.

8         Q.    That's because you wanted to make sure the

9     guns were secured around your waist?

10        A.    No.  The canvas belt was part of the pants.

11    That was built into the pants.  They were there to

12    hold up my trousers.  The leather belt was there for

13    the holsters, yes.

14        Q.    Where did you get the holsters from?

15        A.    My uncle's.

16        Q.    They came with the two guns?

17        A.    Yes.

18        Q.    Did you load the guns at home in Wilmington?

19        A.    I did not load the guns.  The guns were

20    loaded when I got them from my uncle's and I did not

21    unload them.

22        Q.    Did you check them before you left?

23        A.    I don't know that I did.


                    DAVID WASHINGTON
                Official Court Reporter

                        A 68

J. BENGE - CROSS

1      Q.    Well, you said your plan was to commit

2    suicide.  Didn't you want to make sure the guns had at

3    least one bullet in them?

4      A.    I could see there were rounds, bullets in the

5    cylinders.  The guns were in the holsters.  The

6    holsters were on the belt.  I did not wear them as I

7    drove.  I got down to the motel and I put the belt

8    with the holster on at that time.  I don't know that I

9    ever opened up the guns to check them.

10      Q.    Gee, you had been working on this plan for a

11    number of months and you don't bother to open up the

12    guns to check to see if there were an adequate number

13    of bullets?

14      A.    This was not a situation, Ms. Withers, where

15    I had a checklist.  I was very upset.  I was

16    distraught.  I was debating with myself whether or not

17    this was a thing I should do.  And a point of fact, I

18    decided that ultimately I was not going to do it and I

19    did not.  As I recall, I can't tell -- I can't sit

20    here and say I methodically opened up the handguns to

21    look to see if there was a round in the chambers.  I

22    don't remember that being a part of the process.

23      Q.    You know from your training in the Army that

DAVID WASHINGTON
Official Court Reporter

A 49

J. BENGE - CROSS

1    ammunition can sometimes get stale?

2        A.    No, Ms. Withers, they didn't teach us that.

3        Q.    You weren't aware of that?

4        A.    No.

5        Q.    When you got the guns from your uncle's

6    estate, it was a number of years before October 20th

7    of 2002, right?

8        A.    Two years.

9        Q.    And yet you didn't think: Gee, maybe I ought

10   to put fresh bullets in to make sure nothing went

11   wrong?

12       A.    I am sure that's why I carried loose rounds.

13   Your question: Did I check. I can't tell you that I

14   did that. I may have. I can't say yes.

15       Q.    Which pocket did you put the speed loaders

16   in?

17       A.    One of the pants pocket. It may have been in

18   the same pocket with the wire cutters.

19       Q.    Where did you get the spray, pepper spray

20   from?

21       A.    I got that from the hardware store. I

22   originally purchased it for my daughter, Sarah. She

23   was going to go to college in Brooklyn and I thought

DAVID WASHINGTON
Official Court Reporter

A 70

J. BENGE - CROSS

1    she ought to have that, but then I found out she

2    couldn't.  It was a small hardware store in the

3    Naaman's Road area.  It is the True Value or

4    Silverside Hardware or Claymont Hardware, either of

5    those three places.

6        Q.    When did you buy it?

7        A.    That would have been in the spring of 2002.

8        Q.    What attracted you to that particular brand

9    of pepper spray?

10       A.    Nothing that I recall.  It was displayed near

11   the counter of the store and I simply picked it up,

12   thinking it might be of some use to Sarah when she

13   went to school in Brooklyn.

14       Q.    So you deny you were aware that it was a

15   particularly strong form of disabling spray?

16       A.    I have no idea about relative strengths.  I

17   don't know that much about pepper spray, if anything

18   at all.

19       Q.    You indicated that you broke your heel early

20   in August and, therefore, the plan had to be put off

21   for a while?

22       A.    I shattered my heel falling from 18 feet off

23   a ladder on August the 1st, yes.

DAVID WASHINGTON
Official Court Reporter

A71

J. BENGE - CROSS

1       Q.    So the plan had already been somewhat

2   formulated before that accident?

3       A.    When you say "the plan", the thinking that I

4   had that I should take my life was going through my

5   head constantly, along with lots and lots of reasoning

6   why I should not do that.  There was thinking about

7   it:  Yes, no, yes, no all the time.  It dominated my

8   thinking.  And there was not a set plan, as your

9   question implies.  But, yes, when I could not walk,

10  when I was on crutches, there wasn't much opportunity

11  to carry anything out.  I can't say that I'm sorry

12  that I broke my heel because it did prevent anything

13  from happening for two months.

14      Q.    When you went into the Florence Avenue

15  residence that morning and confronted Donna and

16  Stacey, how did you get in?

17      A.    You are talking about in July?

18      Q.    Yes, July of 2002, that would be correct.

19      A.    Yeah.  I think I just walked in the door.  It

20  was open.

21      Q.    Standing open?

22      A.    No, closed.

23      Q.    Locked or unlocked?

DAVID WASHINGTON
Official Court Reporter

A 72

F-79

J. BENGE - CROSS

1   questions asked is a deliberate -- it's a violation of

2   what you said.

3            THE COURT:  I mean, why wouldn't the answer

4   be:  They wouldn't talk to me because of the

5   protection from abuse?

6            MR. HURLEY:  It isn't the same.  It's not the

7   same if there was a PFA.

8            THE COURT:  No.  Well, I mean, as I

9   understand it, they had talked before and there were

10  no harsh words said, no threats, none of those things,

11  why is it different now, why would they not come out

12  and talk to him?

13           MR. HURLEY:  I, fortunately, have never had a

14  protection from abuse, but I expect if I did whatever,

15  I violated my ex-wife, the ex-wife would pick up the

16  phone and call in.  It violates the protection from

17  abuse.

18           THE COURT:  I understand that part of it.

19           MR. HURLEY:  "Why would you expect it would

20  be different"?  The difference is there is a

21  protection from abuse now.  They would call and get me

22  the hell out of there.

23           THE COURT:  Well, how much further are you

DAVID WASHINGTON
Official Court Reporter
A73

F-80

J. BENGE - CROSS

1  going with this question?  They wouldn't come talk to

2  me.

3          MS. WITHERS:  I don't recall how many more

4  questions I have directed to this.  I think I'm

5  basically through with them, that point, but maybe I

6  can make the point by simply asking it.

