G—162

1    a reasonable doubt that the state of mind or belief

2    required for guilt existed.

3        During the course of the trial, you have

4    heard evidence of unsworn statements of a witness

5    occurring before trial.  By way of example, the audio-

6    and video-taped interviews of Stacey Smith prior to

7    trial by Detective Paul Parsons.  Such testimony is

8    permissible under a provision of a Delaware statute

9    which reads, in pertinent part, as follows:

10        "(a)  In a criminal prosecution, the

11        voluntary out-of-court statement of a witness

12        who is present and subject to cross-examination

13        may be used as affirmative evidence with

14        substantive independent testimonial value.

15        "(b)  The rule in Subsection (a) of this

16        section shall apply regardless of whether the

17        witness' in-court testimony is consistent with

18        the prior statement or not."

19        With regard to this provision, caution must

20    be exercised by you, the jury, when a conflict exists

21    between the out-of-court statements and the in-court

22    testimony or when a conflict exists among the

23    out-of-court statements themselves.  The jury should be

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 116

G-163

1    particularly careful if there is no evidence to

2    corroborate an inconsistent out-of-court statement.

3    Nevertheless, you, as the jury, may convict on such

4    statement if you are satisfied beyond a reasonable

5    doubt that the statement is true.

6           There are two types of evidence from which

7    you, as the jury, may properly find the facts of the

8    case.  One is direct evidence.  The testimony of an

9    eyewitness is an example of direct evidence.  The other

10   is indirect or circumstantial evidence.  That is, the

11   proof of facts or circumstances from which the

12   existence or non-existence of other facts may

13   reasonably be inferred.

14          In this case, the State and the defendant

15   have relied, in part, upon circumstantial evidence.  It

16   is not unusual in a criminal case to rely upon

17   circumstantial evidence.  To warrant a conviction, all

18   the evidence, direct and circumstantial, must lead you

19   to conclude beyond a reasonable doubt that the accused

20   committed the offenses charged.

21          In this case, the parties have stipulated to

22   certain facts.  A stipulation that is in evidence is an

23   agreement by both parties that those facts giving rise

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 117

G–164

1    to the stipulation require no further proof.  You must

2    accept these facts as true for purposes of this trial.

3            Ladies and gentlemen, during the course of

4    this trial, you have heard evidence which you might

5    regard as evidence of other bad acts.  This evidence

6    was offered by the prosecution in the context of

7    demonstrating the mental state or motive that the State

8    alleges the defendant had.  It cannot be used for any

9    other purpose.  The weight that you give this evidence,

10   if any, as it pertains to the defendant's mental state

11   or motive is entirely for you to decide in your

12   discretion as you see fit.

13           While I allowed the introduction of this

14   evidence, as a matter of law, you are not, in any way,

15   to interpret that decision as any reflection of the

16   Court's view of the evidence or the weight, if any, to

17   which it is entitled.  I want you to understand that

18   you must not use this evidence to infer that the

19   defendant is a person of bad character who, because of

20   bad character, is more likely to be guilty of any one

21   of the offenses charged.  You are required to consider

22   all the evidence that is introduced before you in order

23   to determine whether the State has met its burden of

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A118

1    proving guilt beyond a reasonable doubt.

2        Ladies and gentlemen, you, as the jury, are

3    the sole judge of the credibility of each witness who

4    has testified and of the weight to be given to the

5    testimony of each.  If you should find the evidence in

6    this case to be conflict, then it is within your

7    province to reconcile the conflicts, if you can, so as

8    to make one harmonious story of it all.  If you cannot

9    reconcile these conflicts, then it is your duty to give

10   credit to that portion of the testimony which you

11   believe is worthy of credit and you may disregard that

12   portion of the testimony which you do not believe to be

13   worthy of credit.

14       In considering the credibility of witnesses

15   and in considering any conflict in testimony, you

16   should take into consideration each witness' means of

17   knowledge, strength of memory and opportunity for

18   observations; the reasonableness or unreasonableness of

19   the testimony; the consistency or inconsistency of the

20   testimony; the motives actuating the witness; the fact,

21   if it is a fact, that the testimony has been contra-

22   dicted; the witness' bias, prejudice, or interest in

23   the outcome of this litigation; the ability of the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 119

G-166

1    witness to have acquired the knowledge of the facts to

2    which the witness testified; the manner and demeanor of

3    the witness while on the witness stand; the apparent

4    truthfulness of the testimony; and any and all other

5    facts and circumstances shown by the evidence which

6    affects the credibility of the testimony.

7         Ladies and gentlemen, the role of an attorney

8    is to zealously and effectively advance the claims of

9    the party that he or she represents within the bounds

10   of the law.  An attorney may argue all reasonable

11   inferences from evidence in the record.  However, it is

12   not proper for an attorney to state his or her personal

13   opinion as to the truth or falsity of any testimony or

14   evidence or his or her opinion as to the guilt or

15   innocence of an accused.

16        What an attorney personally thinks or

17   believes about the testimony or evidence in a case is

18   not relevant, and you are instructed to disregard any

19   personal opinion or belief concerning testimony or

20   evidence which an attorney may have offered during the

21   course of this trial.

22        Further, what an attorney states in his or

23   her opening or closing arguments is not evidence.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 120

G-167

1   Evidence consists of testimony from witnesses

2   testifying from the witness stand and exhibits

3   introduced through their testimony.  It is this

4   evidence alone which you may consider in reaching your

5   verdicts.

6            I instruct you that your verdict must be

7   based solely and exclusively on the evidence in this

8   case; that you cannot be governed by passion,

9   prejudice, sympathy, public opinion, or any motive

10  whatever except a fair and impartial consideration of

11  the evidence; and that you must not, under any

12  circumstances, allow any sympathy which you might have

13  or entertain for any of those involved to influence you

14  in any degree whatsoever in arriving at your verdict.

15           The fact, if it is a fact, that the criminal

16  acts were committed while the defendant was in a state

17  of intoxication or were committed because of such

18  intoxication, is no defense to any criminal charge if

19  the intoxication was voluntary.  "Intoxication" means

20  the inability, resulting from the introduction of

21  substances into the body, to exercise control over

22  one's mental faculties.

23           "Voluntary intoxication" means intoxication

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*A 121*

G–168

1    caused by substances which the actor knowingly

2    introduces into his body, the tendency of which to

3    cause intoxication he knows or should know, unless he

4    introduces them pursuant to medical advice or under

5    such duress as would afford a defense to a prosecution

6    for a criminal offense.

7            Ladies and gentlemen, during the course of

8    the testimony, on more than one occasion, a witness

9    referred to someone as "the victim".  You will recall

10   that I instructed you to disregard that characteri-

11   zation.

12           Several of the exhibits that will be with you

13   at the time of your deliberations are contained in

14   police envelopes with preprinted and handwritten

15   notations apparent on the face of the envelope.  You

16   will note that many of those envelopes display a

17   preprinted format that includes the word "victim".

18           Those envelopes are standard police envelopes

19   using standard language for police purposes.  I

20   instruct you specifically that you are to totally

21   disregard that characterization.  It is for you and you

22   alone to determine whether anyone in this matter is a

23   victim.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*A 122*

G-169

1          The law presumes every person charged with a

2    crime to be innocent.  This presumption of innocence

3    requires a verdict of not guilty unless you are

4    convinced by the evidence that the defendant is guilty

5    beyond a reasonable doubt.  The burden of proof is upon

6    the State to prove all the facts necessary to establish

7    the crimes charged beyond a reasonable doubt.

8          Reasonable doubt is a practical standard.  On

9    the one hand, in criminal cases, the law imposes a

10   greater burden than in civil cases.  Proof that a

11   defendant is probably guilty is not sufficient.  On the

12   other hand, there are very few things in this world

13   that we know with absolute certainty.

14         Therefore, in criminal cases, the law does

15   not require proof that overcomes every possible doubt.

16   Proof beyond a reasonable doubt is proof that leaves

17   you firmly convinced of the defendant's guilt.

18         Therefore, based upon your conscientious

19   consideration of the evidence, if you are firmly

20   convinced that the defendant is guilty of the crimes

21   charged, you should find the defendant guilty.  If, on

22   the other hand, you think there is a real possibility

23   or, in other words, a reasonable doubt, that the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 123

G-170

1   defendant is not guilty, you have to give the defendant

2   the benefit of the doubt by finding the defendant not

3   guilty.

4           Before finishing, I want to say a few words

5   about your deliberation process.  How you conduct your

6   deliberations is solely within your province.  However,

7   I would like to suggest that you discuss the issues

8   fully, giving all jurors a fair opportunity to express

9   their views before committing yourself to a particular

10  position.

11          Each of you has a duty to consult with the

12  others with an open mind and to deliberate with a view

13  toward reaching an agreement.  Each of you should

14  decide the case for yourself, but only after

15  impartially considering the evidence with your fellow

16  jurors.

17          You should not surrender your honest

18  convictions solely because of the opinions of your

19  fellow jurors or for the mere purpose of returning a

20  verdict.  But you should not hesitate to re-examine

21  your own view and change your opinion if you are

22  persuaded by another view.

