## Summary:  Standard Prior History Categories for Violent Felonies as Lead Offense

| Category | Factor | Fel A | Fel B | Fel C | Fel D | Fel E | Fel F | Fel G |
|---|---|---|---|---|---|---|---|---|
| A | One or less prior felonies | Presumptive Sentence | | | | | | |
| B | While on release or pending trial/sentencing | Level V for up to the time shown below: | | | | | | |
| | | 25 yrs | 10 yrs | 5 yrs | 4 yrs | 2.5 yrs | 1.5 yrs | 1 yr |
| C | Two or more prior felonies | 25 yrs | 10 yrs | 5 yrs | 4 yrs | 2.5 yrs | 1.5 yrs | 1 yr |
| D | One prior **violent** felony | 25 yrs | 10 yrs | 5 yrs | 4 yrs | 2.5 yrs | 1.5 yrs | 1 yr |
| E | Two or more prior **violent** felonies | Life | 20 yrs | 10 yrs | 8 yrs | 5 yrs | 3 yrs | 2yrs |
| F | Excessive Cruelty | Life | 20 yrs | 10 yrs | 8 yrs | 5 yrs | 3 yrs | 2yrs |

**If violent crime is a secondary offense :  Use UP TO the presumptive sentence**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Aggravated Prior History Sentences  at Level V  for  Non-violent Felonies | | | | | | | |
| H | Repetitive criminal history | NA | NA | 24 months | Up this number of months: | | |
| | | | | | 24 | 15 | 9 | 6 |
| J | Lack of amenability to lesser sanctions | NA | NA | 24 moths | Up to this number of months: | | |
| | | | | | 24 | 15 | 9 | 6 |

**If Non-violent crime is a secondary Offense:   Use UP TO the Non-Aggravated Presumptive Sentence**

50

A 177

# Exceptional Sentence Factors

**EXCEPTIONAL SENTENCE FACTORS**

**Aggravating** :

| | |
|---|---|
| A1 | Excessive Cruelty |
| A2 | Prior Violent Criminal Conduct |
| B3 | Repetitive Criminal Conduct |
| B4 | Need for Correctional Treatment |
| B5 | Undue Depreciation of Offense |
| B6 | Major Economic Offense or Series of Offenses |
| B7 | Prior Abuse of Victim |
| B8 | Custody Status at Time of Offense |
| B9 | Lack of Remorse |
| B10 | Betrayal of Public Trust |
| B11 | Supervision to Monitor Restitution |
| B12 | Lack of Amenability |
| B13 | Vulnerability of Victim |
| B14 | Statutory Aggravation |
| B15 | Statutory Habitual Offender |
| B16 | Rule 11 Sentence........... |
| *B17 | Child Domestic Violence Victim |
| *B18 | Offense Against a Child |
| B19 | Other...................... |
| A20 | Sentenced to Time Already Served Only |

(*Revisions 10/8/98)

**Mitigating** :

| | |
|---|---|
| M1 | Victim Involvement |
| M2 | Voluntary Redress or Treatment |
| M3 | Under Duress or Compulsion |
| M4 | Inducement By Others |
| M5 | Physical/Mental Impairment |
| M6 | Concern for Victim by Non-Principal |
| M7 | No Prior Convictions |
| M8 | Treatment Need exceeds Need for Punishment |
| M9 | Could Lose Employment |
| M10 | Statutory Mitigation |
| M11 | Assistance to Prosecution |
| M12 | Mental Retardation....... |
| M13 | Rule 11 Sentence......... |
| M14 | Other................. |

51

A178

# Exceptional Sentences

The standard sentence range is presumed to be appropriate for the typical criminal case. The court may impose a sentence outside the standard sentence range for that offense if it finds that there are **substantial and compelling** reasons justifying an exceptional sentence.

The following aggravating and mitigating circumstances for exceptional sentences are provided as examples and are not intended to be exclusive reasons for departure. An aggravating or mitigating circumstance, whether listed below or not, shall only apply if it does not reflect the statutory language defining the current offense, or constitute an element thereof.

When an exceptional sentence is decreed, the <u>governing</u> factor(s) leading to the exceptional sentence must be stated for the record, and should be identified in the sentencing order or on the sentencing worksheet.

# AGGRAVATING FACTORS  For Exceptional Sentences

A. The following factors apply to <u>**VIOLENT FELONIES ONLY:**</u>

1. **EXCESSIVE CRUELTY**
   a. Definition : Those facts surrounding the commission of a violent felony which demonstrate such a callousness and cruelty towards the victim as to shock the conscience of the Court. [Standard 4 II.A.(i)]
   b. Allowable Penalty : Up to the statutory maximum for the instant offense.
2. **PRIOR VIOLENT CRIMINAL CONDUCT**
   a. Definition : Defendant has demonstrated, by his prior criminal history, a propensity for violent criminal conduct. (SEE POLICY NO. 4) [Standard 4 I.A.(i)]
   b. Recommended Penalties :
      1. With <u>two or more</u> prior, separate violent felonies --Up to the statutory maximum.
      2. With <u>one</u> prior violent felony -- up to 50% of the statutory maximum.

B. The following factors are applicable to <u>**ANY OFFENSE**</u>
3. **REPETITIVE CRIMINAL CONDUCT**
   a. Definition : Repetitive Criminal Conduct is    conviction or adjudication for the same or   similar offense on two or more previous, separate    occasions. (SEE POLICY NO. 4)

4. **NEED FOR CORRECTIONAL TREATMENT**
   a. The defendant is in need of correctional treatment which can be most effectively provided if he is placed in total confinement. [Standard 4 I.B]

5. **UNDUE DEPRECIATION OF OFFENSE**
   a. Definition : It would unduly depreciate the seriousness of the offense to impose a sentence of other than total confinement. [Standard 4 I.D.]

6. **MAJOR ECONOMIC OFFENSE OR SERIES OF OFFENSES**:identified by a consideration of any of the following factors:
   A.The offense involved multiple victims or multiple incidents per victim;
   B. the offense involved attempted or actual monetary loss substantially greater than

A179

typical for the offense;
C. the offense involved a high degree of sophistication or planning, or occurred over a lengthy period of time;
D. The defendant used his/her position of trust, confidence or fiduciary responsibility to facilitate the offense.

7. **PRIOR ABUSE OF VICTIM**:On prior occasions, the defendant has harassed, threatened, or physically abused the victim of the current offense.

8. **CUSTODY STATUS AT TIME OF OFFENSE**:The offender was on bail, early release from incarceration, or was serving a sentence in other than Level V at the time the offense was committed.

9. **LACK OF REMORSE**: The offender has demonstrated a total lack of remorse or acceptance of responsibility with regard to the offense.

10. **BETRAYAL OF PUBLIC TRUST**:The offender, in attempting to gain,or while holding, public office by appointment or election, betrayed the Public Trust by his or her unlawful conduct.

11. **SUPERVISION TO MONITOR RESTITUTION**: A long period of supervision is necessary to monitor the offender's restitution responsibilities. Penalty Note: Applicable to sentences involving **less than Level V time** only.

12. **LACK OF AMENABILITY**:The defendant has demonstrated a lack of amenability to lesser restrictive sanctions through violation of a prior period of probation, or a failure to meet the conditions of a prior or current period of probation.

13. **VULNERABILITY OF VICTIM**:The Defendant knew, or should have known, that the victim of the offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health.

14. **STATUTORY AGGRAVATION**: The current offense carries with it a statutory minimum mandatory period of incarceration which exceeds the sentencing guidelines.

15. **STATUTORY HABITUAL OFFENDER**:The Court, on motion, determined the defendant to be an habitual offender under the provisions of 11 Del.C., s4214, thus calling for a sentence of incarceration which exceeds the sentencing guidelines.

16. **RULE 11 SENTENCE:** The sentence was in accord with a Rule 11 Plea Agreement, even though the agreed sentence was outside these guidelines. The reason for the agreed sentence to be outside the presumptive sentence should be stated in the Plea Agreement.

*17. **CHILD DOMESTIC VIOLENCE VICTIM:** The person who is a victim in domestic violence is a child.

*18. **OFFENSE AGAINST A CHILD**: The victim in the offense was a child under 16 years old.

(*Revisions 10/8/98)

A180

# MITIGATING FACTORS FOR EXCEPTIONAL SENTENCES

1. **VICTIM INVOLVEMENT**: To a significant degree, the victim was an initiator, willing participant, aggressor, or instigator of the incident.