7          MR. HURLEY:  I think you have -- the reason

8  for being here, I am afraid the next question:  Well,

9  why would it be different.

10         THE COURT:  I think you made your point.  It

11  is up there for comparison and argument.

12         MS. WITHERS:  Okay.

13         THE COURT:  And I am afraid if you go too

14  far, we will get something we do not want to hear.

15         MS. WITHERS:  Okay.

16         THE COURT:  All right.  Let's move on.

17         (Whereupon, counsel returned to the trial

18     table and the following proceedings were had:)

19  BY MS. WITHERS:

20     Q.   When you walked in you found Donna alone in

21  her bedroom; is that correct?

22     A.   Yes.  Donna was alone in the bedroom, yes.

23     Q.   Did you ask her where Stacey was?

DAVID WASHINGTON
Official Court Reporter
A-74

J. BENGE - CROSS

```
1      A.   I said:  Where is Stacey.

2      Q.   Did she answer you?

3      A.   No.

4  ´   Q.   Is that when you sprayed her in the face with

5  the pepper spray?

6      A.   I did not spray her in the face with the

7  pepper spray, so the answer to your question is:  No.

8      Q.   Is that when you sprayed the pepper spray in

9  her general direction?

10     A.   I did not spray pepper spray in her general

11 direction, so the answer is:  No.

12     Q.   How did she wind up with all the pepper spray

13 on her face and her hair?

14     A.   Ms. Withers, when I walked in the bedroom, I

15 asked Donna once where Stacey was.  She said:  What

16 are you doing here.  And at that point, my only

17 thought was to make her leave the room, get away from

18 me so that nothing bad would happen.  I was hoping she

19 would lock herself in the bathroom.  I took out the

20 can and sprayed the can towards the single bed in that

21 room.  She said:  What is that, and she jumped up off

22 the bed and ran out of the bedroom.  If you are asking

23 how she wound up with pepper spray, I can only think
```

F-82

J. BENGE - CROSS

1    that she was seated in the living room behind

2    Mr. Smith when I sprayed him in his face to keep him

3    away from me.  She was directly in the line of fire of

4.   that spray.

5         Q.   I thought the purpose of the suicide mission

6    was so she would watch you die, how would she do that

7    if she locked herself somewhere else?

8         A.   I wasn't going to, at that point, hurt

9    anyone, not Donna, not Mr. Smith, not myself.  I had

10   lost my -- I had lost my thought of doing that.  I was

11   too weak.  I was too weak a person to carry that out.

12   I did not have the strength.  I didn't have that

13   strength.

14        Q.   Why didn't you just leave then?

15        A.   At what point?

16        Q.   Before Stacey -- well, before you chased her

17   into the living room and grabbing her about her neck

18   and before Stacey Smith hears the screams and he has

19   to come running to her aid and Stacey Smith gets shot

20   in the chest?  You had a lot of time to walk out of

21   that motel.

22        A.   No, Ms. Withers.  All of this happened within

23   a matter of a minute or two.


                    DAVID WASHINGTON
                 Official Court Reporter
                        A 76

F-83

J. BENGE - CROSS

1      Q.    Why don't you tell us your version of what

2   happened, Mr. Benge?

3      A.    I was hoping you would ask for that, so I

4   will do so.  I was in House 5.  I sat down on the bed.

5   I was watching the oval area.  Nothing was happening

6   that Sunday morning.

7      Q.    You were watching what area?

8      A.    There is the grass oval that separates the

9   office house, the motel and the building where the

10  office and the apartment are.

11     Q.    It's a courtyard?

12     A.    Well, yes and no.  There is another area in

13  which some people may call the courtyard.  There is an

14  area that is framed by the stone drive that opens up

15  on Canal Street.

16     Q.    I'm sorry, I interrupted you.  You were

17  sitting in House No. 5 watching the oval area.

18     A.    Nothing was happening.  I was debating what I

19  was going to do.  Again, I went through the same

20  thoughts for the -- I don't know how many times I had

21  them in the past:  Should I do this, should I not do

22  this.  And not having resolved it, I went out and I

23  walked around the building that has the office and the

DAVID WASHINGTON
Official Court Reporter

A 77

J. BENGE - CROSS

1    that respect it is also similar?

2         A.    I did not know Mr. Smith was there.  Yes,

3    Mr. Smith and Donna were there and in that respect it

4    is similar, yes.

5         Q.    You had keys that you had stolen to both of

6    the residences and to the motel and in that respect

7    the incidents are similar?

8         A.    Yes.

9         Q.    The only thing missing were the guns, right?

10        A.    And, Ms. Withers, more important, my state of

11   mind.

12        Q.    On October 20, 2002, you left your home in

13   Wilmington and you drove to the Oak Grove Motor Court,

14   did you not?

15        A.    Yes.

16        Q.    You went into the motel and it was early in

17   the morning?

18        A.    Yes.

19        Q.    It was a Sunday morning?

20        A.    That's correct.

21        Q.    It was late in October?

22        A.    October 20th.

23        Q.    The office was still closed when you went in?

                    DAVID WASHINGTON
                 Official Court Reporter

                    A 78

J. BENGE - CROSS

1      A.    The office was -- the office door was locked.

2    The office was, at that time of year, open for

3    business.    In that sense --

4      Q.    It had not yet opened for business that

5    morning?

6      A.    That's correct.

7      Q.    Donna and Stacey were in the motel room or in

8    the office or in his apartments alone, you knew that?

9      A.    I did not know who was there, no.    I did not

10   know where anyone was.

11     Q.    You didn't watch for a period of time from

12   Room No. 5 as you sat drinking your beer?

13     A.    I watched from House 5, not Motel 5.    And I

14   did not drink beer and I didn't see anything.    No, I

15   didn't see anyone or anything.

16     Q.    You weren't drinking?

17     A.    I had some type of whiskey with me at that

18   point.

19     Q.    Were you drinking it that morning?

20     A.    Yes, I did.

21     Q.    Did you need some liquid courage?

22     A.    No, Ms. Withers.    I had that there -- I had

23   that with me in the hope that it might dull the pain.

F-86

J. BENGE - CROSS

1        Q.    How long did you sit watching the office

2    before you broke in?