23          Ladies and gentlemen, the possible verdicts

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 124

1    in this case are as follows:

2          As to Count 1, possession of a firearm during

3    the commission of a felony:  (1) Guilty as charged, or

4    (2)  Not guilty;

5          As to Count No. 2, possession of a firearm

6    during the commission of a felony, the possible

7    verdicts are:  (1)  Guilty as charged; or (2)  Not

8    guilty;

9          As to Count No. 3, attempted murder in the

10   first degree, the possible verdicts are:  (1)  Guilty

11   as charged; or (2)  Guilty of assault in the first

12   degree, Section 613(a)(1); or (3)  Guilty of assault in

13   the first degree, Section 613(a)(3); or (4)  Guilty of

14   assault in the second degree; or (5)  Guilty of assault

15   in the third degree; or (6)  Not guilty.

16         As to Count No. 4, assault in the second

17   degree, the possible verdicts are:  (1)  Guilty as

18   charged; or (2)  Guilty of offensive touching; or (3)

19   Not guilty;

20         As to Count No. 5, burglary in the second

21   degree, the possible verdicts are:  (1)  Guilty as

22   charged; or (2)  Guilty of criminal trespass; or (3)

23   Not guilty.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A125

G-172

1           All twelve jurors must unanimously agree as

2    to any verdict returned by the jury.  To reach a

3    verdict of guilty, you must find that the State has

4    proved the elements of a particular offense unanimously

5    and beyond a reasonable doubt.

6           When you have agreed upon your verdicts,

7    notify the Bailiff and the Bailiff will inform you when

8    to return to the courtroom.  Upon your return, the

9    Clerk will ask the Foreperson as to each charge, "What

10   is the jury's verdict?," and your Forepereson will

11   announce the verdict.

12          Those are all of the jury instructions.  You

13   will each get a written copy of those.  The very last

14   two pages contain definitions that I used previously

15   throughout the instructions.  The two previous pages

16   are the verdict sheets.  You can, as I said earlier,

17   circle your verdicts on there so that when you come

18   back, it will be easier to go through them.

19          You will get these.  You will get all the

20   other evidence that was introduced, and you can take

21   all that back.

22          Right now, I will excuse the four alternates.

23          MRS. WITHERS:  May we approach?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 126

COPY

*135*

```
 1        IN  THE  SUPERIOR  COURT  OF  THE  STATE  OF  DELAWARE

 2                    IN  AND  FOR  SUSSEX  COUNTY

 3     - - - - - - - - - - -x
                                :
 4     STATE OF DELAWARE        :      I. D. NO. 0210012355
                                :
 5           v.                 :      CRIMINAL ACTIONS NOS.
                                :      S02-10-0927 and 0928
 6     JOHN H. BENGE, JR.,      :         and S03-01-0361
                                :
 7           Defendant.         :
                                :
 8     - - - - - - - - - - -x

 9                    T R A N S C R I P T
                              O F
10              P R O C E E D I N G S

11                          Sussex County Courthouse
                            Georgetown, Delaware
12                          Friday, October 10, 2003

13        The above-entitled matter was scheduled for

14   sentencing in open court at 11:00 o'clock a.m.

15      BEFORE:

16          THE HONORABLE E. SCOTT BRADLEY, Judge.

17      APPEARANCES:

18          MELANIE C. WITHERS, Deputy Attorney General,
               appearing on behalf of the State of
19             Delaware.

20          JOSEPH A. HURLEY, ESQ., appearing on behalf
               of the Defendant.

21

22

23
```

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER

*A 127*

2

1                    P R O C E E D I N G S

2          THE COURT:  Mrs. Withers, Mr. Hurley, could I

3    see you up at the bench?

4               (Whereupon, counsel approached the bench

5          and the following proceedings were had:)

6          THE COURT:  I received a number of letters

7    about the Benge sentencing from people who did not

8    express particularly favorable things about Mr. Benge.

9    I mentioned one of them earlier today to Mr. Hurley.

10   It has never been at issue before as to what defense

11   counsel is entitled to see, so I have never addressed

12   the issue.

13          But Mr. Hurley apparently wants to see the

14   letter that I received from Mrs. Benge's domestic

15   relations attorney, and I don't know what the correct

16   answer is to Mr. Hurley's request.  I can say that

17   Mr. Hurley is not going to learn anything that he

18   hasn't heard probably twenty times before, and I didn't

19   read anything that I haven't heard twenty times during

20   the course of the pretrial proceedings.

21          It is a reoccurring theme.  When you piece

22   all the letters together, you get the picture that

23   Mr. Benge was a non-productive citizen the last two or

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 128

3

1    three years; then he lost his law practice; spent too

2    much time sitting around the house drinking; was not

3    out working; then went through a difficult divorce with

4    his wife; and, to some extent, snooped on her and

5    harassed her; and "We are all very concerned about what

6    he might do in the future."

7              If you put all the letters together, that is

8    what you get.  I heard that probably right from the

9    get-go when we talked about bail issues.  So I learned

10   nothing new in that regard.

11             But I don't know what the correct answer is

12   to Mr. Hurley's request.  That's why I asked you come

13   up.

14             MRS. WITHERS:  I don't have a problem with

15   Mr. Hurley's seeing it, but I do have a problem with

16   Mr. Benge's seeing it.  I do have objection to

17   Mr. Benge seeing the letter.

18             Miss Kerr has concerns for her personal

19   safety with respect to Mr. Benge.  I think his being

20   allowed to read the letter, while she understood she

21   may have been taking on that risk, would only add fuel

22   to the fire.  If Mr. Hurley wants to read it, I do not

23   have a problem.  For Mr. Benge to sit and read through

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 129

4

1    it word by word would not be in Miss Kerr's best

2    interest.

3            MR. HURLEY:  The position I take is that due

4    process requires that any information given to a Judge

5    in conjunction with sentencing must be reviewed.  I

6    don't have any particular interest in Mr. Benge's

7    looking at letters from attorneys or letters that have

8    been submitted by persons.  I can look at it and I can

9    address the issues.

10           On the other hand, if I felt the need to

11   communicate with Mr. Benge about something specifically

12   that had been addressed in the letter, I would want to

13   be able to get his input if there was a factual

14   statement in a letter.

15           THE COURT:  You can look at it.  Do what you

16   wish with it, Mr. Hurley.  I suspect Mr. Benge know

17   where all the people who contacted me stand on these

18   issues.  I have no doubt about that, frankly.

19           MR. HURLEY:  You mentioned other letters.

20   I just thought there was this one letter.  Are there

21   other letters that have been submitted by supporters of

22   the Mr. Smith—Mrs. Benge group?

23           THE COURT:  I received a number of letters

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER
                        A 130

5

1  from, I believe, Mrs. Benge, Mr. Smith, and members of

2  the Lovett family. So, yes, there are other letters.

3          MR. HURLEY: Are they attached as exhibits to

4  the Presentence report?

5          THE COURT: They are attached to my copy of

6  the Presentence report. I am not sure what Presentence

7  has or what they gave you, but I am guessing, based on

8  what you told me, that you have not seen any of these

9  letters.

10         MR. HURLEY: I have not. I think I have to

11  look at them.

12         THE COURT: Mrs. Withers?

13         MRS. WITHERS: That is fine, Your Honor.

14  I do have a sentencing downstairs with Judge Graves.

15  At some point when he gets ready, if we are not ready,

16  I may need to go down there.

17         MR. HURLEY: Given what you said they are, I

18  am going to look at them. If it is the same thing

19  regurgitated, I am not going to spend a lot of time.

20         THE COURT: You will make your own judgments.

21  If you read anything you haven't heard before, I will

22  be surprised, but you may.

23         MRS. WITHERS: I would like a chance to look

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 131

1    at Miss Kerr's letter, as well.

2        THE COURT:  You two can sort of read it

3    together, or whatever.

4        I will get you the other letters, Mr. Hurley.

5        (Whereupon, the Court proceeded with

6        other court business, after which the following

7        proceedings were had in the above-entitled

8        matter:)

9        MR. HURLEY:  If there are going to be

10   comments in court from persons under the statute, I

11   would like to be able to respond to them and I would

12   suggest that the comments be made first so I can then

13   give a complete presentation.  I understood there is

14   going to be that.

15       MRS. WITHERS:  The defendant is always asked

16   to go first.  I don't see any reason to deviate from

17   that standard practice.

18       THE COURT:  Why don't you go ahead,

19   Mr. Hurley.  I will certainly give everybody an

20   opportunity to talk as long as they want.  When you are

21   done, you will tell me, and you won't have anything

22   left unsaid.

23       MR. HURLEY:  Does that mean the Court is

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 132

7

1   precluding me from responding to any comments that are

2   made by witnesses who testify?

3           THE COURT:  No.  I apologize.  I was oblique,

4   I guess.  You will be able to respond to everything

5   that is said.

6           MR. HURLEY:  Generally speaking, when there

7   has been a trial and a Judge has heard the evidence, I

8   don't know that I say anything except that you heard

9   all the evidence and you can make up your mind for

10  yourself.  I will depart slightly -- and slightly is

11  probably about four minutes worth -- in this particular

12  case because of the oddity of this case.  The oddity to

13  which I refer is the inflamed passions that this

14  defendant seems to have provoked.