2. **VOLUNTARY REDRESS OR TREATMENT**:Before detection, the defendant compensated, or made a good faith effort to compensate, the victim of the criminal conduct for any damage or injury sustained, or, before detection, he voluntarily sought professional help for drug/alcohol treatment, or for any other recognized compulsive behavioral disorders related to the offense.

3. **UNDER DURESS OR COMPULSION**: The defendant committed the crime under duress, coercion, emotional distress, threat or compulsion insufficient to constitute a complete defense but which significantly affected his or her conduct.

4. **INDUCEMENT BY OTHERS**:The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime.

5. **PHYSICAL/MENTAL IMPAIRMENT**: The offender, because of physical or mental impairment, lacked substantial capacity for judgement when the offense was committed. The voluntary use of intoxicants (drugs or alcohol) does not fall within the purview of this circumstance.

6. **CONCERN FOR VICTIM BY NON-PRINCIPAL**: The offense was principally accomplished by another person and the defendant manifested extreme caution or sincere concern for the safety or well-being of the victim.

7. **NO PRIOR CONVICTIONS**

8. **TREATMENT NEED EXCEEDS NEED FOR PUNISHMENT**:The offender is in greater need of an available treatment program than of punishment through incarceration.

9. **COULD LOSE EMPLOYMENT**:The offender is gainfully employed and will more than likely lose his/her job if the sentencing standard is imposed.

10. **STATUTORY MITIGATION**
   a. Regarding violation of 16 Del.C., s4752 or s4761(2), see 16 Del C., s4763(b)(1).
   b. Regarding violation of 16 Del.C., s4754, see 16 Del.C., s4763(b)(2).
   c. Regarding violation of 16 Del.C., s4753 or s4754, see 16 Del.C., s4764.

11. **ASSISTANCE TO PROSECUTION**: Defendant rendered substantial assistance to Authorities in the investigation and/or prosecution of this or other crimes.

12. **MENTAL RETARDATION**
   a. Defendant is "significantly subaverage in general intellectual function" (usually interpreted as an IQ score of 70 or less); **AND** b. "has deficits in adaptive behavior" (has insufficient life skills to get along without constant assistance from others); **AND** c. "manifested the above handicaps during the developmental period". (usually interpreted as having experienced the onset of handicap at the age of 21 or younger).

13. **RULE 11 SENTENCE**:The sentence was in accord with a Rule 11 Plea Agreement, even though the agreed sentence was outside these guidelines. The reason for the agreed sentence to be outside the presumptive sentence should be stated in the Plea Agreement.

54

A181

# STATEMENTS OF POLICY

1. The purposes of the Sentencing Standards are as follows:
   a. To incapacitate, through incarceration, the violence prone offender.
   b. To avoid, in so far as possible, the incarceration of the non-violent offender for the purposes of:
      1. Enabling the offender to make any ordered restitution in a more timely manner.
      2. Enabling participation in programs aimed at rehabilitation of the offender.
      3. Conserving the limited incarceration facilities for use by violent felons.

2. For the purposes of sentencing, a violence-prone offender is defined as one for whom the current most serious offense is a crime included in the current list of violent crimes. (See definition sheets)

3. For the purposes of sentencing, only those offenses adjudicated at age 14 or older shall be counted in prior history.

4. for the purposes of sentencing, a conviction-free period of ten (10) years after final release from incarceration, or from date of sentence if only probation at levels I thru IV was ordered, shall be sufficient to "wash" the criminal history prior to that date. Felony A and Felony B crimes are excluded from this policy and should always be considered at time of sentencing.

5. In an instance where an offender, who is awaiting sentencing after conviction, is brought before the court and convicted of additional charges, the sentencing order may include all the offenses in a single order. The earlier (unsentenced) offenses shall not be considered in the prior history of the later offenses unless the later offenses occurred in the period after conviction on the earlier offenses.

6. When it can be determined that two or more prior convictions were the result of a single incident, only one conviction per incident shall be considered in reaching a decision on length of incarceration. (Example: Conviction on same date of Robbery 2 and Possession of Deadly Weapon During Commission of Felony = 1 prior violent Felony.)
   **In addition to its normal definition, convictions for a single incident shall include all convictions resulting from a single indictment or information.**

7. When sentencing on multiple charges, prior criminal history should be considered only in determining sentence for the "lead" or most serious offense. Sentences for other current charges shall be calculated based on zero criminal history.

8. When sentencing on multiple charges and the lead offense is a violent felony, time for other current violent felonies will be added to Level V time. In all other instances, (e.g. misdemeanors and non-violent felonies) time will normally be added to time to be served in Levels I through III.

9. When considering multiple charges, a violent felony shall be considered to be the most serious offense, for sentence calculation purposes, even though non-violent felonies of higher classification are present.

10. When ordering a sentence, the Judge will order the offender to a specific initial level of supervision (Assessment of Risk). The judge may recommend a specific treatment program. The DOC will make every effort to assign the offender, or procure admittance into, the recommended program, or equivalent, as slots become available.

A 182

11. In those cases where the Court would consider a level IV alternative to Level V incarceration and no vacancy exists, the judge should sentence the offender to Level IV, with the proviso that the offender be held at Level V only until a Level IV facility becomes available.

12. When a Violation of Probation is involved with sentencing for new charges, the Violation should be take precedence and disposition settled as a separate action before sentence for the new offenses is ordered.

13. All probation sentences handed down at one time (levels I, II, and III) should in the normal case be imposed to run concurrently.

14. All sentencing alternatives, both supervisory and treatment, in Levels III and IV shall be reserved for use in the following priority order:
      a. Direct Sentence
      b. Standard flow-down eligibility
      c. Pretrial release

15. Traffic offenses as listed in Del.C, Title 21, **with the  exception of section 2810, Driving after Judgement  Prohibited,** will not currently come under the purview of the Sentencing Standards. However, in the interest of conserving expensive and limited prison space for the violent and proven-incalcitrant offender, it is strongly recommended that Title 21 offenders not be given a sentence to Level V incarceration unless they have previously been sentenced to, and failed at, supervision in Level III and Level IV, or unless incarceration is mandated by law.

16. Repetitive criminal history, as an aggravating factor, is defined as conviction or adjudication for the same or similar offense on two or more previous occasions. **This  policy is subject to the limitations outlined in Policy  Nos. 3 and 4, and to the limitations outlined in the  various misdemeanor presumptive sentencing standards.**

17. Excessive cruelty, as an aggravating factor, is defined as those facts surrounding the commission of a **violent  felony** which demonstrate such a callousness and cruelty towards the victim of the offense as to shock the conscience of the court.

18. **Aggravating factors for the use of Level V as sanction  for the non-violent categories of misdemeanor should be  limited to objective factors, such as:  a. Vulnerability of victim due to age or impairment**
      **b. Lack of Amenability - If offender is or was  already at or above the presumptive Level of  Supervision.**

19. When an offender is released from incarceration by any means (good time credits, conditional release, etc.) the release will be to the highest level specified by the court, **or by statute, for any unserved sentence, or  portion thereof.**  If no level has been specified, release will be to Level II by default.

20. The supervisory levels (Level IV [Quasi-Incarceration]; Level III [Intensive Supervision]; etc.) refer to the perceived risk and resultant control to be exercised over the individual.  The levels assigned to the various treatment programs refer to the approximate time requirement upon the individual participant. there is no defined correlation between the two. An offender at Level II may, as a result of evaluation, be assigned to any type of treatment program without effecting the supervision level. Therefore, a change in supervisory level does not require a change in treatment program.

21. Offenders who participate in Alternative Sentencing Programs should be required to pay for the cost

56

A 183

of the program. A sliding scale, based on ability to pay, is currently in use. Payment of the minimum fee ($5.00 / Mo.) may be waived in case of indigency, but in such cases, the offender should be required to perform community service in its place.

22. For purposes of determining conformance to standard, the final sentence, **after any suspensions,** is the determinant factor. For example, if a given sentence is 2 years at Level V suspended for 2 years at Level II, the Level II sentence is the portion which will actually be served and, therefore, the portion which will be considered as conforming (or not conforming) to the standard.

23. In those instances involving **non-violent felonies,** where a decision to incarcerate, with appropriate aggravating factors, has been made, the sentence should be **UP TO, but NOT IN EXCESS of, 25%** of the statutory maximum for the crime.