3        A.    I didn't break in the office.  But to answer

4    your question:  I was there for what seemed to be a

5    "lifetime, but was probably 15 minutes, 15 to 20

6    minutes.

7        Q.    Then you cut the phone lines?

8        A.    Yes.

9        Q.    All nine of them?

10       A.    I cut however many were there, yes.

11       Q.    Did that take some time?  Those wires are

12    fairly thick.

13       A.    As I recall, Ms. Withers, I wasn't thinking

14    about it.  But if I'm not wrong, no, it took no time

15    whatsoever.  The wire cutters cut the wires like a hot

16    knife through butter, if I recall.  I wasn't thinking

17    about it mechanically at that point.  I just did it.

18    But it was very, very simple it seemed.

19       Q.    You used the keys you had stolen to unlock

20    the office door and you went into the office?

21       A.    Yes.

22       Q.    You went in uninvited?

23       A.    Correct.

DAVID WASHINGTON
Official Court Reporter

A 80

J. BENGE - CROSS

1          Q.   At that point you could have simply walked up

2     to them, addressed them calmly, said whatever you

3     needed to say to them, and then shot yourself in the

4     head; isn't that right?

5          A.   Well, that's correct, except as it turned

6     out, Mr. Smith was in a different apartment.  And what

7     you suggest just wasn't possible.

8          Q.   That was a surprise, wasn't it?  You weren't

9     expecting them to be in different bedrooms that early

10    in the morning?

11         A.   I didn't know what to expect, Ms. Withers.  I

12    didn't know what to expect.

13         Q.   When you walked in you could have gone in and

14    Donna was awake, you could have gone into her bedroom

15    and say:  Donna, I would like to talk to you and

16    Stacey?  Given your past history with the two people,

17    isn't it likely they would have sat with you at the

18    kitchen table and talked to you there in the office?

19         A.   No, Ms. Withers, that is not likely to have

20    been the case.

21         Q.   Was Stacey Smith going to tackle you?

22         A.   I don't know, but I would not have expected

23    that they would have calmly invited me to sit down at

F-88

J. BENGE - CROSS

1    the kitchen table and talk, no.

2        Q.   There wasn't a whole lot of difference from

3    what happened at the Florence Avenue residence, was

4    there?

5            MR. HURLEY:  Your Honor, may counsel and I

6    approach?

7            THE COURT:  Come on up.

8            (Whereupon, counsel approached the bench and

9        the following proceedings were had:)

10           MR. HURLEY:  You have made a pretrial ruling

11   that the admission of the PFA would not be appropriate

12   for the jury.  The prosecutor is deliberately

13   eliciting questions, what is the difference.  The

14   difference would be back in July there wasn't a

15   protection from abuse.  These questions are calling

16   for information that contravenes your prior ruling.  I

17   ask that we not ask these questions.

18           MS. WITHERS:  We determined that he is not

19   having any respect for their privacy or he isn't

20   showing any respect for the divorce decree.  I am not

21   trying to elicit a response regarding the protection

22   from abuse.  My point, this situation is equally the

23   same as the Florence Avenue residence, except he came

DAVID WASHINGTON
Official Court Reporter

A 82

F-92

J. BENGE - CROSS

1       A.   Ms. Withers, when I walked in the bedroom, I

2   asked Donna once where Stacey was.  She said:  What

3   are you doing here.  And at that point, my only

4   thought was to make her leave the room, get away from

5   me so that nothing bad would happen.  I was hoping she

6   would lock herself in the bathroom.  I took out the

7   can and sprayed the can towards the single bed in that

8   room.  She said:  What is that, and she jumped up off

9   the bed and ran out of the bedroom.  If you are asking

10  how she wound up with pepper spray, I can only think

11  that she was seated in the living room behind

12  Mr. Smith when I sprayed him in his face to keep him

13  away from me.  She was directly in the line of fire of

14  that spray.

15      Q.   I thought the purpose of the suicide mission

16  was so she would watch you die, how would she do that

17  if she locked herself somewhere else?

18      A.   I wasn't going to, at that point, hurt

19  anyone, not Donna, not Mr. Smith, not myself.  I had

20  lost my -- I had lost my thought of doing that.  I was

21  too weak.  I was too weak a person to carry that out.

22  I did not have the strength.  I didn't have that

23  strength.

DAVID WASHINGTON
Official Court Reporter

A83

J. BENGE - CROSS

1     Q.   Why didn't you just leave then?

2     A.   At what point?

3     Q.   Before Stacey -- well, before you chased her

4  into the living room and grabbing her about her neck

5  and before Stacey Smith hears the screams and he has

6  to come running to her aid and Stacey Smith gets shot

7  in the chest?  You had a lot of time to walk out of

8  that motel.

9     A.   No, Ms. Withers.  All of this happened within

10  a matter of a minute or two.

11    Q.   Why don't you tell us your version of what

12  happened, Mr. Benge?

13    A.   I was hoping you would ask for that, so I

14  will do so.  I was in House 5.  I sat down on the bed.

15  I was watching the oval area.  Nothing was happening

16  that Sunday morning.

17    Q.   You were watching what area?

18    A.   There is the grass oval that separates the

19  office house, the motel and the building where the

20  office and the apartment are.

21    Q.   It's a courtyard?

22    A.   Well, yes and no.  There is another area in

23  which some people may call the courtyard.  There is an

J. BENGE - CROSS

1    area that is framed by the stone drive that opens up

2    on Canal Street.

3        Q.    I'm sorry, I interrupted you.  You were

4    sitting in House No. 5 watching the oval area.

5        A.    Nothing was happening.  I was debating what I

6    was going to do.  Again, I went through the same

7    thoughts for the -- I don't know how many times I had

8    them in the past:  Should I do this, should I not do

9    this.  And not having resolved it, I went out and I

10   walked around the building that has the office and the

11   apartment in it, cut the phone lines, came up to the

12   front door of the office, put the keys in, walked in,

13   and I was thinking:  This is so wrong, I can't do

14   this.  I walked over to the little counter with the

15   Formica top that's in the office proper.  I can

16   remember resting my head on that, thinking that I

17   couldn't go through with this, there is too many

18   reasons why I could not take my own life.  I thought

19   of my children, my family.  I thought of what it was

20   going to do to Donna.  And then I heard what had

21   sounded like someone walking into the kitchen and I

22   thought:  Here I am now where I shouldn't be and I

23   have got no explanation for being here.  I can't just

DAVID WASHINGTON
Official Court Reporter

A 85

J. BENGE - CROSS

1    Q.    What do you mean you were afraid to leave it

2    at the house?