15          I don't, in any way, seek to validate his

16  actions that Sunday morning because that is

17  invalidable.  But dealing in the system for as many

18  years as I have dealt in the system, I have, over the

19  years, seen horrific injuries to people, deaths, and

20  vehicular homicides with people who have .30 and a

21  person is dead, and the passion that is inflamed by

22  those losses doesn't parallel what has occurred here.

23          I just don't know why, and I guess I will

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 133

1    never know why.  Is it because John Benge is the most

2    odious creature to walk the shores of Delaware?  Is it

3    because he is an attorney?  What he did that day or

4    intended to do at one point in time, the thought

5    process, is despicable.

6         We will assume, for the purpose of this

7    sentencing, that you will assume, of course, that he

8    did commit the crime of assault.  Whether or not that

9    crime of assault was the reckless introduction of a

10   deadly weapon, a gun, into a volatile scene which

11   resulted in injury or whether it was the reckless

12   introduction of spray that caused serious physical

13   injury, we do not know for sure, because they both fall

14   within the penumbra of assault second degree.

15   Despicable behavior, but reckless behavior.

16        When we look at the injuries -- and I am not

17   referring to the psychic injury because that is not

18   measurable.  When we look at the physical injury, as

19   cases go, this doesn't rival bar fights where people

20   get twenty-six stitches from lacerations across their

21   face; when people get concussions and are in the

22   hospital for a week; where people get broken limbs and

23   are hospitalized; where people have permanent physical

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A134

1   injuries.

2           Fortunately, by the grace of God, for want of

3   better terminology, the injury that Mr. Smith sustained

4   was relatively minor -- to him, of course, it is not --

5   given, again, the entire globe of people who come

6   before the Court as victims.

7           We stand here relatively certain -- and I

8   haven't talked to the prosecutor -- that the prosecutor

9   is not going to say, "We are asking for the presumptive

10  sentencing guideline."  I think probably after

11  "maximum", the prosecution's request would stop.

12          The basic thrust of the letters that you have

13  seen is repetitive, over and over, about what a bad

14  person John was and how horrible he was in his

15  intentions that day.  I can live with that.  The group

16  of people who came forward, they are associated with

17  Mrs. Benge and Mr. Smith, and it would be expected that

18  they would have that perspective.

19          My concern in those letters -- and as an

20  attorney, I have never seen before, in twenty some odd

21  years, a domestic violence attorney come forward and

22  proclaim to mind read someone, which is remarkable.  If

23  we look at that as something for you to consider, the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 135

1    basic thrust of all those letters is that one of the

2    functions of punishment is warehousing, because the

3    constant theme is, "Judge, if you let him out, he is

4    going to finish his business," and that puts you in a

5    very awkward situation.

6            If I were sitting there, which I am not, it

7    is not fair -- because that is not the Court's

8    function.  You can't predict the future any more than

9    these people can predict the future -- to say that it

10   is a valid function of a punishing procedure for you to

11   assume somehow magically, "If I let him out today on

12   time served, if I give him the maximum presumptive

13   sentence guideline, he is going out on the street and

14   he is going to do what he didn't do that day.

15           The law does not allow you to make that

16   assumption, and certainly not because these people

17   basically say, "Warehouse him."  That's what it amounts

18   to.  "Give him the maximum so he can't get out and do

19   it again."  Guess what?  He is going to get out some

20   day, and that argument falls on its face in any event.

21           But I suggest to the Court that there are

22   three things that you should be considering.  One is

23   the deterrent value; two is the rehabilitation; and

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A136

1    three is the appropriate punishment.

2         With regard to the deterrent value, I don't

3    know that there is anybody out there who says, "Well,

4    here is a lawyer who went out and did some crazy things

5    and he received a year in prison or two years in

6    prison. Well, I am going to go out and do it, too. If

7    he had gotten five years or eight years or nine years

8    and thirty days, I wouldn't do it, but he only got two

9    and a half years, so I think I will go out and do the

10   same thing." So I suggest that the message that needs

11   to be sent is sent when someone is incarcerated as a

12   result of the actions that happened here.

13        With regard to the rehabilitation, I don't

14   know what rehabilitation there is. This is a man who

15   abandoned the moral compass that he had followed

16   through the majority of his life. He is somebody who

17   fell apart. It is sad, pathetic, tragic. He hurt

18   people in doing it, but he did fall apart. Maybe

19   Humpty-Dumpty can be put back together again.

20        The stresses and the pressures led him to do

21   that craziness that day, although not making him

22   legally insane, I suppose, because it is so difficult

23   to find legal insanity. He was crazy as hell that day.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 137

12

1    That wasn't John Benge who existed for fifty some years

2    on the face of this world.

3              Presumably he is intelligent enough to

4    reflect upon those events.  Hopefully, those events

5    that pushed him that day when he went over the edge are

6    no longer upon him.  Presumably, whenever he is

7    released, he will have the mental and emotional

8    wherewithal to turn the page and realize the error of

9    his ways and there will not be a repeat performance of

10   what happened in this particular case.

11             And, lastly, I have to say that in balancing

12   things out, I would suggest that you balance out three

13   things:  One is the two and a half hours -- and I

14   didn't sit and count -- with the thousands and tens of

15   thousands he existed on the earth.  You balance that

16   two and a half hours against the thousands and

17   thousands and thousands of hours of his being a tax-

18   paying citizen and a pride of a community up until the

19   year 2000 or 1999.  He was a good father up to that

20   point in time.  They will argue that he is not now.  It

21   is hard to be a good dad when you are in prison.  You

22   balance that out.

23             And, lastly, look at, fortunately, the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 138

13

1   limited nature of the injuries.  This is not a case of

2   what could have been; this is a case of what happened.

3   And I suggest to you -- and I don't like to play number

4   games and I don't -- that somewhere in the sentencing

5   guidelines is the appropriate sentence, whether it is

6   the minimum, whether it is the middle, or whether it is

7   the maximum.  But I don't think there is anything,

8   considering the mitigators and aggravators, that

9   suggests that you should depart from the presumptive

10  sentencing guidelines.

11          THE COURT:  Thank you, Mr. Hurley.

12          Mr. Benge, would you like to say anything?

13          THE DEFENDANT:  Yes, Your Honor, just

14  briefly, if I may.  I did send you a letter which I

15  assume you have seen.  I attempted to express my

16  thoughts in that so as not to burden the Court with a

17  presentation here.  I am seeking a chance, Your Honor,

18  to rebuild.  I won't be able to do that fully, but that

19  is what I am seeking.

20          THE COURT:  All right.  I did read your

21  letter, Mr. Benge.  Is there anything else you want to

22  say, Mr. Benge?

23          MR. BENGE:  No, Your Honor.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 139

14

1          THE COURT:  Thank you, Mr. Hurley and

2   Mr. Benge.

3          Mrs. Withers?

4          MRS. WITHERS:  Donna Benge and Stacey Smith

5   would both like to address the Court, Your Honor.  I

6   would ask them to come forward.

7          THE COURT:  Good morning, Mr. Smith.

8          MR. SMITH:  Good morning.  My name is Edward

9   Stacey Smith.  I appreciate you letting me speak today

10  in regards to the occurrences that happened not only on

11  the morning of October 20th, that Sunday, but

12  throughout this ordeal.  And I make reference to the

13  "ordeal" meaning that it has continued up until today.

14         It will always continue in my own mind.  And

15  I just want to reiterate the fact that I am one of two

16  victims here and I am fearful of my life, either

17  directly from John Howard Benge or indirectly should he

18  hire someone to act in his own behalf.

19         He has shown himself to be very clever in his

20  own way with the knowledge of the law.  He has used

21  this knowledge as an advantage in planning his violent

22  act.  For example, he avoided an attempted murder

23  charge by tying it to breaking and entering and

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A140

15

1    burglary because he knew the legal definition of these

2    crimes and the seriousness of each of those crimes, or

3    so it seems to me.

4           He very cleverly took keys from others, made

5    copies, and returned those he had taken so no one knew

6    that he had taken them, again to cover up his actions,

7    to get a jump myself and the other victim involved, his

8    ex-wife.  He used these keys he had made to gain entry

9    to private premises and avoid the more serious charges

10   should he be caught.

11          There had been restraining orders against

12   this person and he was not to have any weapons.  He

13   violated these legal efforts implemented for the

14   victim's safety with impunity.

15          I will always carry with me in my chest the

16   bullet that he fired at me as evidence of his attempt

17   to kill me.  I can feel it there as a constant reminder

18   of the violence he perpetrated upon me.  It period-

19   ically causes a numbness in my arm and a weakness

20   sometimes when I try to lift with that arm.

21          I suffered hyperventilation brought on by the

22   stress of the trial and had to be treated by an

23   emergency unit after the court session.  My heart rate

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A141

1    was measured at one hundred sixty-five and I could not

2    breathe.  It was another scary moment in my life from

3    the cause of this horrible act that this man perpe-

4    trated on myself and the other victim involved.  It was

5    a terrible feeling brought on by the stress.

6             I have very great concern when my attacker is

7    released, he will continue to drink and plot criminal

8    acts.  I have lost a fair amount of time from my

9    teaching job in order to attend the trial testimony and

10   meet with people.  My principal has been great, but she

11   does have a school to run.  And my co-workers, though

12   they are understanding, must wonder what is happening.

13            In regards to that, I do express to them what

14   is going on.  My co-workers, just like my friends,

15   because I treat them as both.  I do console with them,

16   share with them, and they take on their own beliefs in

17   what they thought should have happened or should be

18   happening in this trial or in this past trial.