24. In those instances involving **misdemeanors,** where, due to stated aggravating factors, a decision has been reached that a sentence to incarcerate is **unavoidable;** the sentence should not exceed the **"recommended maximum"** as noted in the standards.

25. In instances when a non-TIS sentence to Level V is followed by a sentence to Level IV and/or Level III supervision, the Board of Parole may grant parole as follows:

    (a) Parole to the highest level specified by the original sentencing order. Should a violation occur during the parole period, the offender would be returned before the Board of Parole for violation of parole. Upon successful completion of the required period, the Department may, if appropriate, move the offender pursuant to Policy No. 26, **if such a move is not in conflict with the Board of Parole Order.** (Revised 9/22/98)

    (b) Offenders released upon reaching their short-time release date (conditional release) shall be released to serve the balance of the Level V sentence (i.e. conditional release supervision period) to the next highest level specified by the original court order **or other subsequent sentencing order.** If appropriate, the Department may move the offender pursuant to Policy No. 26, if such a move is not in conflict with the Board of Parole Order.

    (c) If a paroled or mandatory-released offender is serving a court-ordered Level IV or III sentence and the unexpired portion of the Level V sentence is less than one (1) year, the Board of Parole, upon application by the Department of Correction, may issue an order discharging the offender from the balance of the Level V sentence, once an equivalent period has been successfully served at Level IV or III.

26    In those cases where an offender is subject to sentences for more than one offense, and when the combined sentence to intermediate sanction at level IV is in excess of one year, including any work release time on a sentence of incarceration, the Department of Correction shall, absent specific objections from the judge(s), be permitted to move the offender, after one year, to a lower level of supervision, providing the offender has met, and continues to meet, the regulations and any special conditions placed upon him/her by the courts. Any lapse in meeting those conditions shall be grounds for a return to completion of the Level IV sentence without recourse to the courts.

    In like manner, combined sentences to Level III in excess of twelve months shall be subject to movement to a lower level. Such movements, both up and down, will have no effect on the overall length of sentence, except when a formal violation report is filed with the court.

27.    Any person failing to return to a Level IV facility shall be deemed to be on escape status. The facility shall cause a warrant to be issued charging the offender with Escape After Conviction and

57

A184

identifying him as a Level IV escapee. (See P. 37 of this Benchbook for recommended sentences.) Any such person arrested on the warrant shall be returned to the original sentencing court for both a violation hearing and the new charge.

28.     Where a defendant is directly sentenced to Level IV Work Release Center, residential treatment, or Home confinement, and has awaited placement pending slot availability at Level V for a period of 90 days or one-half of the Level IV sentence (whichever is less), the department may place the individual at Level III Day Reporting Center, evaluation Phase, or another comparable alternative if the DRC is not available, and the department shall make appropriate sentence modification recommendations to the sentencing judge upon completion of that evaluation.

29.     Level IV, work release center or halfway house, is deemed quasi-incarceration. A defendant serving a sentence at Level IV, work release or halfway house, i.e., quasi-incarceration, is entitled to earn "good time credits" pursuant to 11 Del. C s4381(b) and (c).
     It is further the policy of SENTAC that individuals sentenced to Level IV (any variation), who must serve a term at Level V awaiting placement at Level IV, shall, during the time served with good conduct at Level V, be awarded good time pursuant to 11 Del. C. S4381(b)(2).

30.     It is the policy of SENTAC that the program entitled "Live Out" meets the definition and requirements of a Level IV sentence and may be imposed as a level IV sanction during the last 60 days of an individual's (direct or flowdown) Level IV sentence as an aid to reintegration into the community.

31. Any person arrested on a charge of escape from any Correctional facility, including both Level V and Level IV facilities, should be returned by the court to a Level V secured facility pending such hearings as may ensue from the charge. Persons charged with such escapes should not be released on bond. (Adopted November, 1996)

32. With regard to sentences of incarceration conditioned by section 4204(k) of Title 11, as amended in 1997, it shall be understood that such sentences are to be served in their entirety at level V, and that there shall be no diminution of such sentence by any of the normally available early release devices, including (but not limited to) good time credits, furlough, work release or community transition. Because such sentences add significant complexity to the management of the population of incarcerated offenders, and, if used indiscriminately, would substantially increase the prison population, Section 4204(k) should be used by judges only in exceptional circumstances.
     Since imposition of a sentence pursuant to 11 Del C., sec 4204(k) is, in effect, a departure from the presumptive sentencing guidelines, the reason for use of Sec 4204(k) must be stated on the record and included in the sentencing order. When Section 4204(k) is used with a sentence for an escape-related offense, the reasons for its use are self explanatory and need not be stated on the record or sentencing order. (Adopted December, 1997)

A185

<u>DOC/ Bureau of Prisons **WORK RELEASE Policy**</u>

A program permitting an inmate of proper custody status to work in the community at paid employment. The inmate is still assigned to a Halfway House/Work Release Center when not working or participating in extracurricular programs. Inmates meeting the following standards may be given consideration.

Inmates within 36 months to short-time release date and 9 months to parole eligibility. (Non- TIS offenders only.)

Inmates convicted of a violent crime against person(s) and served more than a year at Level V must have a mental evaluation prior to being considered for the program.

MDT must review and recommend placement.

Inmates with minor open charges can be approved and will be expected to clear the charges; i.e., motor vehicle offenses.

Inmates serving a sentence for a third DUI offense occurring within 5 years from a prior offense are not eligible for work release during the first 3 months of the sentence imposed.

Inmates serving a sentence for a fourth or subsequent offense occurring any time after 3 prior offenses are not eligible for work release during the first 6 months of the original sentence imposed.

Truth In Sentencing Inmates

1. Sentenced to one year or more under Truth in Sentencing if they are in the last 180 days of their sentence.

2. Truth in Sentencing inmates sentenced to less than 1 year provided, however, the first 5 days be served at Level V, may be classified to work release, unless the court states otherwise.

Inmates serving a Level V sentence with a Level IV sentence to follow.

Inmates must not have had any Class I or major conduct offenses within the last 6 months prior to consideration.

A186

Inmates in the following categories **will not** be given consideration in this program due to either statutory or departmental/bureau policy.

1.　　　　　Class A Felons, those committed as a Habitual Criminal or those previously convicted of two or more offenses listed herein on page 8 or 9 until within six months of the date of release from custody.

2.　　　　　Any offender convicted of a sex offense, including but not limited to offenders convicted of any of the following offenses: Unlawful sexual contact in the First or Second Degree, Unlawful sexual penetration in the First, Second, or Third Degree, Unlawful sexual intercourse in the First, Second, or Third Degree, Sexual Extortion, Continuous sexual abuse of a child, Dangerous crimes against a child, Sexual exploitation of a child, Unlawfully dealing in material depicting a child in a prohibited sexual act, or Subsequent convictions of Sec. 1108 or Sec. 1109.

3.　　　　　Inmates with detainer, unless the detaining authority has given specific written approval for work release.

4.　　　　　Inmates serving a sentence under 4204K, unless the sentencing judge specifies that work release is allowed.

5.　　　　　Inmates convicted of escape after conviction or escape 2nd and are never eligible for work release.

Inmates serving minimum mandatory sentences for trafficking are not eligible until the mandatory portion of their sentence is completed. Those serving minimum mandatory sentences for other offenses are eligible after serving 50%t of the minimum mandatory, unless minimum term is set by statute. (Non TIS offenders only.)

60

A187

IN THE SUPREME COURT OF THE STATE OF DELAWARE

JOHN H. BENGE, JR.             )
                               )
        Defendant-Below,       )
        Appellant,             )
                               )
v.                             )          No. 544, 2003
                               )
STATE OF DELAWARE,             )
                               )
        Plaintiff-Below,       )
        Appellee.              )

---

ON APPEAL FROM THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

---

APPELLANT'S OPENING BRIEF

BERNARD J. O'DONNELL (#252)
Office of Public Defender
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

Attorney for Appellant

Dated:  May 6, 2004

A188

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . iii

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . .

ARGUMENT

I.    THE PRIOR BAD CONDUCT ADMITTED AGAINST THE DEFENDANT AT
      TRIAL WAS IRRELEVANT AND UNDULY PREJUDICIAL TO THE
      DEFENDANT'S RIGHT TO A FAIR TRIAL UNDER D.R.E. 404(B)  . . 8

II.   THE PROSECUTOR'S PERSONALLY SARCASTIC REMARK TO THE
      DEFENDANT BEFORE THE JURY THAT HE WAS A "REAL
      HUMANITARIAN" UNFAIRLY DEPRIVED THE DEFENDANT OF A FAIR
      TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  BECAUSE THE TRIAL EVIDENCE COULD HAVE SUPPORTED A
      VERDICT OF ASSAULT SECOND DEGREE BASED ON EITHER OF TWO
      ACTS -- SPRAYING STACEY SMITH WITH PEPPER SPRAY OR
      CAUSING A GUNSHOT WOUND TO HIS SHOULDER -- THE TRIAL
      COURT'S FAILURE TO SPECIFICALLY CHARGE THE JURY AS TO
      THE LESSER INCLUDED OFFENSE OF ASSAULT SECOND DEGREE
      WITH RESPECT TO THESE TWO DISTINCT ACTS DEPRIVED THE
      DEFENDANT TO THE RIGHT TO A UNANIMOUS JURY VERDICT . . . 19

IV.   THE TRIAL COURT'S FAILURE TO ADEQUATELY DEFINE THE
      LESSER INCLUDED OFFENSE OF ASSAULT THIRD DEGREE
      DEPRIVED THE DEFENDANT OF THE RIGHT UNDER 11 *DEL. C.* §
      206 TO HAVE THE JURY CHARGED WITH ANY LESSER INCLUDED
      OFFENSE . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . 22

COURT'S RULING  . . . . . . . . . . . . . . . . . . . . Exhibit

SENTENCE ORDER  . . . . . . . . . . . . . . . . . . . . Exhibit

i

A189

TABLE OF CITATIONS

Cases

*Allen v. State*, 644 A.2d 982 (Del. 1994) . . . . . . . . . . . 9

*Brett v. Berkowitz*, 706 A.2d 509 . . . . . . . . . . . . . 13

*Brokenbrough v. State*, 522 A.2d 851 (Del. 1987) . . . . . . 16,17

*Deshields v. State*, 706 A.2d 502 (Del. 1998) . . . . . . . 13,14

*Doyle v. Ohio*, 426 U.S. 610 (1976) . . . . . . . . . . . . .

*Getz v. State*, 538 A.2d 726 (Del. 1988) . . . . . . . . . . 13

*Hughes v. State*, 437 A.2d 559 (Del. 1981) . . . . . . . . 16,17

*Hunter v. State*, 815 A.2d 730 (Del. 2002) . . . . . . . . 15,19

*MacDonald v. State*, 816 A.2d 750 (Del. 2003) . . . . . . . . .

*Mason v. State*, 658 A.2d 994 (Del. 1995) . . . . . . . . . 17

*Michaels v. State*, 529 A.2d 752 (Del. 1987) . . . . . . . . 16

*Moorhead v. State*, 638 A.2d 52 (Del. 1994) . . . . . . . . 14

*Pennell v. State*, 602 A.2d 48 (Del. 1991) . . . . . . . . . 16

*Robelen Piano Co. v. DiFonzo*,
    169 A.2d 240 (Del. 1961) . . . . . . . . . . . . . . . 18

*United States v. Hale*, 422 U.S. 171 (1975) . . . . . . . . . .

*Weber v. State*, 547 A.2d 948 (Del. 1988) . . . . . . . . . 16

*Williams v. State*, 803 A.2d 927 (Del. 2002) . . . . . . . . 15

*Word v. State*, 801 A.2d 927 (Del. 2002) . . . . . . . . . . .

Commentary, ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980).

ii

A190

<u>NATURE AND STAGE OF PROCEEDINGS</u>

The Defendant was arrested on October 20, 2002. He was later indicted for the offenses of attempted murder, assault second degree, two counts of possession of a firearm during a felony, burglary second degree, attempted kidnapping second degree, possession of a firearm by a person prohibited, and two counts of violation of a protection from abuse order. The possession of a firearm by a person prohibited and two counts of violation of a protection from abuse order were severed before trial. After his trial on the instant offenses, the Defendant later pleaded guilty and was sentenced on the three severed charges. The attempted kidnapping charge was dismissed.

Before his trial, the Defendant moved *in limine* to preclude the admission of various instances of alleged bad character during his trial on the basis that it was irrelevant or unfairly prejudicial. The trial court admitted most of the State's proffered other bad conduct evidence.

The Defendant was tried before a jury in Kent County during a seven day trial in August 2003, the Honorable Scott Bradley presiding, and represented by Joseph A. Hurley, Esquire.

The jury rendered verdicts acquitting the Defendant of the charge of attempted murder but convicting him of the lesser included offense of assault second degree, acquitting the

1

A191

Defendant of the charge of assault second degree but convicting him of the lesser included offense of offensive touching, acquitting the Defendant of the charge of burglary second degree but convicting him of the lesser included offense of criminal trespass first degree, and acquitting him of two counts of possession of a firearm during the commission of a felony.

The Defendant was thereafter sentenced on October 10, 2003 for these three offenses. The Superior Court imposed, *inter alia*, maximum terms of imprisonment of 8 years at Level V for the assault second degree offense followed by six months at the Violation of Probation Center and Work Release; one year of imprisonment at Level V for the criminal trespass offense, and 30 days of imprisonment at Level V for the offensive touching offense for a cumulative total of nine years and seven months imprisonment. All terms of imprisonment were also imposed subject to the Superior Court's imposed requirement that the Defendant would be denied "any form of early release, good time, furlough, work release, supervised custody, or any other form of reduction or dimunition of sentence." 11 *Del. C.* §4204(k)(1).

A notice of appeal was docketed thereafter and this is the Defendant's opening brief on direct appeal.

2

A192

SUMMARY OF THE ARGUMENTS

1.    The prior bad conduct admitted against the defendant at trial was irrelevant and unduly prejudicial to the defendant's right to a fair trial under D.R.E. 404(b).

2.    The prosecutor's personally sarcastic remark to the defendant before the jury that he was a "real humanitarian" unfairly deprived the defendant of a fair trial.

3.    Because the trial evidence could have supported a verdict of assault second degree based on either of two acts -- spraying Stacey Smith with pepper spray or causing a gunshot wound to his shoulder -- the trial court's failure to specifically charge the jury as to the lesser included offense of assault second degree with respect to these two distinct acts deprived the defendant to the right to a unanimous jury verdict.

4.    The trial court's failure to adequately define the lesser included offense of assault third degree deprived the defendant of the right under 11 *Del. C.* § 206 to have the jury charged with any lesser included offense.

3

A193

STATEMENT OF FACTS

In the early morning of Sunday, October 20, 2002, the Defendant found himself in the office of the Oak Grove Motel in Rehoboth Beach, Delaware, a 54 year old "broken man." (A192). Until recent years, he had been, by all appearances, moderately successful in life. He graduated from college, served in the United States Army, graduated from law school, was admitted to the Delaware Bar in 1976, and practiced in a small law firm for twenty years. He also married Donna Lovett Benge in 1979, later had three children with Donna, and their family lived in a comfortable suburban home. (A99-101).

A few years before that Sunday morning in Rehoboth Beach, his previous life began to unravel. He left his firm to try to establish a solo practice. Donna said that he had started drinking too much and became distant. He encountered economic difficulties in his practice, his income dwindled, and eventually he lost his ability to practice law altogether. Donna, who had started working full-time again, had distanced herself from him and suggested their separation which he could not understand because he did not want their marriage to end. (A102,103). They lived apart in their home although he wanted to reconcile with her.

In time, he began to suspect that Donna was having

4

A194

extramarital affairs and asked her whether it was so. She denied it to him. (E106-109). When he found and could no longer ignore signs of his Donna's infidelity, he became more despondent. He later realized that, despite her denials to him, she had an affair with her boss at work while he and Donna were still married. (A-110-113). He also believed that, while they were still married, Donna had begun an affair with Stacey Smith, the 15 years younger maintenance man at the Oak Grove Motel that her family owned and that she also managed in Rehoboth Beach during summers. (A114-123, 134-140).

In the meantime, Donna petitioned and they were officially divorced. Although he had remained in the family home pending their divorce, he would have to leave it the following month according to their property division agreement, and he had no livelihood or place else to live afterwards.

In the midst of this, while he had lost or was losing all that he had valued during his past life, he thought often of taking his own life, which Donna knew. His own sister had shot herself several years before. (A99,131). Despondent and embittered in believing that his wife had abandoned him when he needed her most, by the morning of October 20, 2002, he had decided that he would take his own life in front of her. (A131, 140-143).