3    A.    My son was there.

4    Q.    You were afraid you might spray him by

5    ''accident?

6    A.    I didn't want it in the house with my son

7    present and me not being there.  I wanted it out.

8    Q.    Had you ever left him alone there at the

9    house with the guns in the garage?

10    A.    Yes.

11    Q.    So you walked in with the mace, you cut the

12    phone wires -- all nine of them -- You unlocked the

13    office door with the keys that you had stolen out of

14    Donna's car, you then locked the door behind you,

15    right?

16    A.    Yes.

17    Q.    You then went in search of Donna and Stacey?

18    A.    No, I didn't.  As I said, I entered into the

19    office area and I knew that I could not do this.  I

20    couldn't end my life.  I just didn't have the strength

21    to do it.

22    Q.    Do what?

23    A.    As a final matter, when I was standing in the

DAVID WASHINGTON
Official Court Reporter

A86

J. BENGE - CROSS

1    office and I was looking at the surroundings that were

2    so familiar to me, I said:  I can't do it, I can't

3    kill myself.

4         Q.    You were in the office?

5         A.    Correct.

6         Q.    The door to your escape was right next to

7    you?

8         A.    The door to my escape was behind me, yes.

9         Q.    In the same room with you?

10        A.    Yes.

11        Q.    No one had seen you yet?

12        A.    At that point, that's what I believed, yes.

13        Q.    No one would have seen your van because you

14   had it hidden behind the Oak Grove Motel?

15        A.    Yes, parked on 6th Street.

16        Q.    All you had to do was undo the two locks and

17   let yourself out quietly and thus end the plan, right?

18        A.    That is correct.

19        Q.    That isn't what you did, is it?

20        A.    No, that's not what I did.

21        Q.    You went in and confronted your wife --

22   ex-wife, excuse me?

23        A.    Yes.


                    DAVID WASHINGTON
                Official Court Reporter

                      A 87

J. BENGE - CROSS

1   didn't take advantage of any of them.

2          THE COURT:  Are you withdrawing the question?

3          MS. WITHERS:  I will withdraw the question.

4          THE COURT:  You are right, that made the

5   point.

6          I understand where you are coming from,

7   Mr. Hurley.

8          So just go up and withdraw it and we will

9   move on.

10         (Whereupon, counsel returned to the trial

11      table and the following proceedings were had:)

12         MS. WITHERS:  I'll withdraw the question,

13  Your Honor.

14  BY MS. WITHERS:

15     Q.   So you go into Donna's bedroom to make sure

16  she hasn't seen you and isn't calling the police.  You

17  said when you walked in she was reading, correct?

18     A.   Yes.

19     Q.   So it was pretty obvious she wasn't on the

20  phone dialing 911 at that point, right?

21     A.   Yes.

22     Q.   So at that point you feel you need to get her

23  away from you and you hoped to chase her into a locked

J. BENGE - CROSS

1   the door, and I was hoping she would lock herself in

2   the bathroom.  You said I wanted to chase her into a

3   locked room.  No, I wanted to chase her in the

4   bathroom where she could lock herself in and I could

5   get away and run just as far as I could just as fast

6   as I could, which wasn't very far because my ankle was

7   still hurting me.

8       Q.   You wanted her in a safe place, didn't you?

9       A.   I wanted her out of the area.  She might get

10  hurt.

11       Q.   You wanted Stacey, that's who you were after,

12  not Donna?

13       A.   I did not.  I wasn't thinking about Stacey at

14  all after I spoke his name.  I was thinking about

15  getting Donna out and away from me so I can get out of

16  the door and hopefully be on my way and try to come up

17  with some explanation as to why I was there --

18       Q.   You wanted --

19       A.   And be thankful nobody was hurt.

20       Q.   You wanted Donna in another area, you wanted

21  Donna away from you, Donna somewhere she wouldn't get

22  hurt and you asked her where Stacey was; do you agree

23  with all those things?

DAVID WASHINGTON
Official Court Reporter

*A89*

J. BENGE - CROSS

1        A.    In the reverse order, yes.  In the reverse

2    order you spoke them, the answer is:  Yes.

3        Q.    You then pulled her, as you say, ever so

4    gently away from the door as she attempts to run

5    outside and seat her ever so gently on the bench and

6    at that point Mr. Smith comes in, then charges at you

7    and attempts to tackle you; is that correct?

8        A.    Let me go through that.  That's a bunch of

9    questions, but I didn't use the words "ever so

10   gently".  I grabbed Donna around her left arm to

11   try -- in the step area.  I did it with enough force

12   to lead her back, not to pull her, not to grab her,

13   but to lead her back.  She came back willingly.  She

14   wasn't fighting me.  She wasn't screaming.  She wasn't

15   hollering.  She didn't offer any resistance.

16   Willingly is not the right word.  She didn't offer any

17   resistance.  I was able to sit her down on the bench,

18   but, again, not ever so gently, but without harming

19   her in any way. As I took a step back, Mr. Smith

20   rounded the corner, halted just for an instant, looked

21   me in the face.  I looked him in the face.  We were

22   eye to eye looking at one another for just a blink of

23   an eye.  I could see he recognized me and then he

DAVID WASHINGTON
Official Court Reporter

*A 90*

F-114

J. BENGE - CROSS

1    charged at me two or three steps and lowered his head.

2    His arms were around me.  She was probably three feet

3    from me when I got the pepper spray into his face

4    initially and within an instant, his arms were sort of

5    halfway around my waist after he had pulled the

6    sweatshirt up over my head so I couldn't see anything.

7        Q.   In your version of what happened in the

8    living room, Mr. Smith, when he came barreling around

9    the corner, would have seen Donna sitting on the

10   bench, not crying, not screaming, not looking

11   particularly distraught, certainly not gagging from

12   the pepper spray because you hadn't sprayed her, you

13   were simply standing over her with no guns in your

14   hand and I am assuming no pepper spray in your hand at

15   that point, yet his reaction is to charge at you?