19            I have great anxiety for my safety and those

20   close to me.  I have a large family that includes many

21   young nieces and nephews, brothers and sisters.  We

22   have family gatherings on a regular basis, and I am

23   tempted to disregard those family gatherings because of

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A142

1    the fear that I have.   Now my finally and I have been

2    afraid to meet.

3              We do not know the outcome of this man's

4    fate, nor the fate of myself, nor those around me.   My

5    siblings regularly visit me and I them, but they are

6    apprehensive now for fear for their children and fear

7    for themselves.   I don't know what to say to them.   I

8    don't know how to respond to those comments that they

9    make to me.   I feel some burden in this even though,

10   again, I am the victim.   I continue to feel victimized.

11             I pray you put this defendant, John Howard

12   Benge, away for a long time.   When he is released, no

13   good can come of it and my nightmares will return.   I

14   can only speculate what he might have done, what he is

15   capable of doing, and what he may try to do when he is

16   free.   I realize that some day he will be free and I

17   will have to live with that, also.

18             I hope for my sake and the sake of those

19   around me and, yes, for his own family that you will

20   sentence John Howard Benge to the maximum allowed by

21   the law for the crimes he has committed, for who can

22   say what he may have done had he gotten past me or what

23   he may try to do in the future.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A143

1        I thank you for your indulgence.

2        THE COURT:  Thank you, Mr. Smith.

3        Mrs. Benge, good morning.

4        MRS. BENGE:  Good morning.  My name is

5   Donna Kay Lovett Benge.

6        Your Honor, the defendant, John Benge, Jr.,

7   was charged with many more crimes on October 20th last

8   year than were dealt with in these proceedings.  You,

9   Your Honor, are aware of the evidence supporting those

10  other charges.  The jury was not, nor did they know

11  that I had a protective order against him.

12       The jury saw John Benge as a broken man who

13  failed at everything, including the ability to keep the

14  affections of his wife.  I can only assume that the

15  jury saw the incident last October as a marital dispute

16  rather than the seriousness of this crime.  I was often

17  called his wife even when speaking of events that took

18  place after the divorce was final.

19       My mistake was to stay in this marriage for

20  as long as I did.  I felt that my children needed a

21  mother and father together in the same household.  I

22  stayed too long.  It become detrimental to my children

23  and to me.  Because of his drinking, his mental abuse

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A144

1   and his refusal to seek help or find employment to help

2   provide for his family, I took that step that had been

3   so difficult for me.  I separated from him and filed

4   for divorce, not without the understanding and support

5   of my children.  They saw the abuse and they felt the

6   antagonism in the home.

7        I felt that my character was marred during

8   this trial.  Yet the jury did not see the true

9   character of John Benge, Jr., nor did they understand

10  the reasons why I left him.  This man neglected his

11  responsibilities as a lawyer, as a husband, and as a

12  father.  He often said the Army stole a year from his

13  life, the Bar Association was out to get him, and he

14  would never repay the debts to his clients as ordered

15  by the Court because he did no wrong.  It was the Bar

16  Association that caused him his practice and I was the

17  one that caused the problems in our marriage.

18       Yes, he turned over all the marital assets to

19  me, including the house that was my family home where I

20  grew up.  But, Your Honor, I got all the responsi-

21  bilities, as well, the normal household bills, the

22  college tuitions, and many of his debts.

23       I was bound by the Court not to reveal many

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A 145

1   things.  The State was unable to tell the jury about

2   the disciplinary actions against him; reprimands,

3   probations, suspension, and finally disbarment from the

4   very Bar of which Your Honor, Ms. Withers, and

5   Mr. Hurley are members.  You three continue to uphold

6   the values of the Delaware Bar Association.  John Benge

7   did not hold himself to those same standards.

8           The defendant stalked me for nearly two

9   years, devoting himself to this course of action as he

10  had never devoted himself to his career.  He called my

11  friends asking about me under the guise of being

12  worried.  He represented himself falsely to retrieve my

13  phone messages and checked messages on my cell phone.

14  He wrote a letter to a phone company on the phone card

15  taken from my purse fabricating a story that he needed

16  the records in order to be reimbursed for those calls

17  by a former employer and even attaching to that letter

18  a notary seal copied from divorce papers sent to him.

19          During the trial he admitted taking keys from

20  my car while I was at work and copying them.  He

21  admitted tapping the phone, spying on me, breaking into

22  my residence, and placing the tape-recorder in my

23  bedroom.  I don't believe he told the Court about the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A146

21

1    things that he had taken from my home, the bathing suit

2    that he was apparently wearing as he committed the

3    crime last October.

4           Nor did he explain my underwear and Stacey's

5    boxers also taken from my home. We found them each in

6    a plastic bag, one marked Exhibit A and the other

7    Exhibit B, stuffed into an Army surplus mortar casing,

8    along with boxes of bullets that fit both of the guns

9    that he brought to Rehoboth. We found this hidden in

10   the garbage of the Snuff Mill Road house as we readied

11   it for sale.

12          My brothers urged me to file for a

13   Protection From Abuse Order. My divorce attorney did,

14   as well. When he broke into the Florence Avenue home

15   the first time, the New Castle County Police urged me

16   to file for the same protection. He continued to

17   harass me with ugly phone messages left almost daily on

18   my phone at work, at the motel in Rehoboth, or my cell

19   phone, by waiting outside my home to watch Stacey's

20   comings and goings.

21          He called all of my children at any hour to

22   tell them that Stacey was with me. He threatened to

23   make things very uncomfortable for me, proclaiming that

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 147

1   he could change the way the kids felt about me.

2   Although I become increasing afraid, I still did not

3   file for the Protection From Abuse Order.

4          My co-workers were victims of this abuse.  I

5   sometimes shared my phone messages with them.  They

6   were afraid for me and uncomfortable when John came to

7   my office.  They saw him deliver those newspapers

8   containing the divorce information and asking for my

9   autograph.  They, too, urged me to get the Protection

10  From Abuse Order.  Still, I did not.

11         Once again, New Castle County Police were

12  called to my home at Florence Avenue after the

13  discovery of the voice-activated recorder in my

14  bedroom.  They again urged me to get a Protective

15  Order.  Finally, two and a half months after the

16  divorce, I filed for the PFA Order.  John Benge

17  consented to that order, still refusing to admit any

18  wrongdoing.

19         But just as he had not upheld the standards

20  of the Court in the past, he did not hold himself to

21  the legal conditions of the Protection From Abuse

22  Order.  He did not turn over all his guns to New Castle

23  County, as ordered, he did not undergo the alcohol

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A148

1   evaluation, and he did not stay one hundred yards away

2   from me.

3           On October 20th, he violated that Court Order

4   and brutally attacked me and Stacey Smith.  The jury

5   was not allowed to know of this Order.  I wonder why?

6   I think the outcome of this proceeding may have been

7   much different if they had.

8           John was not truthful in his testimony

9   concerning the events that day.  He did viciously

10  attack me many times with that canister of pepper

11  spray, and Stacey Smith did not attack, but did rush to

12  my aid, not knowing that John had two guns.

13          For these reasons, I ask you to consider the

14  fear in which I will live when the defendant is

15  released from jail.  I have a new Protection From Abuse

16  Order in place.  I filed for this at the urging of my

17  brothers.  But tell me, Your Honor, what good has it

18  done me in the past and to what extent can I expect to

19  be protected in the future?  I am trying to provide a

20  safe and loving home for my children, free from fear.

21  But how can they expect to be protected?

22          Mr. Hurley placed great emphasis on the fact

23  that John outweighed me by sixty to eighty pounds.  He

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 149

24

1    painted a picture that I could not have escaped his

2    grasp.  Well, Your Honor, I do not know how I got away

3    from him that day.  My only thought was to fight back.

4    I know that his intentions were far more sinister than

5    his explanation of suicide.  I believe all the things

6    he brought with him, the wire cutters, the pepper

7    spray, the ice pick, and the ties, prove that.

8            Maybe I was just lucky last October 20th.

9    Next time -- and I am fearful that there will be a next

10   time -- I may not be so lucky and my children will no

11   longer have a home to come to or a mother or a father.

12   The words of one my children haunt me.  "What was he

13   thinking?  Was he going to leave us with no one?"

14           Mr. Hurley described John as a leopard that

15   does not change his spots.  I agree with that

16   assessment.  His deceitful activities have escalated

17   over the years, becoming far more serious and criminal,

18   never taking any responsibility or remorse for his

19   actions.  How can I expect him to change his ways?

20   It is frightening to be the object of this obsession.

21           For these reasons, I ask you to sentence John

22   Benge to the fullest extent.

23           Thank you.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A150

1          THE COURT:  Thank you, Mrs. Benge.

2          Mrs. Withers?

3          MRS. WITHERS:  Your Honor, I do not intend to

4   make lengthy comments.  The letters that you received

5   from the family and friends of Donna Benge and Stacey

6   Smith are eloquent and full of details that are crucial

7   for Your Honor to hear.