5

A195

He drove to the Oak Grove Motel in Rehoboth where he knew Donna would be. Early in the morning, he entered into the locked office area using keys of Donna that he had copied secretly. He was armed with two handguns in belt holsters. He had cut the telephone wires to the office. (A144-155).

Once he had entered the motel office where he had intended to kill himself in front of Donna, it became clearer to him that he could not carry out what he had planned to do because of how his death would affect his family and children. (A157-159, 170-171). He heard a noise in the office area, however, and feared that his entry had been discovered. On checking to see where the noise originated, he found Donna reading in her bed alone. (A175). Surprised that Stacey was not with Donna and realizing he may have been wrong about believing that Donna and Stacey had been having an affair, he asked Donna where Stacey was. When Donna screamed and jumped from the bed, he panicked and sprayed mace towards the bed hoping that it would cause her to flee and lock herself in the bathroom so he could get away. (A177).

Donna fled from the bedroom to the office. He chased her fearing that she would get outside before him and hinder his escape. He caught her by the door and pulled her down on a chair near the office door so he could get outside before she did.

6

A196

(A177-178). As he did, he saw Stacey charging him from the rear of the office. He sprayed Stacey with the mace hoping that he could get away but Stacey tackled him in front of the office door. (A179). The mace spray may have hit Donna. As Stacey and he grappled while he tried to get out the front door, he felt Stacey grabbing for the gun in the holster around his waist. The gun discharged as they struggled over it wounding Stacey in the shoulder. They tumbled out the door and were struggling on the ground outside when Rehoboth Police officers arrived and separated the two men. (A197).

7

A197

I.    THE PRIOR BAD CONDUCT ADMITTED AGAINST
      THE DEFENDANT AT TRIAL WAS IRRELEVANT
      AND UNDULY PREJUDICIAL TO THE
      DEFENDANT'S RIGHT TO A FAIR TRIAL UNDER
      D.R.E. 404(B).

Standard and Scope of Review

Whether bad character evidence is independently relevant for some purpose other than proving propensity to commit the offense is a question of law which may be reviewed *de novo*. *Allen v. State*, Del. Supr., 644 A.2d 982 (1994).

Argument

As a result of the incident at the Oak Grove Motel that morning, the Defendant was convicted of the offenses of assault second degree against Stacey Smith, offensive touching against his ex-wife Donna, and criminal trespass first degree.

Prior to trial, he had moved *in limine* to preclude the State from introducing into evidence before the jury other instances of his alleged misbehavior concerning Donna prior to this incident. (A22-25). The State identified the other alleged misconduct of the Defendant it would seek to introduce evidence of at trial. (A28-32).

Over defense objection, the Superior Court ruled as admissible evidence that several months prior to the incident at Oak Grove in October, the Defendant had covertly obtained keys and surreptitiously entered the home in Fairfax where Donna had

8

4198

been living while separated from the Defendant pending their
divorce. Sometime afterwards, Donna found a voice tape recorder
concealed in the dresser drawer in her bedroom. (A33-70).

The defense argued that evidence concerning the prior
alleged burglary was irrelevant and unfairly prejudicial because
the evidentiary facts concerning the October 20 incident at the
Oak Grove were straightforward and uncontested, and the
allegation that the Defendant illegally entered his wife's home
months before to plant a recording device proved nothing as to
what he intended to do on October 20 at the Oak Grove Motel.
(A42). Furthermore, the defense argued it was unfairly
prejudicial because the prosecution had no need to introduce
evidence of the prior burglary because the facts that occurred on
October 20 were essentially clear and that the prior burglary
would add nothing other than to show the Defendant had previously
made illegal entries:

> What we have here on October 20th is
> uncontradicted testimony that John Benge entered the
> Oak Grove Motel, that John Benge was armed with a
> chemical spray device, that the chemical spray device
> was some device that was relevant to an event, Donna
> Benge and Mr. Smith. John Benge was armed. A fight,
> altercation, whatever the words of art may be, broke
> out between Mr. Smith and John Benge, that during the
> course of that fight, two weapons were removed from
> holsters in some fashion; that during the course of
> that fight, at least one of the weapons was fired in
> some fashion; that during the course of that fight,
> John Benge was subdued.

9

A199

What need is there for an April 12th break-in to a vacant home six months before under those factual circumstances? (A43-44).

The defense also contended that the similarity between the two offenses was unfairly prejudicial to the Defendant and there was significant alternative and less prejudicial proof of the Defendant's preoccupation with his relationship with his ex-wife and her present relationships with others. (A44, 52-53).

The Superior Court ruled that evidence of the prior burglary would be admissible as relevant to the Defendant's intent and motive that morning in the Oak Grove Motel, that its probative value outweighed its prejudicial effect, and that the court would give a limiting instruction. (A56-64).

Admission of the Defendant's burglary of his former wife's home in order to install a recording device was an abuse of discretion not only because it was unfairly prejudicial but also because, if the Defendant's intent and motive was relevant concerning the October 20 incident at the Oak Grove Motel, there was significant alternative evidence of the Defendant's fixation with his former spouse. The State had already been permitted to introduce other misconduct evidence that: the Defendant had previously called Donna's new paramour, Stacey Smith, while he and Donna were separated in order to contentiously question him

10

A 200

concerning his relationship with Donna; the Defendant had entered Donna's new home without invitation to question her and Stacey about whether the children knew about their relationship; the Defendant told Donna before the October 20 incident that Stacey Smith's "shadow will never darken the doorstep" of their previous marital home; the night before the October 20 incident, the Defendant hung up the phone several times and then announced to his son that "the whore is on the phone" when Donna attempted to call their son. (A28-31).

      This uncontested evidence served the prosecution's purpose in making it altogether clear to the jury that the Defendant was obsessed with his former spouse and her new relationship with Stacey Smith. Nothing further was served by evidence that the Defendant had burglarized his former spouse's home in order to plant a recording device in her bedroom other than to show his propensity for criminal misconduct in their relationship. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted on conformity therewith." D.R.E. 404(b). *See also Allen v. State*, 644 A.2d 982 (Del. 1994).

      The defense already possessed and was able to employ significant uncontested evidence of the Defendant's obsession with his former wife. No permissible purpose was served by

11

A201

additional evidence that he had previously burglarized her home:

> Where, as here, the State presents
> direct evidence, through the testimony
> of the alleged victim, that an attack
> occurred, no evidential purpose is
> served by proof that the defendant
> committed other intentional acts of the
> same type.

*Getz v. State*, 538 A.2d 726, 733 (Del. 1988). *See also Brett v.*
*Berkowitz*, 706 A.2d 509, 516-517 (Del. 1998). Where the victim

provided direct evidence of the robbery offense by identifying

the defendant at trial, proof of another robbery by the defendant

against the same victim had no independent logical relevance to a

material issue in dispute. *Deshields v. State*, 706 A.2d 502, 506

(Del. 1998) ("the fact that other crime evidence comports with

one of the exceptions listed in Rule 404(b) does not make it

admissible per se").

     The probative value of the Defendant's prior

burglary of his former wife's home was substantially outweighed

under D.R.E. 403 by the unfair prejudice it invited with respect

to the alleged burglary and assaults at the Oak Grove Motel on

October 20 because: the extent to which the point to be proved --

the Defendant's obsession with his former wife -- was not in

dispute; the proponent (prosecution) had no need for the evidence

because there was an abundance of less prejudicial proof to prove

the point that the Defendant was obsessed with his former spouse

and her new relationship; and, the similarity of the prior burglary to the charged burglary invited unnecessary prejudice. *Deshields v. State*, 706 A.2d at 506-507. Under these circumstances, it had an unfair tendency to invite the Defendant's conviction on an improper emotional basis -- that he was compulsively harassing his former wife after the termination of their marriage when that was unfairly prejudicial as to his alleged intent on October 20. *Moorhead v. State*, 638 A.2d 52, 55 (Del. 1994) (the admission of evidence becomes *unfairly* prejudicial when the evidence has an "undue tendency to suggest decision on a improper basis, commonly, although not necessarily, an emotional one") (emphasis in original) (citing F.R.E. 403 advisory committee note).

A203

II.     THE PROSECUTOR'S PERSONALLY SARCASTIC
        REMARK TO THE DEFENDANT BEFORE THE JURY
        THAT HE WAS A "REAL HUMANITARIAN"
        UNFAIRLY DEPRIVED THE DEFENDANT OF A
        FAIR TRIAL.

                    Standard and Scope of Review

      The standard and scope of review is plenary.