16       A.   Ms. Withers, again, let me -- you asked a lot

17   there.  Let me go back.  I don't know what the look on

18   Donna's face was.  I am sure it was distraught.  She

19   was not screaming.  She was not making any noise.  In

20   fact, the only two noises she made was:  What are you

21   doing here, she said, and then that strange sound of

22   fright that I tried to mimic.  That's all the noises

23   she made with her vocal cords, that was it.  Yes,

DAVID WASHINGTON
Official Court Reporter

A91

J. BENGE - CROSS

1    their attention, won't it?

2        A.    Yes.

3        Q.    You were going to kill Stacey and make Donna

4    watch, weren't you?

5        A.    No, Ms. Withers, I was not.  I had no

6    intention to harm Stacey Smith.

7        Q.    Then you were probably going to kill

8    yourself, right?

9        A.    As I've said, I had the idea, I had the

10   thought that this would end the nightmare I was

11   living.  I didn't have the strength, if that's what it

12   takes, to end my own life.

13       Q.    You told Donna Stacey's shadow shall never

14   darken the doorway of this home?

15       A.    I said:  Stacey Smith's shadow should never

16   darken the doorstep of Snuff Mill Road.

17       Q.    And the only way to insure that before you

18   killed yourself was to kill him, right?

19       A.    No, Ms. Withers, that was not my intention.

20   I was not thinking that to be what I wanted to have

21   happen.  And, in fact, when the gun went off -- and

22   you haven't asked me about the rest of it.  When the

23   initial shot went off, I was petrified.  I didn't

DAVID WASHINGTON
Official Court Reporter

A 92

F-131

1    believe it was real.  I couldn't believe it was

2    happening.  I didn't know he was shot.  I couldn't

3    see.  I hoped he wasn't.  My only thought was to get

4    those guns out of the way of doing harm.

5         Q.    You are quite a humanitarian, aren't you?

6              MR. HURLEY:  I ask that be stricken from the

7    record.

8              THE COURT:  Ladies and gentlemen of the jury,

9    disregard the prosecutor's last comment.

10             Mr. Hurley.

11             MR. HURLEY:  Yes.

12                   REDIRECT EXAMINATION

13   BY MR. HURLEY:

14        Q.    I will not make any snide remarks, just ask

15   you a question.  The first question is:  Would you

16   pick up at the point where you and Mr. Smith were next

17   to each other with your sweatshirt over your head and

18   you heard the sound of a gun discharge, tell us step

19   by step what happened thereafter?

20        A.    You are talking about the gun that came out

21   from my left side?

22        Q.    Yes.

23        A.    When the gun went off, it happened so fast

DAVID WASHINGTON
Official Court Reporter

*A 93*

J. BENGE - REDIRECT

1    that I had no thought -- no time to think about what

2    was happening. I had no time to even consider

3    anything other than the fact that there is a gun, it's

4    out, it's gone off, I don't know what happened, I got

5    to make sure that does not happen again. I jammed my

6    right hand back where the other gun was, trying to

7    hold that into the holster because I thought the first

8    gun was on the floor because I didn't feel any -- I

9    couldn't see it, of course, and I thought that that

10   was out of harm's way. I had another one that was --

11   my thought was to make sure that it doesn't come up

12   and go off and get in trouble. That gun was back

13   behind my hipbone. Somewhere half way in the scuffle,

14   my hand is back, I pushed it down. Mr. Smith's hands

15   were there. The next thing I knew, that gun was up,

16   it had fired, and it was quite a bit louder. A very,

17   very loud noise and we were then out the door. I was

18   on my back and I was being hit in the face with what I

19   thought was the underside of that gun. My nose was

20   broken. Very quickly I saw stars. The next thing I

21   knew, a police officer or someone was standing over me

22   asking me what happened.

23        Q.   The gun that was on your left side, what

DAVID WASHINGTON
Official Court Reporter

A94

1    Supreme Court, I'm asking that you go back and make a

2    reference to the remark made by the prosecutor at the

3    end of her cross-examination that you ordered stricken

4    and go a little further and tell them just to make it

5    very clear that that's not to be given any

6    consideration whatsoever.

7              THE COURT:  Ms. Withers, is there anything

8    you want to say?

9              MS. WITHERS:  No, Your Honor.

10             THE COURT:  All right.  Like I said, it is an

11   area of heightened concern.  The Supreme Court is

12   certainly frustrated about these things coming up over

13   and over and over, not only looking at the prosecutors

14   not to do these things, it is looking to the trial

15   court to take a more active role and to the extent

16   these things can be cleaned up, they be cleaned up.  I

17   did want to mention those two things to you.  I will

18   go back and say something more forceful.

19             We need to put something on the record with

20   the defendant regarding waiving his Fifth Amendment

21   protections.  He testified he placed the tape recorder

22   under her bed in her home.  Those charges are pending

23   in New Castle County.  We had some brief discussions

DAVID WASHINGTON
Official Court Reporter

A 95

G-142

1    gentlemen of the jury.

2                THE JURY:  Good afternoon.

3                THE COURT:  I just have one little comment

4    that I want to read to you regarding the closing

5    arguments by counsel.  It is very brief.

6                At the conclusion of her remarks,

7    Mrs. Withers beseeched you to return a verdict of

8    guilt.  It is improper for an attorney to make a plea

9    for a desired verdict.  You are to base your verdict

10   only on the evidence and not on the request or plea by

11   an attorney.  I instruct you, therefore, that you must

12   completely ignore and disregard that remark and not

13   allow that, in any way, to affect your verdict.

14               I am now going to read to you the

15   instructions on the law.  This is going to take a

16   little while, but they have to be read in open court.

17   When I am done, I will excuse the four alternates and

18   the twelve jurors will get the case for consideration.

19               Each of you will get a copy of the

20   instructions so that you may refer to them, if you need

21   to.  The last two pages of the instructions have some

22   of the definitions that are used throughout and the two

23   previous pages are a list of the possible verdicts in

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 96

1   this case.

2        Members of the jury, you have now heard all

3   the evidence that is going to be presented in this

4   case, and you have heard the arguments of the attorney

5   for the State and for the defendant.  I shall not

6   review the evidence that has been presented to you

7   because you, as the jury, are the sole and exclusive

8   judges of the facts of the case, of the credibility of

9   the witnesses, and of the weight and value of their

10  testimony.