8          You presided over the trial.  You are aware

9   of the evidence that the jury was allowed to hear.  You

10  know the full extent of how frightening Mr. Benge truly

11  is.  You know the full extent as to what he obviously

12  intended to do that day when he came down to Rehoboth

13  Beach.

14         The only point I would like to make to Your

15  Honor is the man sitting over there next to Mr. Hurley,

16  the only difference between him now and that man who

17  appeared in that motel room that morning and shot

18  Stacey Smith is that now he is a convicted felon.  His

19  life now is only worse.  He has no future.  He has no

20  family.  He has nowhere to go.  His wife is still

21  divorced and is still moving on with her life.  His

22  purpose that was intended that day has yet to be

23  accomplished.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A151

1          While Your Honor is left with very little,

2     unfortunately, with which to hurt Mr. Benge, the State

3     will never understand the jury's verdict except, of

4     course, they were hampered by the limitations of

5     evidence that they were allowed to hear. Even so, what

6     they were allowed to hear should have been sufficient

7     for them to understand that Mr. Benge came there with

8     enough ammunition to kill a small Army of people; not

9     just himself.

10          There was no need to cut the phone wires into

11     that motel room if all he intended to do is kill

12     himself.  There were so many chances for him to stop

13     and get out of there.  Therefore, it is incredible to

14     believe that he only ever intended to hurt himself and

15     he was only trying to get out of there.  In fact, it is

16     laughable that that is his explanation.

17          If you do not give him every day of (k) time

18     permitted by statute to keep him in jail for as long as

19     you can, someone is going to wind up dead.

20          THE COURT:  Thank you, Mrs. Withers.

21          Mr. Hurley?

22          MR. HURLEY:  I don't have anything to

23     respond.  I think all the issues have been covered.


                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER
                        A152

1          THE COURT:  All right.

2          Come on up, Mr. Benge.

3          I certainly believe that I am very familiar

4     with all of the facts of this case.  I have presided

5     over all of the pretrial matters.  I presided over the

6     trial and I had a very extensive presentence investi-

7     gation report done, which I read very diligently.

8          There are many negative things about

9     Mr. Benge that have come to my attention.  Mr. Benge

10    was disbarred.  Mr. Benge behaved badly during his

11    domestic relations proceedings.  Mr. Benge may well

12    have stalked his wife incessantly.

13         While all of those things are very important

14    to all the people involved, in terms of sentencing, I

15    am not giving Mr. Benge one extra day for any of those

16    things.  Those are not the kind of things that we

17    necessarily put people in jail for.  While I certainly

18    have carefully read every letter and certainly

19    understand why those letters were written and the

20    emotions those people hold, I have put all those things

21    in what I consider to be the appropriate place.

22         There are some positive things that I have

23    learned about Mr. Benge.  Mr. Benge graduated from

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A153

1  college and did pretty well.  He graduated from law

2  school and did pretty well.  He was in the military.

3  He was, I assume, a reasonably productive attorney for

4  a fairly long time.  He was a father and spouse, which,

5  I guess again, he did reasonably well for a fairly long

6  time.

7          So I certainly considered all of those things

8  in mitigation and I read everything in great detail.

9  All of his reports from Brandywine High School and Boys

10 State, and all of those things.  Mr. Benge did quite

11 well, I think, for a long time.

12         But, frankly, at the end of the day, that did

13 not reduce Mr. Benge's sentence by one day.  What I am

14 really focussing on is what Mr. Benge did and what he

15 was convicted of.  That is really driving my sentence.

16 I get to see a lot of things -- and I hope you all will

17 take this in the appropriate context -- but not

18 everything moves me as much as this case has moved me.

19 The facts of this case that really are not in dispute

20 have moved me a great deal.

21         I would like to think that I give everything

22 the appropriate level of attention and care.  But I am

23 even more concerned than I normally am when the privacy

1    of someone's home is invaded, and when those people are

2    hurt, I pay a great deal of attention to that.  And I

3    think, notwithstanding everything that has been said

4    and everything that I have heard, and accepting the

5    facts largely as Mr. Benge testified to them, that this

6    is still a terrible case on the facts.

7         Mr. Benge left his home and he left his son

8    in Wilmington and he took two guns and he drove the

9    length of this state, and he went into a residence that

10   he had no business being in.  He went into a bedroom

11   that he had no business being in.  Then, as the jury

12   has found, he created a situation where Mr. Smith was

13   shot.  He could have very well been killed.  There was

14   no doubt that his wife, while you may dispute what

15   happened to her, was certainly terrified by all of

16   that.

17        So to the extent that there is any confusion

18   about why I am sentencing Mr. Benge the way I am going

19   to sentence him, it is the facts of this case as I

20   believe the jury found them based on their ultimate

21   jury verdict.

22        To the extent I am certainly going to exceed

23   the sentencing guidelines, to the extent that an

1    aggravator is needed, it certainly would be the fact

2    that Mr. Benge was subject to a Protection From Abuse

3    Order.  Mr. Benge is a bright man.  He certainly knew

4    he should not have done any of the things that he was

5    convicted of on that day.  But those things were

6    certainly brought to his attention by the PFA.

7           He was not supposed to possess guns.  He was

8    not supposed to be in contact with his wife and he was

9    not supposed to be on her property.  In violation of

10   all of those things, he committed these offenses, as

11   well.  So to the extent that an aggravator is needed

12   for the record, that is the aggravator.

13          Mr. Benge, I am going to sentence you as

14   follows:

15          As to Criminal Action No. S03-01-0361, I am

16   going to sentence you to eight years at Level 5 in

17   accordance with 11 Delaware Code, Section 4204(k)(1).

18   You will receive credit for three hundred fifty-six

19   days served.  Your Level 5 sentence on that offense

20   will be followed by six months at Level 4 Work Release

21   in accordance with 11 Delaware Code, Section 4204(l).

22   You may be held at the Level 4 Violation of Probation

23   Center pending a spot in the Work Release Program;

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A156

31

1        As to Criminal Action No. S02-10-0928, I am

2    going to sentence you to one year Level 5, again in

3    accordance with 11 Delaware Code, Section 4204(k)(1);

4        And, lastly, as to Criminal Action No.

5    S02-10-0927, I am going to sentence you to thirty days

6    Level 5, again in accordance with 11 Delaware Code,

7    Section 4204(k)(1);

8        You are not to have any contact with your

9    ex-wife, Mrs. Benge, or her family.  The only exception

10    to that is that while incarcerated, you may have

11    contact with your two adult children and your minor

12    child;

13        You are not to have any contact at all with

14    Mr. Smith while incarcerated or while on your

15    probation.  While incarcerated, you will have to

16    undergo a program of anger-management counseling and

17    domestic-violence counseling.  You will have to be

18    evaluated for substance abuse and comply with any

19    treatment recommendations;

20        You will also have to pay restitution in the

21    amount of fifteen thousand one hundred forty-four

22    dollars and thirty-six cents -- I have the details of

23    that -- as well as the other customary charges

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER
A157

32

1    associated with a criminal prosecution.

2              Thank you.

3              MR. HURLEY:  Your Honor, one question.  You

4    indicated that he can have contact with the children

5    during incarceration.  I assume that same thing holds

6    true after his release with regard to Level 4?

7              THE COURT:  He may have contact with them

8    while on probation.  Two of them are adults.  One is a

9    minor.  To the extent that they want to have contact

10   with him, I will allow it.  Obviously, I think, given

11   the nature of where he is going to be for roughly the

12   next nine years or so, if they don't want to have

13   contact with him, they can largely prevent it.

14             MR. HURLEY:  Understood.

15             THE COURT:  All right.  Thank you.

16             (Whereupon, the proceedings in the above-

17        matter were concluded.)

18

19

20

21

22

23

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER
                        A158

33

1                  C E R T I F I C A T E

2      I, EILEEN G. KIMMEL, an Official Court Reporter

3 of the Superior Court of the State of Delaware,

4 Certification No. 120-PS, do hereby certify the above

5 and foregoing Pages 2 to 32 to be a true and accurate

6 transcript of the proceedings therein indicated on

7 October 10, 2003, as was stenographically reported by

8 me and reduced to typewriting under my direct

9 supervision, as the same remains of record in the

10 Sussex County Courthouse at Georgetown, Delaware.

11

12

13

14                  Eileen G. Kimmel

15

16                  Date

17

18

19

20

21

22

23

                 EILEEN G. KIMMEL
             OFFICIAL COURT REPORTER

A 159

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE

    VS.

JOHN H BENGE

Alias: See attached list of alias names.

DOB:
SBI: 00494395

CASE NUMBER:                    CRIMINAL ACTION NUMBER:
0210012355A                        IS03-01-0361
                                   ASSAULT 2ND <6(F)
                                   LIO:ATT. MURDER 1ST
                                   IS02-10-0928
                                   CRIM TRES 1ST(M)
                                   LIO:BURGLARY 2ND
                                   IS02-10-0927
                                   OFF TOUCHING(M)
                                   LIO:ASSAULT W/ SPRA

COMMITMENT


SENTENCE ORDER

NOW THIS 10TH DAY OF OCTOBER, 2003, IT IS THE ORDER OF THE
COURT THAT:

The defendant is adjudged guilty of the offense(s) charged.
The defendant is to pay the costs of prosecution and all
statutory surcharges.


  AS TO IS03-01-0361- : TIS
  ASSAULT 2ND <6


  The defendant shall pay his/her restitution as follows:
See attached list of Payees.