                            Argument

            At the end of her cross-examination of the

Defendant, after the Defendant had testified that he realized he

could not take his own life and attempted to prevent Stacey Smith

from taking control of the gun during their struggle, the

prosecutor gratuitously remarked to him before the jury  that

"You're are quite a humanitarian, aren't you." (A196).

            The Defendant's counsel objected and the trial judge

strongly instructed the jury to disregard the prosecutor's

remark. (A196, 202-205).

            The prosecutor's gratuitous, intentionally sarcastic

comment before the jury addressed to the Defendant's credibility

deprived the Defendant of a fair trial. *Hunter v. State*, 815 A.2d

730 (Del. 2002); *Williams v. State*, 803 A.2d 927 (Del. 2002).

            A prosecutor may not state his or her personal

belief in the defendant's guilt. ABA Standard for Criminal

Justice, 3-5.8 (2d ed. 1980).[1] The prosecutor's comment was

_____

                            14

                        A204

unquestionably contrary to the professional standard previously recognized by the Court.[2] The State, through its prosecutor, simply cannot give added weight to the strength of its case by personally attacking the credibility of the defendant. *Weber v. State*, 547 A.2d 948, 960 (Del. 1988).[3]

In this case, the credibility of the defendant was central to the resolution of the case. The prosecutor personally gave added weight to the prosecution's case by attacking the credibility of the Defendant. *Weber*, 547 A.2d at 960. This was manifestly improper and severely prejudiced the defendant's right

---

[1]    The American Bar Association Standard for Criminal Justice, Sec. 3-5.8 provides in pertinent part:

> (b)    It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

[2]    *Pennell v. State*, 602 A.2d 48, 51 (Del. 1991); *Michaels v. State*, 529 A.2d 752, 763 (Del. 1987); *Brokenbrough v. State*, 522 A.2d 851, 858 (Del. 1987); *Hughes v. State*, 437 A.2d 559 (Del. 1981).

[3]    "The prosecutor's argument is likely to have significant persuasive force with the jury.... Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office."
Commentary, ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980).

15

A 205

to a fair trial based exclusively on the evidence before the jury. *Brokenbrough v. State*, 522 A.2d at 859. The prosecutor's gratuitous remark as to the Defendant' credibility had no place in a fair trial. *Mason v. State*, 658 A.2d 994, 997 (Del. 1995). D.R.P.C. 3.4(e).[4]

The sarcastic remark was directed to the central issue of the Defendant's credibility. Although the court below took the step of firmly cautioning the jury to disregard the remark, in a case like this where his credibility was not only a central but the exclusive basis for deciding the Defendant' guilt, the grave potential for prejudice cannot be cured merely by judicial instruction. *Cf. Hughes v. State*, 437 A.2d 559, 571 (1981).[5]

Because the prosecutorial expression of personal opinion unfairly prejudiced the Defendant's substantial right to a fair trial, a reversal of his convictions is required. This

---

[4]       A prosecuting attorney represents all the
         people, including the defendant who was being
         tried.  It is his duty to see that the
         State's case is presented with earnestness
         and vigor, but it is equally his duty to see
         that justice be done by giving the defendant
         a fair and impartial trial.

*Bennett v. State*, 164 A.2d 442, 446 (Del. 1960).

[5] *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962) ("'...if you throe a skunk into the jury box, you can't instruct the jury not to smell it'").

16

A 206

explicit, sarcastic remark had no place at trial below and was manifestly unjust. Counsel may not personally comment on the legitimacy of a party's claim or defense. *Robelen Piano Co. v. DiFonzo*, Del. Supr., 169 A.2d 240, 248-249 (1961).[6]

Because the prosecutor's unfairly prejudicial remark before the jury undermined the Defendant's substantial right to a fair trial, reversal of his conviction is required in the interest of justice. The prosecutor's sarcastic remark assailing the Defendant's credibility, which was not only addressed to a central but the only basis for determining his guilt is a repetitive prosecutorial error undermining the fairness of the trial process. Notwithstanding the trial court's attempt to cure one more example of repetitive and  continuing prosecutorial errors of this egregious and readily unavoidable nature, the "integrity of the judicial process was compromised by the prosecutor's misconduct and the convictions appealed from must be

---

[6]  "The prosecutor's argument is likely to have significant persuasive force with the jury . . . Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office."

Commentary, ABA Standards for Criminal Justice, §3-5.8 (2d ed. 1980).

17

A207

reversed." *Hunter v. State*, 815 A.2d at 738.

18

A208

III.     BECAUSE THE TRIAL EVIDENCE COULD HAVE
         SUPPORTED A VERDICT OF ASSAULT SECOND
         DEGREE BASED ON EITHER OF TWO ACTS --
         SPRAYING STACEY SMITH WITH PEPPER SPRAY
         OR CAUSING A GUNSHOT WOUND TO HIS
         SHOULDER -- THE TRIAL COURT'S FAILURE TO
         SPECIFICALLY CHARGE THE JURY AS TO THE
         LESSER INCLUDED OFFENSE OF ASSAULT
         SECOND DEGREE WITH RESPECT TO THESE TWO
         DISTINCT ACTS DEPRIVED THE DEFENDANT TO
         THE RIGHT TO A UNANIMOUS JURY VERDICT.

### Standard and Scope of Review

The standard and scope of review is plain error.

Although some inaccuracies may appear in jury instructions, plain

error is shown when a deficiency "undermined the ability of the

jury to intelligently perform its duty in returning a verdict."

*Probst v. State*, 547 A.2d 114, 119 (Del. 1988) (internal

quotations omitted).

### Argument

The Defendant was charged with and found guilty of the

offense of assault second degree as a lesser included offense of

the charge of attempted murder of Stacey Smith. The court

instructed the jury that the offense would have been established

if the Defendant recklessly or intentionally caused physical

injury to Stacey Smith by means of a deadly weapon or dangerous

instrument. (A248-249). 11 *Del. C.* § 612(a)(2).

Under the trial evidence, however, the jury could have found

19

A 209

that the Defendant caused injury to Stacey Smith by the alternative means of a handgun or mace. Because the trial evidence could have supported a verdict of assault second degree based on either of two acts -- spraying Stacey smith with pepper spray or causing a gunshot wound to his shoulder -- the trial court should have charged the jury concerning the alternative means of committing of the offense and that they must be unanimous as to the means. Failure to specifically charge the jury as to the means by which the lesser included offense of assault second degree with respect to these two distinct acts deprived the defendant to the right to a unanimous jury verdict on the assault second degree conviction and he is entitled to a new trial under these circumstances. *Probst v. State*, 547 A.2d 114, 120-122 (1988).

20

A210

IV.      THE TRIAL COURT'S FAILURE TO ADEQUATELY
         DEFINE THE LESSER INCLUDED OFFENSE OF
         ASSAULT THIRD DEGREE DEPRIVED THE
         DEFENDANT OF THE RIGHT UNDER 11 *DEL. C.*
         § 206 TO HAVE THE JURY CHARGED WITH ANY
         LESSER INCLUDED OFFENSE.

### Standard and Scope of Review

The standard and scope of review is plain error. A jury must be adequately informed by the Court concerning all the essential elements of the offense. A failure to instruct the jury concerning an essential element of the offense is plain and reversible error. *Walls v. State*, 560 A.2d 1038, 1052 (Del. 1989); *Taylor v. State*, 464 A.2d 897, 899 (Del. 1983); *Waters v. State*, 443 A.2d 500, 506 (Del. 1982).

### Argument

The Superior Court ruled that the jury should be charged with the lesser included offense of assault third degree. In defining the lesser included offense of assault 3d degree, the trial court charged that three elements must be proven beyond reasonable doubt in order to convict the Defendant of that offense: 1) the actor must have acted with criminal negligence; 2) the actor must have caused physical injury; 3) the actor must have used a deadly weapon or dangerous instrument. (A249-250).

However, the trial court's definition of dangerous instrument was not complete because it did not include the use of

21

A211

"disabling chemical spray" under 11 *Del. C.* 222(4) & (7). (A246), did not include. Accordingly, because the lesser included offense of assault third degree was inadequately defined, the Defendant was denied his right to a correct instruction for a lesser included offense under 11 *Del. C.* § 206.

A212

CONCLUSION

For the aforementioned reasons and authorities cited, the Defendant's convictions for assault second degree, criminal trespass first degree and offensive touching should be reversed.