11       I shall now instruct you as to the applicable

12  principles of law governing this case.  No single one

13  of these instructions states all of the law applicable

14  to this case.  Therefore, you should listen to and

15  consider all of these instructions together in reaching

16  your verdict.

17       It is your duty as jurors to follow the law

18  as I shall state it to you.  You are not to be

19  concerned with the wisdom of any rule or law stated by

20  me.  You must apply the law, as instructed, even if you

21  do not agree with that law because it is the law of

22  this State as enacted by the Legislature.

23       It is your duty to determine the facts and to

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 91

G-144

1    determine them only from the evidence presented to you.

2    You are to apply the law as I will instruct you to the

3    facts and, in this way, decide the case.  If, in these

4    instructions, any rule, direction, or idea is stated in

5    a manner which appears to give it more significance

6    than the other instructions, no such emphasis is

7    intended by me and none should be inferred by you.

8         The defendant is charged by Indictment with

9    two counts of possession of a firearm during the

10   commission of a felony; attempted murder in the first

11   degree; assault in the second degree; and burglary in

12   the second degree.  The defendant has pled not guilty

13   to these charges.

14        The Indictment is a mere accusation against

15   the defendant.  It is the charging document.  It is

16   not, in itself, any evidence of the guilt of the

17   defendant and you should not allow yourselves to be

18   influenced, in any way, however slightly, by the fact

19   that an Indictment has been filed against the

20   defendant.

21        In these instructions, I will explain the

22   elements of the offenses charged in the Indictment.

23   The elements of an offense are those physical acts,

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*A 98*

G-145

1    attendant circumstances, results and states of mind

2    which are specifically included within the definition

3    of the offense in the Criminal Code.  If words are

4    defined in the Criminal Code, I will give you their

5    Code definitions.  Otherwise, you should give words

6    their commonly-accepted meanings.

7          I will also explain the burdens of proof the

8    law imposes upon the State, as well as other aspects of

9    your function as jurors.  And, finally, I will explain

10   the possible verdicts in this case.

11         Do you hear a lot of echo, Janice, through

12   the microphone?

13         All right, ladies and gentlemen.  Count No. 1

14   is possession of a firearm during the commission of a

15   felony.  The pertinent definition of the offense in the

16   Criminal Code is as follows:

17         "A person who is in possession of a

18       firearm during the commission of a felony

19       is guilty of possession of a firearm during

20       the commission of a felony.

21         In order to find the defendant guilty of

22   possession of a firearm during the commission of a

23   felony, you must find that all the following elements

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A99

G—146

1    have been established beyond a reasonable doubt:

2         (1)  There was a firearm.  "Firearm" is

3    defined as follows:  Any weapon from which a shot,

4    projectile, or other object may be discharged by force

5    of combustion, explosive gas, and/or mechanical means,

6    whether operable or inoperable, loaded or unloaded,

7    excluding a B-B gun; and,

8         (2)  The defendant possessed the firearm.

9    "Possession" generally means dominion, control, and

10   authority.  But a person is in possession of a firearm

11   within the meaning of this section only when it is

12   physically available and accessible to him during the

13   commission of a crime; and,

14        (3)  The defendant acted knowingly.  In other

15   words, he was aware that he possessed a firearm; and,

16        (4)  The defendant possessed the firearm

17   during the commission of a felony.  The felony is

18   alleged to be the commission of attempted murder in the

19   first degree, which is defined in Count No. 3.

20        If, after considering all the evidence, you

21   find that the State has established beyond a reasonable

22   doubt that the defendant acted in such a manner as to

23   satisfy all the elements which I have just stated, at

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A100

1    or about the date and place in the Indictment, you

2    should find the defendant guilty of possession of a

3    firearm during the commission of a felony.  If you do

4    not so find or if you have a reasonable doubt as to any

5    element of this offense, you must find the defendant

6    not guilty of possession of a firearm during the

7    commission of a felony.

8         Count No. 2 is possession of a firearm during

9    the commission of a felony.  Again, the pertinent

10   definition of the offense in the Criminal Code is as

11   follows:

12        "A person who is in possession of a

13        firearm during the commission of a felony

14        is guilty of possession of a firearm during

15        the commission of a felony."

16        In order to find the defendant guilty of

17   possession of a firearm during the commission of a

18   felony in Count No. 2, you must find that all the

19   following elements have been established beyond a

20   reasonable doubt:

21        (1)  There was a firearm.  I have previously

22   defined "firearm" for you in Count No. 1; and,

23        (2)  The defendant possessed the firearm.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 101

1    Again, I have previously defined "possession" for you

2    in Count No. 1; and,

3            (3)  The defendant acted knowingly.  In other

4    words, he was aware that he possessed a firearm; and,

5            (4)  The defendant possessed the firearm

6    during the commission of a felony.  That felony is

7    alleged to be the commission of burglary in the second

8    degree, which is defined in Count No. 5.

9            If, after considering all the evidence, you

10   find that the State has established beyond a reasonable

11   doubt that the defendant acted in such a manner so as

12   to satisfy all the elements which I have just stated,

13   at or about the date and place in the Indictment, you

14   should find the defendant guilty of possession of a

15   firearm during the commission of a felony.  If you do

16   not find or if you have a reasonable doubt as to any

17   element of this offense, you must find the defendant

18   not guilty of possession of a firearm during the

19   commission of a felony.

20           Count No. 3 is attempted murder in the first

21   degree.  In order to find the defendant guilty of

22   attempted murder in the first degree, you have to find

23   that the following elements have been established

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A102

G-149

1    beyond a reasonable doubt:

2         (1)  The defendant attempted to cause the

3    death of Edward S. Smith.  That is, the defendant

4    engaged in conduct which, under the circumstances as he

5    believed them to be, was a substantial step in a course

6    of conduct planned to culminate in commission of the

7    crime of murder in the first degree, as I shall define

8    it for you.  A "substantial step" is an act or omission

9    which leaves no reasonable doubt in your mind as to the

10   defendant's intention to commit the crime of murder in

11   the first degree.

12        The pertinent definition of murder in the

13   first degree in the Criminal Code is as follows:

14        "A person is guilty of murder in the

15        first degree when he intentionally causes

16        the death of another person;"

17        (2)  The defendant acted intentionally.  That

18   is, it was his conscious object or purpose to cause the

19   death of Edward S. Smith.