**Effective October 10, 2003  the defendant is sentenced
as follows:**

  - The defendant is placed in the custody of the Department
of Correction for 8 year(s) at supervision level 5 with
credit for 356 day(s) previously served


  - Followed by 6 month(s) at supervision level 4 <u>WORK</u>
**APPROVED ORDER**    1    November 10, 2003 15:11

A160

STATE OF DELAWARE
     VS.
JOHN H BENGE
DOB:
SBI: 00494395

<u>RELEASE</u>

- Pursuant to 11 Del.C.4204(L)

- Hold at supervision level 4 <u>**VOPCENTER**</u>

- Until space is available at supervision level 4 <u>**WORK**</u>
<u>RELEASE</u>

This is a mandatory sentence pursuant to DE114204000k .

Probation is consecutive to any probation now serving


**AS TO IS02-10-0928- : TIS**
**CRIM TRES 1ST**

- The defendant is placed in the custody of the Department
of Correction for 1 year(s) at supervision level 5


This is a mandatory sentence pursuant to DE114204000k .


**AS TO IS02-10-0927- : TIS**
**OFF TOUCHING**

- The defendant is placed in the custody of the Department
of Correction for 30 day(s) at supervision level 5


This is a mandatory sentence pursuant to DE114204000k .


**APPROVED ORDER**     2     November 10, 2003 15:11

A161

## SPECIAL CONDITIONS BY ORDER

STATE OF DELAWARE
      VS.
JOHN H BENGE
DOB:
SBI: 00494395

                          CASE NUMBER:
                              0210012355A


The defendant shall pay any monetary assessments ordered during the period of probation pursuant to a schedule of payments which the probation officer will establish.


Have no contact with the victim(s) Donna Benge , the victim's family or residence.


Have no contact with the victim(s) Edward S. Smith , the victim's family or residence.


See Notes


Zero tolerance for contact with victims


Defendant shall successfully complete anger management, counseling, treatment program.


Participate and complete a certified domestic violence intervention program.


Defendant shall receive mental health evaluation and comply with all recommendations for counseling and treatment deemed appropriate.


Should the defendant be unable to complete financial obligations during the period of probation ordered, the defendant may enter the work referral program until said obligations are satisfied as determined by the Probation Officer.


Be evaluated for substance abuse and follow any recommendations for counseling, testing or treatment deemed appropriate.

**APPROVED ORDER**     3     November 10, 2003 15:11

A162

STATE OF DELAWARE
    VS.
JOHN H BENGE
DOB:
SBI: 00494395

## NOTES

1) The defendant is specifically advised that he is to have
no contact with the victims in this matter, by any means.
Any communication necessary with his former wife
concerning their children shall be carried out through a
third party, or in a manner that Family Court directs.
There will be zero tolerance for violations of this
condition.

2) An additional aggravating factor present is that, at the
time of this incident, the offender was subject to a
Protection From Abuse Order issued by Family Court, which
prohibited him from contacting victim Donna Benge.

_____
JUDGE E. SCOTT BRADLEY

**APPROVED ORDER**    4    November 10, 2003 15:11

A163

## FINANCIAL SUMMARY

**STATE OF DELAWARE**
     **VS.**
**JOHN H BENGE**
**DOB:**
**SBI: 00494395**

CASE NUMBER:
0210012355A

SENTENCE CONTINUED:

TOTAL DRUG DIVERSION FEE ORDERED

TOTAL CIVIL PENALTY ORDERED

TOTAL DRUG REHAB. TREAT. ED. ORDERED

TOTAL EXTRADITION ORDERED

TOTAL FINE AMOUNT ORDERED

FORENSIC FINE ORDERED

RESTITUTION ORDERED                       15144.36

SHERIFF, NCCO ORDERED                        75.00

SHERIFF, KENT ORDERED

SHERIFF, SUSSEX ORDERED                     510.00

PUBLIC DEF, FEE ORDERED

PROSECUTION FEE ORDERED                     100.00

VICTIM'S COM ORDERED

VIDEOPHONE FEE ORDERED                        3.00

--------

TOTAL                                    15,832.36

**APPROVED ORDER**      5      November 10, 2003 15:11

A 164

## RESTITUTION SUMMARY

**STATE OF DELAWARE**
     **VS.**
**JOHN H BENGE**
**DOB:**
**SBI: 00494395**

                         **CASE NUMBER:**
                             **0210012355A**

**AS TO IS03-01-0361 :**
The defendant shall pay restitution as follows:
|  |  |  |
|---|---|---|
| $ | 1985.96 | to VIOLENT CRIMES COMPENSATION |
| $ | 645.00 | to DONNA   BENGE |
| $ | 3022.67 | to EDWARD S SMITH |
| $ | 9490.73 | to COVENTRY HEALTH CARE |

**APPROVED ORDER**       6       November 10, 2003 15:11

A165

## LIST OF ALIAS NAMES

**STATE OF DELAWARE**
     **VS.**
**JOHN H BENGE**
**DOB:**
**SBI: 00494395**

                            **CASE NUMBER:**
                                  0210012355A

JOHN BENGE

**APPROVED ORDER**     7     November 10, 2003 15:11

A166

## AGGRAVATING-MITIGATING

STATE OF DELAWARE
      VS.
JOHN H BENGE
DOB:
SBI: 00494395

CASE NUMBER:
  0210012355A

**AGGRAVATING**
UNDUE DEPRECIATION OF OFFENSE
OTHER

\*\*APPROVED ORDER\*\*    8    November 10, 2003 15:11

A167

## CLASS D FELONY - VIOLENT
## CATEGORY: FDV CORRECTED

| | |
|---|---|
| Statutory Range | 0 to 8 years |
| Presumptive Initial Level | Level V |
| Presumptive Sentence Length | Up to 2 years |

Crimes in **VIOLENT** category :

| | |
|---|---|
| 11-612 | Assault 2 |
| 11-771 | Rape 3 |
| 11-777 | Bestiality |
| 11-802 | Arson 2 |
| 11-825 | Burglary 2 (Minimum sentence: SEE NEXT PAGE) |
| 11-835 | Carjacking 2nd: take vehicle from another person by coercion |
| 11-1109 | Dealing in Child Pornography |
| 11-1250(c) | Assault 1 on Law enforcement animal (Death or serious injury) |
| 11-1253 | Escape After Conviction **(SEE SPECIAL CATEGORY P.35)** |
| 11-1254(a) | Assault in Detention Facility **(SEE NOTE NEXT PAGE)** |
| 11-1254(c) | Assault in Detention Facility by fluid **(SEE NOTE NEXT PAGE)** |
| 11-1304 | Hate Crime **(SEE NOTE NEXT PAGE)** |
| 11-1312A(e) | Stalking - with threat of death or serious injury |
| 11-1338 | Mfr/Use/Poss Explosive or Incendiary Device |
| 11-1448(e) | Poss. of Firearm by Person Prohibited**(SEE NOTE NEXT PAGE)** |
| 11-1448 (a)6 | Poss. Firearm Under PFA Order |
| 11-1448 (a)7 | Possess Firearm com Domestic Viol |
| 11-1459 | Alter gun numbers |
| 11-3533 | Aggravated Intimidation |
| 16-1136 | Abuse, Neglect of Facility Patient/resident causing injury |
| 16-4752A | Unlawful delivery Non-controlled Substance   (SEE NOTE NEXT PAGE) |
| 31-3913(c) | Abuse of infirm adult causing bodily harm |

### STANDARD SENTENCES FOR PRIOR CRIMINAL HISTORY CATEGORIES

| CLASS D. FELONY VIOLENT | | Presumptive Aggravated Sentence |
|---|---|---|
| B | While on release or pending trial or sentencing | UP TO 4 yrs at Level V |
| C | Two or more prior felonies | UP TO 4 yrs at Level V |
| D | One Prior **violent** felony | UP TO 4 yrs at Level V |
| E | Two or more prior **violent** felonies | UP TO 8 yrs at Level |
| F | Excessive Cruelty | UP TO 8 yrs at Level V |

**If crime is a secondary offense, use the non-aggravated presumptive.**
- All sentences for over 1 year at Level V require six month reintegration at Level IV, III, OR II.
- All Criminal fines require 18% surcharge for Victims fund.
- All Drug crimes require additional 15% surcharge for rehab fund

24

A 168

**Notes for Violent Felony D**

11-325 Burglary 2 - Effective 9/1/94 MINIMUM PRESUMPTIVE SENTENCE

| | |
|---|---|
| First Conviction -- | 12 to 36 Mo. at level V |
| While on Release or pending Trial | 16 to 36 Mo. at Level V |
| Two or more prior felonies -- | 36 to 72 Mo. at Level V |
| One Prior Violent Felony -- | 36 to 72 Mo. at Level V |
| Two or more prior violent felonies - | 48 to 96 Mo. at Level V |
| Excessive cruelty -- | 48 to 96 Mo. at Level V |

11-835(b)2        Carjacking 2nd take vehicle from an: effective 1999/05/12: Becomes Felony D if one of these three elements is present: Recklessly engages in conduct which creates a substantial risk of death or serious physical injury to another person, or compels a lawful occupant of the vehicle to leave the vehicle, or causes the vehicle to be operated recklessly

11-1254(a)        Requires 2 year mandatory min. sentence to Level V which must interrupt the original sentence of confinement.