Respectfully submitted,

BERNARD J. O'DONNELL (#252)
Office of Public Defender
820 N. French Street
Wilmington, DE  19801

Date:  May 6, 2004

23

A213

IN THE SUPREME COURT OF THE STATE OF DELAWARE

JOHN H. BENGE, JR.                 )
                                   )
            Defendant Below,       )
            Appellant,             )
                                   )
      v.                           )     No. 544, 2003
                                   )
                                   )
STATE OF DELAWARE,                 )
                                   )
            Plaintiff Below,       )
            Appellee.              )


DEFENDANT'S SUPPLEMENTAL MEMORANDUM

        This is the Appellant's supplemental memorandum
addressing the application of the decision of the United
States Supreme Court in *Blakely v. Washington*, 542 U.S. ___ ,
124 S.Ct. 2531 (June 24, 2004) to his sentencing in this
appeal.

        At his jury trial, the Defendant was convicted of
the offenses of assault second degree, criminal trespass first
degree, and offensive touching.

        When sentencing the Defendant on October 10, 2003,
the Superior Court not only substantially exceeded the
Sentencing Accountability Commission ("SENTAC") sentencing
guidelines for the Defendant's convictions, but, in fact,
imposed maximum statutory sentences of imprisonment based on
the identified aggravating circumstances of the Defendant's

A 214

*Benge v. State*, No. 544, 2003

undue depreciation of the offense and because the Defendant

was subject to a PFA order when the offenses were committed.[1]

(Docket  135,  10/10/03,  pp.  29-30  --  attached  hereto)

(Sentencing Order attached hereto).

  Instead  of  the  SENTAC  range  of  up  to  2  years

imprisonment at Level V for the assault second degree offense,

the Superior Court imposed the statutory maximum of 8 years

imprisonment at Level V followed by 6 months of Level IV work

release.  Instead  of  the  SENTAC  range  of  up  to  12  months

probation at Level I for the criminal trespass first degree

offense, the Superior Court imposed the statutory maximum of

1 year imprisonment at Level V. Instead of the fine, costs,

and restitution provided under the SENTAC guidelines for the

offensive touching offense, the Superior Court imposed the

statutory  maximum  of  30  days  imprisonment  at  Level  V.

Furthermore, all of the imprisonment time was imposed pursuant

11 *Del. C.* § 4204(k) which meant that the Defendant would not

be  eligible  for  any  form  of  early  release,  good  time,

---

[1]  Subsequent  to  his  sentencing  for  these  offenses,  the
Defendant pleaded guilty on January 20, 2004 to violation of the
protection from abuse order. *State v. John H. Benge*, Cr. ID No.
0210012355B.

A215

*Benge v. State*, No. 544, 2003

furlough, work release, supervised custody or any other form
of reduction or diminution of sentence.

        The judicial enhancement of the Defendant's
sentence to maximum terms of more than 9 years imprisonment
based on the judicial finding of "undue depreciation of the
offense" contravened the constitutional principle recently
announced by the United States Supreme Court in *Blakely v.
Washington*, 542 U.S. ___, 124 S.Ct 2531 (June 24, 2004). In
*Blakely*, the Court found that a judicial enhancement of the
Defendant's sentence based on the defendant's "deliberate
cruelty," which, absent that finding, was beyond that
permitted under the State of Washington's sentencing
guidelines violated the constitutional principle the Court
previously identified in *Apprendi v. New Jersey*, 530 U.S. 466,
490 (2000): "Other than the fact of a prior conviction, any
fact that increases the penalty for a crime beyond the
prescribed statutory maximum must be submitted to a jury, and
proved beyond reasonable doubt."

        In this case, the sentencing judge increased
the Defendant's sentence from up to 2 years imprisonment at
Level V and probation to more than 9 years imprisonment at

A216

Level V based not only on the violation of the PFA order but also based on the "facts of this case" and the similar finding of the Defendant's undue depreciation of the offense: "So to the extent that there is any confusion about why I am sentencing Mr. Benge the way I am going to sentence him, it is the facts of this case as I believe the jury found them based on their ultimate jury verdict." (Sentencing Transcript, 10/10/03, p. 29 -- attached hereto) (Sentencing Order attached hereto).

Before *Blakely*, this enhancement of the Defendant's sentence based on his alleged "undue depreciation of the offense" and "facts of the case" did not invite constitutional question in Delaware because this Court had already found that increasing the Defendant's sentence based on judicially found aggravating circumstances beyond that otherwise provided for by the SENTAC guidelines was legally permissible so long as the Defendant's sentence did not exceed the statutory maximum: "At the present time, there is no constitutional or statutory right in Delaware to appeal a criminal punishment on the sole basis that it deviates from the SENTAC sentencing guidelines." *Siple v. State*, 701 A.2d 79, 83 (Del. 1997) (citing *Gaines v. State*, 571 A.2d 765, 767 (Del. 1990). *Also Siple*, 701 A.2d at 83 ("Except for these constitutional and legal restraints, it is well-established

A217

*Benge v. State*, No. 544, 2003

that appellate review of criminal sentences is limited in Delaware to a determination that the sentence is within the statutory limits." (*citing Mayes v. State*, 604 A.2d 839, 842 (Del. 1992)).

After *Blakely*, however, it is now obvious that the judicial increase in the Defendant's sentence from up to 2 years of imprisonment and probation called for under the SENTAC guidelines to more than 9 years of imprisonment based on the judge's fact-finding of the "facts of the case" and Defendant's "undue depreciation of the offense" now provides a constitutional basis for appeal even if the sentences of imprisonment were no more than the statutory maximum provided by the legislature.

That is because, under *Blakely*, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 124 S.Ct., at 2537 (emphasis in original). Without the judicial finding in this case of the aggravating circumstance of the Defendant's alleged undue depreciation of the offense and the trial judge's finding of the "facts of the case," the trial

A218

*Benge v. State*, No. 544, 2003

judge below was limited to imposing a sentence of up to 2
years imprisonment and probation as called for under the
SENTAC guidelines.[2] In order to "impose[] a sentence
inconsistent with the presumptive sentences adopted by the
Sentencing Accountability Commission, such court must set
forth on the record its reasons for imposing such penalty." 11
*Del. C.* § 4204 (m).

          The Delaware SENTAC guidelines function
identically to the State of Washington's sentencing guidelines
considered by the United States Supreme Court in *Blakely*. A
presumptive sentencing "standard range" is provided for the
offense. A judge may impose a sentence above the standard
range if he finds a justification for the exceptional

---

[2] The General Assembly delegated to SENTAC the responsibility
to develop sentencing guidelines for sentencing of criminal
offenders. 11 *Del. C.* § 6580(c). SENTAC was commissioned to
"[d]efine under what conditions of aggravation or mitigation and in
what manner a sentencing judge may impose a sentence outside of the
sentencing guidelines and recommend such mitigating and/or
aggravating circumstances..." 11 *Del. C.* § 6581(c)(3). That its
guidelines are determined by an appointed commission rather than
the legislature is irrelevant to the constitutional principle
presented by *Blakely*: "The fact that the Federal Sentencing
Guidelines are promulgated by an administrative agency nominally
located in the judicial branch is irrelevant to the majority's
reasoning." *Blakely*, 124 S.Ct., at 2549 (O'Connor, J., dissenting).

A219

*Benge v. State*, No. 544, 2003

sentence. Aggravating circumstances specifically identified in the standards that warrant a departure from the standard sentencing range are illustrative rather than exhaustive. When a sentence outside the presumptive sentencing range is imposed, the judge must identify the reasons for imposing it. *Blakely*, 124 S.Ct., at 2535.

The Defendant's sentence was increased from up to 2 years imprisonment and probation called for under the SENTAC guidelines to more than 9 years imprisonment because of the trial judge's view of the facts of the case and the finding of undue depreciation of the offense. Previously, this Court consistently found that a defendant sentenced under similar circumstances had no constitutional basis for appealing such a judicially enhanced sentence so long as the increased sentence was within the statutory range for the offense. After *Blakely*, however, it is abundantly clear that a sentencing enhancement of this nature is constitutionally impermissible even if the more than 9 years imprisonment was within the statutory maximum range of imprisonment for the offense. "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding

A220

*Benge v. State*, No. 544, 2003

additional facts, but the maximum he may impose *without* any

additional findings." *Blakely*, 124 S.Ct., at 2537 (emphasis in

original).