20        If, after considering all the evidence, you

21   find that the State has established beyond a reasonable

22   doubt that the defendant acted in such a manner as to

23   satisfy all the elements which I have just stated, at

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 103

G-150

1    or about the date and place stated in the Indictment,

2    you should find the defendant guilty of attempted

3    murder in the first degree.  If you do not so find or

4    if you have a reasonable doubt as to any element of

5    this offense, you must find the defendant not guilty of

6    attempted murder in the first degree and you may

7    consider the lesser-included offense of assault in the

8    first degree.

9           I have for your consideration two separate

10   counts of assault in the first degree.  One is Section

11   613(a)(1) and the other is Section 613(a)(3).  They are

12   two separate sections.

13          In order to find the defendant guilty of

14   assault in the first degree, Section 613(a)(1), you

15   must find that the following elements have been

16   established beyond a reasonable doubt:

17          (1)  That the defendant acted intentionally.

18   I previously defined the term "intentionally" for you;

19   and,

20          (2)  The intentional conduct caused serious

21   physical injury to Edward S. Smith by means of a deadly

22   weapon or a dangerous instrument.  "Deadly weapon"

23   includes a firearm; a bomb; a knife of any sort, other

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*A 104*

1    than an ordinary pocket knife carried in a closed

2    position; a switchblade knife; billy; blackjack;

3    bludgeon; metal knuckles; slingshot; razor; bicycle

4    chains; or ice pick; or any dangerous instrument which

5    is used or attempted to be used to cause death or

6    serious physical injury.

7         A "dangerous instrument" means any

8    instrument, article, or substance which, under the

9    circumstances in which it is used, or attempted to be

10   used, or threatened to be used, is readily capable of

11   causing death or serious physical injury. "Serious

12   physical injury" means physical injury which creates a

13   substantial risk of death or which causes serious and

14   prolonged disfigurement, prolonged impairment of

15   health, or prolonged loss or impairment of any bodily

16   organ.

17        If, after considering all the evidence, you

18   find that the State has established beyond a reasonable

19   doubt that the defendant acted in such a manner as to

20   satisfy all the elements which I have just stated, at

21   or about the date and place stated in the Indictment,

22   you should find the defendant guilty of assault in the

23   first degree, Section 613(a)(1). If you do not so find

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 105

G—152

1    or you have a reasonable doubt as to any element of

2    this offense, you must find the defendant not guilty of

3    assault in the first degree, Section 613(a)(1) and you

4    may consider the offense of assault in the first

5    degree, Section 613(a)(3).

6            In order to find the defendant guilty of

7    assault in the first degree, Section 613(a)(3), you

8    have to find that the following elements have been

9    established beyond a reasonable doubt:

10           (1)  That the defendant acted recklessly.  A

11   person acts recklessly with respect to an element of an

12   offense when the person is aware of and consciously

13   disregards a substantial and unjustifiable risk that

14   the element exists or will result from the conduct.

15           The risk must be of such a nature and degree

16   that disregard thereof constitutes a gross deviation

17   from the standard of conduct that a reasonable person

18   would observe in the situation.  A person who creates

19   such a risk but is unaware thereof solely by reason of

20   voluntary intoxication also acts recklessly with

21   respect thereto; and,

22           (2)  The reckless conduct created a

23   substantial risk of death to Edward S. Smith and

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A106

G—153

1   thereby caused serious physical injury to him.  I have

2   previously defined the term "serious physical injury"

3   for you.

4        If, after considering all the evidence, you

5   find that the State has established beyond a reasonable

6   doubt that the defendant acted in such a manner as to

7   satisfy all the elements which I have just stated, at

8   or about the date and place stated in the Indictment,

9   you should find the defendant guilty of assault in the

10   first degree, Section 613(a)(3).  If you do not so find

11   or if you have a reasonable doubt as to any elements of

12   this offense, you must find the defendant not guilty of

13   assault in the first degree, Section 613(a)(3) and you

14   may consider the lesser-included offense of assault in

15   the second degree.

16        In order to find the defendant guilty of

17   assault in the second degree, you have to find that the

18   following elements have been established beyond a

19   reasonable doubt:

20        (1)  The defendant acted recklessly or

21   intentionally.  I previously defined these terms for

22   you; and,

23        (2)  The defendant caused physical injury to

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 107

G-154

1    Edward S. Smith by means of a deadly weapon or a

2    dangerous instrument.  "Physical injury" means the

3    impairment of physical condition or substantial pain.

4    I previously defined the terms "deadly weapon" and

5    "dangerous instrument" for you.

6            If, after considering all the evidence, you

7    find that the State has established beyond a reasonable

8    doubt that the defendant acted in such a manner as to

9    satisfy all the elements which I have just stated, at

10   or about the date and place stated in the Indictment,

11   you should find the defendant guilty of assault in the

12   second degree.  If you do not so find or if you have a

13   reasonable doubt as to any element of this offense, you

14   must find the defendant not guilty of assault in the

15   second degree and you may consider the lesser-included

16   offense of assault in the third degree.

17           In order to find the defendant guilty of

18   assault in the third degree, you have to find that all

19   the following elements have been established beyond a

20   reasonable doubt:

21           (1)  The defendant acted with criminal

22   negligence.  A person acts with criminal negligence

23   with respect to an element of an offense when the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 108

G—155

1    person fails to perceive a risk that the element exists

2    or will result from the conduct.  The risk must be of

3    such a nature and degree that failure to perceive it

4    constitutes a gross deviation from the standard of

5    conduct that a reasonable person would observe in the

6    situation; and,

7         (2)  The defendant's criminal negligence

8    caused physical injury to Edward S. Smith.  Again, I

9    have previously defined "physical injury" for you; and,

10   lastly,

11        (3)  The defendant used a deadly weapon or a

12   dangerous instrument to cause the physical injury.

13   And, again, I have previously defined those terms

14   "deadly weapon" and "dangerous instrument" for you.

15        If, after considering all the evidence, you

16   find that the State has established beyond a reasonable

17   doubt that the defendant acted in such a manner as to

18   satisfy all the elements which I have just stated, at

19   or about the date and place stated in the Indictment,

20   you should find the defendant guilty of assault in the

21   third degree.  If you do not so find or if you have a

22   reasonable doubt as to any element of this offense, you

23   should find the defendant not guilty of assault in the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 109

G-156

1    third degree.