11-1254(c)        Assault in Detention Facility State calls for a minimum mandatory sentence of one year for striking with bodily fluids, as well as testing for diseases transmittable through bodily fluids.

11-1304        Hate Crime: If underlying offense is Felony D, sentence as if it were a Felony C.

11-1305        11-1448(a)7        Possess Firearm com Domestic Viol : effective 1999/07/24.

11-1448(a)6        Possess Firearm under PFA order: effective 1999/07/24.

11-1448(e)        Requires Minimum Sentence of one year at Level V.

16-4752A        Sentence is governed by the penalty for delivery of the substance which the defendant represented the noncontrolled substance to be. If no specific express or implied representation was made, the penalty shall be that for delivery of a nonnarcotic controlled substance. Section 4751(b) of Title 16 shall not apply

16-4763(c) One year @ Level V if moved to DE to engage in drug sales

25

A169

## CLASS A MISDEMEANOR

### Crimes in Category MA1 - VIOLENT

| | |
|---|---|
| Statutory Range | 0 to 1 yr |
| Statutory Fine | UP TO $2,300 |
| PRESUMPTIVE SENTENCE | 1st offense          UP TO 12 Mo @ Level II<br>2nd offense in 2 yrs. Up to 6 Mo @ Level III<br>          AND  Up to 6 Mo @ Level II<br>3rd offense in 5 yrs  Up to 3 Mo @ Level  V<br>          AND  Up to 9 Mo@ Level  II |

| | |
|---|---|
| 11-603 | Reckless Endangering 2 **(Spec. Category P.46 may apply)** |
| 11-611 | Assault 3 **(Spec. Category P. 46 may Apply)** |
| 11-614 | Assault on Sports official |
| 11-621 | Terroristic Threatening **(Spec. Category P.46 may apply)** |
| 11-766 | Incest **(Spec. Category P.46 may apply)** |
| 11-767 | Unlawful Sexual Contact 3 **(Spec. Category P.46 may apply)** |
| 11-1443 | Concealed Dangerous Instrument |
| 11-1250(b) | Assault Law enforcement animal with risk of injury |
| 11-1257A | Animal to Avoid Capture |
| 11-1271 | Crim Contempt Dom Viol Prot phy inj |
| 11-1304 | Hate Crime **(SEE NOTE BELOW)** |
| 16-1136 | Abuse of patient in Residential Facility |
| 31-3913 | Abuse, Neglect of Infirm Adult |

_    All sentences for over 1 year at Level V require six month reintegration at Level IV, III, OR II.
     All Criminal fines require 18% surcharge for Victims fund.
_    All Drug crimes require additional 15% surcharge for rehab fund

Note: 11-1304  Hate Crime - If underlying offense is a Misdemeanor, the presumptive sentence for Felony G (Violent) will apply.

11-1257 Becomes felony G if injury to LE or a felony

11-1271A0c1   Crim Contempt Dom Viol Prot phy inj: effective 1999/06/24: Minimum 15 days incarceration if: physical injury, or threat or use of deadly weapon, or third or subsequent conviction .

| CLASS A MISDEMEANOR | |
|---|---|
| **Crimes in Category MA2 - ESCAPE  11-1251**<br>Escape 3  **(SEE SPECIAL CATEGORY P.35)** | |
| Statutory Range | 0 to 1 yr |
| Statutory Fine | UP TO $2,300 |
| PRESUMPTIVE SENTENCE | UP TO 3 Mo  at Level IV<br>Recommended MaximumUP TO 1 Mo@  Level V |

_    All sentences for over 1 year at Level V require six month reintegration at Level IV, III, OR II.
     All Criminal fines require 18% surcharge for Victims fund.
_    All Drug crimes require additional 15% surcharge for rehab fund

38

A 170

**CLASS A MISDEMEANOR**

**Crimes in Category MA3 - Property Crimes**

| | |
|---|---|
| Statutory Range | 0 to 1 yr |
| Statutory Fine | UP TO $2,300 |
| PRESUMPTIVE SENTENCE | 1st Offense          I      UP TO 12 Mo.<br>2nd offense in 18 Mo.      II      UP TO 6 Mo<br>3rd offense in 3 yrs.   IV   UP TO 3 Mo **AND**   II  UP TO 9 Mo.<br>Recommended Maximum @V      up to 15 days |

| | |
|---|---|
| 11-804 | Reckless Burning (damage under $1500) |
| 11-805 | Cross or Religious Symbol Burning |
| 11-811(b)(2) | Criminal Mischief over $1000 |
| 11-823 | Criminal Trespass 1 |
| 11-840 | Shoplifting < $1000 |
| 11-841 | Theft < $1000 |
| 11-842 | Theft - lost or mislaid property |
| 11-843 | Theft - False Pretense |
| 11-844 | Theft - False Promise |
| 11-845 | Theft of Services |
| 11-848 | Misapplication of Property < $1000 |
| 11-849 | Theft of rental property < $1000 |
| 11-851 | Receiving Stolen Property < $1000 |
| 11-853 | Unauthorized Use - Vehicle |
| 11-861(b)(3) | Forgery 3 **(restitution req'd if loss suffered)** |
| 11-891 | Defrauding Secured Creditors |
| 11-892 | Fraud in Insolvency |
| 11-900 | Issue Bad Check < $1000  **(Restitution & Fee Required)** |
| 11-903 | Unauthorized Use - Credit Card < $1000 |
| 11-906 | Deceptive Business Practices |
| 11-916 | Home Improvement Fraud < $500 |
| 11-917(d) | New Home Construction Fraud <$1,000 |
| 11-918 | Ticket Scalping - Second Offense |
| 11-937(e) | Computer Crime 5 |
| 11-938 | Comp Crime 5th fail to cease <=$500 |
| 11-1304 | Hate Crime **(Sentence as a Violent Felony G)** |
| 31-1003 | False Statement to obtain Benefits <$500 |
| 31-1004(2) | False Benefit Reimbursement Statement <$500 |
| 31-1006 | Unlawful Conversion of Benefits <$500 |
| 31-3913(a) | Abuse, exploit, neglect of infirm adult |

‒   All sentences for over 1 year at Level V require six month reintegration at Level IV, III, OR II.
‒   All Criminal fines require 18% surcharge for Victims fund.
‒   All Drug crimes require additional 15% surcharge for rehab fund

| | |
|---|---|
| 11-937(a) | Comp Crime 5th Unre e-mail </= $500  : effective 1999/07/02    : Fines between $100 and $500, plus injunctive relief in Chancery Court |
| 11-937(b) | Comp Crime 5th Falsify </= $500: effective 1999/07/02: Fines between $100 and $500, plus injunctive relief in Chancery Court |
| 11-937(c) | Comp Crime 5th sell softw </=$500: effective 1999/07/02. |
| 11-938(a) | Comp Crime 5th fail to cease <=$500: effective 1999/07/02. |

A171

# Misdemeanor B Offenses

| Statutory Range | UP TO 6 Months |
|---|---|
| Statutory Fine | UP TO $1,150 |
| PRESUMPTIVE SENTENCE | 1st or 2nd offense: Fine, Costs, Restitution Only<br>3rd Offense in 2 yrs:  Level I or II  Up to 6 Mo |

| | |
|---|---|
| 11-653 | Issuing Abortion Articles |
| 11-820 | Trespass with Intent to Peep |
| 11-850 | Possess or Deal in Device for Unl. Taking of Telecommunication Services |
| 11-910 | Debt Adjusting |
| 11-917 | Ticket Scalping - First Offense |
| 11-1106 | Unlawful Dealing with Child |
| 11-1113 | Criminal non-support |
| 11-1114 | Body Piercing & Tattoos |
| 11-1241 | Refusing to Aid Police Officer |
| 11-1248 | Obstructing Control of rabies |
| 11-1271(1) | Criminal Contempt (Disorderly or Insolent Behavior in Court) |
| 11-1273 | Unlawful Grand Jury Disclosure |
| 11-1304 | Hate Crime - **sentence as a violent Felony G** |
| 11-1311 | Harassment  **(Special Category on pp 46 may apply)** |
| 11-1313 | Malicious Obstruction of Emergency Phone Calls |
| 11-1325(a) | Trade in Dog/Cat ByProducts (fur or hair) |
| 11-1326(b) | Fighting and Baiting Animals |
| 11-1333 | Trading in Human Remains or Funerary Objects |
| 11-1341 | Lewdness |
| 11-1342 | Prostitution |
| 11-1355 | Permitting Prostitution |
| 11-1452 | Unlawful Dealing with Knuckles-combination Knife **(SEE NOTE BELOW)** |
| 11-1453 | Unlawful Dealing with Martial Arts Throwing Star **(SEE NOTE BELOW)** |
| 11-1457(j)(2) | Poss. Weapon in Safe School/Recr. Zone |
| 16-4754 | Possess/Use/Consumption Non-Narcotics **(SEE NOTES BELOW)** |
| 16-4754A | Possession of Noncontrolled Prescription Drug |

_  All Criminal fines require 18% surcharge for Victims fund.
_  All Drug crimes require additional 15% surcharge for rehab fund

16-4754  Under the provisions of Title 16, Sec. 4763, if there is a prior conviction of a Title 16 offense, the statutory range increases to 2 years.