Under *Blakely*, the trial judge's increase in

the Defendant's sentence from up to 2 years imprisonment and

probation called for under the SENTAC guidelines to more than

9 years imprisonment based on his finding of fact that the

Defendant depreciated the seriousness of the offense was

constitutionally impermissible because it exceeded that which

was otherwise permitted and not determined by the Defendant's

jury. Therefore, the Defendant's sentences must be vacated and

remanded for resentencing in conformance with the SENTAC

guidelines.


Date:    August 17, 2004    _____
                            BERNARD J. O'DONNELL (#252)
                            Office of Public Defender
                            Carvel State Building
                            820 N. French Street
                            Wilmington, Delaware  19801
                            (302) 577-5119


A221

936

CHAPTER 402

FORMERLY

SENATE BILL NO. 434

AS AMENDED BY SENATE AMENDMENT NO. 2

AN ACT AMENDING CHAPTER 65, TITLE 11, DELAWARE CODE TO CREATE A SENTENCING ACCOUNTABILITY COMMISSION, AND TO ESTABLISH THE POWERS AND DUTIES THEREOF.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Amend Chapter 65, Title 11, Delaware Code, by adding thereto a new Subchapter X, which shall hereafter read as follows:

"SUBCHAPTER X. SENTENCING ACCOUNTABILITY COMMISSION

§6580.  Formulation and Purpose

(a)  The Delaware Sentencing Accountability Commission (hereinafter referred to as the 'Commission') is hereby established.  The Commission shall consist of eleven members, the body of which shall be comprised as follows:

(1)  Four members of the Judiciary appointed by the Chief Justice, two of whom shall be initially appointed for a two year term and two of whom shall be appointed to a four year term, provided that each succeeding term for all four of such members shall be four years.

(2)  The Attorney General or his designee.

(3)  The Public Defender or his designee.

(4)  The Commissioner of Corrections or his designee.

(5)  Four other members-at-large, each of whom shall, by virtue of experience, possess a knowledge of Delaware sentencing practices, two to be appointed by the Governor, one by the President Pro Tempore of the Senate and one by the Speaker of the House.  One of the members-at-large shall be appointed by and one by the Governor shall be appointed to a two year term and one shall be appointed for four year terms, provided that each succeeding term following the initial term of all four members-at-large shall be four years.

The Chief Justice shall designate one of the members of the Judiciary serving on the Commission to serve as chairman of the committee.

(b)  It shall be the overall purpose of this body to establish a system which emphasizes accountability of the offender to the criminal justice system, and accountability of the criminal justice system to the public.

For purposes of this subchapter, the grouping of punishments consistent with the guidelines developed by the Commission shall be known as 'accountability levels'.

§6581.  Powers and Duties of the Commission

(a)  The Commission shall develop sentencing guidelines consistent with the overall goals of ensuring certainty and consistency of punishment commensurate with the seriousness of the offense and with due regard for resource availability and cost.  In developing these guidelines, the Commission shall also consider the following additional goals in the priority in which they appear:

(1)  Incapacitation of the violence-prone offender;

(2)  Restoration of the victim to his/her pre-offense status;

(3)  Rehabilitation of the offender.

(b)  The Commission on or before March 1, 1985 shall also recommend to the Governor and the General Assembly sentencing guidelines for the implementation of the accountability levels

---

Chapter 402:

Commission shall:

(c)  Consistent with the goals of this Act, the sentencing guidelines recommended by the Commission shall:

(1)  Formulate a series of sanctions ranging from nonincarcerative to incarcerative.  These sanctions may include, but not be limited to fines, costs, restitution, supervised probation, community service, work release and community-based residential and nonresidential programs, work camps and electronic monitoring.  These sanctions shall be placed in one or more accountability levels.

(2)  Establish detailed objective criteria to be utilized in determining which offenders shall be assigned to each of the various accountability levels, such criteria to combine factors relating to the nature of the offense, the background and criminal history of the offender, and the availability of resources.

(3)  Define under what conditions of sentencing a judge may impose a sentence outside of the sentencing guidelines and recommend such mitigating and/or aggravating circumstances.

(4)  Define under what circumstances, by what process, and by whom offenders may be moved from one accountability level to another, subject to any law regulating such movement.

(5)  The Commission shall define the roles of the various criminal justice agencies in the implementation of the proposed guidelines.

(d)  The Commission shall estimate to what extent public and private resources are appropriate and available to meet the specifications and supervision standards necessitated by the population of offenders to be assigned to each level.

(e)  The Commission shall recommend as appropriate mechanisms to insure that offenders are assessed a reasonable fee for their supervision and/or treatment.

(f)  The Commission shall recommend as appropriate mechanisms to insure that offenders are either the incarcerant or the state where sentences a procedure or a tribunal for appellate review to insure the uniformity of the state sentences imposed outside of the guidelines.

(g)  The Commission shall have the authority to collect from any state or local governmental entity information, data, reports, statistics or such other material which is necessary to carry out the Commission's functions.

(h)  The executive Department shall provide staff services for the Commission which shall, for administrative purposes, be placed within that office.

(i)  The Commission shall carry out such other duties consistent with its mandate as the General Assembly or the Executive Department shall from time to time direct."

Section 2.  This Act shall be effective from and after the date of its signature by the Governor.

Approved July 18, 1984.

937

370

## CHAPTER 205

### FORMERLY

### SENATE BILL NO. 45

AN ACT TO AMEND CHAPTER 52, TITLE 30, DELAWARE CODE, RELATING TO EXCLUSION OF CERTAIN MOTOR VEHICLES FROM THE OPERATION OF THE MOTOR FUEL TAX.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Amend §5224, Chapter 52, Title 30, Delaware Code, by adding a new subsection to read as follows:

"(d) This Chapter shall not apply to any motor vehicle being road tested for sale or any motor vehicle being delivered to or from a motor vehicle dealer, provided that said vehicle displays a valid dealer's license plate."

Approved September 6, 1985.

## CHAPTER 206

### FORMERLY

### SENATE BILL NO. 59

AN ACT TO AMEND CHAPTER 65, TITLE 11, DELAWARE CODE, RELATING TO ESTABLISHMENT OF REALISTIC DATES FOR COMPLETING THE DUTIES OF THE SENTENCING ACCOUNTABILITY COMMISSION.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Amend Chapter 65, Subchapter X, Title 11, Delaware Code by striking Subsections (a) and (b) of §6581 and substituting, in lieu thereof, the following:

"(a) A computer driven model of proposed sentencing criteria shall be created by March 1, 1985 which will be able to project the effect of alternative policy decisions on the Department of Correction resources. Sentencing guidelines will be drafted with nonbinding pilot testing by July 1, 1985.

The Commission shall submit to the Supreme Court on or before March 1, 1986, sentencing guidelines developed in accordance with §6580(c) for adoption by Court rule. Such guidelines shall have no force or effect unless so adopted, and shall not in any event authorize or be construed as authorizing the exercise of any power or duty exceeding or conflicting with those heretofore or hereafter granted by Act of the General Assembly or pursuant to inherent authority granted under the Delaware Constitution.

(b) The Commission on or before July 1, 1987 shall recommend to the Governor and the General Assembly legislation necessary for the implementation of the sentencing guidelines."

Approved September 6, 1985.

---

## CHAPT

### FORM

### SENATE E
### AS AMENDED BY SEN/

AN ACT TO AMEND SUBCHAPTER 1, CHAPTE
PROVIDING STATEWIDE AUTHORITY TO
CONDITIONS.

BE IT ENACTED BY THE GENERAL ASSEMI
all members elected to each House thereof con

Section 1. Amend §1911, Subchapter 1, Ch
subsection in its entirety and inserting in lieu there

"§1911. Police Officers; Statewide Authority

(a) For purposes of this section 'poli
certification by the Council on Police Trainir
and who is:

(1) A member of the Delaware State

(2) A member of the New Castle Co

(3) A member of the Police Depar
town, or

(4) A member of the Delaware Rive

(b) A police officer may arrest without
he has reasonable grounds to believe is comm

(c) An 'on-duty' police officer may a
offense committed within the jurisdiction of
warrant has been issued. The 'on-duty' poli
take reasonable measures to notify the prim
place of the execution of the arrest warrant.

(d) A police officer may render assista
State when he reasonably believes that the
duty and that death or injury will occur to th

(e) A police officer acting under the a
within the scope of his employment.

(f) The provisions of this Section sh
Delaware State Police or other police offi
authority."

Section 2. This Act shall become effective

Approved September 6, 1985.