2        Count No. 4 of the Indictment is assault in

3    the second degree.  In order to find the defendant

4    guilty of assault in the second degree in Count No. 4,

5    you have to find that the following elements have been

6    established beyond a reasonable doubt:

7        (1) The defendant acted intentionally.  That

8    is, it was the defendant's conscious object or purpose

9    to incapacitate Donna Benge; and,

10       (2) The incapacitation was caused by means

11   of a disabling chemical spray or with any aerosol or

12   hand-sprayed liquid or gas; and,

13       (3) The assault took place while the

14   defendant was engaged in the commission of the crime of

15   burglary in the second degree, which is defined in

16   Count No. 5.

17       If, after considering all the evidence, you

18   find that the State has established beyond a reasonable

19   doubt that the defendant acted in such a manner as to

20   satisfy all the elements which I have just stated, at

21   or about the date and place stated in the Indictment,

22   you should find the defendant guilty of assault in the

23   second degree in Count No. 4.  If you do not so find or

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A110

1    if you have a reasonable doubt as to any element of

2    this offense, you must find the defendant not guilty of

3    assault in the second degree and you may consider the

4    lesser-included offense of offensive touching.

5          In order to find the defendant guilty of

6    offensive touching, you have to find that all of the

7    following elements have been established beyond a

8    reasonable doubt:

9          (1)  The defendant intentionally touched

10    another person, Donna Benge, with a member of his body;

11    and,

12          (2)  The defendant knew or was aware that he

13    was thereby likely to cause offense or alarm to the

14    other person, Donna Benge.  A person acts "knowingly"

15    with respect to an element of an offense when (1) the

16    element involves the nature of the person's conduct or

17    the attendant circumstances, the person is aware that

18    the conduct is of that nature or that such circum-

19    stances exist; and, (2), if the element involves a

20    result of the person's conduct, the person is aware

21    that it is practically certain the conduct will cause

22    that result.

23          If, after considering all the evidence, you

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*A 111*

G-158

1    find that the State has established beyond a reasonable

2    doubt that the defendant acted in such a manner as to

3    satisfy all the elements which I have just stated, at

4    or about the date and place stated in the Indictment,

5    you should find the defendant guilty of offensive

6    touching.  If you do not so find or if you have a

7    reasonable doubt as to any element of this offense, you

8    must find the defendant not guilty of offensive

9    touching.

10           Count No. 5 is burglary in the second degree.

11   In order to find the defendant guilty of burglary in

12   the second degree, you have to find that the following

13   elements have been established beyond a reasonable

14   doubt:

15           (1)  The defendant knowingly entered or

16   remained unlawfully in a dwelling located at the Oak

17   Grove Motel Court, Rehoboth Beach, Delaware.  A person

18   enters unlawfully in a place when he has no license or

19   privilege to be there.  That is, he does not have the

20   permission or consent of the owner of the place to be

21   there.  You must, in order to find the defendant guilty

22   of burglary in the second degree, unanimously decide if

23   the defendant "knowingly entered" or "knowingly and

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 112

1    unlawfully remained" in the dwelling; and,

2          (2)  The place where the defendant entered or

3    remained unlawfully was a dwelling.  The word

4    "dwelling" under our Criminal Code means a building

5    which is normally occupied by a person lodging therein

6    at night; and,

7          (3)  The defendant acted knowingly.  That is,

8    he knew or was aware that the property involved was a

9    dwelling and that he was entering or remaining

10   unlawfully; and,

11          (4)  The defendant intended to commit a crime

12   in the dwelling.  That is, it must have been the

13   defendant's object or purpose to commit some act which

14   is defined in our Criminal Code as a crime.  In this

15   case, the State contends that the defendant intended to

16   commit the crime of attempted murder in the first

17   degree and you must find that the defendant intended to

18   commit that offense in order to convict him of burglary

19   in the second degree.

20          If, after considering all the evidence, you

21   find that the State has established beyond a reasonable

22   doubt that the defendant acted in such a manner as to

23   satisfy all the elements which I have just stated, at

                 EILEEN G. KIMMEL
               OFFICIAL COURT REPORTER
                      A 113

1   or about the date and place stated in the Indictment,

2   you should find the defendant guilty of burglary in the

3   second degree.  If you do not so find or if you have a

4   reasonable doubt as to any element of this offense, you

5   have to find the defendant not guilty of burglary in

6   the second degree and you may consider the lesser-

7   included offense of criminal trespass.

8         In order to find the defendant guilty of

9   criminal trespass in the first degree, you must find

10   that the following elements have been established

11   beyond a reasonable doubt:

12         (1)  The defendant entered unlawfully into a

13   dwelling located at the Oak Grove Motor Court, Rehoboth

14   Beach, Delaware.  I have previously defined the terms

15   "unlawfully" and "dwelling" for you; and,

16         (2)  The defendant acted knowingly.  Again, I

17   previously defined the term "knowingly" for you.

18         If, after considering all the evidence, you

19   find that the State has established beyond a reasonable

20   doubt that the defendant acted in such a manner as to

21   satisfy all the elements which I have just stated, at

22   or about the date and place stated in the Indictment,

23   you should find the defendant guilty of criminal

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 114

G-161

1    trespass in the first degree.  If you do not so find or

2    if you have a reasonable doubt as to any element of

3    this offense, you have to find the defendant not guilty

4    of criminal trespass in the first degree.

5         Those are all the specific instructions on

6    each of the counts.  I will now go into some other

7    instructions in other areas of your function as jurors.

8         I have instructed you that an element of the

9    offense charged is that the defendant acted with a

10   required state of mind or with a particular belief.  It

11   is, of course, difficult to know what is going on in

12   another person's mind.  Therefore, our law permits you,

13   as the jury, to draw an inference or, in other words,

14   to reach a conclusion about the defendant's state of

15   mind from the facts and circumstances surrounding the

16   acts the defendant is alleged to have done.

17        In reaching this conclusion, you may consider

18   whether a reasonable man, in the defendant's circum-

19   stances, would have had or lacked the requisite state

20   of mind or belief.  You should, however, keep in mind

21   at all times that it is this defendant's state of mind

22   or belief that is at tissue here.  And in order to

23   convict the defendant, you are required to find beyond

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 115