16-4764  Effective October 11, 1990, first offense waiver on a Title 16 charge requires 3 years probation at Level I, treatment program, drivers license revocation and community service.

11-1452 AND 11-1453  These offenses become Misdemeanor A if act occurs in a safe school or recreation zone.
11-1114 Body Piercing & Tattoos becomes Mis A for second offense

44

A172

| Unclassified Misdemeanors | |
| --- | --- |
| Statutory Range | UP TO 30 Days |
| Statutory Fine | UP TO $575 |
| Presumptive Sentence | 1st or 2nd offense:  Fine, Costs, Restitution Only<br>3rd Offense in 2 yrs:  Level I or II  Up to 6 Mo. |

| | | |
| --- | --- | --- |
| 11-601 | Offensive Touching   **(Special category pp 46 may apply)** | |
| 11-602 | Menacing     **(Special category pp 46 may apply)** | |
| 11-627 | Substances Releasing Vapors or Fumes | |
| 11-763 | Sexual Harassment    **(Special category pp 46 may apply)** | |
| 11-764 | Indecent Exposure 2 | |
| 11-811(b)(3) | Criminal Mischief - Loss less than $1000 | |
| 11-812 | Graffiti | |
| 11-822 | Criminal Trespass 2 | |
| 11-850 | Poss/deal unlawful telecommunication devices (1 to 4) | |
| 11-914 | Unlawful use of Consumer Identification Info | |
| 11-915 | Unlawful use of Credit card information | |
| 11-922 | Improper Labelling | |
| 11-925 | Video Privacy Protection | |
| 11-1107 | Endangering Children | |
| 11-1245 | Falsely Reporting Incident | |
| 11-1250(a) | Harassment of K-9 dog | |
| 11-1301 | Disorderly Conduct   **(Special category pp 46 may apply)** | |
| 11-1304 | Hate Crime - If offense is unclassified Misdemeanor, sentence as Misd A. | |
| 11-1315 | Public Intoxication **(If Third Offense in 1 Year)** | |
| 11-1322 | Criminal Nuisance | |
| 11-1324 | Obstructing Ingress/Egress at Public Building | |
| 11-1343 | Patronizing a Prostitute | |
| 11-1404 | Providing Premises for Gambling (unless 2nd offense in 5 yr.) | |
| 11-1445 | Unlawful Dealing with Dangerous Weapon **[except subsection(4) class G**<br>**felony or (5) class E felony]** | |
| 11-1446 | Unlawful Dealing with Switchblade **(SEE NOTE BELOW)** | |
| 11-1907 | Fail to answer Summons | |
| 11-2113 | Breach conditions of Release | |
| 11-4120 | Registration of sex offenders | |
| 11-6562A | Furnishing contraband | |
| 16-2513 | Threat/intimidation to withdraw medical maintenance **(Fine $500 to $1000)** | |
| 16-3111 | Violations concerning vital statistics records | |
| 16-4757(c) | Possession of Hypo Syringe or Needle | |
| 16-4774 | Advertisement of Drug Paraphernalia | |
| 16-6611 | Maintaining Fire Hazard | |
| 16-6905 | Sell or Possess Fireworks | |

ANY OTHER OFFENSE NOT SPECIFICALLY DEFINED AS A FELONY, CLASS A MISDEMEANOR, CLASS B
MISDEMEANOR OR VIOLATION.

_   All Criminal fines require 18% surcharge for Victims fund.
_   All Drug crimes require additional 15% surcharge for rehab fund
NOTE: 11-1446 becomes a misdemeanor B if act occurs in a safe school or recreation zone.

45

A 173

## Special Domestic Violence Category

Due to the peculiar nature of criminal charges involving domestic violence, which may be considered as deserving aggravated punishment in that the actions have been repetitive prior to the first formal charge in Court, **and in that children are often witnesses or victims of domestic violence**, the following recommendations are presented. If the guidelines in this category are used, the sentencing order/worksheet must identify the charge as "Domestic Violence Involved".

**CLASS G NON-VIOLENT FELONY**    Statutory Range- 0 to 2 years
    11-1213      Aggravated Harassment
Presumptive Sentence: Up to 12 months at Level II

**CLASS A MISDEMEANORS**    Statutory Range - 0 to 1 years
    11-603      Reckless Endangering 2
    11-611      Assault 3
    11-621      Terroristic Threatening
    11-766      Incest
    11-767      Unlawful Sexual Contact 3
    11-781      Unlawful Imprisonment 2
    11-791      Coercion
    11-885      Interference with Custody
    11-1101     Abandonment of Child
    11-1102     Endangering Welfare of Child
    11-1271A    Criminal Contempt of Family Court Protection From Abuse order

**CLASS B MISDEMEANORS**    Statutory Range - 0 to 6 Months
    11-1311     Harassment

| Presumptive Sentence (Misd A or B) | Level | Time |
|---|---|---|
| 1st Offense | V | Up To 1 Month |
| 2nd Offense in 2 years | V | Up to 2 Months |
| 3rd Offense in 5 years | V | Up To 3 Months |

**UNCLASSIFIED MISDEMEANORS**    Statutory Range - 0 to 30 days
    11-601    Offensive Touching
    11-602    Menacing
    11-763    Sexual Harassment
    11-1301   Disorderly Conduct

| Presumptive Sentence | Level | Time |
|---|---|---|
| Any offense | V | Up To 1 month |

Enhanced Penalties applicable when:
    children are present during the crime OR are victims of the offense
    against a co-defendant if a conspirator was under the age of 14 and the codefendant was 4 or more years older than the child at the time of the crime. (Enhanced penalty for ANY crime)

| Enhanced Presumptive Sentence: | Level | Time |
|---|---|---|
| Any Non-Violent Felony G | II | 12 months or more |
| Misd A or B: | | |
| 1st Offense | V | 1 to 2 months |
| 2nd Offense in 2 years | V | 2 to 3 months |
| 3rd Offense in 5 years | V | 3 or more months |
| Any Unclassified Misdemeanor | V | 1 or more months |

**(Revised 9/22/98, 10/7/98)**

46

A 174

result of conviction for any criminal offense.

**Repetitive Behavior** - The offender persists, after notice, in actions which constitute a pattern of behavior which repeats a past record of non-amenability to community sanctions.

**Revocation** - An order revoking probation may be entered when it is the intention of the Court to raise the level of intensity of supervision after finding that probation has been violated.

**Substantial Risk** - The threat of repetitive violations or causing physical injury to self or others is high.

**Willful Failure to Pay** - A failure to pay a monetary obligation despite the availability of resources with which to pay the obligation, or the refusal to take steps to obtain the resources to pay the obligation.

## Violation of Probation Sentencing Standard

When a violation of probation hearing is held and determination is made that the offender is guilty of the violation and probation is to be revoked, it is presumed that the offender may move up only one SENTAC level from his/her current level.

### AGGRAVATING CIRCUMSTANCES

An offender may have his/her level of supervision raised more than one level if any of the following aggravating circumstances exists:

**A.** Conviction of a new offense which was a <u>felony</u>, a <u>violent</u> <u>misdemeanor</u>, or an offense requiring a mandatory sentence.

**B.** The violation is a violation of a special treatment condition , e.g., offender willfully refuses to attend the ordered program  and, as a result of such refusal, poses a substantial threat to the community or himself. Confinement in this instance should be short-term and could consist of either a Level IV, quasi-incarceration, or a Level V, incarceration, situation until treatment is arranged.

**C.** The offender has demonstrated willful failure to make court-ordered payments, and no other alternatives are possible, or those alternatives would depreciate the seriousness of the offense.

**D.** the offender is found to be in possession of a weapon, leading to the violation, and the offender has       a past history of violence, drug trafficking or weapons violations.

**E.** The behavior of the offender represents an immediate threat to the community or an identified victim.

**F.** The behavior of the offender is repetitive and flagrantly defies the authority of the court.

## Length of Level V Sentences - Invocation of SENTAC Standard

WHEN A PERIOD OF INCARCERATION IS DETERMINED to be the sanction of choice for a violation of probation, a Level V sanction should be in accordance with the current SENTAC standard presumptive sentence for the original crime for which the probation is being served.  If the presumptive sentence is less than level V, the sentence for violation of probation should be UP TO 25% of the statutory maximum.

48

A 175

Effective June 30, 1990, all Violation of Probation sentences must be designated as to whether they are "Truth in Sentencing" or "Non TIS" sentences. A defendant who had an original non-TIS sentence and is violated may not be given a TIS sentence for the violation, unless he specifically agrees thereto, and the sentence is given in relation to TIS guidelines. Designation is imperative so that DOC can maintain proper records on the time to be served, goodtime credits, and parole eligibility.

### Procedural Recommendations for Monitoring purposes:

1. Sentencing orders (and worksheet forms) should refer to all violations as "Violation of Level ___ ", where the blank contains the current level designation.

2. In addition to the above designation, all violation orders, regardless of specific format, should contain the following information:

Client name, Effective date of sentence, Original offense, Type of action: i.e. terminated, continued, modified, or revoked as defined above. New sentence Level(s) and time(s), TIS or NON-TIS status, Aggravating factor(s): if necessary due to a two- level (or more) increase, or a longer than standard sentence length at Level V.

49

A 176